SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Lisa Laukitis
Christine A. Okike
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

– and –

Ron E. Meisler (*pro hac vice* pending)
Christopher M. Dressel (*pro hac vice* pending)
Jennifer Madden (*pro hac vice* pending)
155 North Wacker Drive
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Proposed Counsel to Debtors
and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | Chapter 11 |
| **SYNERGY PHARMACEUTICALS INC.**, *et al.*, | Case No. 18-14010 (___) |
| Debtors.[1] | (Joint Administration Pending) |

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING
THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING
THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND
PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS,
(IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE
AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII)
<u>GRANTING RELATED RELIEF</u>**

Synergy Pharmaceuticals Inc. ("**Synergy Pharmaceuticals**" or "**Borrower**") and

Synergy Advanced Pharmaceuticals, Inc. ("**Synergy Advanced**" or "**Guarantor**" and together

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: Synergy Pharmaceuticals Inc. (5269); Synergy Advanced Pharmaceuticals, Inc. (4596). The address of the Debtors' corporate headquarters is 420 Lexington Avenue, Suite 2012, New York, New York 10170.

with Synergy Pharmaceuticals, the "**Debtors**"), hereby move (this "**Motion**")[2] this Court pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**") for entry of interim and final orders granting the relief requested below. In support thereof, the Debtors submit the *Declaration of Gary G. Gemignani in Support of Chapter 11 Petitions and First-Day Papers* (the "**First-Day Declaration**") and further represent as follows:

**RELIEF REQUESTED**

1.      By this Motion, the Debtors respectfully request entry of an interim order, substantially in the form attached hereto as **Exhibit B** (the "**First Interim Order**"), a second interim order (the "**Second Interim Order**") and a final order (the "**Final Order**," and together with the First Interim Order and the Second Interim Order, collectively, the "**Financing Orders**"):

   a.      authorizing the Debtors to obtain, and for the Guarantor to guarantee, unconditionally, on a joint and several basis, and subject to the terms and limitations set forth in the DIP Loan Documents, postpetition financing consisting of a senior secured, super-priority multiple delayed draw term loan credit facility (the "**DIP Facility**") on the terms and conditions set forth in the to-be-filed *DIP Term Loan Agreement* (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "**DIP Credit Agreement**", and together with any other related agreements, documents, security agreements, or pledge agreements, the "**DIP Loan Documents**"), which shall contain only those conditions to borrowing, representations, warranties, covenants, and events of default expressly set forth in that certain Binding Term Sheet annexed hereto as **Exhibit A** (the "**DIP Term Sheet**") made by and among the Borrower, the Guarantor, CRG Servicing LLC ("**CRG**"), as administrative agent and collateral

---

[2] Capitalized terms not otherwise defined herein have the meanings given to them in the DIP Term Sheet defined below or the applicable exhibits to the DIP Term Sheet.

agent (in such capacities, together with its successors and assigns, the "**DIP Loan Agent**"), and each lender party thereto (the "**DIP Lenders**" and, together with the DIP Loan Agent, the "**DIP Secured Parties**")), and be otherwise consistent with the Documentation Principles, in an aggregate principal amount of **$155,000,000** (the "**DIP Loans**"), comprised of (i) approximately **$110,000,000** of loans (the "**Roll-Up DIP Loans**") representing a partial "roll-up" of the Prepetition Secured Obligations, equal to the sum of (a) outstanding principal, plus (b) accrued and unpaid interest, including accrued and unpaid post-petition interest at the Default Rate specified in the Prepetition Loan Agreement from the Petition Date through and including the date of the entry of the Second Interim Order and (c) any and all unreimbursed costs, fees and expenses of the DIP Secured Parties (each in their respective capacities under the Prepetition Loan Documents), and (ii) **$45,000,000** of "new money" loans (the "**New Money DIP Loans**"), which will be advanced by the DIP Lenders to the Borrower, subject to the terms and conditions of the DIP Loan Documents, to be used by the Borrower in accordance with the Second Interim Order and the Budget, as follows: (1) upon entry of the Second Interim Order, the DIP Lenders shall advance **$11,500,000** (the "**Initial DIP Advance**"), and (2) upon entry of the Final Order, the DIP Lenders shall advance the remaining **$33,500,000**;

b.     upon entry of the First Interim Order, authorizing the Debtors to use the DIP Secured Parties' (each in their respective capacities under the Prepetition Loan Documents) Cash Collateral and all other Prepetition Collateral in which the DIP Secured Parties (each in their respective capacities under the Prepetition Loan Documents) have an interest during the period from the entry of this First Interim Order to the entry of the Second Interim Order (the "**Initial Interim Cash Collateral Period**");

c.     as adequate protection for the use, during the Initial Interim Cash Collateral Period, of the Cash Collateral securing the Prepetition Secured Obligations, granting to the DIP Secured Parties (each in their respective capacities under the Prepetition Loan Documents) superpriority administrative expense claim status and replacement liens on all assets of the Debtors (other than (x) Avoidance Actions and any proceeds thereof and (y) the Debtors' directors and officers insurance policies and any proceeds thereof (the items described in the foregoing clauses (x) and (y), together, the "**Initial Interim Period Excluded Collateral**"));

d.     authorizing the Debtors, immediately upon entry of the Second Interim Order, to execute, deliver, and enter into the DIP Loan Documents and to perform all of the Debtors' respective obligations thereunder, and such other and further acts as may be required in connection with the DIP Loan Documents;

e.     authorizing the Debtors, immediately upon entry of the Second Interim Order, to implement a partial "roll-up" of the Prepetition Secured Obligations, subject to the terms and conditions of the DIP Loan Documents, in accordance with the Second Interim Order and the Final Order and to deem the Prepetition Secured

Obligations so "rolled up" to have been issued or provided, as applicable, under the DIP Credit Agreement and the other DIP Loan Documents;

f.      authorizing the Debtors, immediately upon entry of the Second Interim Order, to use proceeds of the Initial DIP Advance as permitted in the DIP Loan Documents and consistent with the Second Interim Order and the Budget (subject to Permitted Variances);

g.      immediately upon entry of the Second Interim Order, subject to the Carve Out, with respect to all claims of the DIP Loan Agent and DIP Lenders under the DIP Facility with respect to the DIP Loans and the DIP Obligations, granting to the DIP Loan Agent and the DIP Lenders:

  i.      pursuant to section 364(c)(1) of the Bankruptcy Code, superpriority claim status in the Chapter 11 Cases, which claims shall be payable from and have recourse to all DIP Collateral;

  ii.     pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected first priority lien on all DIP Collateral other than all property of the Debtors that is subject to valid and perfected liens in existence at the time of the commencement of the Chapter 11 Cases or subject to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code (the "**Prior Senior Liens**");

  iii.    pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected junior lien on all property of the Debtors that is subject to a Prior Senior Lien; and

  iv.     pursuant to section 364(d)(1) of the Bankruptcy Code, a perfected first priority, senior priming lien on all of the property of the Debtors (including, without limitation, inventory, receivables, equipment, machinery, intellectual property, general intangibles, real property, capital stock of subsidiaries, membership interests in limited liability companies) that is subject to the existing liens that secure the obligations of the Debtors to the DIP Secured Parties (each in their respective capacities under the Prepetition Loan Documents) under or in connection with the Prepetition Loan Documents and the Prepetition Secured Obligations;

h.      approving certain stipulations by the Debtors with respect to the Prepetition Loan Documents and the liens and security interests arising therefrom;

i.      with respect to the indebtedness represented by the Prepayment Premium and the Back-End Facility Fee, authorizing the Debtors to acknowledge that such indebtedness constitutes a valid and enforceable prepetition secured claim on

behalf of the DIP Secured Parties (each in their respective capacities under the Prepetition Loan Documents);

j.  immediately upon entry of the Second Interim Order, authorizing the Debtors to continue to use, subsequent to the Initial Interim Cash Collateral Period, the Cash Collateral securing the Prepetition Secured Obligations and all other Prepetition Collateral in which the DIP Secured Parties (each in their respective capacities under the Prepetition Loan Documents) have an interest consistent with the Second Interim Order and the Budget;

k.  as adequate protection for the use, subsequent to the Initial Interim Cash Collateral Period, of the Cash Collateral and other Prepetition Collateral securing the Prepetition Secured Obligations and the priming of the Prepetition Liens by virtue of the making of the New Money DIP Loan immediately upon entry of the Second Interim Order, granting to the DIP Secured Parties (each in their respective capacities under the Prepetition Loan Documents) with respect to the Remaining Prepetition Secured Claim, to the extent of any diminution in the value of the Prepetition Collateral:

   i.  superpriority administrative expense claim status;

   ii.  replacement liens on all DIP Collateral, junior only to (x) the liens of the DIP Loan Agent and the DIP Lenders and (y) Prior Senior Liens;

   iii.  commencing on the date upon which the Second Interim Order is entered in the Bankruptcy Court, payment on a monthly basis of postpetition interest accruing from such date at the Default Rate specified in the Prepetition Credit Agreement; and

   iv.  reimbursement of all fees, costs, and expenses incurred in connection with defending the validity and enforceability of the Prepetition Secured Obligations, the Prepetition Liens or the Remaining Prepetition Secured Claim;

l.  subject to and effective upon entry of the Final Order, granting to the DIP Secured Parties a security interest in and continuing lien on all of the Debtors' rights, title and interest in, to and under the Avoidance Actions (other than Avoidance Actions acquired by the purchaser under an Acceptable 363 Sale), and all proceeds thereof;

m.  subject to and effective upon entry of the Final Order, authorizing the Debtors to waive the Debtors' right to assert a 506(c) claim on account of amounts covered by the Carve Out;

n.  subject only to and effective upon entry of a Final Order, authorizing the Debtors to waive the Debtors' right to assert claims to surcharge against the DIP Collateral

pursuant to section 506(c) of the Bankruptcy Code and any right of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

o.      modifying the automatic stay to the extent hereinafter set forth;

p.      setting (a) no later than December 21, 2018, a second interim hearing on the Motion (the "**Second Interim Hearing**) to consider entry of the Second Interim Order authorizing, among other things, approval of (i) the DIP Loan Documents, (ii) the Initial DIP Advance, and (iii) the Roll-Up, provided that on or before December 18, 2018 (x) the DIP Loan Documents are executed and delivered by the parties thereto, and (y) on or before December 21, 2018, the Debtors have filed an Acceptable Plan (as defined in the DIP Term Sheet) and disclosure statement, and (b) a final hearing on the Motion ("**Final Hearing**") to consider entry of the Final Order authorizing, among other things, the borrowing under the DIP Loan Documents on a final basis no later than January 15, 2019, as set forth in the Motion and the DIP Credit Agreement filed with the Court; and

q.      granting the Debtors such other and further relief as is just and proper.

## PRELIMINARY STATEMENT

2.      In the weeks leading up to the Petition Date, the Debtors and their advisors engaged in extensive, hard-fought negotiations with their prepetition lenders regarding potential proposals for debtor-in-possession financing that would provide the Debtors with (a) critical liquidity to fund their operations and these Chapter 11 Cases and (b) the best path forward for their reorganization. This process proved successful, culminating in a postpetition financing facility provided by the Debtors' secured prepetition lenders and the consensual use of cash collateral during these Chapter 11 Cases.

3.      By this motion, the Debtors seek approval of the DIP Facility provided by the DIP Lenders in an aggregate principal amount of $155,000,000, comprised of (i) approximately $110,000,000 of loans representing a partial "roll-up" of the Prepetition Secured Obligations, and (ii) $45,000,000 of "new money" loans.

4.      As set forth in more detail above, at this time, the Debtors are only seeking authorization for the Debtors to use the DIP Secured Parties' Cash Collateral and all other

6

Prepetition Collateral in which the DIP Secured Parties have an interest during the period from the entry of the First Interim Order to the entry of the Second Interim Order.

5.      At the Second Interim Hearing, the Debtors will seek entry of the Second Interim Order approving (i) the DIP Loan Documents, (ii) the Initial DIP Advance, and (iii) the Roll-Up, and, at the Final Hearing, the Debtors will seek authorization to borrow the remaining amounts under the DIP Loan Documents and to reaffirm the borrowing and related obligations authorized by the First Interim Order and the Second Interim Order on a final basis, as applicable.

6.      If approved, the use of Cash Collateral and the DIP Facility will provide the Debtors with ample liquidity to fund the Debtors' business operations and administrative expenses during these Chapter 11 Cases. Moreover, the consensual use of Cash Collateral and access to the DIP Facility will send a clear signal to the Debtors' customers and vendors that the Debtors' operations can and will continue on a business-as-usual basis, which is critical to the success of the proposed sale of substantially all of the Debtors' assets in these Chapter 11 Cases.

7.      For these reasons, and for the reasons set forth below, and in the First-Day Declaration, the Debtors firmly believe that entry into the DIP Facility will maximize value for the Debtors' stakeholders and represents an exercise of the Debtors' sound business judgment. Accordingly, the Debtors respectfully request that the Court approve the entry of the First Interim Order, the Second Interim Order and the Final Order.

## CONCISE STATEMENTS PURSUANT TO BANKRUPTCY RULE 4001(B) AND LOCAL BANKRUPTCY RULE 4001-2

8.      The below chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant documents, as required by Bankruptcy Rule 4001(b)(1)(B) and Local Bankruptcy Rule 4001-2.[3]

| Bankruptcy Rule/ Local Rule | Summary of Material Terms[4] |
|---|---|
| **Borrowers** *Bankr. R. 4001(c)(1)(B)* | Synergy Pharmaceuticals Inc. *See* DIP Term Sheet at p. 1. |
| **Guarantors** *Bankr. R. 4001(c)(1)(B)* | Synergy Advanced Pharmaceuticals Inc., a wholly owned subsidiary of the Borrower. *See* DIP Term Sheet at p. 1. |
| **DIP Lenders** *Bankr. R. 4001(c)(1)(B)* | CRG Partners III L.P., CRG Partners III (Cayman) Unlev AIV I L.P., CRG Partners III – Parallel Fund "A" L.P., CRG Partners III – Parallel Fund "B" L.P., CRG Partners III (Cayman) Lev AIV I L.P., CRG Issuer 2017-1, as may be amended prior to the entry of the Final Order solely to adjust the proportionate shares of the DIP Lenders, but not to reduce the aggregate commitments of the DIP Lenders, collectively. *See* DIP Term Sheet at p. 1, Ex. A. |
| **Agent** *Bankr. R. 4001(c)(1)(B)* | CRG Servicing LLC. *See* DIP Term Sheet at p. 1. |
| **Entities with Interests in Cash Collateral** *Bankr. R. 4001(b)(1)(B)(i)* | The Prepetition Secured Parties. *See* DIP Term Sheet at pp. 1-2. |
| **Commitment** Bankr. R. *4001(c)(1)(B)* L.R. *4001-2(a)(1), (a)(7)* | Commitments total $155,000,000 in the aggregate, consisting of (a) $45,000,000 of "new money" loans, and (b) approximately $110,000,000 of loans representing a "roll up" of a portion of the Prepetition Obligations. *See* DIP Term Sheet at p. 2. |
| **Cash Collateral** | Subject to the terms and conditions contained in the DIP Term Sheet and the Financing Orders, the Prepetition Lenders consent to the use of their "cash collateral" as defined in |

---

[3] This statement is qualified in its entirety by reference to the applicable provisions of the DIP Term Sheet.  To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Term Sheet, the provisions of the DIP Term Sheet, as applicable, shall control.

[4] Capitalized terms used but not otherwise defined in this chart shall have the meanings ascribed to them in the DIP Term Sheet.

| | |
|---|---|
| *L.R. 4001-2(a)(1)* | section 363(a) of the Bankruptcy Code.<br><br>*See* DIP Term Sheet at p. 5. |
| **Term/Maturity**<br>*Bankr. R. 4001(c)(1)(B)* | The earliest of (a) April 9, 2019; (b) the consummation of a sale of all or substantially all of the Borrower's assets; (c) acceleration of the DIP Loans pursuant to the DIP Loan Documents; and (d) such later date as the DIP Lenders in their sole discretion may agree in writing with the Debtors.<br><br>*See* DIP Term Sheet at p. 2. |
| **Interest Rates**<br>*Bankr. R. 4001(c)(1)(B)*<br>*L.R. 4001-2(a)(3)* | Interest shall accrue on the DIP Loans at the rate of Libor + 9.50% per annum, and shall be payable monthly, on the first (1st) business day of each month, in arrears, in accordance with the Budget.<br><br>*See* DIP Term Sheet at p. 2. |
| **Default Rate**<br>*Bankr. R. 4001(c)(1)(B)*<br>*L.R. 4001-2(a)(3)* | 4.00% in excess of the interest rate set forth in "Interest Rates" above.<br><br>*See* DIP Term Sheet at p. 2. |
| **Expenses and Fees**<br>*Bankr. R. 4001(c)(1)(B)*<br>*L.R. 4001-2(a)(3)* | Upfront Fee:  The Debtors agree to pay a fee equal to 2.00% of the total amount of New Money DIP Loans upon entry of the Final Order.<br><br>Exit Fee:  The Debtors agree to pay a fee equal to 3.00% of the total amount of New Money DIP Loans upon the Maturity Date.<br><br>Expenses of DIP Secured Parties: The Debtors agree to pay the reasonable and documented professional fees and expenses incurred by the DIP Secured Parties promptly on no less than a monthly basis.<br><br>*See* DIP Term Sheet at p. 2. |
| **Use of Proceeds**<br>*Bankr. R. 4001(b)(1)(B)(ii), (c)(1)(B)*<br>*L.R. 4001-2(a)(2)* | The proceeds of the New Money DIP Loans and Cash Collateral shall be available to finance, in each case in accordance with the Budget (as defined below):<br><br>1.    working capital and general corporate purposes of the Debtors;<br><br>2.    the pursuit of an Acceptable 363 Sale; and<br><br>3.    bankruptcy-related costs and expenses, subject to the Carve Out.<br><br>*See* DIP Term Sheet at pp. 5-6. |
| **13-Week Budget**<br>*Bankr. R. 4001(c)(1)(B)*<br>*L.R. 4001-2(a)(2)* | All advances under the DIP Facility and any Cash Collateral shall be used by the DIP Loan Parties solely in accordance with a rolling 13-week budget (the "***Budget***") for the period commencing on the Petition Date through and including March 31, 2019 (the "***Budget Period***"), setting forth all forecasted (i) cash receipts of the DIP Loan Parties (the "***Cash Receipts***") (ii) cash operating disbursements (the "***Cash Operating Disbursements***") of the DIP Loan Parties, and (iii) non-operating, bankruptcy-related cash disbursements of the DIP Loan Parties (the "***Cash Bankruptcy Disbursements***"), which Budget shall be approved by the DIP Administrative Agent in its sole and absolute discretion and may be modified by the DIP Loan Parties with the written consent of the DIP Administrative Agent in its sole and absolute discretion and without further order of the Bankruptcy Court; provided, that (i) the total amount of funding |

provided pursuant to the Budget shall not exceed the total amount of the DIP Facility authorized by each of the Financing Orders, and (ii) the reasonable and documented professional fees and expenses incurred by the DIP Secured Parties shall not be subject to a cap. For purposes of illustration, on the third week following the Petition Date, the DIP Loan Parties' compliance with the Budget for the first two weeks following the Petition Date shall be measured. Each date on which compliance with the Budget is measured is referred to herein as a "***Testing Date***".

Compliance with the Budget will be measured every week, starting with the third week following the Petition Date, for the period beginning as of the week of the Petition Date and ending the week prior to the week on which compliance is measured.

As of any applicable Testing Date:

1.      the cumulative Cash Receipts may vary from the Budget by no more than the following: (a) 20.00% for the first four-week period (and each week thereof), beginning as of the week of the Petition Date, (b) 15.00% for the first five-week period beginning as of the week of the Petition Date, and (c) 10.00% for the first six-week period and all subsequent weeks of the period beginning as of the week of the Petition Date (the "***Cash Receipt Variance***");

2.      the cumulative Cash Operating Disbursements may vary from the Budget by no more than the following: (a) 20.00% for the first four-week period (and each week thereof), beginning as of the week of the Petition Date, (b) 15.00% for the first five-week period beginning as of the week of the Petition Date, and (c) 10.00% for the first six-week period and all subsequent weeks of the period beginning as of the week of the Petition Date (the "***Cash Operating Variance***"); and

3.      the cumulative Cash Bankruptcy Disbursements shall not exceed at any time during the Budget Period the aggregate capped amount set forth in the Budget with respect thereto (the "***Cash Bankruptcy Disbursement Cap***"), subject to a variance of no more than 10% (the "***Cash Bankruptcy Disbursement Variance***" and together with the Cash Receipt Variance and the Cash Operating Variance, the "***Permitted Variances***").

The DIP Loan Parties shall be deemed to be in compliance with the Budget for all purposes under the DIP Term Sheet, the DIP Loan Documents, and the Financing Orders unless, as of any applicable date of determination, the DIP Loan Parties' (x) cumulative Cash Receipts, (y) cumulative Cash Operating Disbursements, or (z) cumulative Bankruptcy Disbursements, as applicable, vary from the Budget by more than the applicable Permitted Variance as measured on any Testing Date; *provided*, *however*, that with respect to cumulative Cash Receipts, the DIP Loan Parties shall not be deemed to have failed to comply with the Budget unless the DIP Loan Parties' cumulative Cash Receipts fall beneath the amounts set forth in the Budget as measured on any two consecutive Testing Dates during the first four week period beginning as of the Petition Date. All references to compliance with the "Budget" in the DIP Term Sheet shall be construed as being qualified by the phrase, "subject to Permitted Variances."

As further set forth in the DIP Term Sheet, after the first three weeks following the Petition Date, the Debtors shall provide the DIP Administrative Agent with weekly and cumulative variance reporting on a line item basis for Cash Receipts, Cash Operating Disbursements and Cash Bankruptcy Disbursements, which reporting shall (i) detail the variance, if any, of actual cash disbursements and actual cash receipts from the Budget and (ii) provide an explanation of any per line item variance greater

| | than 5.00% (the "***Variance Report***"). <br><br> See DIP Term Sheet at pp. 3-4. |
|---|---|
| **Liens and Priorities Other Than Adequate Protection Liens** <br> *Bankr. R. 4001(c)(1)(B)(i), (xi), L.R. 4001-2(a)(4)* | As security for the DIP Obligations, each Debtor shall grant to the DIP Lenders a security interest in and continuing lien on the DIP Collateral. <br><br> All of the claims of the DIP Administrative Agent and the DIP Lenders under the DIP Facility with respect to the DIP Loans and the DIP Obligations shall at all times: <br><br> 1.      pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority claim status in the Chapter 11 Cases (which claims shall be payable from and have recourse to all DIP Collateral); <br><br> 2.      pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all DIP Collateral other than all property of the Debtors that is subject to Prior Senior Liens; <br><br> 3.      pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all property of the Debtors that is subject to a Prior Senior Lien; and <br><br> 4.      pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by a perfected first priority, senior priming lien on all of the property of the Debtors that is subject to the existing liens that secure the obligations of the Debtors to the Prepetition Lenders under or in connection with the Prepetition Loan Documents and the  Prepetition Obligations. <br><br> *See* DIP Term Sheet at pp. 7-8. |
| **Adequate Protection** <br> *Bankr. R. 4001(b)(1)(B)(iv), (c)(1)(B)(ii) L.R. 4001-2(a)(2)* | The Prepetition Lenders will be entitled to receive, as adequate protection for the use of the collateral securing the Remaining Prepetition Secured Claim and the priming of the liens and security interests granted to the Prepetition Secured Parties under the Prepetition Loan Documents, to the extent of any use of, or diminution in the value of, the Prepetition Collateral: <br><br> 1.      superpriority claim status; <br><br> 2.      replacement liens on all DIP Collateral, junior only to the liens of the DIP Administrative Agent and the DIP Lenders, but subject to any Prior Senior Liens; <br><br> 3.      commencing on the date upon which the Second Interim Order is entered in the Bankruptcy Court, payment on a monthly basis of postpetition interest accruing from such date at the Default Rate specified in the Prepetition Credit Agreement; and <br><br> 4.      reimbursement of all fees, costs and expenses incurred in connection with defending the validity and enforceability of the Prepetition Obligations, the Prepetition Liens or the Remaining Prepetition Secured Claim. <br><br> *See* DIP Term Sheet at p. 8. |
| **Carve Out** <br> *L.R. 4001-2(a)(5), (a)(9)* | The liens on and security interests in the DIP Collateral and the super-priority administrative expense claims shall be subject to a carve-out, which shall be comprised of the following (the "**Carve Out**"): (i) all unpaid fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code, (ii) all reasonable fees and expenses up to |

|  | $50,000 incurred by a trustee under Section 729(b) of the Bankruptcy Code; and (iii) in the event of the occurrence and during the continuance of an Event of Default, the payment of documented unpaid professional fees and disbursements incurred by the Borrower and any statutory committees appointed in the Chapter 11 Cases, in each case to the extent allowed by the Court, in an aggregate amount not to exceed all accrued and unpaid professional fees and disbursements owing as of the date of the Event of Default (whether allowed as of such date or subsequent thereto), plus $2,500,000; provided, that (a) no portion of the Carve Out shall be utilized for the payment of professional fees and disbursements incurred in connection with any challenge to (i) the amount, extent, priority, validity, perfection or enforcement of the indebtedness of, or other claims against, the Debtors owing to the DIP Lenders or the Prepetition Lenders or (ii) the collateral securing such indebtedness, the perfection, priority or validity of the liens granted in favor of the DIP Lenders or the Prepetition Lenders with respect thereto, and (b) the Carve Out shall not reduce the amounts payable to the DIP Lenders under the DIP Loan Documents and to the Prepetition Lenders under the Prepetition Loan Documents.<br><br>*See* DIP Term Sheet at p. 9. |
|---|---|
| **Cross Collateralization**<br>*L.R. 4001-2(a)(6)* | The DIP Term Sheet does not provide for cross-collateralization. |
| **Roll Up**<br>*L.R. 4001-2(a)(7)* | The DIP Facility provides for the roll-up of a portion, representing approximately $110,000,000 of the Prepetition Obligations equal to the sum of (i) outstanding principal, plus (ii) accrued and unpaid interest, including accrued and unpaid postpetition interest at the Default Rate specified in the Prepetition Credit Agreement from the Petition Date through and including the date of the entry of the Second Interim Order (and as otherwise provided in the Second Interim Order), plus (iii) any and all unreimbursed costs, fees and expenses of the Prepetition Secured Parties incurred in accordance with the Prepetition Credit Agreement.<br><br>*See* DIP Term Sheet at p. 2. |
| **Events of Default**<br>*Bankr. R. 4001(c)(1)(B)*<br>*L.R. 4001-2(a)(10)* | The Events of Default under the DIP Loan Documents shall be substantially similar to those set forth in the Prepetition Credit Agreement, subject to the Documentation Principles, and include the following, in each case subject to certain exceptions, qualifications, cure periods, and carve-outs to be set forth in the DIP Loan Documents and substantially consistent with the Documentation Principles:<br><br>a.    The failure by the Debtors to perform or comply with any material term, condition, covenant or obligation (including a payment obligation) contained in the DIP Loan Documents, or any of the Financing Orders.<br><br>b.    The cessation of the DIP Facility to be in full force and effect or the DIP Facility being declared by the Bankruptcy Court to be null and void or the validity or enforceability of the DIP Facility being contested by any Debtor or any Debtor denying in writing that it has any further liability or obligation under the DIP Facility or the DIP Lenders ceasing to have the benefit of the liens granted by the Financing Orders.<br><br>c.    The entry of any order of the Bankruptcy Court granting to any third party a claim or lien *pari passu* with or senior to that granted to the DIP Lenders.<br><br>d.    Until the DIP Obligations are repaid in full, the Debtors making any payment of principal or interest or otherwise on account of any indebtedness for borrowed money or payables other than the DIP Obligations under the DIP Facility or other than in |

accordance with the Budget approved by the DIP Administrative Agent in its sole and absolute discretion.

e.      The Debtors failing to make any interest payments due under any of the Financing Orders within three (3) business days of when due.

f.      Failure of the Debtors to meet any of the applicable Case Milestones (other than as the result of any action or omission of the DIP Secured Parties).

g.      Failure of the Debtors to maintain cash disbursements and collections within the Permitted Variance under the Budget.

h.      The entry of an order converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or the Debtors filing a motion or not opposing a motion seeking such relief.

i.      The entry of an order dismissing the Chapter 11 Cases, or the Debtors filing a motion or not opposing a motion seeking such relief without the consent of the DIP Lenders.

j.      The entry of an order in the Chapter 11 Cases appointing any examiner having expanded powers or a trustee to operate all or any part of the Borrower's business.

k.      The entry of an order in the Chapter 11 Cases granting relief from the automatic stay so as to allow a third party or third parties to proceed against any material (in the DIP Administrative Agent's sole discretion) property, including the collateral pledged pursuant to the DIP Facility and the Prepetition Liens, of the Debtor or to commence or continue any prepetition litigation against the Debtor involving potential liability not covered by insurance, in excess of $1,000,000 in the aggregate.

l.      The entry of an order in the Chapter 11 Cases charging any of the DIP Collateral or Prepetition Collateral under section 506(c) of the Bankruptcy Code against the DIP Secured Parties or Prepetition Secured Parties or the commencement of other actions by any DIP Loan Party or affiliate thereof that challenges the rights and remedies of any of the DIP Secured Parties under the DIP Facility or Prepetition Secured Parties under the Prepetition Credit Agreement in any of the Chapter 11 Cases or in a manner inconsistent with the DIP Loan Documents.

m.      Without the prior written consent of the DIP Administrative Agent and other than in respect of the DIP Facility and the Carve-Out, the bringing of any motion or taking of any action seeking entry of an order, or the entry of an order by the Bankruptcy Court, in any of the Chapter 11 Cases (i) granting superpriority administrative expense status to any claim *pari passu* with or senior to the claims of the DIP Secured Parties or the Prepetition Lenders, (ii) permitting the Debtors to obtain financing under Section 364 of the Bankruptcy Code, (iii) permitting the Debtors to grant security interests or liens under Section 364 of the Bankruptcy Code, (iv) permitting the Debtors to use cash collateral under Section 364 of the Bankruptcy Code, or (v) authorizing the Debtors to take other actions adverse to any DIP Secured Party or any Prepetition Secured Party or their rights and remedies under the DIP Loan Documents, the Prepetition Credit Agreement or their interest in Prepetition Collateral or the DIP Collateral under Section 364 of the Bankruptcy Code.

n.      The entry of any order terminating any Debtor's exclusive right to file a plan of reorganization or the expiration of any Debtor's exclusive right to file a plan of

reorganization.

o.      There shall arise any superpriority claim in the Chapter 11 Case which is *pari passu* with or senior to the priority of the claims of the DIP Secured Parties, except with respect to the Carve-out and as set forth in the DIP Loan Documents.

p.      The entry of any order in the Chapter 11 Cases which provides adequate protection, or the granting by any DIP Loan Party of similar relief in favor of any one or more of any DIP Loan Party's prepetition creditors, contrary to the terms and conditions of any of the Financing Orders or the DIP Loan Documents.

q.      The DIP Loan Parties or any of their subsidiaries or affiliates, or any person claiming by or through any of the foregoing, shall obtain court authorization to commence, or commencing, joining in, assisting, acquiescing to, or otherwise participating as an adverse party in any suit or other proceeding against any DIP Secured Party or any Prepetition Secured Party regarding the DIP Facility or the Prepetition Secured Parties regarding the Prepetition Credit Agreement.

r.      A plan of reorganization being filed by the Debtors, or confirmed in any of the Chapter 11 Cases, that is not an Acceptable Plan, or any order being entered which dismisses any of the Chapter 11 Cases and which order (i) does not provide for termination of the unused commitments under the DIP Facility and payment in full in cash of the DIP Loan Parties' obligations under the DIP Facility, (ii) does not provide, to the extent permitted by applicable law, for release and exculpatory provisions relating to the DIP Secured Parties and the Prepetition Lenders that are satisfactory to the DIP Administrative Agent and the Prepetition Administrative Agent in their sole and absolute discretion and (iii) is not otherwise reasonably satisfactory to the DIP Administrative Agent and the Prepetition Administrative Agent in their sole and absolute discretion, or any of the DIP Loan Parties or any of their subsidiaries or affiliates, shall file, propose, support, or fail to contest in good faith the filing or confirmation of such a plan or the entry of such an order.

s.      Any judgment or order as to liability not covered by insurance, or debt for the payment of money, in excess of $1,000,000 being rendered against the Debtors (individually or in the aggregate), and the enforcement thereof shall not have been stayed.

t.      The Bankruptcy Court entering an order authorizing the sale of all or substantially all of the assets of the Debtors unless (i) such order contemplates indefeasible repayment in full in cash of the DIP Facility upon consummation of the sale or (ii) consummated as part of an Acceptable Plan.

u.      The entry of an order in the Chapter 11 Cases avoiding or permitting recovery of any portion of the payments made on account of the obligations under the DIP Facility, the DIP Loan Documents, the Prepetition Credit Agreement or any related documents or the taking of any action by any DIP Loan Party to challenge, support or encourage a challenge of any such payments.

v.      The Final Order and the terms thereof shall cease to create a valid and perfected security interest and lien on the DIP Collateral.

y.      The Final Order does not include a waiver, in form and substance satisfactory to the DIP Administrative Agent in its sole and absolute discretion, of (i) the right to surcharge the Prepetition Collateral and/or the DIP Collateral under Section 506(c) of the Bankruptcy Code; (ii) any ability to limit the extension under Section 552(b) of the

| | |
|---|---|
| | Bankruptcy Code of the liens of the Prepetition Administrative Agent on the Prepetition Collateral to any proceeds, products, offspring, or profits of the Prepetition Collateral acquired by any DIP Loan Party after the Petition Date and (iii) the doctrine of marshalling. |
| | x.      The filing or support of any pleading by any DIP Loan Party (or any affiliate thereof) seeking, or otherwise consenting to, any relief the granting of which could reasonably be expected to result in the occurrence of an Event of Default. |
| | y.      Any non-monetary judgment or order with respect to a post-petition event shall be rendered against any Debtor which does or would reasonably be expected to (i) cause a material adverse change in the financial condition, business, prospects, operations or assets of the Debtors as a whole or (ii) have a material adverse effect on the rights and remedies of the DIP Lenders, and, in each case, there shall be a period of ten (10) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect. |
| | z.      Any of the Financing Orders being amended or modified without the consent of the DIP Lenders. |
| | aa.     Any Vendor Contract or Customer Contract being terminated or modified without the prior written consent of the DIP Administrative Agent, in its sole and absolute discretion, and such modification or termination does or would reasonably be expected to (i) cause a material adverse change in the financial condition, business, prospects, operations or assets of the Debtors as a whole, (ii) have a material adverse effect on the rights and remedies of the DIP Secured Parties, or (iii) result in a termination of the BH APA. |
| | bb.     The commencement of any investigation by, or issuance of any recall order by, the U.S. Food and Drug Administration and such FDA investigation or recall order does or would reasonably be expected to (i) cause a material adverse change in the financial condition, business, prospects, operations or assets of the Debtors as a whole, (ii) have a material adverse effect on the rights and remedies of the DIP Secured Parties, or (iii) result in a termination of the BH APA. |
| | cc.     The commencement of any investigation of any Debtor by any federal or state agency or other governmental or judicial entity and such investigation does or would reasonably be expected to (i) cause a material adverse change in the financial condition, business, prospects, operations or assets of the Debtors as a whole, (ii) have a material adverse effect on the rights and remedies of the DIP Lenders, or (iii) result in a termination of the BH APA. |
| | dd.     The issuance by the Internal Revenue Service or any state tax authority of one or more deficiency notices exceeding, in the aggregate, $1,000,000 at any time. |
| | ee.     The closing of an Acceptable 363 Sale shall not have occurred on or prior to March 31, 2019, <u>and</u> the Budget shall not have been modified by the DIP Loan Parties (with the consent of the DIP Administrative Agent in its sole an absolute discretion) to reflect and forecast the DIP Loan Parties' Cash Receipts, Cash Operating Disbursements and Cash Bankruptcy Disbursements for the period commencing on April 1, 2019 through and including April 10, 2019 (subject to Permitted Variances). |
| | *See* DIP Term Sheet at pp. 17-22. |
| **Mandatory** | Mandatory prepayment of the DIP Loans will be required: (i) upon the consummation of |

| | |
|---|---|
| **Prepayments**<br>*L.R. 4001-2(a)(11)* | an Acceptable 363 Sale, or (ii) upon the effectiveness of an Acceptable Plan, as an alternative to a sale. |
| **Affirmative and Negative Covenants Including Financial Covenants**<br>*Bankr. R. 4001(c)(1)(B)*<br>*L.R. 4001-2(a)(8)* | The affirmative covenants of the DIP Loan Parties under the DIP Loan Documents shall be limited to the following, in each case subject to certain exceptions, qualifications, and carve outs to be set forth in the DIP Loan Documents and substantially consistent with the Documentation Principles:<br><br>a.    use the advances made under the DIP Facility and/or the Cash Collateral only for the purposes set forth in the DIP Term Sheet and identified in the Budget, except as would not cause the Borrower's cash disbursements on an aggregate basis for operating expenses to vary from the Budget by more than the applicable Operating Variance, and shall not use such funds to commence any action against the DIP Administrative Agent, the DIP Lenders or their respective affiliates, employees, directors, officers or principals;<br><br>b.    permit the DIP Secured Parties and their representatives and designees to visit and inspect the properties, books and records of the Debtors upon reasonable notice at the Debtors' expense;<br><br>c.    subject to the Budget, pay all taxes, assessments, contributions and other governmental charges imposed upon any Debtor or any of its properties or assets as they become due and payable, to the extent payment and/or enforcement thereof is not stayed as a result of the Chapter 11 Cases;<br><br>d.    maintain in good working order all material properties used in the Borrower's business, as and to the extent in good working order as of the Petition Date;<br><br>e.    maintain insurance with respect to the business and property of the Debtors against loss of the kind and in the amounts maintained by the Debtors as of the Petition Date;<br><br>f.    comply in all material respects with the requirements of all applicable laws;<br><br>g.    cause its financial professionals to provide the DIP Secured Parties and the Prepetition Lenders with detailed weekly status reports regarding the post-petition marketing efforts and provide any information regarding the Acceptable Sale that the DIP Lenders/Prepetition Lenders may request;<br><br>h.    comply in all material respects with the schedule of Case Milestones;<br><br>i.    promptly upon request execute and deliver such documents and do such other acts as the DIP Secured Parties may reasonably request in connection with the DIP Facility, and in accordance with the DIP Loan Documents (including but not limited to execution of any additional security documents that may be required); and<br><br>j.    comply with all obligations of the Debtors under the DIP Loan Documents and the Financing Orders.<br><br>The negative covenants of the DIP Loan Parties under the DIP Loan Documents shall be limited to the following, in each case subject to certain exceptions, qualifications, and carve outs to be set forth in the DIP Loan Documents and substantially consistent with the Documentation Principles:<br><br>a.    incur any indebtedness (other than the borrowings under the DIP Facility and |

obligations permitted to be incurred under the Budget, any other indebtedness permitted to be incurred by the DIP Lenders and the Bankruptcy Court, and any unsecured obligations incurred in the ordinary course of business by the Debtors and permitted to be incurred by the Budget);

b.      incur any liens other than liens permitted in writing by the DIP Administrative Agent in its sole and absolute discretion;

c.      make any investments in any person or make any loan to any person (other than as permitted in writing by the DIP Administrative Agent in its sole and absolute discretion);

d.      engage in any business other than the business engaged in by the Debtors on the Petition Date;

e.      sell any assets outside the ordinary course of business (i) except with the written consent of the DIP Administrative Agent in its sole and absolute discretion, or (ii) unless such sale results in the indefeasible payment in full in cash of the DIP Obligations;

f.      acquire assets, merge, consolidate or dissolve without the consent of the DIP Administrative Agent in its sole and absolute discretion;

g.      terminate or agree to any modification to any organizational documents of any Debtor except with the written consent of the DIP Administrative Agent in its sole and absolute discretion;

h.      engage in any transactions with insiders without the written consent of the DIP Administrative Agent in its sole and absolute discretion, except as set forth in the Budget;

i.      use proceeds of the Carve Out, DIP Collateral or Prepetition Collateral except as set forth in the DIP Term Sheet, including, but not limited to, investigate or challenge the validity, perfection, priority, extent, or enforceability of Prepetition Liens; provided, that not more than $75,000 of the proceeds of the Carve Out, DIP Collateral or Prepetition Collateral may be set aside for use by any statutory committees appointed in the Chapter 11 Cases for purposes of investigating such validity, perfection, priority, extent or enforceability of Prepetition Liens;

j.      amend any of the Financing Orders or the Budget without the DIP Lenders' consent;

k.      agree to entry of any order precluding or modifying the DIP Lenders' and Prepetition Lenders' rights to "credit bid" up to the full amount of the outstanding DIP Loans plus the Remaining Prepetition Secured Claim for the Debtor's assets; or

l.      other than the Carve Out, consent to the granting of adequate protection payments or liens, super-priority administrative expense claims or liens having priority senior or *pari passu* with those granted to the DIP Lenders or Prepetition Lenders, except as permitted by the DIP Loan Documents.

*See* DIP Term Sheet at pp. 14-17.

| | |
|---|---|
| **Milestones**<br>*Bankr. R.*<br>*4001(c)(1)(B)(vi)* | **Budget**<br><br>1.      On the Petition Date, the DIP Administrative Agent shall have approved, based on |

| | |
|---|---|
| *L.R. 4001-2(a)(10), (12)* | then current information, the Budget.<br><br>2.     On or before December 18, 2018, the DIP Administrative Agent shall have reaffirmed its approval, based on the then current information, of the Budget, or the DIP Loan Parties shall have adopted a revised budget acceptable to the DIP Administrative Agent in its sole and absolute discretion.<br><br>**DIP Facility**<br><br>1.     Not later than the Petition Date, the Debtors shall file with the Bankruptcy Court a motion seeking approval of the DIP Facility, the DIP Term Sheet, the DIP Loans, and all fees, expenses, indemnification, and other obligations contemplated thereunder.<br><br>2.     Not later than 3 days following the Petition Date, the Bankruptcy Court shall have entered the First Interim Order.<br><br>3.     Not later than December 18, 2018, finalize DIP Credit Agreement.<br><br>4.     Not later than December 21, 2018, the Bankruptcy Court shall have entered the Second Interim Order.<br><br>5.     Not later than January 15, 2019, the Bankruptcy Court shall have entered the Final Order.<br><br>**Acceptable 363 Sale**<br><br>1.     Not later than December 12, 2019, the Debtors shall file with the Bankruptcy Court Sale Motion and Bid Procedures Motion, in each case acceptable to the DIP Administrative Agent in its sole and absolute discretion.<br><br>2.     Not later than January 4, 2019, a Bid Procedures Hearing shall be held in the Bankruptcy Court.<br><br>3.     The deadline for bidding shall be a date not later than February 9, 2019.<br><br>4.     The date specified for an auction, if necessary, shall be a date not later than February 12, 2019.<br><br>5.     Not later than February 15, 2019, a Sale Hearing shall be held in the Bankruptcy Court.<br><br>6.     The closing of the Acceptable 363 Sale shall occur on or before April 9, 2019.<br><br>**Acceptable Plan**<br><br>1.     Not later than January 4, 2019, the Debtors shall file their Schedules and Statement of Financial Affairs.<br><br>2.     The bar date for filing proofs of claim shall be a date not later than February 11, 2019.<br><br>3.     Not later than December 21, 2019, the Debtors shall file with the Bankruptcy Court an Acceptable Plan and a disclosure statement with respect thereto.<br><br>4.     Not later than February 18, 2019, the Bankruptcy Court shall enter an order |

| | |
|---|---|
| | approving a disclosure statement with respect to an Acceptable Plan.<br><br>5.    Not later than March 15, 2019, the Bankruptcy Court shall enter an order confirming an Acceptable Plan.<br><br>6.    Not later than April 10, 2019, such Acceptable Plan shall become effective.<br><br>*See* DIP Term Sheet at p. 17, Ex. D. |
| **Borrowing Conditions**<br>*Bankr. R. 4001(c)(1)(B)*<br>*L.R. 4001-2(a)(2)* | The several obligations of the DIP Lenders to make the DIP Loans shall be conditioned on the satisfaction or waiver of the following:<br><br>1.    with respect to the First Advance of the New Money DIP Loans and the "Roll Up":<br><br>    a.    the filing by the Debtors of an Acceptable Plan and disclosure statement in the Bankruptcy Court not later than December 21, 2018;<br><br>    b.    definitive DIP Loan Documents in form and substance acceptable to the DIP Administrative Agent in its sole and absolute discretion shall have been executed and delivered by the parties thereto on or prior to December 18, 2018;<br><br>    c.    the entry by the Bankruptcy Court of the Second Interim Order in form and substance acceptable to the DIP Administrative Agent in its sole and absolute discretion; and<br><br>    d.    the Debtor shall have been at all times in compliance with the Budget (subject to Permitted Variances).<br><br>2.    with respect to the Second Advance of the New Money DIP Loans, the entry of the Final Order in form and substance acceptable to the DIP Administrative Agent in its sole and absolute discretion;<br><br>3.    with respect to the BH APA, the Bid Procedures Motion, the Sale Motion and the respective orders of the Court related thereto shall not have been modified or amended in a manner adverse in any material respects to the rights and interests of the DIP Secured Parties without the prior written consent of the DIP Administrative Agent in its sole and absolute discretion; and<br><br>4.    other than the Designated Defaults or a Liquidity Covenant Default (as such terms are defined in the Limited Forbearance Agreement dated November 19, 2018, among the Debtors and the Prepetition Secured Parties, as amended by Amendment to Limited Forbearance Agreement dated December 5, 2018) and the event of default under the Prepetition Credit Agreement resulting from the Debtors filing for bankruptcy (and any default or other event of default arising therefrom or related thereto), no Default or Event of Default shall have occurred.<br><br>*See* DIP Term Sheet at pp. 12-13. |
| **Joint Obligations**<br>*L.R. 4001-2(a)(14)* | The Guarantor will guaranty the obligations of the Borrower under the DIP Term Sheet.<br><br>*See* DIP Term Sheet at p. 1. |
| **Funding of Non-Debtor Affiliates** | No non-Debtor affiliates will be funded by the DIP Loans. |

| *L.R. 4001-2(a)(15)* | |
|---|---|
| **Material Terms, Including Duration and Use of Cash Collateral** *Bankr. R. 4001(b)(1)(B)(iii)* | Subject to the terms and conditions set forth in the DIP Loan Documents, DIP Term Sheet and Financing Orders, including the Conditions Precedent, Events of Default and Remedies:<br><br>1.      Upon entry of the First Interim Order, in form and substance acceptable to the DIP Administrative Agent, the Debtors are authorized to use Cash Collateral, in accordance with the DIP Term Sheet, First Interim Order and Budget during the Initial Interim Cash Collateral Period and any period beyond the Initial Interim Cash Collateral Period (a) established by the Second Interim Order or (b) approved by the DIP Loan Agent, in its sole and absolute discretion; provided, however, that the Debtors shall operate their cash management system in a manner consistent with the Cash Management Order.<br><br>2.      Upon the entry in the Court of the Second Interim Order, in form and substance acceptable to the DIP Administrative Agent in its sole and absolute discretion, approving the DIP Loans, the continued use of Cash Collateral in accordance with the DIP Term Sheet, the Second Interim Order and Budget and providing Adequate Protection for the Prepetition Lenders in accordance with the DIP Term Sheet: (i) $11,500,000 of the New Money DIP Loans will be advanced for the liquidity needs of the Debtors in accordance with the Budget (the "**First Advance**"), and (ii) 100% of the Rollup DIP Loans will be used to discharge, on a dollar for dollar basis, all outstanding Prepetition Obligations, other than the Prepayment Premium and the Back-End Facility Fee. The indebtedness represented by the Prepayment Premium and the Back-End Facility Fee, including all accrued and unpaid postpetition interest from the Petition Date through and including the date of the entry of the Second Interim Order (and otherwise provided in the Second Interim Order), shall constitute a prepetition secured claim of the Prepetition Administrative Agent on behalf of the Prepetition Lenders (the "**Remaining Prepetition Secured Claim**").<br><br>2.      The remaining $33,500,000 of New Money DIP Loans will be advanced for the liquidity needs of the Debtors in accordance with the Budget (the "**Second Advance**") upon the entry in the Bankruptcy Court of a Final Order, in form and substance acceptable to the DIP Administrative Agent in its sole and absolute discretion, approving (among other things) the DIP Loans.<br><br>*See* DIP Term Sheet at pp. 6-7. |
| **Waiver/Modification of the Automatic Stay** *Bankr. R. 4001(c)(1)(B)(iv)* *L.R. 4001-2(a)(10)* | Any automatic stay otherwise applicable to the DIP Secured Parties is modified so that, upon and after the occurrence of the Maturity Date (whether by acceleration or otherwise), the DIP Secured Parties shall be entitled to immediate payment of all obligations under the DIP Facility and to enforce the remedies provided for under the DIP Loan Documents or under applicable law, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court, but subject to the following conditions (the "**Waiting Period Procedures**"):<br><br>1.      The DIP Secured Parties shall notify the DIP Loan Parties that the Maturity Date has occurred (such notice, a "**Maturity Date Notice**" and the date of any such notice, the "**Maturity Date Notice Date**"). A copy of any Maturity Date Notice shall be provided by email to the Debtors' counsel.<br><br>2.      A waiting period shall commence upon delivery of the Maturity Date Notice and shall expire four (4) business days after the Maturity Date Notice Date (the "**Waiting Period**"). During the Waiting Period, the Debtors shall be entitled to seek an emergency |

| | hearing before the Court for the sole purpose of contesting the occurrence of a Maturity Date (including, for the avoidance of doubt, contesting the occurrence of any breach, default, or Event of Default alleged to underlie the occurrence of the Maturity Date). |
| --- | --- |
| | 3.      During the Waiting Period, the Debtors may continue to use the DIP Collateral, including the Cash Collateral. |
| | 4.      None of the DIP Secured Parties or the Prepetition Secured Parties shall object to any motion filed by the Debtors during the Waiting Period seeking such expedited hearing nor seek to reduce such Waiting Period. |
| | *See* DIP Term Sheet at p. 12. |
| **Indemnification** <br> *Bankr. R.* <br> *4001(c)(1)(B)(ix)* | The DIP Administrative Agent and the DIP Lenders (and their affiliates and respective officers, directors, employees, advisors and agents) (each such person, an "**Indemnitee**") will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated by the DIP Term Sheet or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the gross negligence or willful misconduct of the relevant indemnified person. <br><br> The indemnity shall not be available (i) to the extent arising from a material breach of any obligation of such Indemnitee under the DIP Loan Documents or (ii) to the extent arising out of any loss, claim, damage, liability or expense that does not involve an act or omission of the DIP Loan Parties and that is brought by an Indemnitee against another Indemnitee (other than claims against an Indemnitee in its capacity or in fulfilling its role as DIP Administrative Agent or any similar role under the DIP Loan Documents). <br><br> *See* DIP Term Sheet at pp. 22-23. |
| **Debtor's Stipulations** <br> *Bankr. R.* <br> *4001(c)(1)(B)(iii)* <br> *L.R. 4001-2(a)(18)* | The Debtors will make customary stipulations as to the validity of the Prepetition Obligations. <br><br> *See* DIP Term Sheet at pp. 13-14. |
| **Section 506(c) Waiver** <br> *Bankr. R.* <br> *4001(c)(1)(B)(x)* <br> *Bankr. R* <br> *4001(c)(1)(B)(viii)* | Effective upon the entry of the Final Order, the DIP Administrative Agent, the DIP Lenders, the Prepetition Administrative Agent, and the Prepetition Lenders shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral (as defined below); the Interim Order shall approve the waiver of all 506(c) claims on account of amounts covered by the Carve-Out; and the Final Order shall approve the waiver of all 506(c) claims. <br><br> *See* DIP Term Sheet at p. 12. |
| **Section 552(b) Waiver** <br> *L.R. 4001-2(a)(4)* <br> *Bankr. R* <br> *4001(c)(1)(B)(viii)* | The Final Order shall approve the waiver of rights under section 552(b) of the Bankruptcy Code. <br><br> *See* DIP Term Sheet at p. 12. |
| **Liens on Avoidance Actions** <br> *Bankr. R* | The DIP Collateral includes any actions under sections 544, 545, 547, 548 and 550 of the Bankruptcy Code, and the proceeds thereof, other than any such actions acquired by a purchaser under an Acceptable 363 Sale, but only upon entry of the Final Order. |

| *4001(c)(1)(B)(xi)* | *See* DIP Term Sheet at p. 7. |

## JURISDICTION AND VENUE

9.      This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

10.      The legal predicates for the relief requested herein are sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003 and 9014, and Local Bankruptcy Rule 4001-2.

## BACKGROUND

11.      Synergy is a biopharmaceutical company focused on the development and commercialization of novel gastrointestinal therapies. The Company has pioneered discovery, research, and development efforts around analogs of uroguanylin, a naturally occurring human gastrointestinal peptide, for the treatment of gastrointestinal disease and disorders. Synergy's proprietary gastrointestinal platform includes one commercial product, TRULANCE, and a second product candidate, dolcanatide. The Company's business operations, corporate and capital structures, and restructuring efforts are described in greater detail in the First-Day Declaration.  As of the Petition Date, the Debtors have approximately $128 million in funded debt.

## I.      The Chapter 11 Cases

12.      On the date hereof (the "**Petition Date**"), each of the Debtors commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**"). The Debtors have requested that the Chapter 11 Cases be jointly administered.

13.     The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

14.     To date, the Office of the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") has not appointed a creditors' committee in the Chapter 11 Cases, nor has any trustee or examiner been appointed therein.

## II.     The Debtors' Prepetition Capital Structure

15.     As of the Petition Date, the Debtors' capital structure consisted of outstanding funded-debt obligations in the aggregate principal of approximately $128 million, consisting of the Prepetition Term Loan Agreement and the 7.5% Unsecured Notes (each as defined below). The Prepetition Term Loan (as defined below) is subject to a prepayment premium (the "**Prepayment Premium**"), upon the occurrence of certain events including the commencement of these Chapter 11 Cases and the prepayment of the Prepetition Term Loan. The Prepayment Premium steps down each year. For the period July 1, 2018 to June 30, 2019, the Prepayment Premium is equal to 32.5% of the aggregate outstanding principal amount of Prepetition Term Loan being prepaid. In addition, upon any prepayment or repayment of the Prepetition Term Loans (including at maturity), there is a back-end facility fee equal to two percent (2.0%) of (a) in the case of a partial optional or mandatory prepayment, the aggregate principal amount of Prepetition Term Loans (including PIK Loans (as defined in the Prepetition Term Loan Agreement)) prepaid or (b) in the case of any other payment for any other reason, the aggregate principal amount of the maximum amount of Prepetition Term Loans (including PIK Loans (as defined in the Prepetition Term Loan Agreement)) advanced or deemed advanced  (the "**Back-End Facility Fee**").

A.    **Prepetition Term Loan Agreement**

16.    Synergy Pharmaceuticals is party to a senior secured term loan (the "**Prepetition Term Loan**") under that certain Term Loan Agreement (as amended, restated, modified, or supplemented from time to time, the "**Prepetition Term Loan Agreement**"),[5] with CRG, as administrative agent and collateral agent (in such capacity, the "**Prepetition Administrative Agent**"), and the lenders named therein (the "**Prepetition Lenders**", and together with the Prepetition Administrative Agent, the "**Prepetition Secured Parties**"). Synergy Pharmaceuticals' obligations under the Prepetition Term Loan are guaranteed by Synergy Advanced and secured by liens on and security interests in (a) substantially all of the Debtors' tangible and intangible assets, other than Excluded Collateral (as defined in the Prepetition Loan Documents), and (b) certain capital stock owned by the Borrower.

17.    Synergy Pharmaceuticals borrowed $100 million under the Prepetition Term Loan on September 1, 2017, the closing date of the facility. Pursuant to Amendment No. 1 and Amendment No. 2, Synergy Pharmaceuticals had the ability to borrow additional principal amounts, including an additional $25 million on or before October 31, 2018 ("**Second Borrowing**"). Synergy Pharmaceuticals elected not to make the Second Borrowing, and as a result there are no additional principal borrowings available under the Prepetition Term Loan Agreement.

18.    Between October 30, 2018 and November 16, 2018, the Company entered into four waivers (the "**Term Loan Waivers**"), pursuant to which the Prepetition Lenders waived compliance with the Minimum Market Capitalization Covenant (as defined in the Prepetition

---

[5] The Prepetition Term Loan Agreement was amended on February 26, 2018, August 28, 2018, October 30, 2018, November 13, 2018, and November 16, 2018.

Term Loan Agreement).  As consideration for the Prepetition Lenders' entry into the last two Term Loan Waivers, the Company paid the Prepetition Lenders $300,000 in fees.

19.     The Prepetition Term Loan matures on June 30, 2025. Prior to November 20, 2018, the Prepetition Term Loan bore interest at a rate equal to 9.5% per annum, with quarterly, interest-only payments, a portion of which, at the Company's option, were paid-in-kind. Under the terms of a November 21, 2018 forbearance agreement, the Prepetition Term Loan bears interest at the Default Rate of 13.5%, which must be paid in cash.

20.     The Prepayment Premium was triggered upon the filing of these Chapter 11 Cases and became due and payable upon the filing. In addition, the Back-End Facility Fee will apply upon payment of the Prepetition Term Loan at maturity or prepayment on any earlier date.

21.     As of the Petition Date, approximately $110 million is outstanding under the Prepetition Term Loan Agreement, inclusive of accrued but unpaid interest.

**B.     7.5% Unsecured Notes**

22.     Synergy Pharmaceuticals issued $200 million aggregate principal amount of 7.50% convertible senior notes due November 1, 2019 (the "**7.5% Unsecured Notes**") pursuant to that certain Indenture, dated as of November 3, 2014, by and among Wells Fargo Bank, National Association, as Trustee and Synergy Pharmaceuticals. The 7.5% Unsecured Notes are convertible, at any time, into shares of Synergy Pharmaceuticals' common stock at an initial conversion rate of 321.5434 shares per $1,000 principal amount of 7.5% Unsecured Notes.

23.     In several transactions from January 2015 through March 2017, approximately $181.4 million in aggregate principal amount of the 7.5% Unsecured Notes were converted pursuant to the terms of the 7.5% Unsecured Notes, or pursuant to the terms of various privately negotiated exchanges, into shares of Synergy Pharmaceuticals' common stock, including shares issued in satisfaction of accrued and unpaid interest.

25

24.     As of the Petition Date, the 7.5% Unsecured Notes had an outstanding principal balance of approximately $18.6 million.

**III.    The Debtors' Need to Use Cash Collateral and Access DIP Financing**

25.     The Debtors require immediate access to liquidity to ensure that they are able to continue operating during these Chapter 11 Cases and preserve the value of their estates for the benefit of all parties-in-interest. Absent immediate access to Cash Collateral, the Debtors simply cannot continue their operations and, thus, would not be able to consummate anticipated near-term sales, which are the primary source of the Debtors' revenues. Without immediate access to Cash Collateral, the Debtors will be unable to pay wages for their employees or the invoices of vendors critical to business operations, preserve and maximize the value of their estates, and administer these Chapter 11 Cases, causing immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders. Moreover, ample post-petition financing is necessary to send a strong signal to the market that these Chapter 11 Cases are well-funded, which is particularly important given vendor and customer concerns regarding the Debtors' restructuring efforts, and the Debtors' intention to market and sell substantially all of their assets during these Chapter 11 Cases.

26.     In connection with their liquidity situation and the prospect of a chapter 11 filing, the Debtors, with the assistance of FTI Consulting, Inc. ("**FTI**"), analyzed their projected cash needs and prepared the budget outlining the Debtors' postpetition cash needs during these Chapter 11 Cases. The Debtors believe that the budget and their projections provide an accurate reflection of their funding requirements over the identified period, and will allow them to meet their obligations, and are reasonable and appropriate under the circumstances.

27.     The Debtors relied on these forecasts to determine the amount of postpetition financing required to administer these Chapter 11 Cases. Access to the postpetition financing

provided by the DIP Facility is critical to the Debtors' ability to smoothly operate postpetition, including by providing sufficient liquidity to fund the administrative cost of these Chapter 11 Cases. As a result, the Debtors believe that the DIP Facility will provide the Debtors sufficient liquidity to stabilize their operations and fund the administration of these Chapter 11 Cases as the Debtors seek to implement the sale transaction contemplated by the Asset Purchase Agreement, and are therefore essential to the preservation of their assets during the pendency of these cases.

### IV.    Alternative Sources of Financing Are Not Readily Available

28.    The Debtors do not have alternative sources of financing readily available. Substantially all of the Debtors' assets are encumbered under their existing capital structure, which, along with the Debtors' uncertain financial condition, restricts the availability of, and options for, postpetition financing.

29.    Over the course of the past several weeks, the Debtors received two postpetition financing proposals, one from the Prepetition Lenders and one from Highbridge Capital Management, LLC ("Highbridge"), a holder of the Debtors' 7.5% Unsecured Notes. Both proposals contemplated a "priming" DIP facility. Given that the Prepetition Secured Parties indicated that they would not consent to "priming" debtor-in-possession financing provided by a third party and Highbridge was unwilling to provide postpetition financing on a junior basis, the Debtors determined that the Highbridge proposal was not executable. In addition, the Debtors and their advisors approached several third-party lenders requesting postpetition financing proposals. None of the parties contacted were willing to provide postpetition financing on a junior basis or participate in a priming fight under these circumstances. The Debtors therefore focused their efforts on the DIP financing proposal provided by the Prepetition Secured Parties.

30.    The Debtors and their advisors negotiated over a number of weeks regarding the structure and economics of the proposed DIP Facility. Ultimately, the Debtors and the

Prepetition Administrative Agent agreed to a set of terms that provide the Debtors with necessary access to liquidity during the pendency of these Chapter 11 Cases at fees and rates that the Debtors and their advisors consider to be reasonable under the current circumstances. Those terms provide the Debtors with the necessary liquidity to fund operations, and now provide the Debtors with sufficient time to negotiate a sale of substantially all of their assets. Based on the DIP Facility's terms and the related benefits provided by the Prepetition Administrative Agent, the Debtors determined that entry into the DIP Facility is reasonable, fair, and in the best interests of the Debtors and their estates.

## BASIS FOR RELIEF REQUESTED AND APPLICABLE AUTHORITY

I.    **The DIP Facility Should Be Approved**

A.    **The Debtors Should Be Authorized to Use Prepetition Cash Collateral**

31.    Section 363 of the Bankruptcy Code generally governs the use of estate property, and permits a debtor in possession to use cash collateral with the consent of the secured party. 11 U.S.C. § 363(c).   Specifically, section 363(c)(2) of the Bankruptcy Code provides that the Debtors may not use, sell or lease cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Therefore, the Debtors may not use the Cash Collateral without the consent of the Prepetition Secured Parties or authority granted by the Court.   Further, Bankruptcy Code section 363(e) provides that on request of an entity that has an interest in property to be used by a debtor, the Court shall prohibit or condition such use as necessary to provide adequate protection of such interest.

32.    Here, the Debtors require use of Cash Collateral to (a) pay vendors and service providers necessary to maintain their business operations consistent with prepetition practices; (b) pay certain prepetition obligations as further described in the Debtors' motions filed

contemporaneously herewith; and (c) pay disbursements as described in the Budget.    The
Prepetition Secured Parties have consented to the use of the Cash Collateral pursuant to the
Budget and under the proposed First Interim Order.    In addition, the Debtors submit that the
adequate protection to be provided to the Prepetition Secured Parties, as detailed herein, is
sufficient to approve the use of the Cash Collateral under section 363 of the Bankruptcy Code.

33.    Accordingly, based upon the foregoing, the Debtors respectfully request that the
Court authorize the Debtors to use the Cash Collateral in accordance with the terms set forth in
the First Interim Order.

**B.    Entry into the DIP Facility Is an Exercise of the Debtors' Sound Business
Judgment.**

34.    Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or
superpriority financing under certain circumstances as described in greater detail herein. If an
agreement to obtain secured credit does not violate the Bankruptcy Code, courts grant debtors
considerable deference in acting in accordance with their sound business judgment in obtaining
such credit. *See In re Barbara K. Enters., Inc*., No. 08-11474, 2008 WL 2439649, at \*14 (Bankr.
S.D.N.Y. June 16, 2008) (explaining that courts generally defer to a debtor's business judgment
"so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede
control of the reorganization to one party in interest"); *In re Ames Dep't Stores, Inc*., 115 B.R.
34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under
section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's]
reasonable business judgment to be exercised so long as the financing agreement does not
contain terms that leverage the bankruptcy process and powers or its purpose is not so much to
benefit the estate as it is to benefit a party-in-interest.").

35.     Furthermore, in determining whether the Debtors have exercised sound business judgment in deciding to enter into the DIP Loan Documents, the Court may appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility.

36.     For example, in *In re ION Media Networks, Inc.,* the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and establishing allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

37.     This rationale applies here. The DIP Facility represents a resolution between the Debtors and their prepetition secured lenders. Following extensive negotiations, the Debtors were able to come to a resolution not only on economic terms, but also achieved a resolution regarding case controls that provide the Debtors with flexibility to ensure they maintain a value-maximizing path to a sale of substantially all of their assets. The Debtors' access to the DIP Facility therefore will enable the Debtors to preserve their value as a going concern by providing crucial liquidity under terms that allow for the prospect of completing a successful sale.

38.     Based on the facts and circumstances present in these cases, it is clear that the proposed DIP Loans represent a proper exercise of the Debtors' business judgment. Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the

decision to borrow money. *See In re Ames Dep't Stores, Inc.*, 115 B.R. at 38 (courts should approve borrowings pursuant to section 364(c) and 364(d) of the Bankruptcy Code if the debtor was within its business judgment); *see also In re Utah 7000, L.L.C.*, 2008 WL 2654919, *2 (Bankr. D. Utah 2008); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that approval of interim loan, receivables facility and asset-based facility "reflect[ed] sound and prudent business judgment . . . [was] reasonable under the circumstances and in the best interest of [the debtor] and its creditors.").

39.    To determine whether the business judgment test is met, the court "is required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs, Inc.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Helm*, 335 B.R. 528, 538-39 (Bankr. S.D.N.Y. 2006).

40.    Here, the Debtors have exercised sound business judgment in determining that the DIP Facility is appropriate and have satisfied the legal prerequisites to obtain the proposed DIP Loans. As set forth herein and in the First-Day Declaration, the matter was extensively and diligently considered by the Debtors' management and submitted to the Board of Directors for approval. The Debtors' decision to agree to the DIP Facility is reasonable under the circumstances, where no financing was available on different terms and where the Debtors' need for liquidity was immediate. Accordingly, the Debtors have demonstrated sound business judgment and should be granted authority to enter into the DIP Facility and borrow funds from the DIP Lenders on the terms described herein and take the other actions contemplated by the DIP Facility and as requested herein.

### C. The Debtors Should Be Authorized To Obtain Postpetition Financing On A Senior Secured Superpriority Basis

41.     The Debtors propose to obtain financing under the DIP Term Sheet and other DIP Loan Documents by providing security interests and liens as set forth above pursuant to section 364(c) of the Bankruptcy Code. Specifically, the Debtors propose to provide the DIP Lenders postpetition security interests in and liens on the DIP Collateral, which includes substantially all of the Debtors' assets.

42.     Section 364(c) provides as follows:

> (c)     If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt —
>
> > (1)     with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
> >
> > (2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or
> >
> > (3)     secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

43.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, the courts look to whether:

> (a)     the debtor cannot obtain credit unencumbered or without superpriority status;
>
> (b)     the credit transactions are necessary to preserve assets of the estate; and
>
> (c)     the terms of the credit agreements are fair, reasonable and adequate.

*See In re Barbara K. Enters., Inc.*, 2008 WL 2439649 at *10; *see also In re Crouse Group*, Inc., 71 B.R. 544 (Bankr. E.D. Pa. 1987).

44.    In addition, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where (A) the debtor "is unable to obtain such credit otherwise," and (B) "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). Consent by the secured creditors to priming obviates the need to show adequate protection. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

45.    The focus of a bankruptcy court's approval of a financing agreement on a priming secured basis is whether the transaction would enhance the value of the debtor's assets. Courts advocate using a "holistic approach" to evaluate postpetition financing agreements that focusing on the transaction as a whole, not just on the priming of liens. As one court has noted:

> [o]btaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and that the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere.

*In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991).

46.    In furtherance of this approach, courts consider a number of factors, including: (a) whether alternative financing is available on any other basis (e.g. whether any better offers, bids or timely proposals are before the court); (b) whether the proposed financing is necessary to preserve estate assets and is necessary, essential, and appropriate for continued operation of the

debtor's business; (c) whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s); (d) whether the proposed financing agreement adequately protects prepetition secured creditors; and (e) whether the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and its creditors. *See Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003).

47.     Here, for the reasons set forth below, the Debtors satisfy the requirements of section 364 of the Bankruptcy Code to obtain post-petition financing on a superpriority basis.

48.     First, the Debtors are unable to obtain debtor-in-possession financing without providing a superpriority claim and priming liens. As set forth above and in the First-Day Declaration, the Debtors have made all reasonable efforts to obtain financing on the best terms available in light of market circumstances and the Debtors' situation. Substantially all of the Debtors' existing assets are encumbered, and any workable financing will require the support of, or be provided by, the Debtors' existing lenders. Despite their efforts, the Debtors have not been able to obtain postpetition financing or other financing accommodations from any alterative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein. Under the proposed financing, the DIP Lenders have agreed to prime their own prepetition collateral, eliminating many of the concerns applicable in non-consensual priming cases.

49.     Section 364 of the Bankruptcy Code does not require that a debtor seek alternative financing from every possible lender. Rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien. *Bray v. Shenandoah*

*Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financing institutions in the geographic area); *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) ("Section 364(d)(1) does not require the debtor to seek alternate financing from every possible lender."); *In re Aqua Assocs.*, 123 B.R. at 195 ("Section 364(d)(1)(A) seemingly requires only a showing that the Debtor has attempted unsuccessfully to obtain credit on better terms from other sources."); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 37; *In re Dunes Casino Hotel*, 69 B.R. 784, 796 (Bankr. D. N.J. 1986) (holding that the debtor had made required efforts under section 364(d)(1) of the Bankruptcy Code based on evidence that the debtor had attempted unsuccessfully to borrow funds on an unsecured basis or secured by junior liens, but that at least three such lenders were willing to advance funds secured by a superpriority lien).

50.     Second, it is essential that the Debtors obtain access to Cash Collateral and financing in order to continue operating their business in the ordinary course and to preserve estate assets. As described above and in the First Day Declaration, the Debtors require the DIP Loans to pay their ongoing operating expenses and conduct an orderly sale process. Without immediate access to Cash Collateral, and the right to access the liquidity provided through the DIP Loans within approximately 10 days of the Petition Date, the going concern value of the Debtors' assets would be jeopardized, to the detriment of all creditors and other parties in interest.

51.     Third, the proposed DIP Facility subjects the security interests of the DIP Lenders to a Carve Out. Such "carve outs" for professional fees have been found to be not only reasonable but necessary to ensure that debtors' estates – and where applicable official

committees – will be assured of the assistance of counsel and other bankruptcy professionals. *See In re Ames Dep't Stores, Inc.*, 115 B.R. at 38. Indeed, the DIP Facility does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases. *Id.* (observing that courts insist on carve-outs for professionals representing parties in interest because "absent such protection, the collective rights and expectation of all parties in interest are solely prejudiced"). Moreover, the various fees and charges to be paid to the DIP Lenders under the DIP Term Sheet are reasonable and appropriate under the circumstances. Accordingly, the Debtors submit that the terms of the DIP Agreement are fair and reasonable in light of current market conditions (particularly the lack of a ready market for any financing, including debtor-in-possession financing) and are in the best interests of the Debtors' estates. Finally, the terms of the DIP Facility were negotiated by the parties in good faith and at arm's length. Thus, after thorough analysis, the Debtors have concluded that the terms of the DIP Facility are reasonable and appropriate under the circumstances, and in the best interest of the Debtors' estates and stakeholders.

52.     Finally, the Prepetition Secured Parties are adequately protected, and consenting to the proposed use of Cash Collateral. Adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims. What constitutes adequate protection is decided on a case-by-case basis. *See*, *e.g.*, *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[t]he determination of adequate protection is a fact specific inquiry . . . left to the vagaries of each case"); *In re Realty Sw. Assocs.*, 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection is case specific, but "its

focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process" (citation omitted)). The critical purpose of adequate protection is to guard against the diminution of a secured creditor's collateral during the period when such collateral is being used by the debtor in possession. *See In re 495 Central Park Ave. Corp.*, 136 B.R. at 631 ("The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization."); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); *In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996).

53.    The DIP Facility provides the Prepetition Secured Parties with adequate protection in the form of a superpriority claim status, replacement liens on all DIP Collateral, junior only to the liens of the DIP Administrative Agent and the DIP Lenders and Prior Senior Liens, and reimbursement of all fees, costs, and expenses incurred in connection with defending the validity and enforceability of the Prepetition Obligations, the Prepetition Liens, or the Remaining Prepetition Secured Claims. This adequate protection appropriately safeguards the Prepetition Secured Parties from the diminution in the value of their interests in the Cash Collateral, and, as such, is fair and reasonable and satisfies the requirements of section 364 of the Bankruptcy Code.

**D.    The Debtors Should Be Authorized to Provide Adequate Protection to the Prepetition Secured Parties**

54.    Under section 361 of the Bankruptcy Code, the Debtors may provide adequate protection by making a cash payment or periodic cash payments "to such entity, to the extent that . . . any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property." 11 U.S.C. § 361(1). Adequate protection may also be provided by providing to such entity an additional or replacement lien to the extent that such stay, use,

sale, lease, or grant results in a decrease in the value of such entity's interest in such property.  11 U.S.C. § 361(2).

55.    The Debtors request that the Court approve certain protections of the Prepetition Secured Parties' interests in the Prepetition Collateral from any diminution in value resulting from (i) the use, sale, or lease of the Prepetition Collateral, including the Cash Collateral, (ii) the priming of their security interests and liens in the applicable Prepetition Collateral, and (iii) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.  Such protections include, among other things:

(a)    superpriority claim status;

(b)    replacement liens on all DIP Collateral, junior only to the liens of the DIP Administrative Agent and the DIP Lenders, but subject to any Prior Senior Liens;

(c)    commencing on the date upon which the Second Interim Order is entered in the Bankruptcy Court, payment on a monthly basis of postpetition interest accruing from such date at the Default Rate specified in the Prepetition Term Loan Agreement; and

(d)    reimbursement of all fees, costs and expenses incurred in connection with defending the validity and enforceability of the Prepetition Obligations, the Prepetition Liens or the Remaining Prepetition Secured Claim.

56.    The Debtors submit that the proposed Adequate Protection for the Prepetition Secured Parties is appropriate to protect the Prepetition Secured Parties from any diminution in the value of their interest in the Prepetition Collateral. Moreover, the Prepetition Secured Parties have consented to the Debtors' proposed adequate protection as sufficient to protect against any diminution in the value of the Prepetition Collateral.

II.     **The Refinancing of a Portion of the Prepetition Obligations Is Necessary and Appropriate**

57.     As set forth herein, the DIP Facility contemplates refinancing a portion of the Prepetition Obligations.  Specifically, the DIP Loans include approximately $110,000,000 of loans representing a "roll up" of a portion of the Prepetition Obligations equal to the sum of (i) outstanding principal, plus (ii) accrued and unpaid interest, plus (iii) any and all unreimbursed costs, fees and expenses of the Prepetition Secured Parties incurred in accordance with the Prepetition Term Loan Agreement.

58.     Without the liquidity provided by the DIP Loans and access to Cash Collateral to fund the administration of these Chapter 11 Cases and support the Debtors' business operations without interruption, the Debtors could face irreparable harm to their ability to continue their business and conduct an orderly sale process.  Maintaining the ability to continue as a going concern and conduct the sale process is of immense benefit to the Debtors' estates and will maximize value for the benefit of all of its stakeholders.  As the only party willing to provide necessary postpetition financing to the Debtors, the Prepetition Secured Parties were unwilling to provide the DIP Facility unless a portion of the Prepetition Term Loan was "rolled-up".  Notably, the Roll Up DIP Loans do not include the Prepayment Premium and the Back-End Facility Fee, which will remain prepetition secured claims.  Thus, after careful consideration of all available alternatives, the Debtors have determined that refinancing a portion of the Prepetition Obligations is necessary to obtain access to the liquidity necessary to preserve the value of their business for the benefit of all stakeholders.

59.     The refinancing of prepetition debt is a common feature in debtor-in-possession financing arrangements. Courts in this jurisdiction and others have approved similar debtor-in-possession features on an interim basis. *See, e.g., In re Cenveo*, Case No. 18-22178 (RDD)

(Bankr. S.D.N.Y. Feb. 6, 2018) (authorizing repayment of $50 million of outstanding revolving obligations and conversion of all remaining outstanding prepetition revolving obligations on an interim basis); *In re BCBG Max Azria Global Holdings, LLC*, Case No. 17-10466 (SCC) (Bankr. S.D.N.Y. Mar. 2, 2017) (approving interim roll-up of $35 million outstanding revolving obligations); *In re Avaya Inc.*, Case No. 17-10089 (SMB) (Bankr. S.D.N.Y. Jan. 23, 2017) (approving repayment of $105 million of outstanding revolving obligations on an interim basis); *In re Aéropostale, Inc.*, Case No. 16-11275 (Bankr. S.D.N.Y. May 6, 2016) (approving repayment of $78 million outstanding revolving obligations on an interim basis); *In re Charming Charlie*, Case No. 17-12906 (Bankr. D. Del. Dec. 13, 2017) (approving on an interim basis the conversion and "roll-up" of all outstanding prepetition revolving obligations); *In re The Gymboree Corp.*, No. 17-32968 (Bankr. E.D. Va. June 12, 2017) (approving on an interim basis the conversion and "roll-up" of all outstanding prepetition revolving obligations and $70 million of prepetition term loan obligations).

60.     Consistent with this authority, the Debtors respectfully submit that the Court should approve the Debtors' decision to enter into the DIP Facility and comply with the provisions thereof, including the refinancing of a portion of the Prepetition Obligations, as a sound exercise of the Debtors' business judgment.

## III.    The DIP Secured Parties Are Entitled to the Protections under Section 364(e) of the Bankruptcy Code

61.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Specifically, section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur

> debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

62.     Because "good faith" is not defined in the Bankruptcy Code, courts often look to case law under section 363(m). 7 Collier on Bankruptcy, 16th ed. ¶ 364.08, ("Section 364(e) is consistent with section 363(m), which provides similar protection to a buyer or lessee of property of the estate in a section 363 transaction."). As one court in this district explained, "the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Pan Am Corp.*, No. 91 CIV. 8319 (LMM), 1992 WL 154200, at *4 (S.D.N.Y. June 18, 1992) (*citing In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)); *accord In re Gen. Growth Props., Inc.*, 423 B.R. 716, 722 (S.D.N.Y. 2010).

63.     The terms of the DIP Facility were negotiated in good faith and at arm's length between the Debtors and the DIP Secured Parties, and all of the DIP Facility obligations will be extended by the DIP Lenders in good faith (as such term is used in section 364(e) of the Bankruptcy Code). Furthermore, no consideration is being provided to any party to, or guarantor of, obligations arising under the DIP Facility, other than as disclosed in the DIP Term Sheet. Finally, the DIP Facility has been extended in express reliance upon the protections offered by Bankruptcy Code section 364(e), and the DIP Lenders should be entitled to the full protection of section 364(e) in the event that the First Interim Order or any provision thereof is vacated, reversed, or modified on appeal or otherwise.

41

## IV.    The DIP Facilities' Fees Were Negotiated in Good Faith, at Arms' Length and Should be Approved

64.     As described above, the Debtors have agreed, subject to Court approval, to pay certain fees described in the DIP Term Sheet and reasonable costs and expenses to the DIP Administrative Agent, including without limitation, fees and expenses of the professionals retained by the DIP Administrative Agent and the DIP Lenders, as provided for in the DIP Term Sheet without the necessity of filing retention applications or fee applications.

65.     These fees and other obligations under the Credit Documents were negotiated in good faith and at arms' length and represent the most favorable terms to the Debtors on which the DIP Lenders would agree to make the DIP Facility available. The Debtors considered the fees described above when determining in their sound business judgment that the DIP Facility constituted the best terms on which the Debtors could obtain the postpetition financing necessary to continue their operations pending one or more sales of the assets and prosecute their Chapter 11 Cases, and that paying these fees in order to obtain the DIP Facility is in the best interests of the Debtors' estates, creditors, and other parties in interest.

66.     Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Term Sheet in connection with entering into those agreements.

## V.    Modification of the Automatic Stay Is Warranted.

67.     The DIP Term Sheet and the proposed First Interim Order contemplate that the automatic stay arising under section 362 of the Bankruptcy Code shall be vacated or modified to permit the DIP Administrative Agent and the DIP Lenders to enforce their rights under the DIP Documents and the proposed First Interim Order. Specifically, upon the Maturity Date, and following the giving of four (4) business days' prior written notice to the Debtors, the DIP Lenders and the DIP Administrative Agent may exercise any remedies available to them,

including foreclosure on the DIP Collateral. The Debtors believe that this three-day notice period will provide the Debtors and other interested parties sufficient time to seek an expedited hearing before the Court for the purpose of determining whether, in fact, the Maturity Date has occurred.

68.    Stay modification provisions are ordinary features of debtor in possession financing facilities and, in the Debtors' business judgment, this modification is reasonable under the circumstances. Courts in this jurisdiction have approved similar provisions. *See, e.g., In re Nine West Holdings, Inc.*, Case No. 18-10947 (SCC) (Bankr. S.D.N.Y. April 8, 2018); *In re Cenveo*, Case No. 18-22178 (RDD) (Bankr. S.D.N.Y. Feb. 6, 2018); *In re BCBG Max Azria Global Holdings, LLC*, Case No. 17-10466 (SCC) (Bankr. S.D.N.Y. Mar. 28, 2017); *In re Avaya, Inc.*, Case No. 17-10089 (SMB) (Bankr. S.D.N.Y. Mar. 10, 2017); *In re Dacco Transmission Parts (NY), Inc.*, Case No. 16-13245 (MKV) (Bankr. S.D.N.Y. Dec. 23, 2016); *In re Breitburn Energy Partners LP*, Case No. 16-11390 (SMB) (Bankr. S.D.N.Y. Aug. 19, 2016).

## VI.    Failure to Obtain Immediate Interim Access to Cash Collateral Would Cause Immediate and Irreparable Harm.

69.    Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy and to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion. Upon request, however, pursuant to Bankruptcy Rules 4001(b) and (c) and Local Bankruptcy Rule 4001-2, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the Debtor's estate.

70.    The Court may grant the relief requested in this Motion immediately if the "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003; see also *In re First NLC Fin. Servs., LLC*, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008). In explaining the

standards governing preliminary injunctions, the Second Circuit instructed that irreparable harm "'is a continuing harm which cannot be adequately redressed by final relief on the merits' and for which 'money damages cannot provide adequate compensation.'" *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (quoting *N.Y. Pathological & X-Ray Labs., Inc. v. INS*, 523 F.2d 79, 81 (2d Cir. 1975)). Further, the "harm must be shown to be actual and imminent, not remote or speculative. " *Id.; see also Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1998). The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).

71.     Here, the Debtors seek authorization to use the Cash Collateral immediately.  The Debtors will use the cash to, among other things, fund the administration of these Chapter 11 Cases and the operation of their business. The Debtors believe that substantially all of their available cash constitutes the Prepetition Lenders' Cash Collateral. The Debtors will therefore be unable to operate their business or otherwise fund these Chapter 11 Cases without immediate access to the Cash Collateral and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest. In short, the Debtors' ability to administer these Chapter 11 Cases through the use of Cash Collateral is vital to preserve and maximize the value of the Debtors' estates.

## VII.    Requests for First and Second Interim Hearings

72.     Thus, the Debtors request that the Court schedule and conduct a hearing on the First Interim Order to authorize the Debtors to use Cash Collateral.  The Debtors also request that the Court schedule and conduct a Second Interim Hearing to consider entry of the proposed Second Interim Order (a) authorizing the Debtor to borrow from the DIP Facility up to

$11,500,000 on an interim basis, (b) authorizing the Debtor to utilize the Cash Collateral as provided in the proposed Second Interim Order, and (c) granting the adequate protection as provided in the proposed Second Interim Order. This relief will enable the Debtors to operate their businesses in the ordinary course and avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

73.     The Debtors request that the Court schedule the Second Interim Hearing and authorize the Debtors to serve a copy of the signed First Interim Order which fixes the time and date for the Second Interim Hearing and the filing of objections within three (3) business days after entry thereof by first-class mail upon (i) the Office of the United States Trustee for the Southern District of New York, (ii) counsel to the Prepetition Lenders, (iii) counsel to the DIP Administrative Agent and the DIP Lenders, (iv) counsel to any statutory committees appointed in these Chapter 11 Cases or, if no committee has been appointed, the parties listed in the consolidated list of twenty (20) largest unsecured creditors filed by the Debtors in these Chapter 11 Cases, and (vi) any party who filed a request for notices in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002 prior to entry of the First Interim Order.

**VIII.   Request for a Final Hearing**

74.     The Debtors further respectfully request that the Court schedule the Final Hearing and authorize the Debtors to serve a copy of the signed Second Interim Order which fixes the time and date for the Final Hearing and the filing of objections within three (3) business days after entry thereof by first-class mail upon (i) the Office of the United States Trustee for the Southern District of New York, (ii) counsel to the Prepetition Lenders, (iii) counsel to the DIP Administrative Agent and the DIP Lenders, (iv) counsel to any statutory committees appointed in these Chapter 11 Cases or, if no committee has been appointed, the parties listed in the consolidated list of twenty (20) largest unsecured creditors filed by the Debtors in these Chapter

11 Cases, and (vi) any party who filed a request for notices in these Chapter 11 Cases pursuant to

Bankruptcy Rule 2002 prior to entry of the Second Interim Order.

### RESERVATION OF RIGHTS

75.     Nothing in this Motion should be construed as (a) authority to assume or reject

any executory contract or unexpired lease of real property, or as a request for the same; (b) an

admission as to the validity, priority, or character of any claim or other asserted right or

obligation, or a waiver or other limitation on the Debtors' ability to contest the same on any

ground permitted by bankruptcy or applicable non-bankruptcy law; (c) a promise to pay any

claim; (d) granting third-party-beneficiary status or bestowing any additional rights on any third

party; or (e) being otherwise enforceable by any third party.

### NOTICE

76.     Notice of this Motion will be given to: (a) the U.S. Trustee, (b) counsel to the

administrative agent under the Debtors' Prepetition Term Loan Facility and proposed DIP

Facility, (c) counsel to the Stalking-Horse Bidder, (d) the Internal Revenue Service, (e) the

Securities and Exchange Commission, (f) the parties included on the Debtors' consolidated list

of their 20 largest unsecured creditors, (g) the United States Attorney of the Southern District of

New York, and (h) all parties entitled to notice pursuant to Local Bankruptcy Rule 9013-1(b).

The Debtors submit that no other or further notice is required.

### NO PRIOR REQUEST

77.     No previous request for the relief sought herein has been made to this Court or

any other court.


*[Remainder of Page Intentionally Left Blank]*

## CONCLUSION

The Debtors respectfully request that this Court enter the Interim Order and the

Final Order, substantially in the form annexed hereto, granting the relief requested herein and

such other and further relief as may be just and proper.

Dated: New York, New York
       December 12, 2018

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ Lisa Laukitis*
Lisa Laukitis
Christine A. Okike
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

– and –

Ron E. Meisler
Christopher M. Dressel
Jennifer Madden
155 North Wacker Drive
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Proposed Counsel to Debtors
and Debtors-in-Possession*

**EXHIBIT A**

**DIP Term Sheet**

EXECUTION

### SYNERGY PHARMACEUTICALS INC.

### SUPERPRIORITY DIP FACILITY

### Binding Term Sheet

### December 11, 2018

This binding term sheet (the "**_Binding Term Sheet_**") sets forth the terms and conditions with respect to the New Money DIP Loans (as defined below), the DIP Facility (as defined below), the treatment of the Prepetition Obligations (as defined below), which terms and conditions will be set forth in the DIP Loan Documents (as defined below).

The obligations of the DIP Lenders to provide financing pursuant to this Binding Term Sheet shall be subject to the terms and conditions set forth herein and conditioned upon (i) the execution and delivery of definitive DIP Loan Documents (as defined below), (ii) the execution and delivery of signature pages to this Binding Term Sheet by each of the parties hereto, and (iii) the entry in the Bankruptcy Court (as defined below) of the Financing Orders (as defined below).

| | |
|---|---|
| Borrower: | Synergy Pharmaceuticals Inc., a debtor-in-possession in the cases (the "**_Chapter 11 Cases_**") pending with respect to itself and Synergy Advanced Pharmaceuticals, Inc., its wholly owned subsidiary (each a "**_Debtor_**" and, collectively, the "**_Debtors_**) under Chapter 11 of Title 11 of the United States Code (as amended, the "**_Bankruptcy Code_**") and filed with the United States Bankruptcy Court for the Southern District of New York (the "**_Bankruptcy Court_**"). (As used herein, the term "**_Petition Date_**" shall mean the date upon which the Chapter 11 Cases are commenced in the Bankruptcy Court.) |
| Guarantor: | Synergy Advanced Pharmaceuticals, Inc., a wholly owned subsidiary of the Borrower (the Borrower and the Guarantor, together, the "**_DIP Loan Parties_**"). |
| DIP Lenders and Commitments: | Each of the entities and their respective commitments set forth on Exhibit A hereto, as such exhibit may be amended prior to the entry of the Final Order (as defined below) solely to adjust the "proportionate shares" of the DIP Lenders, but not to reduce the aggregate commitments of the DIP Lenders, collectively. |
| **Administrative Agent and Collateral Agent:** | CRG Servicing LLC (the "**_DIP Administrative Agent_**" and collectively with the DIP Lenders, the "**_DIP Secured Parties_**"). |
| **Prepetition Credit Agreement:** | That certain Term Loan Agreement (the "**_Prepetition Credit Agreement_**"), dated as of September 1, 2017 (as later modified or amended), among Synergy Pharmaceuticals Inc. (the "**_Prepetition Borrower_**"), the Subsidiary Guarantors party thereto (the "**_Prepetition Guarantors_**"), the lenders party thereto (the "**_Prepetition Lenders_**"), and CRG Servicing LLC as Administrative Agent and Collateral Agent (the "**_Prepetition Administrative Agent_**" and collectively with the Prepetition Lenders, the "**_Prepetition Secured Parties_**"). Unless |

1

|  | |
|---|---|
|  | otherwise defined herein, terms defined in the Prepetition Credit Agreement are used herein with such defined meanings. |
| **DIP Facility:** | Debtor-in-possession senior secured superpriority term loan facility in an aggregate principal amount equal to [$155,000,000], comprised of [$45,000,000] of "new money" loans (the "*New Money DIP Loans*"), plus approximately [$110,000,000] of loans representing a "roll up" of a portion of the Prepetition Obligations (as defined below) equal to the sum of (i) outstanding principal, plus (ii) accrued and unpaid interest, including accrued and unpaid postpetition interest at the Default Rate specified in the Prepetition Credit Agreement (the "*Prepetition Default Rate*") from the Petition Date through and including the date of the entry of the Second Interim Order (and as otherwise provided in the Second Interim Order), plus (iii) any and all unreimbursed costs, fees and expenses of the Prepetition Secured Parties incurred in accordance with the Prepetition Credit Agreement (the "*Roll Up Dip Loans*" and together with the New Money DIP Loans, the "*DIP Loans*"). |
| **Interest Rate:** | Interest shall accrue on the DIP Loans at the rate of Libor + 9.50% per annum, and shall be payable monthly, on the first (1st) business day of each month, in arrears, in accordance with the Budget (defined below). |
| **Default Rate:** | At all times while an Event of Default (as defined in the DIP Loan Documents) exists, principal, interest and other amounts shall bear interest at a rate per annum equal to 4.00% in excess of the interest rate set forth in "Interest Rate" above. |
| **New Money DIP Loan Fees:** | 1. An "*Upfront Fee*" equal to 2.00% of the total amount of New Money DIP Loans shall be paid upon entry of the Final Order (as defined below).<br><br>2. An "*Exit Fee*" equal to 3.00% of the total amount of New Money DIP Loans shall be paid upon the Maturity Date (as defined below). |
| **Nature of Fees:** | Fully earned and non-refundable under all circumstances. |
| **Expenses of DIP Secured Parties:** | The reasonable and documented professional fees and expenses incurred by the DIP Secured Parties shall be promptly paid by the Debtors on no less than a monthly basis. |
| **Maturity Date:** | The earliest of (a) April 9, 2019; (b) the consummation of a sale of all or substantially all of the Borrower's assets; (c) acceleration of the DIP Loans pursuant to the DIP Loan Documents (as defined below); and (d) such later date as the DIP Lenders in their sole discretion may agree in writing with the Debtors. |
| **Budget:** | All advances under the DIP Facility and any Cash Collateral shall be used by the DIP Loan Parties solely in accordance with a rolling 13- |

EXECUTION

week budget (the "*Budget*"), for the period commencing on the Petition Date through and including March 31, 2019 (the "*Budget Period*"), setting forth all forecasted (i) cash receipts of the DIP Loan Parties (the "*Cash Receipts*") (ii) cash operating disbursements (the "*Cash Operating Disbursements*") of the DIP Loan Parties, and (iii) non-operating, bankruptcy-related cash disbursements of the DIP Loan Parties (the "*Cash Bankruptcy Disbursements*"), which Budget shall be approved by the DIP Administrative Agent in its sole and absolute discretion and may be modified by the DIP Loan Parties with the written consent of the DIP Administrative Agent in its sole and absolute discretion and without further order of the Bankruptcy Court; provided, that (i) the total amount of funding provided pursuant to the Budget shall not exceed the total amount of the DIP Facility authorized by each of the Financing Orders (as defined below), and (ii) the reasonable and documented professional fees and expenses incurred by the DIP Secured Parties shall not be subject to a cap. A copy of the Budget approved by the DIP Administrative Agent is attached hereto as Exhibit B.

Compliance with the Budget will be measured every week, starting with the third week following the Petition Date, for the period beginning as of the week of the Petition Date and ending the week prior to the week on which compliance is measured. For purposes of illustration, on the third week following the Petition Date, the DIP Loan Parties' compliance with the Budget for the first two weeks following the Petition Date shall be measured. Each date on which compliance with the Budget is measured is referred to herein as a "*Testing Date*". As of any applicable Testing Date:

1. the cumulative Cash Receipts may vary from the Budget by no more than the following: (a) 20.00% for the first four-week period (and each week thereof), beginning as of the week of the Petition Date, (b) 15.00% for the first five-week period beginning as of the week of the Petition Date, and (c) 10.00% for the first six-week period and all subsequent weeks of the period beginning as of the week of the Petition Date (the "*Cash Receipt Variance*");

2. the cumulative Cash Operating Disbursements may vary from the Budget by no more than the following: (a) 20.00% for the first four-week period (and each week thereof), beginning as of the week of the Petition Date, (b) 15.00% for the first five-week period beginning as of the week of the Petition Date, and (c) 10.00% for the first six-week period and all subsequent weeks of the period beginning as of the week of the Petition Date (the "*Cash Operating Variance*"); and

EXECUTION

|  |  |
|---|---|
|  | 3. the cumulative Cash Bankruptcy Disbursements shall not exceed at any time during the Budget Period the aggregate capped amount set forth in the Budget with respect thereto (the "***Cash Bankruptcy Disbursement Cap***"), subject to a variance of no more than 10% (the "***Cash Bankruptcy Disbursement Variance***" and together with the Cash Receipt Variance and the Cash Operating Variance, the "***Permitted Variances***"). |
|  | The DIP Loan Parties shall be deemed to be in compliance with the Budget for all purposes under this Binding Term Sheet, the DIP Loan Documents, and the Financing Orders unless, as of any applicable date of determination, the DIP Loan Parties' (x) cumulative Cash Receipts, (y) cumulative Cash Operating Disbursements, or (z) cumulative Bankruptcy Disbursements, as applicable, vary from the Budget by more than the applicable Permitted Variance as measured on any Testing Date; *provided, however*, that with respect to cumulative Cash Receipts, the DIP Loan Parties shall not be deemed to have failed to comply with the Budget unless the DIP Loan Parties' cumulative Cash Receipts fall beneath the amounts set forth in the Budget as measured on any two consecutive Testing Dates during the first four week period beginning as of the Petition Date. All references to compliance with the "Budget" in this Term Sheet shall be construed as being qualified by the phrase, "subject to Permitted Variances." |
|  | As further set forth below, after the first three weeks following the Petition Date, the Debtors shall provide the DIP Administrative Agent with weekly and cumulative variance reporting on a line item basis for Cash Receipts, Cash Operating Disbursements and Cash Bankruptcy Disbursements, which reporting shall (i) detail the variance, if any, of actual cash disbursements and actual cash receipts from the Budget and (ii) provide an explanation of any per line item variance greater than 5.00% (the "***Variance Report***"). |
| **Mandatory Prepayments:** | Mandatory prepayment of the DIP Loans shall be required: (i) upon the consummation of an Acceptable 363 Sale (as defined below), or (ii) upon the effectiveness of an Acceptable Plan (as defined below), as an alternative to a sale. |
| **DIP Obligations:** | As used herein, the term "***DIP Obligations***" means (a) the due and punctual payment by the Debtors of (i) the unpaid principal amount of and interest on (including interest accruing after the maturity of the DIP Loans and interest accruing after the commencement of the Chapter 11 Cases) the DIP Loans, as and when due, whether at maturity, by acceleration or otherwise, and (ii) all other monetary obligations, including advances, debts, liabilities, obligations, fees, costs, expenses and indemnities, whether primary, secondary, direct, |

4

EXECUTION

| | |
|---|---|
| | indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise, of the Debtors to the DIP Lenders under the DIP Loan Documents and the Financing Orders, and (b) the due and punctual payment and performance of all covenants, duties, agreements, obligations and liabilities of the Debtor to the DIP Lender under or pursuant to the DIP Loan Documents and the Financing Orders. |
| **Prepetition Obligations:** | As used herein, the term "**Prepetition Obligations**" means, as of the Petition Date, the indebtedness of the Debtors to the to the Prepetition Lenders under the Prepetition Credit Agreement and all other documents executed and delivered in connection therewith (collectively, the "**Prepetition Loan Documents**") in the approximate aggregate amount of $[147,100,000], which amount is the sum of: (i) principal in the amount of $107,551,191.90, plus (ii) accrued and unpaid interest in the amount of $2,322,806.99 (including interest at the Prepetition Default Rate in the amount of $250,952.78), plus (iii) Prepayment Premium[1] in the amount of $34,954,137.37, plus (iv) Back-End Facility Fee[2] in the amount of $2,151,023.84, plus (v) unreimbursed costs, fees and expenses in accordance with the Prepetition Loan Documents (collectively, the "**Prepetition Obligations**"). |
| **Cash Collateral:** | The Prepetition Lenders shall consent to the use of their "cash collateral" as defined in section 363(a) of the Bankruptcy Code (the "**Cash Collateral**"), all in accordance with the terms and conditions set forth in this Binding Term Sheet, the Financing Orders (as defined below), and the Budget; provided, that the DIP Loan Parties shall operate their cash management system in a manner that is the same as or substantially similar to their prepetition cash management system, including daily "sweeps" of cash from the DIP Loan Parties' revenue lock-box to their main operating account which shall continue in the same or substantially similar manner as prior to the Petition Date. |
| **Use of New Money DIP Loan Proceeds and Cash Collateral:** | The proceeds of the New Money DIP Loans and Cash Collateral shall be available to finance, in each case in accordance with the Budget (as defined below): <br><br> 1. working capital and general corporate purposes of the Debtors, <br><br> 2. the pursuit of an Acceptable 363 Sale (as defined below), and <br><br> 3. bankruptcy-related costs and expenses, subject to the Carve Out (as defined below). |

---

[1] Prepayment Premium calculated in accordance with Section 3.03(a) (i) (B) of the Prepetition Credit Agreement.
[2] Back-End Facility Fee is defined and set forth in the Fee Letter dated September 1, 2017.

EXECUTION

| | |
|---|---|
| **Initial Approval by the Bankruptcy Court:** | The use of Cash Collateral, the DIP Facility, this Binding Term Sheet and all terms and conditions set forth herein (collectively, the "***Transactions***") shall be subject to the entry in the Bankruptcy Court of an interim order, in form and substance acceptable to the DIP Administrative Agent in its sole and absolute discretion, approving the Transactions (the "***First Interim Order***). In the event that the Second Interim Order (as defined below) is not entered in the Bankruptcy Court on or prior to December 21, 2018, the consent of the Prepetition Lenders to the use of Cash Collateral shall automatically terminate. |
| **Documentation:** | Definitive financing documentation with respect to the DIP Loans satisfactory in form and substance to the DIP Secured Parties (the "***DIP Loan Documents***") shall be executed and delivered by the parties thereto on or prior to December 18, 2018, and shall be approved upon the entry in the Bankruptcy Court of a second interim order, in form and substance acceptable to the DIP Administrative Agent in its sole and absolute discretion, approving (among other things) the DIP Loan Documents (the "***Second Interim Order***"). |
| **Documentation Principles:** | The DIP Loan Documents shall, except as otherwise set forth herein, be based on and consistent with the Prepetition Credit Agreement and the other Prepetition Loan Documents, as modified by the terms set forth in this Binding Term Sheet and subject to (i) materiality qualifications and other exceptions that give effect to, permit and/or accommodate the structure of any Acceptable 363 Sale or Acceptable Plan, as applicable, (ii) modifications to reflect the status of the DIP Loan Parties as debtors-in-possession in the Chapter 11 Cases, and (iii) be negotiated in good faith within a reasonable (consistent with the term of this Binding Term Sheet) time period. This paragraph collectively referred to herein as the "***Documentation Principles***". |
| **Initial Funding, Roll Up and Prepetition Claim:** | Subject to the terms and conditions set forth in the DIP Loan Documents and this Binding Term Sheet, including the Conditions Precedent (defined below): |
| | 1. Upon the entry in the Bankruptcy Court of the Second Interim Order, in form and substance acceptable to the DIP Administrative Agent in its sole and absolute discretion, approving the DIP Loans, the continued use of Cash Collateral in accordance with this Binding Term Sheet, and providing Adequate Protection for the Prepetition Lenders in accordance with this Binding Term Sheet: (i) $11,500,000 of the New Money DIP Loans will be advanced for the liquidity needs of the Debtors in accordance with the Budget (the "***First Advance***"), and (ii) 100% of the Rollup DIP Loans will be used to discharge, on a dollar for dollar basis, all outstanding Prepetition Obligations, other than the Prepayment Premium and the Back-End Facility Fee. The indebtedness represented by the Prepayment Premium and the Back-End Facility Fee, including all accrued and unpaid |

EXECUTION

| | |
|---|---|
| | postpetition interest from the Petition Date through and including the date of the entry of the Second interim Order (and as otherwise provided in the Second Interim Order), shall constitute a prepetition secured claim of the Prepetition Administrative Agent on behalf of the Prepetition Lenders (the "***Remaining Prepetition Secured Claim***").<br><br>2. The remaining $33,500,000 of New Money DIP Loans will be advanced for the liquidity needs of the Debtors in accordance with the Budget (the "***Second Advance***") upon the entry in the Bankruptcy Court of a final order, in form and substance acceptable to the DIP Administrative Agent in its sole and absolute discretion, approving (among other things) the DIP Loans (the "***Final Order***" and collectively with the First Interim Order and the Second Interim order, the "***Financing Orders***"). |
| Security: | As security for the DIP Obligations, each Debtor shall grant to the DIP Lenders a security interest in and continuing lien on all of such Debtor's right, title and interest in, to and under all the Debtor's assets, including, but not limited to the following, in each case, whether now owned or existing or hereafter acquired, created or arising and wherever located (all of which being hereafter collectively referred to as the "***DIP Collateral***"): all assets and property of each Debtor and its estate, real or personal, tangible or intangible, now owned or hereafter acquired, whether arising before or after the Petition Date, including, without limitation, all contracts, contract rights, licenses, general intangibles, instruments, equipment, accounts, documents, goods, inventory, fixtures, documents, cash, cash equivalents, chattel paper, letters of credit and letter of credit rights, investment property, commercial tort claims, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations and instruments, all interests in leaseholds and real properties, all patents, copyrights, trademarks, trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), all equity interests, all books and records relating to the foregoing, all other personal and real property of the Debtor, and all other collateral pledged under the DIP Loan Documents, any actions under sections 544, 545, 547, 548 and 550 of the Bankruptcy Code, other than any such actions acquired by the purchaser under an Acceptable 363 Sale (the "***Avoidance Actions***"), and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (in each case as the foregoing are defined in the Uniform Commercial Code as in effect from time to time in the State of Delaware (and, if defined in more than one Article of such Uniform Commercial Code, shall have the meaning given in Article 9 thereof)); provided, that (i) the DIP Lender shall receive perfected security interests in and a lien on Avoidance Actions and their proceeds only upon entry of the Final Order; and (ii) the DIP Collateral shall not include the |

7

EXECUTION

| | |
|---|---|
| | Company's directors and officers insurance policy or any proceeds thereof. |
| Priority and Liens: | All of the claims of the DIP Administrative Agent and the DIP Lenders under the DIP Facility with respect to the DIP Loans and the DIP Obligations shall at all times: |
| | 1. pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority claim status in the Chapter 11 Cases (which claims shall be payable from and have recourse to all DIP Collateral); |
| | 2. pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all DIP Collateral other than all property of the Debtors that is subject to valid and perfected liens in existence at the time of the commencement of the Chapter 11 Cases or subject to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code (the "*Prior Senior Liens*"); |
| | 3. pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all property of the Debtors that is subject to a Prior Senior Lien; and |
| | 4. pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by a perfected first priority, senior priming lien on all of the property of the Debtors (including, without limitation, inventory, receivables, equipment, machinery, intellectual property, general intangibles, real property, capital stock of subsidiaries, membership interests in limited liability companies) that is subject to the existing liens that secure the obligations of the Debtors to the Prepetition Lenders under or in connection with the Prepetition Loan Documents and the Prepetition Obligations. |
| Adequate Protection: | The Second Interim Order shall provide, as adequate protection for the use of the collateral securing the Remaining Prepetition Secured Claim and the priming of the liens and security interests granted to the Prepetition Secured Parties under the Prepetition Loan Documents (the "*Prepetition Liens*"), the Prepetition Lenders shall be entitled to receive, to the extent of any use of, or diminution in the value of, the collateral securing the Prepetition Obligations (the "*Prepetition Obligations*"): |
| | 1. superpriority claim status; |
| | 2. replacement liens on all DIP Collateral, junior only to the liens of the DIP Administrative Agent and the DIP Lenders, but subject to any Prior Senior Liens; |

EXECUTION

|  | 3. commencing on the date upon which the Second Interim Order is entered in the Bankruptcy Court, payment on a monthly basis of postpetition interest accruing from such date at the Default Rate specified in the Prepetition Credit Agreement; and<br><br>4. reimbursement of all fees, costs and expenses incurred in connection with defending the validity and enforceability of the Prepetition Obligations, the Prepetition Liens (as defined below) or the Remaining Prepetition Secured Claim. |
| --- | --- |
| Carve Out: | The liens on and security interests in the DIP Collateral and the super-priority administrative expense claims shall be subject to the *"Carve Out."* For purposes hereof, the "Carve Out" means: (i) all unpaid fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code, (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under Section 729(b) of the Bankruptcy Code (the *"Chapter 7 Trustee Fee Cap"*); and (iii) in the event of the occurrence and during the continuance of an Event of Default, the payment of documented unpaid professional fees and disbursements incurred by the Borrower and any statutory committees appointed in the Chapter 11 Cases, in each case to the extent allowed by the Court, in an aggregate amount not to exceed all accrued and unpaid professional fees and disbursements owing as of the date of the Event of Default (whether allowed as of such date or subsequent thereto), plus $2,500,000; provided, that (a) no portion of the Carve Out shall be utilized for the payment of professional fees and disbursements incurred in connection with any challenge to (i) the amount, extent, priority, validity, perfection or enforcement of the indebtedness of, or other claims against, the Debtors owing to the DIP Lenders or the Prepetition Lenders or (ii) the collateral securing such indebtedness or the perfection, priority or validity of the liens granted in favor of the DIP Lenders or the Prepetition Lenders with respect thereto, and (b) the Carve Out shall not reduce the amounts payable to the DIP Lenders under the DIP Loan Documents and to the Prepetition Lenders under the Prepetition Loan Documents. |
| Acceptable 363 Sale: | As used herein, the term *"Acceptable 363 Sale"* means a sale of all or substantially all of the Debtor's assets pursuant to Section 363 of the Bankruptcy Code, subject to the following conditions:<br><br>1. the DIP Administrative Agent shall have reviewed and approved in writing any bid procedures, "stalking horse" asset purchase agreement (the *"Stalking Horse Purchase Agreement"*), or any other related agreement; it being understood and agreed that the DIP Administrative Agent has reviewed and approved the form of |

9

EXECUTION

| | |
|---|---|
| | Stalking Horse Purchase Agreement with Bausch Health Companies Inc., a corporation organized under the laws of British Columbia, Canada ("**BH**"), and its wholly owned subsidiary Bausch Health Ireland Limited, a private limited company organized under the laws of Ireland (the "**BH APA**"), the agreements, schedules and exhibits thereto, and bid procedures related to it presented to the DIP Administrative Agent prior to the Petition Date;<br><br>2.  the sale order shall provide for the indefeasible repayment in full in cash of the DIP Facility upon consummation of the sale; and<br><br>3.  the sale shall be consummated not later than April 9, 2019. |
| Acceptable Plan: | As used herein, the term "**Acceptable Plan**" means a plan of reorganization or liquidation for each of the Chapter 11 Cases that:<br><br>1.  Is confirmed on or prior to March 15, 2019; provided, that the closing of the BH APA (or the asset purchase agreement of a higher bidder pursuant to an auction), has occurred on or before April 9, 2019.<br><br>2.  Either: (a) Pays the Remaining Prepetition Secured Claim (estimated to be $37.1 million) indefeasibly in full in cash on the effective date of such Acceptable Plan; **OR**<br><br>    (b) Offers to the class of unsecured creditors, if they vote to accept such Acceptable Plan, the amounts set forth below, and satisfies the Remaining Prepetition Secured Claim by the applicable amounts below:<br><br>  (i)  If there is a "shortfall" (i.e. the amount of remaining sale proceeds held for distribution is less than $37.1 million per the Budget) of $0.00 to $5 million, then the Prepetition Secured Parties shall receive $20 million in cash to satisfy the Remaining Prepetition Claim and $12 million in cash shall be made available for distributions to general unsecured creditors;<br><br>  (ii)  If there is no shortfall but the amount of remaining sale proceeds exceeds $37.1 million then the excess proceeds up to $5 million shall be shared 75% to the Prepetition Secured Lenders and 25% to the general unsecured creditors, such that the Prepetition Secured Parties would receive a total up to $24 million in cash to satisfy in full the Remaining Prepetition Secured Claim and the general unsecured creditors up to $13 million in cash; and<br><br>  (iii)  If there is no shortfall but the amount of remaining sale proceeds exceeds $42.1 million, then such excess proceeds shall be shared 50/50 as between the Prepetition Secured Lenders and the general unsecured |

10

EXECUTION

<table>
<tr>
<td></td>
<td>creditors until, as applicable, the Prepetition Secured Parties have received $37.1 million cash to satisfy the Remaining Prepetition Secured Claim and the general unsecured creditors have received payment in the full amount of their allowed claims.

(For the avoidance of doubt, a chart illustrating each waterfall scenario is attached as <u>Exhibit C</u>.)

3.    Assigns to the Debtors the Avoidance Actions (and/or proceeds thereof) given to the Prepetition Secured Lenders as adequate protection.

4.    Contains, to the maximum extent permissible by law, releases and other exculpatory provisions for the DIP Secured Parties, Prepetition Secured Parties and each of their respective affiliates in form and substance satisfactory to the DIP Administrative Agent and the Prepetition Administrative Agent in their sole and absolute discretion.

5.    Becomes effective on or before April 10, 2019.

6.    Is otherwise in form and substance reasonably satisfactory to the DIP Administrative Agent with respect to any provision that may adversely affect the DIP Secured Parties and/or the Prepetition Secured Parties.</td>
</tr>
<tr>
<td>Credit Bidding:</td>
<td>Each of the Financing Orders and the DIP Loan Documents shall provide that, in connection with an Acceptable 363 Sale or an Acceptable Plan that provides for the sale of the DIP Collateral, the DIP Administrative Agent and the Prepetition Administrative Agent shall have the right to credit bid up to and including the full amount of the DIP Obligations <u>plus</u> the full amount of the Remaining Prepetition Secured Claim for the DIP Collateral. Any such credit bid may provide for the assignment of the right to purchase the acquired assets to a newly formed acquisition vehicle. Notwithstanding the foregoing, the DIP Administrative Agent and the Prepetition Administrative Agent shall not be entitled to exercise such right to credit bid unless and until the BH APA is terminated or modified in a manner adverse in any material respect to the DIP Secured Parties.</td>
</tr>
<tr>
<td>Marshalling and Waiver of 506(c) Claims 552(b) Rights:</td>
<td>(i) Each of the Financing Orders shall provide, effective upon the entry of the Final Order, that in no event shall the DIP Administrative Agent, the DIP Lenders, the Prepetition Administrative Agent, or the Prepetition Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral (as defined below), (ii) the First Interim Order shall approve the waiver of all 506(c) claims on account of amounts covered by the Carve-Out, and (iii) the Final Order shall</td>
</tr>
</table>

11

EXECUTION

| | |
|---|---|
| | approve the waiver of all 506(c) claims and similar rights under 552(b). |
| **Automatic Stay:** | Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Financing Orders, as the case may be, upon the Maturity Date (whether by acceleration or otherwise), the DIP Secured Parties shall be entitled to immediate payment of all obligations under the DIP Facility and to enforce the remedies provided for under the DIP Loan Documents or under applicable law, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court, but subject to the following conditions (the "*Waiting Period Procedures*"):<br><br>1.  The DIP Secured Parties shall notify the DIP Loan Parties that the Maturity Date has occurred (such notice, a "*Maturity Date Notice*" and the date of any such notice, the "*Maturity Date Notice Date*"). A copy of any Maturity Date Notice shall be provided by email to the Debtors' counsel.<br><br>2.  A waiting period shall commence upon delivery of the Maturity Date Notice and shall expire four (4) business days after the Maturity Date Notice Date (the "*Waiting Period*"). During the Waiting Period, the Debtors shall be entitled to seek an emergency hearing before the Bankruptcy Court for the sole purpose of contesting the occurrence of a Maturity Date (including, for the avoidance of doubt, contesting the occurrence of any breach, default, or Event of Default alleged to underlie the occurrence of the Maturity Date.<br><br>3.  During the Waiting Period, the Debtors may continue to use the DIP Collateral, including the Cash Collateral.<br><br>None of the DIP Secured Parties or the Prepetition Secured Parties shall object to any motion filed by the Debtors during the Waiting Period seeking such expedited hearing nor seek to reduce such Waiting Period. |
| **Conditions Precedent:** | The several obligations of the DIP Lenders to make the DIP Loans shall be conditioned on the satisfaction or waiver of the following:<br><br>1.  with respect to the First Advance of the New Money Dip Loans and the "Roll Up":<br><br>    a.  the filing by the Debtors of an Acceptable Plan and disclosure statement in the Bankruptcy Court not later than December 21, 2018;<br>    b.  definitive DIP Loan Documents in form and substance acceptable to the DIP Administrative Agent in its sole and absolute discretion, shall have been executed and delivered by the parties thereto on or prior to December 18, 2018; |

EXECUTION

| | |
|---|---|
| | c. the entry by the Bankruptcy Court of the Second Interim Order in form and substance acceptable to the DIP Administrative Agent in its sole and absolute discretion; and |
| | d. the Debtors shall have been at all times in compliance with the Budget (subject to the Permitted Variances). |
| | 2. with respect to the Second Advance of the New Money DIP Loans, the entry of the Final Order in form and substance acceptable to the DIP Administrative Agent in its sole and absolute discretion; |
| | 3. with respect to the BH APA, the Bid Procedures Motion, the Sale Motion and the respective orders of the Bankruptcy Court related thereto shall not have been modified or amended in a manner adverse in any material respects to the rights and interests of the DIP Secured Parties without the prior written consent of the DIP Administrative Agent in its sole and absolute discretion; and |
| | 4. other than the Designated Defaults or a Liquidity Covenant Default (as such terms are defined in the Limited Forbearance Agreement dated November 19, 2018, among the Debtors and the Prepetition Secured Parties, as amended by Amendment to Limited Forbearance Agreement dated December 5, 2018) and the event of default under the Prepetition Credit Agreement resulting from the Debtors filing for bankruptcy (and any default or other event of default arising therefrom or related thereto), no Default or Event of Default shall have occurred. |
| **Representations and Warranties:** | The representations and warranties of the DIP Loan Parties under the DIP Loan Documents shall be substantially similar to those set forth in the Prepetition Credit Agreement, subject to the Documentation Principles, and include the following, in each case subject to certain exceptions, qualifications, and carve outs to be set forth in the DIP Loan Documents and substantially consistent with the Documentation Principles: |
| | a. The Debtor is duly organized, validly existing, in good standing and qualified to do business in the state of its organization. |
| | b. As of the Petition Date, the approximate aggregate outstanding amount of the Prepetition Obligations is [$147,100,000], which amount is the sum of: (i) principal in the amount of $107,551,191.90, plus (ii) accrued and unpaid interest in the amount of $2,322,806.99 (including interest at |

EXECUTION

|  |  |
|---|---|
|  | the Prepetition Default Rate in the amount of $250,952.8), _plus_ (iii) Prepayment Premium in the amount of $34,954,137.37, _plus_ (iv) Back-End Facility Fee in the amount of $2,151,023.84, _plus_ (v) unreimbursed costs, fees and expenses in accordance with the Prepetition Loan Documents.<br><br>c. The stipulations of the Debtors in each of the Financing Orders are true, accurate and correct.<br><br>d. The Debtor has full power and authority to operate and conduct its business, to execute, deliver and perform this Binding Term Sheet and associated documents and to incur obligations under this Binding Term Sheet, the DIP Loan Documents and the Financing Orders.<br><br>e. Neither the DIP Obligations nor the Prepetition Obligations shall be subject to setoff or recoupment or any such rights under Bankruptcy Code section 553 or otherwise with respect to any claim the Debtor may have against the DIP Lender arising on or before the Petition Date.<br><br>f. All material contracts and agreements with critical Vendors (the "**_Vendor Contracts_**") and key customers (the "**_Customer Contracts_**") shall remain in full force and effect and no defaults or termination events exist or have been asserted with respect to any such contracts, other than a default resulting from the commencement of the Chapter 11 Cases, or the insolvency or financial condition of the DIP Loan Parties; _provided,_ that no such default shall result in a termination of the (i) BH APA or (ii) any material Vendor Contracts or Customer Contracts. |
| **Affirmative Covenants:** | The affirmative covenants of the DIP Loan Parties under the DIP Loan Documents shall be limited to the following, in each case subject to certain exceptions, qualifications, and carve outs to be set forth in the DIP Loan Documents and substantially consistent with the Documentation Principles:<br><br>a. use the advances made under the DIP Facility and/or the Cash Collateral only for the purposes set forth herein and identified in the Budget, except as would not cause the Borrower's cash disbursements on an aggregate basis for operating expenses to vary from the Budget by more than the applicable Operating Variance, and shall not use such funds to commence any action against the DIP Administrative Agent, the DIP Lenders or their respective affiliates, employees, directors, officers or principals; |

14

|  |  |
|---|---|
|  | b. permit the DIP Secured Parties and their representatives and designees to visit and inspect the properties, books and records of the Debtor upon reasonable notice at the Debtor's expense;

c. subject to the Budget, pay all taxes, assessments, contributions and other governmental charges imposed upon any Debtor or any of its properties or assets as they become due and payable, to the extent payment and/or enforcement thereof is not stayed as a result of the Chapter 11 Cases;

d. maintain in good working order all material properties used in the Borrower's business, as and to the extent in good working order as of the Petition Date;

e. maintain insurance with respect to the business and property of the Debtors against loss of the kind and in the amounts maintained by the Debtors as of the Petition Date;

f. comply in all material respects with the requirements of all applicable laws;

g. cause its financial professionals to provide the DIP Secured Parties and the Prepetition Secured Parties with detailed weekly status reports regarding the post-petition marketing efforts and provide any information regarding the Acceptable Sale that the DIP Lenders/Prepetition Lenders may request;

h. comply in all material respects with the schedule of Case Milestones (as defined below);

i. promptly upon request execute and deliver such documents and do such other acts as the DIP Secured Parties may reasonably request in connection with the DIP Facility, and in accordance with the DIP Loan Documents (including but not limited to execution of any additional security documents that may be required); and

j. comply with all obligations of the Debtors under the DIP Loan Documents and the Financing Orders. |
| **Negative Covenants:** | The negative covenants of the DIP Loan Parties under the DIP Loan Documents shall be limited to the following, in each case subject to certain exceptions, qualifications, and carve outs to be set forth in the DIP Loan Documents and substantially consistent with the Documentation Principles:

a. incur any indebtedness (other than the borrowings under the DIP Facility and obligations permitted to be incurred under |

15

EXECUTION

|   |   |
|---|---|
|   | the Budget, any other indebtedness permitted to be incurred by the DIP Lenders and the Bankruptcy Court, and any unsecured obligations incurred in the ordinary course of business by the Debtors and permitted to be incurred by the Budget);<br><br>b.   incur any liens other than liens permitted in writing by the DIP Administrative Agent in its sole and absolute discretion;<br><br>c.   make any investments in any person or make any loan to any person (other than as permitted in writing by the DIP Administrative Agent in its sole and absolute discretion);<br><br>d.   engage in any business other than the business engaged in by the Debtors on the Petition Date;<br><br>e.   sell any assets outside the ordinary course of business (i) except with the written consent of the DIP Administrative Agent in its sole and absolute discretion, or (ii) unless such sale results in the indefeasible payment in full in cash of the DIP Obligations;<br><br>f.   acquire assets, merge, consolidate or dissolve without the consent of the DIP Administrative Agent in its sole and absolute discretion;<br><br>g.   terminate or agree to any modification to any organizational documents of any Debtor except with the written consent of the DIP Administrative Agent in its sole and absolute discretion;<br><br>h.   engage in any transactions with insiders without the written consent of DIP Administrative Agent in its sole and absolute discretion, except as set forth in the Budget;<br><br>i.   use proceeds of the Carve Out, DIP Collateral or Prepetition Collateral except as set forth herein, including, but not limited to, investigate or challenge the validity, perfection, priority, extent, or enforceability of Prepetition Liens; <u>provided</u>, that not more than $75,000 of the proceeds of the Carve Out, DIP Collateral or Prepetition Collateral may be set aside for use by any statutory committees appointed in the Chapter 11 Cases for purposes of investigating such validity, perfection, priority, extent or enforceability of Prepetition Liens |

16

EXECUTION

| | |
|---|---|
| | j. amend the any of the Financing Orders or the Budget without the DIP Lenders' consent; |
| | k. agree to entry of any order precluding or modifying the DIP Lenders' and Prepetition Lenders' rights to "credit bid" up to the full amount of the outstanding DIP Loans plus the Remaining Prepetition Secured Claim for the Debtor's assets; or |
| | l. other than the Carve Out, consent to the granting of adequate protection payments or liens, super-priority administrative expense claims or liens having priority senior or *pari passu* with those granted to the DIP Lenders or Prepetition Lenders, except as permitted by the DIP Loan Documents. |
| Case Milestones: | The milestone schedule with which the Debtors shall comply, for the purpose of ensuring the timely pursuit and consummation of an Acceptable 363 Sale on or before April 9, 2019 or the consummation of an Acceptable Plan on or before April 10, 2019, shall be as set forth on Exhibit D hereto. |
| Events of Default: | The Events of Default under the DIP Loan Documents shall be substantially similar to those set forth in the Prepetition Credit Agreement, subject to the Documentation Principles, and include the following, in each case subject to certain exceptions, qualifications, cure periods, and carve-outs to be set forth in the DIP Loan Documents and substantially consistent with the Documentation Principles:

a. The failure by the Debtors to perform or comply with any term, condition, covenant or obligation (including a payment obligation) contained in the DIP Loan Documents or any of the Financing Orders.

b. The cessation of the DIP Facility to be in full force and effect or the DIP Facility being declared by the Bankruptcy Court to be null and void or the validity or enforceability of the DIP Facility being contested by any Debtor or any Debtor denying in writing that it has any further liability or obligation under the DIP Facility or the DIP Lenders ceasing to have the benefit of the liens granted by the Financing Orders.

c. The entry of any order of the Bankruptcy Court granting to any third party a claim or lien *pari passu* with or senior to that granted to the DIP Lenders hereunder.

d. Until the DIP Obligations are repaid in full, the Debtors shall make any payment of principal or interest or otherwise on |

17

account of any indebtedness for borrowed money or payables other than the DIP Obligations under the DIP Facility or other than in accordance with the Budget approved by the DIP Administrative Agent in its sole and absolute discretion.

e. The Debtor fails to make any interest payments due under the any of the Financing Orders within three (3) business days of when due.

f. Failure of the Debtor to meet any of the applicable Case Milestones (other than as the result of any action or omission of the DIP Secured Parties).

g. Failure of the Debtors to maintain cash disbursements and collections within the Permitted Variance under the Budget.

h. The entry of an order converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or the Debtors filing a motion or not opposing a motion seeking such relief.

i. The entry of an order dismissing the Chapter 11 Cases, or the Debtors filing a motion or not opposing a motion seeking such relief without the consent of the DIP Lenders.

j. The entry of an order in the Chapter 11 Cases appointing any examiner having expanded powers or a trustee to operate all or any part of the Borrower's business.

k. The entry of an order in the Chapter 11 Cases granting relief from the automatic stay so as to allow a third party or third parties to proceed against any material (in the DIP Administrative Agent's sole discretion) property, including the collateral pledged pursuant to the DIP Facility and the Prepetition Liens, of the Debtor or to commence or continue any prepetition litigation against the Debtors involving potential liability not covered by insurance, in excess of $1,000,000 in the aggregate.

l. The entry of an order in the Chapter 11 Cases charging any of the DIP Collateral or Prepetition Collateral under Section 506(c) of the Bankruptcy Code against the DIP Secured Parties or Prepetition Secured Parties or the commencement of other actions by any DIP Loan Party or affiliate thereof that challenges the rights and remedies of any of the DIP Secured Parties under the DIP Facility or Prepetition Secured Parties under the Prepetition Credit Agreement in any of the Chapter 11 Cases or in a manner inconsistent with the DIP Loan Documents.

18

EXECUTION

m.  Without the prior written consent of the Agent and other than in respect of the DIP Facility and the Carve-Out, the bringing of any motion or taking of any action seeking entry of an order, or the entry of an order by the Bankruptcy Court, in any of the Chapter 11 Cases (i) granting superpriority administrative expense status to any claim *pari passu* with or senior to the claims of the DIP Secured Parties or the Prepetition Secured Parties, (ii) permitting the Debtors to obtain financing under Section 364 of the Bankruptcy Code, (iii) permitting the Debtors to grant security interests or liens under Section 364 of the Bankruptcy Code, (iv) permitting the Debtors to use cash collateral under Section 364 of the Bankruptcy Code, or (v) authorizing the Debtors to take other actions adverse to any DIP Credit Party or any Prepetition Credit Party or their rights and remedies under the DIP Loan Documents, the Prepetition Credit Agreement or their interest in Prepetition Collateral or the DIP Collateral under Section 364 of the Bankruptcy Code.

n.  The entry of any order terminating any Debtor's exclusive right to file a plan of reorganization or the expiration of any Debtor's exclusive right to file a plan of reorganization.

o.  There shall arise any superpriority claim in the Chapter 11 Case which is *pari passu* with or senior to the priority of the claims of the DIP Secured Parties, except with respect to the Carve-Out and as set forth in the DIP Loan Documents.

p.  The entry of any order in the Chapter 11 Cases which provides adequate protection, or the granting by any DIP Loan Party of similar relief in favor of any one or more of any DIP Loan Party's prepetition creditors, contrary to the terms and conditions of any of the Financing Orders or the DIP Loan Documents.

q.  The DIP Loan Parties or any of their subsidiaries or affiliates, or any person claiming by or through any of the foregoing, shall obtain court authorization to commence, or shall commence, join in, assist, acquiesce to, or otherwise participate as an adverse party in any suit or other proceeding against any DIP Credit Party or any Prepetition Credit Party regarding the DIP Facility or the Prepetition Secured Parties regarding the Prepetition Credit Agreement.

r.  A plan of reorganization shall be filed by the Debtors, or be confirmed in any of the Chapter 11 Cases that is not an Acceptable Plan, or any order shall be entered which dismisses any of the Chapter 11 Cases and which order (i) does not provide for termination of the unused commitments under the DIP Facility and payment in full in cash of the DIP Loan Parties' obligations under the DIP Facility, (ii) does not

19

EXECUTION

provide, to the extent permitted by applicable law, for release and exculpatory provisions relating to the DIP Secured Parties and the Prepetition Secured Parties that are satisfactory to the DIP Administrative Agent and the Prepetition Administrative Agent in their sole and absolute discretion and (iii) is not otherwise reasonably satisfactory to the DIP Administrative Agent and the Prepetition Administrative Agent in their sole and absolute discretion, or any of the DIP Loan Parties or any of their subsidiaries or affiliates, shall file, propose, support, or fail to contest in good faith the filing or confirmation of such a plan or the entry of such an order.

s.  Any judgment or order as to liability not covered by insurance, or debt for the payment of money, in excess of $1,000,000 shall be rendered against the Debtors (individually or in the aggregate), and the enforcement thereof shall not have been stayed.

t.  The Bankruptcy Court shall enter an order authorizing the sale of all or substantially all of the assets of the Debtors unless (i) such order contemplates indefeasible repayment in full in cash of the DIP Facility upon consummation of the sale or (ii) consummated as part of an Acceptable Plan.

u.  The entry of an order in the Chapter 11 Cases avoiding or permitting recovery of any portion of the payments made on account of the obligations under the DIP Facility, the DIP Loan Documents, the Prepetition Credit Agreement or any related documents or the taking of any action by any DIP Loan Party to challenge, support or encourage a challenge of any such payments.

v.  The Final Order and the terms thereof shall cease to create a valid and perfected security interest and lien on the DIP Collateral.

w.  The Final Order does not include a waiver, in form and substance satisfactory to the Agent in its sole and absolute discretion, of (i) the right to surcharge the Prepetition Collateral and/or the DIP Collateral under Section 506(c) of the Bankruptcy Code; (ii) any ability to limit the extension under Section 552(b) of the Bankruptcy Code of the liens of the Prepetition Administrative Agent on the Prepetition Collateral to any proceeds, products, offspring, or profits of the Prepetition Collateral acquired by any DIP Loan Party after the Petition Date and (iii) the doctrine of marshalling.

x.  The filing or support of any pleading by any DIP Loan Party (or any affiliate thereof) seeking, or otherwise consenting to, any relief the granting of which could reasonably be expected to result in the occurrence of an Event of Default.

y.  Any non-monetary, judgment or order with respect to a post-petition event shall be rendered against any Debtor which does or would reasonably be expected to (i) cause a material adverse change in the financial condition, business, prospects, operations or assets of the Debtors as a whole or (ii) have a material adverse effect on the rights and remedies of the DIP Lenders, and, in each case, there shall be a period of ten (10) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect.

z.  Any of the Financing Orders being amended or modified without the consent of the DIP Lenders.

aa. Any Vendor Contract or Customer Contract is terminated or modified without the prior written consent of the DIP Administrative Agent in its sole and absolute discretion, and such modification or termination does or would reasonably be expected to (i) cause a material adverse change in the financial condition, business, prospects, operations or assets of the Debtors as a whole, (ii) have a material adverse effect on the rights and remedies of the DIP Secured Parties, or (iii) result in a termination of the BH APA.

bb. The commencement of any investigation by, or issuance of any recall order by, the U.S. Food and Drug Administration, and such FDA investigation or recall order does or would reasonably be expected to (i) cause a material adverse change in the financial condition, business, prospects, operations or assets of the Debtors as a whole, (ii) have a material adverse effect on the rights and remedies of the DIP Secured Parties, or (iii) result in a termination of the BH APA.

cc. The commencement of any investigation of any Debtor by any federal or state agency or other governmental or judicial entity, and such investigation does or would reasonably be expected to (i) cause a material adverse change in the financial condition, business, prospects, operations or assets of the Debtors as a whole, (ii) have a material adverse effect on the rights and remedies of the DIP Secured Parties, or (iii) result in a termination of the BH APA.

dd. The issuance by the Internal Revenue Service or any state tax authority of one or more deficiency notices exceeding, in the aggregate, $1,000,000 at any time.

ee. The closing of an Acceptable 363 Sale shall not have occurred on or prior to March 31, 2019, and the Budget shall not have been modified by the DIP Loan Parties (with the consent of

| | |
|---|---|
| | the DIP Administrative Agent in its sole an absolute discretion) to reflect and forecast the DIP Loan Parties' Cash Receipts, Cash Operating Disbursements and Cash Bankruptcy Disbursements for the period commencing on April 1, 2019 through and including April 10, 2019 (subject to Permitted Variances). |
| Remedies: | Notwithstanding the provisions of Section 362 of the Bankruptcy Code, but subject to the Waiting Period Procedures and any other applicable provisions of the Financing Orders, as the case may be, if any Event of Default occurs and is continuing, the DIP Secured Parties may take any or all of the following actions:<br><br>a.  declare by a Maturity Date Notice the commitment of the DIP Lenders to make Loans and consent to use of Cash Collateral to be terminated, whereupon such commitment and consent shall be terminated;<br><br>b.  declare a Maturity Date Notice  the unpaid amount of the DIP Obligations and the Prepetition Obligations, all interest accrued and unpaid thereon, and all other amounts owing or payable under the DIP Loan Documents, the Prepetition Loan Documents, this Binding Term Sheet and the Financing Orders;<br><br>c.   to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Debtor; or<br><br>d.  take any other action or exercise any other right or remedy (including, without limitation, with respect to the liens in favor of the DIP Administrative Agent and the DIP Lenders) permitted under the Dip Loan Documents, or by applicable law. |
| **Expenses and Indemnification:** | The DIP Administrative Agent and the DIP Lenders (and their affiliates and respective officers, directors, employees, advisors and agents) (each such person, an "*Indemnitee*") will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the gross negligence or willful misconduct of the relevant indemnified person. Such indemnity shall not be available (i) to the extent arising from a material breach of any obligation of such Indemnitee under the DIP Loan Documents or (ii) to the extent arising out of any loss, claim, damage, liability or expense that does not involve an act or omission of the DIP Loan Parties and that is brought by an Indemnitee against another Indemnitee (other than claims against an Indemnitee in its |

22

EXECUTION

| | capacity or in fulfilling its role as DIP Administrative Agent or any similar role under the DIP Loan Documents). |
|---|---|
| **Governing Law:** | New York. |

*{Signatures follow.}*

23

**IN WITNESS WHEREOF**, the parties hereto have caused this Binding Term Sheet to be executed as of the date first set forth above.


**DIP LOAN PARTIES:**

**SYNERGY PHARMACEUTICALS INC.**, as Borrower

By: _____

Name:    Gary G. Gemignani

Title:    EVP, Chief Financial Officer


**SYNERGY ADVANCED PHARMACEUTICALS, INC.**, as Guarantor

By: _____

Name:    Gary G. Gemignani

Title:    EVP, Chief Financial Officer

24

EXECUTION

**CRG SERVICING LLC,** as DIP Administrative Agent

By _____
    Nathan Hukill
    President


**DIP LENDER**S:

**CRG PARTNERS III L.P.**
    By CRG PARTNERS III GP L.P., its General Partner
        By CRG PARTNERS III GP LLC, its General Partner

        By _____
          Nathan Hukill
          Authorized Signatory


**CRG PARTNERS III (CAYMAN) UNLEV AIV I L.P.**
    By CRG PARTNERS III (CAYMAN) GP L.P., its General Partner
        By CRG PARTNERS III GP LLC, its General Partner

        By _____
          Nathan Hukill
          Authorized Signatory

    Witness: _____
    Name: Nicole Nesson


**CRG PARTNERS III–PARALLEL FUND "A" L.P.**
    By CRG PARTNERS III–PARALLEL FUND "A" GP L.P., its General Partner
        By CRG PARTNERS III GP LLC, its General Partner

        By _____
          Nathan Hukill
          Authorized Signatory


**CRG PARTNERS III–PARALLEL FUND "B" L.P.**
    By CRG PARTNERS III–PARALLEL FUND "B" GP L.P., its General Partner
        By CRG PARTNERS III GP LLC, its General Partner

        By _____
          Nathan Hukill
          Authorized Signatory

25

EXECUTION

**CRG PARTNERS III (CAYMAN) LEV AIV I L.P.**
   By CRG PARTNERS III (CAYMAN) GP L.P., its General Partner
   By CRG PARTNERS III GP LLC, its General Partner

By _____
   Nathan Hukill
   Authorized Signatory

Witness: _____
Name: Nicole Nesson

**CRG ISSUER 2017-1**
   By CRG SERVICING LLC, acting by power of attorney

By _____
   Nathan Hukill
   Authorized Signatory

26

EXECUTION

## EXHIBIT A: DIP LENDERS AND COMMITMENTS

| Lender | $ Amount | Proportionate Share |
|---|---|---|
| CRG Partners III L.P. | 7,618,864 | 4.919% |
| **CRG Partners III (Cayman) Unlev AIV I L.P.** | **7,743,700** | 5.000% |
| **CRG Partners III – Parallel Fund "A" L.P.** | 12,497,080 | **8.069%** |
| CRG Partners III – Parallel Fund "B" L.P. | 18,000,000 | 11.622% |
| **CRG Partners III (Cayman) Lev AIV I L.P.** | 13,500,000 | **8.717%** |
| CRG Issuer 2017-1 | 95,514,355 | 61.672% |
| **Total** | 154,873,999 | **100.000%** |

27

## EXHIBIT B: BUDGET

*Prepared at the Direction of Counsel*
*Privileged and Confidential*
*DRAFT - Subject to Material Change*
*For Professional Eyes ONLY*

($ in Thousands)

| Fiscal Year: | 2018 | 2018 | 2018 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2018-2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ended: | 12/14/18 | 12/21/18 | 12/28/18 | 01/04/19 | 01/11/19 | 01/18/19 | 01/25/19 | 02/01/19 | 02/08/19 | 02/15/19 | 02/22/19 | 03/01/19 | 03/08/19 | 03/08/19 |
| Actual / Forecast: | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| Post-Petition Week: | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | Total |

**13-Week Cash Flow Budget**

**Operating Receipts**

| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sales Receipts | $ 1,039 | $ 1,712 | $ 1,806 | $ 1,891 | $ 1,766 | $ 1,766 | $ 1,766 | $ 1,766 | $ 1,766 | $ 1,766 | $ 1,766 | $ 1,766 | $ - | $ 20,579 |
| Other Receipts | - | - | - | 40 | - | - | - | 40 | - | - | - | 40 | - | 120 |
| **Total Operating Receipts** | $ 1,039 | $ 1,712 | $ 1,806 | $ 1,931 | $ 1,766 | $ 1,766 | $ 1,766 | $ 1,806 | $ 1,766 | $ 1,766 | $ 1,766 | $ 1,806 | $ - | $ 20,699 |

**Operating Disbursements**

| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Payroll | - | - | (1,823) | - | (1,823) | - | - | (1,823) | - | (3,545) | - | (1,823) | - | (10,837) |
| Sales & Marketing | - | (101) | - | (713) | (4) | (4) | (4) | (887) | (4) | (139) | (4) | (887) | - | (2,749) |
| GTN (Relay/ TC) | - | (89) | (386) | (1,920) | (372) | - | (150) | (970) | (476) | (1,333) | (150) | (8,163) | - | (14,009) |
| Inventory | - | (15) | (3,716) | (103) | (157) | (1) | (1) | (4,353) | (1) | (1) | (1) | (43) | - | (8,390) |
| R&D / Regulatory | - | - | (342) | (666) | - | - | (405) | (425) | (95) | - | - | (385) | - | (2,318) |
| G&A | - | - | - | (201) | (15) | (15) | (15) | (201) | (15) | (125) | (15) | (481) | - | (1,083) |
| Other Disbursements | - | (733) | (131) | - | (700) | (72) | (733) | (131) | (700) | (447) | (733) | (331) | (500) | (5,010) |
| **Total Operating Disbursements** | $ - | $ (939) | $ (6,397) | $ (3,603) | $ (3,070) | $ (92) | $ (1,308) | $ (8,790) | $ (1,291) | $ (5,589) | $ (903) | $ (11,912) | $ (500) | $ (44,395) |

| **Operating Cash Flow** | $ 1,039 | $ 773 | $ (4,591) | $ (1,672) | $ (1,304) | $ 1,674 | $ 458 | $ (6,983) | $ 475 | $ (3,825) | $ 863 | $ (10,106) | $ (500) | $ 23,696 |

**Non-Operating Disbursements**

| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Interest | - | - | (258) | (279) | - | - | - | (2,095) | - | - | - | (1,837) | - | (4,469) |
| **Total Non-Operating Disbursements** | $ - | $ - | $ (258) | $ (279) | $ - | $ - | $ - | $ (2,095) | $ - | $ - | $ - | $ (1,837) | $ - | $ (4,469) |

**Bankruptcy Related Disbursements**

| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DIP Financing Fees | - | (900) | - | - | - | - | - | - | - | - | - | (1,350) | - | (2,250) |
| Professional Fees | - | (200) | - | - | - | (650) | - | (395) | - | (4,153) | - | (1,490) | - | (6,889) |
| Utility Deposit | (30) | - | - | - | - | - | - | - | - | - | - | - | - | (30) |
| **Total Bankruptcy Related Disbursements** | $ (30) | $ (1,100) | $ - | $ - | $ - | $ (650) | $ - | $ (395) | $ - | $ (4,153) | $ - | $ (2,840) | $ - | $ (9,169) |

| **Net Cash Flow before Financing** | $ 1,009 | $ (327) | $ (4,849) | $ (1,950) | $ (1,304) | $ 1,024 | $ 458 | $ (9,474) | $ 475 | $ (7,976) | $ 863 | $ (14,784) | $ (500) | $ (37,334) |

**Cash Balance**

| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | 14,328 | 15,336 | 26,509 | 21,660 | 53,210 | 51,906 | 52,930 | 53,389 | 43,915 | 44,390 | 36,414 | 37,277 | 52,171 | 14,328 |
| Net Cash Flow before Financing | 1,009 | (327) | (4,849) | (1,950) | (1,304) | 1,024 | 458 | (9,474) | 475 | (7,976) | 863 | (14,784) | (500) | (37,334) |
| DIP Proceeds (New Money) | - | 11,500 | - | 33,500 | - | - | - | - | - | - | - | - | - | 45,000 |
| DIP Paydown | - | - | - | - | - | - | - | - | - | - | - | (155,323) | - | (155,323) |
| 363 Sale Proceeds | - | - | - | - | - | - | - | - | - | - | - | 185,000 | - | 185,000 |
| **Ending Cash Balance** | $ 15,336 | $ 26,509 | $ 21,660 | $ 53,210 | $ 51,906 | $ 52,930 | $ 53,389 | $ 43,915 | $ 44,390 | $ 36,414 | $ 37,277 | $ 52,171 | $ 51,671 | $ 51,671 |

## EXHIBIT C: ACCEPTABLE PLAN ILLUSTRATION

**Synergy Pharmaceuticals**
**Illustrative Sharing Waterfall**

*Confidential Preliminary Working Draft*
*Work Product Prepared at the Direction of Counsel For Discussion Purposes Only*

| | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Distributable Cash After Wind-Down | | 30,100 | 32,100 | 34,100 | 37,100 | 38,600 | 42,100 | 44,600 | 47,100 | 49,600 | 52,100 | 54,600 | 57,100 | 59,600 | 62,100 | 64,600 | 67,100 | 69,600 | 72,100 |
| (Shortfall) / Excess | | (7,000) | (5,000) | (3,000) | - | 2,500 | 5,000 | 7,500 | 10,000 | 12,500 | 15,000 | 17,500 | 20,000 | 22,500 | 25,000 | 27,500 | 30,000 | 32,500 | 35,000 |
| **Initial Sharing** | | | | | | | | | | | | | | | | | | | |
| Proceeds to Secured Lender | | 30,100 | 20,100 | 20,100 | 20,100 | 20,100 | 20,100 | 20,100 | 20,100 | 20,100 | 20,100 | 20,100 | 20,100 | 20,100 | 20,100 | 20,100 | 20,100 | 20,100 | 20,100 |
| Proceeds to Unsecureds | | - | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 |
| Range 1 (Shortfall <5M) | 100% | N/A | - | 2,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Range 2 (Excess up to 5M) | 75% | N/A | - | | 1,875 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 |
| Range 3 (Excess Above 5M) | 50% | N/A | - | | | - | - | 1,250 | 2,500 | 3,750 | 5,000 | 6,250 | 7,500 | 8,750 | 10,000 | 11,250 | 12,500 | 13,750 | 15,000 |
| Total Sharing Proceeds to Secured Lender | | | - | 2,000 | 5,000 | 6,875 | 8,750 | 10,000 | 11,250 | 12,500 | 13,750 | 15,000 | 16,250 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 |
| **Total Proceeds from Distributable Cash After Wind-Down** | | | | | | | | | | | | | | | | | | | |
| Secured Lender | | 30,100 | 20,100 | 22,100 | 25,100 | 26,975 | 28,850 | 30,100 | 31,350 | 32,600 | 33,850 | 35,100 | 36,350 | 37,100 | 37,100 | 37,100 | 37,100 | 37,100 | 37,100 |
| Unsecureds | | | 12,000 | 12,000 | 12,000 | 12,625 | 13,250 | 14,500 | 15,750 | 17,000 | 18,250 | 19,500 | 20,750 | 22,500 | 25,000 | 27,500 | 30,000 | 32,500 | 35,000 |
| *Secured Claim Deficiency* | | | | | | | | | | | | | | | | | | | |
| Recovery % | 37,100 | 81% | 54% | 60% | 68% | 73% | 78% | 81% | 85% | 88% | 91% | 95% | 98% | 100% | 100% | 100% | 100% | 100% | 100% |
| *Unsecured Claims* | | | | | | | | | | | | | | | | | | | |
| Recovery % | 38,603 | 0% | 31% | 31% | 31% | 33% | 34% | 38% | 41% | 44% | 47% | 51% | 54% | 58% | 65% | 71% | 78% | 84% | 91% |

EXECUTION

## EXHIBIT D: CASE MILESTONE SCHEDULE

**Budget**

1. On or before the Petition Date, the DIP Administrative Agent shall have approved, based on then current information, the Budget.

2. On or before December 18, 2018, the DIP Administrative Agent shall have reaffirmed its approval, based on then then current information, of the Budget, or the DIP Loan Parties shall have adopted a revised budget acceptable to the DIP Administrative Agent in its sole and absolute discretion.

**DIP Facility**

1. Not later than the Petition Date, the Debtors shall file with the Bankruptcy Court a motion seeking approval of the DIP Facility, this Binding Term Sheet, the DIP Loans, and all fees, expenses, indemnification, and other obligations contemplated thereunder.

2. Not later than 3 days following the Petition Date, the Bankruptcy Court shall have entered the First Interim Order.

3. Not later than December 18, 2018, finalize DIP Credit Agreement.

4. Not later than December 21, 2018, the Bankruptcy Court shall have entered the Second Interim Order.

5. Not later than January 15, 2019, the Bankruptcy Court shall have entered the Final Order.

**Acceptable 363 Sale**

1. Not later than December 12, 2019, the Debtors shall file with the Bankruptcy Court Sale Motion and Bid Procedures Motion, in each case acceptable to the DIP Administrative Agent in its sole and absolute discretion.

2. Not later than January 4, 2019, a Bid Procedures Hearing shall be held in the Bankruptcy Court.

3. The deadline for bidding shall be a date not later than February 9, 2019.

4. The date specified for an auction, if necessary, shall be a date not later than February 12, 2019.

5. Not later than February 15, 2019, a Sale Hearing shall be held in the Bankruptcy Court.

6. The closing of the Acceptable 363 Sale shall occur on or before April 9, 2019.

**Acceptable Plan**

1. Not later than January 4, 2019, the Debtors shall file their Schedules and Statement of Financial Affairs.

30

2.  The bar date for filing proofs of claim shall be a date not later than February 11, 2019.

3.  Not later than December 21, 2019, the Debtors shall file with the Bankruptcy Court an Acceptable Plan and a disclosure statement with respect thereto.

4.  Not later than February 18, 2019, the Bankruptcy Court shall enter an order approving a disclosure statement with respect to an Acceptable Plan.

5.  Not later than March 15, 2019, the Bankruptcy Court shall enter an order confirming an Acceptable Plan.

6.  Not later than April 10, 2019, such Acceptable Plan shall become effective.

31

**EXHIBIT B**

**First Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------- x
                                                              :
In re:                                                        :          Chapter 11
                                                              :
SYNERGY PHARMACEUTICALS INC., et al.,                         :          Case No. 18-14010 (   )
                                                              :
                        Debtors.[1]                           :          (Joint Administration Requested)
                                                              :
------------------------------------------------------------- x

## FIRST INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

Upon the motion **[Docket No. ___]** (the "**Motion**")[2] of Debtors Synergy Pharmaceuticals Inc. ("**Synergy Pharmaceuticals**" or "**Borrower**") and Synergy Advanced Pharmaceuticals, Inc. ("**Synergy Advanced**" or "**Guarantor**") and together with Synergy Pharmaceuticals, the "**Debtors**") pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503 and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**"), seeking, among other things:

(1)     authorization for the Borrower to obtain, and for the Guarantor to guarantee, unconditionally, on a joint and several basis, and on and subject to the terms and

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: Synergy Pharmaceuticals Inc. (5269); Synergy Advanced Pharmaceuticals, Inc. (4596). The address of the Debtors' corporate headquarters is 420 Lexington Avenue, Suite 2012, New York, New York 10170.

[2]    Capitalized terms used but not defined in this First Interim Order shall have the same meanings ascribed to such terms in the DIP Term Sheet or, if not defined therein, in the Motion.

conditions set forth in the DIP Loan Documents, postpetition financing consisting of a senior secured, super-priority multiple delayed draw term loan credit facility (the "**DIP Facility**") on the terms and conditions set forth in the to-be-filed *DIP Term Loan Agreement* (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time, (the "**DIP Credit Agreement"**, and together with the DIP Term Sheet and any other related agreements, documents, security agreements, or pledge agreements, the "**DIP Loan Documents**"), which shall contain only those conditions to borrowing, representations, warranties, covenants and events of default expressly set forth in that certain Binding Term Sheet annexed hereto as **Exhibit A** (together with all exhibits attached thereto, the "**DIP Term Sheet**"), made by and among the Borrower, the Guarantor, CRG Servicing LLC, as administrative agent and collateral agent (in such capacities, together with its successors and assigns, the "**DIP Loan Agent**") and each of the lenders party thereto (the "**DIP Lenders**" and, together with the DIP Loan Agent, the "**DIP Secured Parties**"), and be otherwise consistent with the Documentation Principles in an aggregate principal amount of approximately **$155,000,000** (the "**DIP Loans**"), comprised of (i) approximately **$110,000,000** of loans (the "**Roll-Up DIP Loans**") representing a partial "roll-up" of the Prepetition Secured Obligations, equal to the sum of (a) outstanding principal, plus (b) accrued and unpaid interest, including accrued and unpaid postpetition interest at the Default Rate specified in the Prepetition Loan Agreement from the Petition Date through and including the date of the entry of the Second Interim Order and (c) any and all unreimbursed costs, fees and expenses of the DIP Secured Parties (in their capacities under the Prepetition Loan Documents); (ii) **$45,000,000** of "new money" loans (the "**New Money DIP Loans**"), which will be advanced by the DIP Lenders to the Borrower, subject to the terms and conditions of the DIP Loan Documents, to be used by the Borrower in accordance with the second interim order (the "**Second Interim Order**") and the Budget, as follows: (A) upon entry of the Second Interim Order, the DIP Lenders shall advance **$11,500,000** (the "**Initial DIP Advance**"), and (B) upon entry of the Final Order, the DIP Lenders shall advance the remaining **$33,500,000** (the "**Final DIP Advance**");

(2)     upon entry of this interim order (the "**First Interim Order**"), authorization for the Debtors to use the DIP Secured Parties' (each in their respective capacities under the Prepetition Loan Documents) Cash Collateral and all other Prepetition Collateral in which the DIP Secured Parties (each in their respective capacities under the Prepetition Loan Documents) have an interest during the period from entry of this First Interim Order to the entry of the Second Interim Order (the entry of which shall be no later than December 21, 2018) (the "**Initial Interim Cash Collateral Period**");

(3)     as adequate protection for the use during the Initial Interim Cash Collateral Period of the Cash Collateral securing the Prepetition Secured Obligations, granting to the DIP Secured Parties (each in their respective capacities under the Prepetition

2

Loan Documents) superpriority administrative expense claim status and replacement liens on all assets of the Debtors (other than (x) Avoidance Actions and any proceeds thereof and (y) the Debtors' interests in directors and officers insurance policies and any proceeds thereof (the items described in the foregoing clauses (x) and (y), together, the "**Initial Interim Period Excluded Collateral**");

(4)    authorization for Debtors, immediately upon entry of the Second Interim Order, to execute, deliver, and enter into the DIP Loan Documents, which shall be consistent with the terms of the DIP Term Sheet, and to perform all of the Debtors' respective obligations thereunder, and such other and further acts as may be required in connection with the DIP Loan Documents;

(5)    authorization for the Debtors, immediately upon entry of the Second Interim Order, to implement a partial "roll-up" of the Prepetition Secured Obligations, including accrued and unpaid postpetition interest at the Default Rate specified in the Prepetition Loan Agreement from the Petition Date through and including the date of the entry of the Second Interim Order, subject to the terms and conditions of the DIP Loan Documents, in accordance with the Second Interim Order and the Final Order and to deem the rolled-up Prepetition Secured Obligations so "rolled up" to have been issued or provided, as applicable, under the DIP Credit Agreement and the other DIP Loan Documents;

(6)    authorization for the Debtors, immediately upon entry of the Second Interim Order, to use proceeds of the Initial DIP Advance as permitted in the DIP Loan Documents and consistent with the Second Interim Order and the Budget (subject to Permitted Variances as provided in the DIP Term Sheet);

(7)    immediately upon entry of the Second Interim Order, subject to the Carve Out, with respect to all claims of the DIP Loan Agent and DIP Lenders under the DIP Facility with respect to the DIP Loans and the DIP Obligations, grant to the DIP Loan Agent and the DIP Lenders:

   a.    pursuant to section 364(c)(1) of the Bankruptcy Code, superpriority claim status in the Cases, which claims shall be payable from and have recourse to all DIP Collateral;

   b.    pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected first priority lien on all DIP Collateral, other than the Initial Interim Period Excluded Collateral and other than property of the Debtors that is subject to valid and perfected liens in existence at the time of the commencement of the Cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code (the "**Prior Senior Liens**");

3

c.  pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected junior lien on all property of the Debtors that is subject to a Prior Senior Lien; and

d.  pursuant to section 364(d)(1) of the Bankruptcy Code, a perfected first priority, senior priming lien on all of the property of the Debtors (including, without limitation, inventory, receivables, equipment, machinery, intellectual property, general intangibles, real property, capital stock of subsidiaries, membership interests in limited liability companies) that is subject to the existing liens that secure the obligations of the Debtors to the DIP Secured Parties (each in their respective capacities under the Prepetition Loan Documents) under or in connection with the Prepetition Loan Documents and the Prepetition Secured Obligations;

(8)  approval of certain stipulations by the Debtors with respect to the Prepetition Loan Documents and the liens and security interests arising therefrom;

(9)  with respect to the indebtedness represented by the Prepayment Premium and the Back-End Facility Fee, acknowledgment by the Debtors that such indebtedness constitutes a valid and enforceable prepetition secured claim on behalf the DIP Secured Parties (each in their respective capacities under the Prepetition Loan Documents);

(10)  immediately upon entry of the Second Interim Order, authorization for the Debtors to continue to use, subsequent to the Initial Interim Cash Collateral Period, the Cash Collateral securing the Prepetition Secured Obligations and all other Prepetition Collateral in which the DIP Secured Parties (each in their respective capacities under the Prepetition Loan Documents) have an interest consistent with the Second Interim Order and the Budget;

(11)  as adequate protection for the use, subsequent to the Initial Interim Cash Collateral Period, of the Cash Collateral and other Prepetition Collateral securing the Prepetition Secured Obligations and the priming of the Prepetition Liens by virtue of the making of the New Money DIP Loan, immediately upon entry of the Second Interim Order, granting to the DIP Secured Parties (each in their respective capacities under the Prepetition Loan Documents) with respect to the Remaining Prepetition Secured Claim, to the extent of any diminution in the value of the Prepetition Collateral:

a.  superpriority administrative expense claim status;

b.  replacement liens on all DIP Collateral, junior only to (x) the liens of the DIP Loan Agent and the DIP Lenders and (y) Prior Senior Liens;

4

c. commencing on the date upon which the Second Interim Order is entered by the Court, payment on a monthly basis of postpetition interest accruing on such date at the Default Rate as specified and defined in the Prepetition Loan Agreement;

d. and reimbursement of all fees, costs and expenses incurred in connection with defending the validity and enforceability of the Prepetition Secured Obligations, the Prepetition Liens or the Remaining Prepetition Secured Claim;

(12) subject to and effective upon entry of the Final Order, granting to the DIP Secured Parties a security interest in and continuing lien on all of the Debtors' rights, title and interest in, to and under the Avoidance Actions (other than Avoidance Actions acquired by the purchaser under an Acceptable 363 Sale), and all proceeds thereof;

(13) subject to and effective upon entry of the Final Order, the waiver of the Debtors' right to assert a 506(c) claim on account of amounts covered by the Carve Out;

(14) subject only to and effective upon entry of a Final Order, the waiver of the Debtors' right to assert claims to surcharge against the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code and any right of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code.

(15) modification of the automatic stay to the extent hereinafter set forth;

(16) the setting of (a) no later than December 21, 2018, a second interim hearing on the Motion (the "**Second Interim Hearing**") to consider entry of the Second Interim Order authorizing, among other things, approval of (i) the DIP Loan Documents, (ii) the Initial DIP Advance, and (iii) the Roll-Up, provided that (x) on or before December 18, 2018, the DIP Loan Documents have been executed and delivered by the parties thereto, and (y) on or before December 21, 2018, the Debtors have filed an Acceptable Plan (as defined in the DIP Term Sheet) and disclosure statement, and (b) a final hearing on the Motion ("**Final Hearing**") to consider entry of a final order (the "**Final Order**") authorizing, among other things, the borrowing under the DIP Loan Documents on a final basis no later than January 15, 2019, as set forth in the Motion and the DIP Credit Agreement filed with the Court; and

(17) granting the Debtors such other and further relief as is just and proper.

The initial hearing on the Motion having been held by this Court on December _____, 2018, (the "**Interim Hearing**"), and upon the record made by the Debtors at the Interim Hearing,

including the Motion, the First Day Declaration, and the filings and pleadings in the above-caption chapter 11 proceedings (the "**Cases**"), the Court having found that the relief requested in the Motion is fair and reasonable and is in the best interests of Debtors, their estates (collectively, the "**Estates**", their stakeholders and other parties in interest, and represents a sound exercise of the Debtors' business judgment and is essential for the continued operation of the Debtors' businesses; it appearing to the Court that granting the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their Estates pending the Second Interim Hearing and the Final Hearing; and appropriate notice of the Motion, the relief requested therein, and the Interim Hearing (the "**Notice**") having been served by the Debtors in accordance with Bankruptcy Rules 4001 and 9014 and the Local Bankruptcy Rules on (i) counsel to the DIP Loan Agent, (ii) the U.S. Trustee, (iii) the holders of the twenty (20) largest unsecured claims against the Debtors' estates, (iv); the Internal Revenue Service, (v) the Securities and Exchange Commission, (vi) the Stalking Horse Bidder and (vii) certain other parties identified in the certificate of service filed with the Court, including, without limitation, all creditors who have filed or recorded prepetition liens or security interests against any of the Debtors' assets, and the opportunity for a hearing on the Motion was appropriate and no other notice need be provided; and after due deliberation sufficient cause appearing therefor;

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.      <u>Petition Date</u>.  On December 12, 2018 (the "**Petition Date**"), each Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6

B.    <u>Disposition</u>.  The Motion is granted on an interim basis in accordance with the terms of this First Interim Order.  Any objections to the Motion with respect to the entry of this First Interim Order that have not been withdrawn, waived or settled are hereby denied and overruled.

C.    <u>Jurisdiction and Venue</u>.  The Court has jurisdiction of this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  The Motion is a "core" proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A), (D) and (M).  Venue of the Cases and the Motion in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 503 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6003 and 9014 and Local Bankruptcy Rule 4001.

D.    <u>Committee Formation</u>. As of the date hereof, no official committee of unsecured creditors under section 1102 of the Bankruptcy Code (the "**Committee**") or any other statutory committee has been appointed in the Case.

E.    <u>Notice</u>.  The Notice was given in the manner described in the Motion.  Under the circumstances, the Notice given by the Debtors of the Motion, the Interim Hearing and the relief granted under this First Interim Order constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and 4001(c).

F.    <u>Debtors' Acknowledgments and Agreements</u>.  In requesting the DIP Facility, and in exchange for, and as a material inducement to, the DIP Lenders to enter into the DIP Term Sheet and provide the DIP Facility and to allow use of their Cash Collateral, after consultation with their attorneys and financial advisors, subject to the rights of the Committee or other

7

parties-in-interest as and to the extent set forth in Section 3.1 of this First Interim Order, the

Debtors permanently and irrevocably admit, stipulate, acknowledge and agree that:

(i)    <u>Prepetition Loan Documents</u>.    Prior to the commencement of the Cases,

the DIP Secured Parties (each in their respective capacities under the Prepetition Loan

Documents) made loans, advances and provided other financial accommodations to the Borrower

pursuant to the terms and conditions set forth in: (1) that certain *Term Loan Agreement*, dated as

of September 1, 2017, by and among the Borrower, the Guarantor, the DIP Loan Agent and the

DIP Lenders (each in their respective capacities under the Prepetition Loan Documents) (as the

same has heretofore been amended, supplemented, modified, extended, renewed, restated and/or

replaced at any time prior to the Petition Date, the "**Prepetition Loan Agreement**"); and (2) all

other agreements, documents and instruments executed and/or delivered with, to, or in favor of

the DIP Secured Parties (each in their respective capacities under the Prepetition Loan

Documents), including, without limitation, all security agreements, notes, guarantees, mortgages,

Uniform Commercial Code financing statements and all other related agreements, documents

and instruments executed and/or delivered in connection therewith or related thereto (all of the

foregoing, together with the Prepetition Loan Agreement, as all of the same have heretofore been

amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior

to the Petition Date, collectively, the "**Prepetition Loan Documents**").    Copies of the operative

Prepetition Loan Documents are on file with counsel to the Debtors and available upon

reasonable request.

(ii)    <u>Prepetition Obligations</u>.    As of the Petition Date, the Debtors were

indebted to the DIP Secured Parties (each in their respective capacities under the Prepetition

Loan Documents) under the Prepetition Loan Documents in the aggregate principal amount of

approximately $147,100,000.00, which amount is the sum of: (a) principal in the amount of $107,551,191.90, (b) accrued and unpaid interest in the amount of $2,322,806.99, (c) accrued and unpaid default interest in the amount of $250,952.78, (d) a prepayment premium in the amount of $34,954,137.37 (the "**Prepayment Premium**")[3], (e) a back-end facility fee in the amount of $2,151,023.84, (the "**Bank-End Facility Fee**"[4], together with the Prepayment Premium, the "**Remaining Prepetition Secured Claim**"), and (f) unreimbursed costs, fees and expenses in accordance with the Prepetition Loan Documents (the forgoing clauses (a) through (f) are collectively referred to herein as the "**Prepetition Secured Obligations**").   The Prepetition Secured Obligations constitute allowed, legal, valid, binding, enforceable and non-avoidable obligations of Debtors, and are not subject to any offset, defense, counterclaim, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or any other applicable law, and Debtors do not possess, shall not assert, hereby forever release, and are forever barred from bringing any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Prepetition Secured Obligations.

(iii)   <u>Prepetition Collateral</u>.  As of the Petition Date, the Prepetition Secured Obligations were fully secured pursuant to the Prepetition Loan Documents by valid, perfected, enforceable and non-avoidable first-priority security interests and liens granted by the Debtors to the DIP Secured Parties (each in their respective capacities under the Prepetition Loan

---

[3] The Prepayment Premium is calculated in accordance with Section 3.03(a)(j)(B) of the Prepetition Loan Agreement.

[4] The Bank-End Facility Fee is set forth in the Fee Letter dated September 21, 2017.

Documents) under the Prepetition Loan Documents (the **"Prepetition Liens"**), upon all or substantially all of the Debtors' assets and property, other than the Excluded Assets (as defined in the Prepetition Loan Documents) (the "**Prepetition Collateral"**), subject only to liens specifically permitted under the Prepetition Loan Agreement, if any, to the extent that such security interests, liens or encumbrances are (1) valid, perfected and non-avoidable security interests, liens or encumbrances existing as of the Petition Date, and (2) senior to and have not been or are not subject to being subordinated to DIP Secured Parties' (each in their respective capacities under the Prepetition Loan Documents) liens on and security interests in the Prepetition Collateral under the Prepetition Loan Documents or otherwise avoided, and, in each instance, only for so long as and to the extent that such encumbrances are and remain senior and outstanding (hereinafter referred to as the "**Permitted Encumbrances**").

(iv)    <u>Validity, Perfection and Priority of Prepetition Liens and Prepetition Secured Obligations</u>. The Debtors further acknowledge and agree that, as of the Petition Date, (a) the Prepetition Liens on the Prepetition Collateral were valid, binding, enforceable, and properly perfected and were granted to, or for the benefit of, the DIP Secured Parties (each in their respective capacities under the Prepetition Loan Documents); (b) the Prepetition Liens were senior in priority over any and all other liens on Prepetition Collateral, other than any Permitted Encumbrances; (c) the Prepetition Secured Obligations constitute legal, valid and binding obligations of the Debtors enforceable in accordance with the terms of the Prepetition Loan Documents; (d) the Debtors do not possess and will not assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the DIP Secured Parties' (each in their respective capacities under the Prepetition Loan Documents) liens, claims or security interests in the

10

Prepetition Collateral; and (e) the Debtors waive, discharge, and release any right to challenge the extent and priority of the Prepetition Liens.

       (v)   <u>Value of Prepetition Liens and Prepetition Claims</u>. The aggregate value of the Prepetition Collateral as of the Petition Date exceeds the aggregate amount of the Prepetition Secured Obligations and the claims of the DIP Secured Parties (each in their respective capacities under the Prepetition Loan Documents) arising under, or secured by, the Prepetition Loan Documents constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

       (vi)   <u>No Control</u>.  None of the DIP Secured Parties (each in their respective capacities under the Prepetition Loan Documents) control the Debtors or their properties or operations, have authority to determine the manner in which any Debtor's operations are conducted or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from the Prepetition Loan Documents.

       (vii)   <u>No Claims or Causes of Action</u>. No claims or causes of action exist against, or with respect to, the DIP Secured Parties (each in their respective capacities under the Prepetition Loan Documents) under any agreements by and among the Debtors and any such party that is in existence as of the Petition Date.

       (viii)   <u>Cash Collateral</u>.  All of the Debtors' cash, and all cash equivalents, including any cash in deposit accounts (whether subject to control agreements or otherwise), whether as Prepetition Collateral or which represent income, proceeds, products, rents, or profits of other Prepetition Collateral, constitutes "cash collateral" of the DIP Secured Parties (each in their respective capacities under the Prepetition Loan Documents) within the meaning of section 363(a) of the Bankruptcy Code (the "**Cash Collateral**").

11

G.     Findings Regarding the Use of Cash Collateral.

(i)     Use of Cash Collateral.  The DIP Secured Parties (each in their respective capacities under the Prepetition Loan Documents) consent to the Debtors' use of their Cash Collateral, in accordance with the Budget, during the Initial Interim Cash Collateral Period, unless such is extended beyond the Initial Interim Cash Collateral Period by entry of the Second Interim Order or otherwise extended by the DIP Loan Agent, in its sole and absolute discretion; provided, however, that the Debtors shall operate their cash management system consistent with the interim or final order (as applicable) entered by the Bankruptcy Court granting the Debtors' "first-day" motion to continue the use of its cash management system (such interim or final order, as applicable, the "**Cash Management Order**").

(ii)     Budget.  The Debtors have prepared and delivered to the DIP Secured Parties a rolling 13-week budget (the "**Budget**") for the period commencing on the Petition Date through and including March 31, 2019, a copy of which is attached hereto as **Exhibit B**.  The Budget sets forth all forecasted (i) cash receipts of the Debtors (the "**Cash Receipts**"), (ii) cash operating disbursements of the Debtors (the "**Cash Operating Disbursements**") and (iii) non-operating, bankruptcy-related cash disbursements of the Debtors (the "**Cash Bankruptcy Disbursements**") of the Debtors, which Budget shall be approved by the DIP Loan Agent in its sole and absolute discretion and may be modified by the DIP Loan Parties with the written consent of the DIP Loan Agent in its sole and absolute discretion without further order of the Court, provided that (A) the total amount of funding provided pursuant to the Budget shall not exceed the total amount of the DIP Facility authorized by each of this First Interim Order, the Second Interim Order and the Final Order, as applicable and (B) the reasonable and documented professional fees and expenses incurred by the DIP Secured Parties shall not be subject to a cap.

12

Compliance with the Budget will be measured every week starting with the third week following the Petition Date for the period beginning as of the week of the Petition Date and ending the week prior to the week on which compliance is measured.  For purposes of illustration, on the third week following the Petition Date, the Debtors' compliance with the Budget for the first two weeks following the Petition Date shall be measured.  Each date on which compliance with the Budget is measured is referred to herein as a "**Testing Date**".  The Debtors believe that the Budget is reasonable under the facts and circumstances. The DIP Secured Parties are relying upon the Debtors' agreement to comply with the Budget and this First Interim Order in determining to allow the use of their Cash Collateral during the Initial Interim Cash Collateral Period.

          (iii)    <u>Variance</u>.  As of any applicable Testing Date, (a) the cumulative Cash Receipts may vary from the Budget by no more than (1) 20.00% for the first four-week period (and each week thereof) beginning as of the week of the Petition Date, (2) 15% for the first five-week period beginning as of the week of the Petition Date and (3) 10% for the first six-week period and all subsequent weeks of the period beginning as of the week of the Petition Date (the "**Cash Receipt Variance**"), (b) the cumulative Cash Operating Disbursements may vary from the Budget by no more than the following: (1) 20.00% for the first four-week period (and each week thereof), beginning as of the week of the Petition Date, (2) 15.00% for the first five-week period beginning as of the week of the Petition Date, and (3) 10.00% for the first six-week period and all subsequent weeks of the period beginning as of the week of the Petition Date (the "**Cash Operating Variance**"), and (c) the cumulative Cash Bankruptcy Disbursements for the thirteen (13)-week period beginning as of the week of the Petition Date shall not exceed the amount of set forth in the Budget with respect thereto (the "**Cash Bankruptcy Disbursement Cap**"),

13

subject to a variance of no more than 10% (the "**Cash Bankruptcy Disbursement Variance**" and together with the "**Cash Receipt Variance**" and the Cash Receipt, the "**Permitted Variances**"). The Debtors shall be deemed to be in compliance with the Budget for all purposes under the DIP Term Sheet, the DIP Loan Documents, and this First Interim Order unless, as of any applicable date of determination, the Debtors' (x) cumulative Cash Receipts, (y) cumulative Cash Operating Disbursements, or (z) cumulative Bankruptcy Disbursements, as applicable, vary from the Budget by more than the applicable Permitted Variance as measured on any applicable Testing Date (it being understood and agreed that no Testing Date with respect to Cumulative Bankruptcy Disbursements shall occur prior to the end of the 13-week period beginning the week of the Petition Date); provided, however, that with respect to cumulative Cash Receipts, the DIP Loan Parties shall not be deemed to have failed to comply with the Budget unless the Debtors' cumulative Cash Receipts fall beneath the amounts set forth in the Budget as measured on any two consecutive Testing Dates during the first four week period beginning as of the Petition Date. After the first three weeks following the Petition Date, the Debtors shall provide the DIP Loan Agent with weekly and cumulative variance reporting on a line item basis for Cash Receipts, Cash Operating Disbursements and Cash Bankruptcy Disbursements, which reporting shall detail the variance, if any, of actual cash disbursements and actual cash receipts from the Budget and provide an explanation of any per line item variance greater than 5.00% (the "**Variance Report**"). All references to the Budget in this First Interim Order, the Second Interim Order or Final Order shall be construed to be qualified by the phrase "subject to Permitted Variances."

(iv)    Adequate Protection. The DIP Secured Parties (each in their respective capacities under the Prepetition Loan Documents) are entitled pursuant to sections 361, 362, 363

14

and 364 of the Bankruptcy Code, to receive adequate protection against any diminution in value of their respective interests in the Prepetition Collateral (including the Cash Collateral), to the extent set forth in this First Interim Order.

       (v)   <u>Conditions</u>.  The DIP Secured Parties' (each in their relevant capacities under the Prepetition Loan Documents) willingness to consent to the use of their Cash Collateral during the Initial Interim Cash Collateral Period, is conditioned upon, among other things, entry of this First Interim Order.

       Based upon the foregoing, and upon the record made before the Court at the Interim Hearing, and after due consideration and good cause appearing therefor;

**IT IS HEREBY ORDERED THAT:**

Section 1.      <u>Authorization and Conditions to Use of Cash Collateral.</u>

       1.1   <u>Motion Granted</u>.  The Motion is granted in accordance with Bankruptcy Rule 4001(c)(2) to the extent provided in this First Interim Order.  The DIP Term Sheet and all terms and conditions thereof are hereby approved. Except as otherwise expressly provided in this First Interim Order, any objection to the entry of this First Interim Order that has not been withdrawn, waived, resolved or settled, is hereby denied and overruled on the merits.

       1.2   <u>Authorization to Use Cash Collateral</u>.  Subject to the terms and conditions of this First Interim Order and the DIP Term Sheet, the Debtors shall be and are hereby authorized to use the Cash Collateral, in accordance with the Budget during the Initial Interim Cash Collateral Period, and any period beyond the Initial Interim Cash Collateral Period (a) established by the Second Interim Order or (b) approved by the DIP Loan Agent, in its sole and absolute discretion; <u>provided</u>, <u>however</u>, that the Debtors shall operate their cash management system in a manner consistent with the Cash Management Order.  Nothing in this First Interim

15

Order shall authorize the disposition of any assets of the Debtors or their Estates outside the ordinary course of business, or any Debtor's use of Cash Collateral or other proceeds resulting therefrom, except as permitted in this First Interim Order, in accordance with the Budget.  Any failure by the Debtors on or after the Petition Date to comply with the segregation requirements of section 363(c)(4) of the Bankruptcy Code in respect of any Cash Collateral shall not be used as a basis to challenge any of the Prepetition Secured Obligations, or the extent, validity, enforceability or perfected status of any of the Prepetition Liens.

   1.3 <u>Replacement Liens</u>.  As adequate protection for the diminution in value of their interests in the Prepetition Collateral (including Cash Collateral) on account of the Debtors' use of  such Cash Collateral during the Initial Interim Cash Collateral Period and the imposition of the automatic stay, the DIP Secured Parties (each in their capacities under the Prepetition Loan Documents), are  hereby granted pursuant to sections 361 and 363 of the Bankruptcy Code, valid, binding, enforceable and perfected replacement liens (the "**Prepetition Replacement Lien**") upon and security interests in all the DIP Collateral, including, without limitation, all assets and property of each Debtor and its Estate, real or personal, tangible or intangible, now owned or hereafter acquired, whether arising before or after the Petition Date, including, without limitation, all contracts, contract rights, licenses, general intangibles, instruments, equipment, accounts, documents, goods, inventory, fixtures, documents, cash, cash equivalents, chattel paper, letters of credit and letter of credit rights, investment property, commercial tort claims, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations and instruments, all interests in leaseholds and real properties, all patents, copyrights, trademarks, trade names and other intellectual property, all equity interests, all books and records relating to the foregoing, all other personal and real property of the Debtor, and all

16

proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (in each case as the foregoing are defined in the Uniform Commercial Code as in effect from time to time in the State of New York and, if defined in more than one Article of such Uniform Commercial Code, shall have the meaning given in Article 9 thereof) (the "**Prepetition Replacement Collateral**"), provided, however, that the Initial Interim Period Excluded Collateral shall not constitute Prepetition Replacement Collateral under this First Interim Order.  The Prepetition Replacement Lien shall be senior to all other security interests in, liens on, or claims against the DIP Collateral, other than (x) Prior Senior Liens or (y) as modified by the Second Interim Order and/or the Final Order.

    1.4 <u>Section 507(b) Priority Claims</u>.  As adequate protection for the diminution in value of their interests in the Prepetition Collateral (including Cash Collateral) on account of the Debtors' use of such  Cash Collateral during the Initial Interim Cash Collateral Period and the imposition of the automatic stay, the DIP Secured Parties (each in their capacities under the Prepetition Loan Documents),are hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in each of the Cases and (any successor cases) (the "**Prepetition Adequate Protection Superpriority Claim**").  The Prepetition Adequate Protection Superpriority Claim shall have priority over all administrative expense claims and unsecured claims against Debtors and their Estates now existing or hereafter arising, of any kind or nature whatsoever, except as modified by the Second Interim Order and/or the Final Order.

    1.5 <u>Accrual of Post-Petition Interest</u>.   During the Initial Interim Cash Collateral Period, the DIP Secured Parties (each in their capacities under the Prepetition Loan Documents) shall accrue interest on their Prepetition Secured Obligations in a manner and in an

amount resulting from applying the Default Rate specified under the Prepetition Loan Agreement to the aggregate outstanding amount of Prepetition Secured Obligations as of the Petition Date in respect of such relevant periods ending after the Petition Date (and not, for the avoidance of doubt, at any different rate set forth in the Prepetition Loan Agreement) calculated on a monthly basis.

1.6    <u>Reimbursement of Fees and Expenses</u>.  The Debtors shall reimburse all reasonable and documented fees, costs and expenses of the DIP Secured Parties (each in their respective capacities under the Prepetition Loan Documents) in accordance with the terms of the Prepetition Loan Documents in connection with defending the validity, enforceability and priority of the Prepetition Secured Obligations, the Prepetition Liens or the Remaining Prepetition Secured Claim.

1.7    <u>Event of Default</u>.  Subject to the Waiting Period and the Waiting Period Procedures (as defined in the DIP Term Sheet), and the Debtors' rights with respect thereto, upon the occurrence and during the continuance of an DIP Event of Default (as defined below) under the DIP Term Sheet during the Initial Interim Cash Collateral Period, the DIP Loan Agent and the DIP Lenders, in addition to any and all other rights and remedies they may have in the DIP Term Sheet or under applicable bankruptcy and/or non-bankruptcy law, may terminate the DIP Term Sheet and shall be under no obligation whatsoever to make any further financial accommodations to the Debtors or in these Cases. As used in this First Interim Order, the term "**DIP Event of Default**" means the occurrence and continuance of any of the events enumerated under the heading "Events of Default" in the DIP Term Sheet (for the avoidance of doubt, after giving effect to the preamble thereto).

18

Section 2.    Other Rights.

      2.1    No Modification or Stay of This First Interim Order.  Notwithstanding (a)

any stay, modification, amendment, supplement, vacating, revocation or reversal of this Interim

Order,  (b) the failure to obtain a Second Interim Order or a Final Order pursuant to Bankruptcy

Rule 4001(c)(2), or (c) the dismissal or conversion of one or more of the Cases (each, a "**Subject**

**Event**"), (x) the acts taken by each of the DIP Loan Agent and the DIP Lenders in accordance

with this First Interim Order shall be governed in all respects by the original provisions of this

First Interim Order, and the acts taken by DIP Loan Agent and DIP Lenders in accordance with

this First Interim Order, and the liens granted to DIP Loan Agent and DIP Lenders (each in their

respective capacities under the Prepetition Loan Documents) in the DIP Collateral, and all other

rights, remedies, privileges, and benefits in favor of the DIP Loan Agent and each DIP Lender

pursuant to this First Interim Order and/or the DIP Term Sheet shall remain valid and in full

force and effect pursuant to section 364(e) of the Bankruptcy Code.  For purposes of this First

Interim Order, the term "appeal", as used in section 364(e) of the Bankruptcy Code, shall be

construed to mean any proceeding for reconsideration, amending, rehearing, or re-evaluating this

First Interim Order by this Court or any other tribunal.

      2.2    Power to Waive Rights; Duties to Third Parties.  The DIP Loan Agent

shall have the right to waive any of the terms, rights and remedies provided or acknowledged in

this First Interim Order in respect of the DIP Loan Agent and DIP Lenders (the "**DIP Lender**

**Rights**"), and shall have no obligation or duty to any other party with respect to the exercise or

enforcement, or failure to exercise or enforce, any DIP Lender Right(s).  Any waiver by DIP

Loan Agent of any DIP Lender Rights shall not be or constitute a continuing waiver.  Any delay

in or failure to exercise or enforce any DIP Lender Right shall neither constitute a waiver of such

DIP Loan Lender Right, subject the DIP Loan Agent or any DIP Lender to any liability to any other party, nor cause or enable any other party to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtors to the DIP Loan Agent or any DIP Lender.

2.3    No Unauthorized Disposition of Collateral.    The Debtors shall not sell, transfer, lease, encumber, use, or otherwise dispose of any portion of the Prepetition Replacement  Collateral (including Cash Collateral), other than in the ordinary course of business pursuant to the DIP Term Sheet.

2.4    No Waiver. The failure of the DIP Secured Parties to seek relief or otherwise exercise their rights and remedies under this First Interim Order shall not constitute a waiver of any of the DIP Lenders' rights hereunder or otherwise. Notwithstanding anything herein, the entry of this First Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the DIP Secured Parties' (in their respective capacities under the Prepetition Loan Documents) rights or remedies under the Bankruptcy Code or under non-bankruptcy law.

2.5    Inventory.    The Debtors shall not, without the consent of the DIP Loan Agent, (a) enter into any agreement to return any inventory to any of their creditors for application against any prepetition indebtedness under any applicable provision of section 546 of the Bankruptcy Code, or (b) consent to any creditor taking any setoff against any of its prepetition indebtedness based upon any such return pursuant to section 553(b)(1) of the Bankruptcy Code or otherwise.

2.6    Reservation of Rights.    The terms, conditions and provisions of this First Interim Order are in addition to and without prejudice to the rights of each of the DIP Secured Parties (in their respective capacities under the Prepetition Loan Documents) to pursue any and

20

all rights and remedies under the Bankruptcy Code or any other applicable agreement or law, including, without limitation, rights to seek adequate protection and/or additional or different adequate protection, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of Cash Collateral other than as provided in this First Interim Order or granting of any interest in the Prepetition Replacement Collateral, as applicable, or priority in favor of any other party, to object to applications for allowance and/or payment of compensation of professionals or other parties seeking compensation or reimbursement from the Estates or to object to any sale of assets (it being understood and agreed that the DIP Loan Agent has reviewed and approved the BH APA (as defined in the DIP Term Sheet), the agreements, schedules and exhibits thereto, and the bid procedures related to it presented to the DIP Loan Agent prior to the Petition Date, and shall not object to any of the foregoing, so long as the foregoing shall not have been modified or amended in a manner adverse to the rights and interests of the DIP Loan Agent or DIP Secured Parties (in their respective capacities under the Prepetition Loan Documents or otherwise) without the prior written consent of the DIP Loan Agent in its sole and absolute discretion.

Section 3.    <u>Objections to Prepetition Secured Obligations.</u>

3.1.    Notwithstanding anything to the contrary in this First Interim Order, any action, claim, defense complaint, motion or other written opposition (hereinafter, an "**Objection**") that seeks to, or seeks standing to, object to, challenge, contest or otherwise invalidate or reduce, whether by setoff, recoupment, counterclaim, deduction, disgorgement or claim of any kind: (a) the existence, validity or amount of the Prepetition Secured Obligations, or (b) the extent, legality, validity, perfection or enforceability of Prepetition Liens and security interests in the Prepetition Collateral shall be properly filed with the Court by any Committee or other party in

21

interest with the requisite standing within sixty (60) calendar days from the entry date of the

Final Order.  If any such Objection is timely and properly filed and successfully pursued, nothing

in this First Interim Order shall prevent the Court from granting appropriate relief with respect to

the Prepetition Secured Obligations or the DIP Secured Parties' (each in their capacities under

the Prepetition Loan Documents) Prepetition Liens on the Prepetition Collateral.  If no Objection

is timely and properly filed, or if an Objection is timely and properly filed but denied, (i) the

Prepetition Secured Obligations shall be deemed allowed in full, shall not be subject to any

setoff, recoupment, counterclaim, deduction or claim of any kind, and shall not be subject to any

further objection or challenge by any party at any time, and the Prepetition Liens on and security

interest in the Prepetition Collateral shall be deemed legal, valid, perfected, enforceable, and

non-avoidable for all purposes and of first and senior priority, subject to only the Permitted

Encumbrances, and (ii) the DIP Loan Agent and the DIP Lenders and each of their respective

participants, agents, officers, directors, employees, attorneys, professionals, successors, and

assigns shall be deemed released and discharged from any and all claims and causes of action

related to or arising out of the Prepetition Loan Documents and shall not be subject to any further

objection or challenge by any party at any time.  Nothing contained in this Section 3.1 or

otherwise shall or shall be deemed or construed to impair, prejudice or waive any rights, claims

or protections afforded to the DIP Loan Agent or any DIP Lenders (each in their capacities under

the Prepetition Loan Documents) in connection with the use of Cash Collateral during the Initial

Interim Cash Collateral Period, or any other post-petition financial and credit accommodations

provided by the DIP Loan Agent and the DIP Lenders to Debtors in reliance on section 364(e) of

the Bankruptcy Code and in accordance with the terms and provisions of this First Interim Order

or the DIP Term Sheet or, including, without limitation, the right to call an "Event of Default"

22

under the DIP Term Sheet in connection with the use of Cash Collateral as provided under this First Interim Order.

Section 4.    Carve Out.

4.1    The Prepetition Replacement Liens on the DIP Collateral and the Prepetition Adequate Protection Superpriority Claim shall be subject to the Carve Out. For purposes hereof, the "**Carve Out**" means: (a) all unpaid fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of the United States Code, (b) all reasonable fees and expenses up to $50,000 incurred by a trustee under Section 729(b) o the Bankruptcy Code (the "**Chapter 7 Trustee Fee Cap**"); and (c) in the event of the occurrence and during the continuance of a DIP Event of Default, the payment of documented unpaid professional fees and disbursements incurred by the Debtors and any statutory committees appointed in the Cases, in each case to the extent allowed by the Court, in an aggregate amount not to exceed all accrued and unpaid professional fees and disbursements owing as of the date of the DIP Event of Default (whether allowed as of such date or subsequent thereto), plus $2,500,000; provided that (x) no portion of the Carve Out shall be utilized for the payment of professional fees and disbursements incurred in connection with any challenge to (i) the amount, extent, priority, validity, perfection or enforcement of the indebtedness of, or other claims against, the Debtors owing to the DIP Secured Parties (either in their capacities under the Prepetition Loan Documents or the DIP Loan Documents) or (ii) the collateral securing such indebtedness or the perfection, priority or validity of the liens granted in favor of the DIP Secured Parties (either in their capacities under the Prepetition Loan Documents or the DIP Loan Documents) with respect thereto, and (b) the Carve Out shall not reduce the amounts payable to the DIP Secured Parties (either in their capacities under the Prepetition Loan Documents or the

23

DIP Loan Documents) under the DIP Loan Documents or under the Prepetition Loan Documents.

Section 5        <u>Collateral Rights</u>.

5.1     Until all Prepetition Secured Obligations shall have been indefeasibly paid and satisfied in full in cash:

(a)     no other party shall foreclose or otherwise seek to enforce any junior lien or claim in the Prepetition Replacement Collateral;

(b)     upon the occurrence and continuance of a DIP Event of Default, and subject to the expiration of the Waiting Period, in connection with a liquidation of any of the Prepetition Replacement Collateral, the DIP Loan Agent, on behalf of the DIP Secured Parties (each in their capacities as under the Prepetition Loan Documents), or any of its employees, agents, consultants, contractors or other professionals, shall have the right, at the sole cost and expense of the Debtors, to: (i) enter upon, occupy and use any real or personal property, fixtures, equipment, leasehold interests or warehouse arrangements owned or leased by the Debtors, and (ii) use any and all trademarks, trade names, copyrights, licenses, patents or any other similar assets of the Debtors, which are owned by or subject to a lien of any third party and which are used by the Debtors in their businesses.  The DIP Secured Parties will be responsible for the payment of any applicable fees, rentals, royalties or other amounts due such lessor, licensor or owner of such property for the period of time that the  DIP Loan Agent actually uses the equipment or the intellectual property (but in no event for any accrued and unpaid fees, rentals or other amounts due for any period prior to the date that the DIP Loan Agent actually occupies or uses such assets or properties or for any fees, rentals or other amounts that may become due following the end of the DIP Loan Agent's occupation or use).

24

Section 6          <u>Binding Effect.</u>

6.1      The provisions of this First Interim Order, the Prepetition Adequate Protection Superpriority Claim, and any and all rights, remedies, privileges and benefits in favor of each of the DIP Loan Agent and the DIP Lenders (in their respective capacities under the Prepetition Loan Documents or otherwise) provided or acknowledged in this First Interim Order, and any actions taken pursuant thereto, shall be effective immediately upon entry of this First Interim Order pursuant to Bankruptcy Rules 6004(g) and 7062, shall continue in full force and effect, and shall survive entry of any such other order, including without limitation any order which may be entered confirming any plan of reorganization, converting one or more of the Cases to any other chapter under the Bankruptcy Code, or dismissing one or more of the Cases.

6.2      This First Interim Order shall be binding upon Debtors, all parties in interest in the Cases and their respective successors and assigns, including any trustee or other fiduciary appointed in the Cases or any subsequently converted bankruptcy case(s) of any Debtor.  This First Interim Order shall also inure to the benefit of the DIP Secured Parties (in their respective capacities under the Prepetition Loan Documents or otherwise), Debtors and their respective successors and assigns.

6.3      <u>Objections Overruled</u>.  All objections to the entry of this First Interim Order are, to the extent not withdrawn, hereby overruled.

6.4      <u>General Authorization</u>.  The Debtors are authorized to take any and all actions necessary to effectuate the relief granted in this First Interim Order.

25

6.5    <u>Retention of Exclusive Jurisdiction</u>.    This Court shall retain exclusive jurisdiction and power with respect to all matters arising from or related to the implementation or this First Interim Order.

Dated: New York, New York
_____

_____
UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT A</u>**

**DIP Term Sheet**

EXECUTION

**SYNERGY PHARMACEUTICALS INC.**

**SUPERPRIORITY DIP FACILITY**

**Binding Term Sheet**

**December 11, 2018**

This binding term sheet (the "***Binding Term Sheet***") sets forth the terms and conditions with respect to the New Money DIP Loans (as defined below), the DIP Facility (as defined below), the treatment of the Prepetition Obligations (as defined below), which terms and conditions will be set forth in the DIP Loan Documents (as defined below).

The obligations of the DIP Lenders to provide financing pursuant to this Binding Term Sheet shall be subject to the terms and conditions set forth herein and conditioned upon (i) the execution and delivery of definitive DIP Loan Documents (as defined below), (ii) the execution and delivery of signature pages to this Binding Term Sheet by each of the parties hereto, and (iii) the entry in the Bankruptcy Court (as defined below) of the Financing Orders (as defined below).

| | |
|---|---|
| Borrower: | Synergy Pharmaceuticals Inc., a debtor-in-possession in the cases (the "***Chapter 11 Cases***") pending with respect to itself and Synergy Advanced Pharmaceuticals, Inc., its wholly owned subsidiary (each a "***Debtor***" and, collectively, the "***Debtors***") under Chapter 11 of Title 11 of the United States Code (as amended, the "***Bankruptcy Code***") and filed with the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***"). (As used herein, the term "***Petition Date***" shall mean the date upon which the Chapter 11 Cases are commenced in the Bankruptcy Court.) |
| Guarantor: | Synergy Advanced Pharmaceuticals, Inc., a wholly owned subsidiary of the Borrower (the Borrower and the Guarantor, together, the "***DIP Loan Parties***"). |
| DIP Lenders and Commitments: | Each of the entities and their respective commitments set forth on <u>Exhibit A</u> hereto, as such exhibit may be amended prior to the entry of the Final Order (as defined below) solely to adjust the "proportionate shares" of the DIP Lenders, but not to reduce the aggregate commitments of the DIP Lenders, collectively. |
| **Administrative Agent and Collateral Agent:** | CRG Servicing LLC (the "***DIP Administrative Agent***" and collectively with the DIP Lenders, the "***DIP Secured Parties***"). |
| **Prepetition Credit Agreement:** | That certain Term Loan Agreement (the "***Prepetition Credit Agreement***"), dated as of September 1, 2017 (as later modified or amended), among Synergy Pharmaceuticals Inc. (the "***Prepetition Borrower***"), the Subsidiary Guarantors party thereto (the "***Prepetition Guarantors***"), the lenders party thereto (the "***Prepetition Lenders***"), and CRG Servicing LLC as Administrative Agent and Collateral Agent (the "***Prepetition Administrative Agent***" and collectively with the Prepetition Lenders, the "***Prepetition Secured Parties***"). Unless |

EXECUTION

| | |
|---|---|
| | otherwise defined herein, terms defined in the Prepetition Credit Agreement are used herein with such defined meanings. |
| **DIP Facility:** | Debtor-in-possession senior secured superpriority term loan facility in an aggregate principal amount equal to [$155,000,000], comprised of [$45,000,000] of "new money" loans (the "***New Money DIP Loans***"), plus approximately [$110,000,000] of loans representing a "roll up" of a portion of the Prepetition Obligations (as defined below) equal to the sum of (i) outstanding principal, plus (ii) accrued and unpaid interest, including accrued and unpaid postpetition interest at the Default Rate specified in the Prepetition Credit Agreement (the "***Prepetition Default Rate***") from the Petition Date through and including the date of the entry of the Second Interim Order (and as otherwise provided in the Second Interim Order), plus (iii) any and all unreimbursed costs, fees and expenses of the Prepetition Secured Parties incurred in accordance with the Prepetition Credit Agreement (the "***Roll Up Dip Loans***" and together with the New Money DIP Loans, the "***DIP Loans***"). |
| **Interest Rate:** | Interest shall accrue on the DIP Loans at the rate of Libor + 9.50% per annum, and shall be payable monthly, on the first (1st) business day of each month, in arrears, in accordance with the Budget (defined below). |
| **Default Rate:** | At all times while an Event of Default (as defined in the DIP Loan Documents) exists, principal, interest and other amounts shall bear interest at a rate per annum equal to 4.00% in excess of the interest rate set forth in "Interest Rate" above. |
| **New Money DIP Loan Fees:** | 1. An "***Upfront Fee***" equal to 2.00% of the total amount of New Money DIP Loans shall be paid upon entry of the Final Order (as defined below).<br><br>2. An "***Exit Fee***" equal to 3.00% of the total amount of New Money DIP Loans shall be paid upon the Maturity Date (as defined below). |
| **Nature of Fees:** | Fully earned and non-refundable under all circumstances. |
| **Expenses of DIP Secured Parties:** | The reasonable and documented professional fees and expenses incurred by the DIP Secured Parties shall be promptly paid by the Debtors on no less than a monthly basis. |
| **Maturity Date:** | The earliest of (a) April 9, 2019; (b) the consummation of a sale of all or substantially all of the Borrower's assets; (c) acceleration of the DIP Loans pursuant to the DIP Loan Documents (as defined below); and (d) such later date as the DIP Lenders in their sole discretion may agree in writing with the Debtors. |
| **Budget:** | All advances under the DIP Facility and any Cash Collateral shall be used by the DIP Loan Parties solely in accordance with a rolling 13- |

21787334-v11

week budget (the "*Budget*"), for the period commencing on the Petition Date through and including March 31, 2019 (the "*Budget Period*"), setting forth all forecasted (i) cash receipts of the DIP Loan Parties (the "*Cash Receipts*") (ii) cash operating disbursements (the "*Cash Operating Disbursements*") of the DIP Loan Parties, and (iii) non-operating, bankruptcy-related cash disbursements of the DIP Loan Parties (the "*Cash Bankruptcy Disbursements*"), which Budget shall be approved by the DIP Administrative Agent in its sole and absolute discretion and may be modified by the DIP Loan Parties with the written consent of the DIP Administrative Agent in its sole and absolute discretion and without further order of the Bankruptcy Court; provided, that (i) the total amount of funding provided pursuant to the Budget shall not exceed the total amount of the DIP Facility authorized by each of the Financing Orders (as defined below), and (ii) the reasonable and documented professional fees and expenses incurred by the DIP Secured Parties shall not be subject to a cap. A copy of the Budget approved by the DIP Administrative Agent is attached hereto as Exhibit B.

Compliance with the Budget will be measured every week, starting with the third week following the Petition Date, for the period beginning as of the week of the Petition Date and ending the week prior to the week on which compliance is measured. For purposes of illustration, on the third week following the Petition Date, the DIP Loan Parties' compliance with the Budget for the first two weeks following the Petition Date shall be measured. Each date on which compliance with the Budget is measured is referred to herein as a "*Testing Date*". As of any applicable Testing Date:

1. the cumulative Cash Receipts may vary from the Budget by no more than the following: (a) 20.00% for the first four-week period (and each week thereof), beginning as of the week of the Petition Date, (b) 15.00% for the first five-week period beginning as of the week of the Petition Date, and (c) 10.00% for the first six-week period and all subsequent weeks of the period beginning as of the week of the Petition Date (the "*Cash Receipt Variance*");

2. the cumulative Cash Operating Disbursements may vary from the Budget by no more than the following: (a) 20.00% for the first four-week period (and each week thereof), beginning as of the week of the Petition Date, (b) 15.00% for the first five-week period beginning as of the week of the Petition Date, and (c) 10.00% for the first six-week period and all subsequent weeks of the period beginning as of the week of the Petition Date (the "*Cash Operating Variance*"); and

EXECUTION

| | |
|---|---|
| | 3. the cumulative Cash Bankruptcy Disbursements shall not exceed at any time during the Budget Period the aggregate capped amount set forth in the Budget with respect thereto (the "*Cash Bankruptcy Disbursement Cap*"), subject to a variance of no more than 10% (the "*Cash Bankruptcy Disbursement Variance*" and together with the Cash Receipt Variance and the Cash Operating Variance, the "*Permitted Variances*").

The DIP Loan Parties shall be deemed to be in compliance with the Budget for all purposes under this Binding Term Sheet, the DIP Loan Documents, and the Financing Orders unless, as of any applicable date of determination, the DIP Loan Parties' (x) cumulative Cash Receipts, (y) cumulative Cash Operating Disbursements, or (z) cumulative Bankruptcy Disbursements, as applicable, vary from the Budget by more than the applicable Permitted Variance as measured on any Testing Date; *provided, however*, that with respect to cumulative Cash Receipts, the DIP Loan Parties shall not be deemed to have failed to comply with the Budget unless the DIP Loan Parties' cumulative Cash Receipts fall beneath the amounts set forth in the Budget as measured on any two consecutive Testing Dates during the first four week period beginning as of the Petition Date. All references to compliance with the "Budget" in this Term Sheet shall be construed as being qualified by the phrase, "subject to Permitted Variances."

As further set forth below, after the first three weeks following the Petition Date, the Debtors shall provide the DIP Administrative Agent with weekly and cumulative variance reporting on a line item basis for Cash Receipts, Cash Operating Disbursements and Cash Bankruptcy Disbursements, which reporting shall (i) detail the variance, if any, of actual cash disbursements and actual cash receipts from the Budget and (ii) provide an explanation of any per line item variance greater than 5.00% (the "*Variance Report*"). |
| **Mandatory Prepayments:** | Mandatory prepayment of the DIP Loans shall be required: (i) upon the consummation of an Acceptable 363 Sale (as defined below), or (ii) upon the effectiveness of an Acceptable Plan (as defined below), as an alternative to a sale. |
| **DIP Obligations:** | As used herein, the term "*DIP Obligations*" means (a) the due and punctual payment by the Debtors of (i) the unpaid principal amount of and interest on (including interest accruing after the maturity of the DIP Loans and interest accruing after the commencement of the Chapter 11 Cases) the DIP Loans, as and when due, whether at maturity, by acceleration or otherwise, and (ii) all other monetary obligations, including advances, debts, liabilities, obligations, fees, costs, expenses and indemnities, whether primary, secondary, direct, |

4

EXECUTION

| | |
|---|---|
| | indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise, of the Debtors to the DIP Lenders under the DIP Loan Documents and the Financing Orders, and (b) the due and punctual payment and performance of all covenants, duties, agreements, obligations and liabilities of the Debtor to the DIP Lender under or pursuant to the DIP Loan Documents and the Financing Orders. |
| **Prepetition Obligations:** | As used herein, the term *"Prepetition Obligations"* means, as of the Petition Date, the indebtedness of the Debtors to the to the Prepetition Lenders under the Prepetition Credit Agreement and all other documents executed and delivered in connection therewith (collectively, the *"Prepetition Loan Documents"*) in the approximate aggregate amount of $[147,100,000], which amount is the sum of: (i) principal in the amount of $107,551,191.90, plus (ii) accrued and unpaid interest in the amount of $2,322,806.99 (including interest at the Prepetition Default Rate in the amount of $250,952.78), plus (iii) Prepayment Premium[1] in the amount of $34,954,137.37, plus (iv) Back-End Facility Fee[2] in the amount of $2,151,023.84, plus (v) unreimbursed costs, fees and expenses in accordance with the Prepetition Loan Documents (collectively, the *"Prepetition Obligations"*). |
| **Cash Collateral:** | The Prepetition Lenders shall consent to the use of their "cash collateral" as defined in section 363(a) of the Bankruptcy Code (the *"Cash Collateral"*), all in accordance with the terms and conditions set forth in this Binding Term Sheet, the Financing Orders (as defined below), and the Budget; provided, that the DIP Loan Parties shall operate their cash management system in a manner that is the same as or substantially similar to their prepetition cash management system, including daily "sweeps" of cash from the DIP Loan Parties' revenue lock-box to their main operating account which shall continue in the same or substantially similar manner as prior to the Petition Date. |
| **Use of New Money DIP Loan Proceeds and Cash Collateral:** | The proceeds of the New Money DIP Loans and Cash Collateral shall be available to finance, in each case in accordance with the Budget (as defined below): <br><br> 1. working capital and general corporate purposes of the Debtors, <br><br> 2. the pursuit of an Acceptable 363 Sale (as defined below), and <br><br> 3. bankruptcy-related costs and expenses, subject to the Carve Out (as defined below). |

---

[1] Prepayment Premium calculated in accordance with Section 3.03(a) (i) (B) of the Prepetition Credit Agreement.
[2] Back-End Facility Fee is defined and set forth in the Fee Letter dated September 1, 2017.

21787334-v11

EXECUTION

| | |
|---|---|
| **Initial Approval by the Bankruptcy Court:** | The use of Cash Collateral, the DIP Facility, this Binding Term Sheet and all terms and conditions set forth herein (collectively, the "***Transactions***") shall be subject to the entry in the Bankruptcy Court of an interim order, in form and substance acceptable to the DIP Administrative Agent in its sole and absolute discretion, approving the Transactions (the "***First Interim Order***). In the event that the Second Interim Order (as defined below) is not entered in the Bankruptcy Court on or prior to December 21, 2018, the consent of the Prepetition Lenders to the use of Cash Collateral shall automatically terminate. |
| **Documentation:** | Definitive financing documentation with respect to the DIP Loans satisfactory in form and substance to the DIP Secured Parties (the "***DIP Loan Documents***") shall be executed and delivered by the parties thereto on or prior to December 18, 2018, and shall be approved upon the entry in the Bankruptcy Court of a second interim order, in form and substance acceptable to the DIP Administrative Agent in its sole and absolute discretion, approving (among other things) the DIP Loan Documents (the "***Second Interim Order***"). |
| **Documentation Principles:** | The DIP Loan Documents shall, except as otherwise set forth herein, be based on and consistent with the Prepetition Credit Agreement and the other Prepetition Loan Documents, as modified by the terms set forth in this Binding Term Sheet and subject to (i) materiality qualifications and other exceptions that give effect to, permit and/or accommodate the structure of any Acceptable 363 Sale or Acceptable Plan, as applicable, (ii) modifications to reflect the status of the DIP Loan Parties as debtors-in-possession in the Chapter 11 Cases, and (iii) be negotiated in good faith within a reasonable (consistent with the term of this Binding Term Sheet) time period. This paragraph collectively referred to herein as the "***Documentation Principles***". |
| **Initial Funding, Roll Up and Prepetition Claim:** | Subject to the terms and conditions set forth in the DIP Loan Documents and this Binding Term Sheet, including the Conditions Precedent (defined below): |
| | 1. Upon the entry in the Bankruptcy Court of the Second Interim Order, in form and substance acceptable to the DIP Administrative Agent in its sole and absolute discretion, approving the DIP Loans, the continued use of Cash Collateral in accordance with this Binding Term Sheet, and providing Adequate Protection for the Prepetition Lenders in accordance with this Binding Term Sheet: (i) $11,500,000 of the New Money DIP Loans will be advanced for the liquidity needs of the Debtors in accordance with the Budget (the "***First Advance***"), and (ii) 100% of the Rollup DIP Loans will be used to discharge, on a dollar for dollar basis, all outstanding Prepetition Obligations, other than the Prepayment Premium and the Back-End Facility Fee. The indebtedness represented by the Prepayment Premium and the Back-End Facility Fee, including all accrued and unpaid |

6

EXECUTION

| | |
|---|---|
| | postpetition interest from the Petition Date through and including the date of the entry of the Second interim Order (and as otherwise provided in the Second Interim Order), shall constitute a prepetition secured claim of the Prepetition Administrative Agent on behalf of the Prepetition Lenders (the "***Remaining Prepetition Secured Claim***").

2. The remaining $33,500,000 of New Money DIP Loans will be advanced for the liquidity needs of the Debtors in accordance with the Budget (the "***Second Advance***") upon the entry in the Bankruptcy Court of a final order, in form and substance acceptable to the DIP Administrative Agent in its sole and absolute discretion, approving (among other things) the DIP Loans (the "***Final Order***" and collectively with the First Interim Order and the Second Interim order, the "***Financing Orders***"). |
| Security: | As security for the DIP Obligations, each Debtor shall grant to the DIP Lenders a security interest in and continuing lien on all of such Debtor's right, title and interest in, to and under all the Debtor's assets, including, but not limited to the following, in each case, whether now owned or existing or hereafter acquired, created or arising and wherever located (all of which being hereafter collectively referred to as the "***DIP Collateral***"): all assets and property of each Debtor and its estate, real or personal, tangible or intangible, now owned or hereafter acquired, whether arising before or after the Petition Date, including, without limitation, all contracts, contract rights, licenses, general intangibles, instruments, equipment, accounts, documents, goods, inventory, fixtures, documents, cash, cash equivalents, chattel paper, letters of credit and letter of credit rights, investment property, commercial tort claims, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations and instruments, all interests in leaseholds and real properties, all patents, copyrights, trademarks, trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), all equity interests, all books and records relating to the foregoing, all other personal and real property of the Debtor, and all other collateral pledged under the DIP Loan Documents, any actions under sections 544, 545, 547, 548 and 550 of the Bankruptcy Code, other than any such actions acquired by the purchaser under an Acceptable 363 Sale (the "***Avoidance Actions***"), and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (in each case as the foregoing are defined in the Uniform Commercial Code as in effect from time to time in the State of Delaware (and, if defined in more than one Article of such Uniform Commercial Code, shall have the meaning given in Article 9 thereof)); <u>provided</u>, that (i) the DIP Lender shall receive perfected security interests in and a lien on Avoidance Actions and their proceeds only upon entry of the Final Order; and (ii) the DIP Collateral shall not include the |

7

EXECUTION

| | |
|---|---|
| | Company's directors and officers insurance policy or any proceeds thereof. |
| **Priority and Liens:** | All of the claims of the DIP Administrative Agent and the DIP Lenders under the DIP Facility with respect to the DIP Loans and the DIP Obligations shall at all times:<br><br>1. pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority claim status in the Chapter 11 Cases (which claims shall be payable from and have recourse to all DIP Collateral);<br><br>2. pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all DIP Collateral other than all property of the Debtors that is subject to valid and perfected liens in existence at the time of the commencement of the Chapter 11 Cases or subject to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code (the "***Prior Senior Liens***");<br><br>3. pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all property of the Debtors that is subject to a Prior Senior Lien; and<br><br>4. pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by a perfected first priority, senior priming lien on all of the property of the Debtors (including, without limitation, inventory, receivables, equipment, machinery, intellectual property, general intangibles, real property, capital stock of subsidiaries, membership interests in limited liability companies) that is subject to the existing liens that secure the obligations of the Debtors to the Prepetition Lenders under or in connection with the Prepetition Loan Documents and the Prepetition Obligations. |
| **Adequate Protection:** | The Second Interim Order shall provide, as adequate protection for the use of the collateral securing the Remaining Prepetition Secured Claim and the priming of the liens and security interests granted to the Prepetition Secured Parties under the Prepetition Loan Documents (the "***Prepetition Liens***"), the Prepetition Lenders shall be entitled to receive, to the extent of any use of, or diminution in the value of, the collateral securing the Prepetition Obligations (the "***Prepetition Obligations***"):<br><br>1. superpriority claim status;<br><br>2. replacement liens on all DIP Collateral, junior only to the liens of the DIP Administrative Agent and the DIP Lenders, but subject to any Prior Senior Liens; |

|  |  |
|---|---|
|  | 3. commencing on the date upon which the Second Interim Order is entered in the Bankruptcy Court, payment on a monthly basis of postpetition interest accruing from such date at the Default Rate specified in the Prepetition Credit Agreement; and<br><br>4. reimbursement of all fees, costs and expenses incurred in connection with defending the validity and enforceability of the Prepetition Obligations, the Prepetition Liens (as defined below) or the Remaining Prepetition Secured Claim. |
| **Carve Out:** | The liens on and security interests in the DIP Collateral and the super-priority administrative expense claims shall be subject to the "*Carve Out*." For purposes hereof, the "Carve Out" means: (i) all unpaid fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code, (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under Section 729(b) of the Bankruptcy Code (the "*Chapter 7 Trustee Fee Cap*"); and (iii) in the event of the occurrence and during the continuance of an Event of Default, the payment of documented unpaid professional fees and disbursements incurred by the Borrower and any statutory committees appointed in the Chapter 11 Cases, in each case to the extent allowed by the Court, in an aggregate amount not to exceed all accrued and unpaid professional fees and disbursements owing as of the date of the Event of Default (whether allowed as of such date or subsequent thereto), plus $2,500,000; provided, that (a) no portion of the Carve Out shall be utilized for the payment of professional fees and disbursements incurred in connection with any challenge to (i) the amount, extent, priority, validity, perfection or enforcement of the indebtedness of, or other claims against, the Debtors owing to the DIP Lenders or the Prepetition Lenders or (ii) the collateral securing such indebtedness or the perfection, priority or validity of the liens granted in favor of the DIP Lenders or the Prepetition Lenders with respect thereto, and (b) the Carve Out shall not reduce the amounts payable to the DIP Lenders under the DIP Loan Documents and to the Prepetition Lenders under the Prepetition Loan Documents. |
| **Acceptable 363 Sale:** | As used herein, the term "*Acceptable 363 Sale*" means a sale of all or substantially all of the Debtor's assets pursuant to Section 363 of the Bankruptcy Code, subject to the following conditions:<br><br>1. the DIP Administrative Agent shall have reviewed and approved in writing any bid procedures, "stalking horse" asset purchase agreement (the "*Stalking Horse Purchase Agreement*"), or any other related agreement; it being understood and agreed that the DIP Administrative Agent has reviewed and approved the form of |

9

EXECUTION

| | |
|---|---|
| | Stalking Horse Purchase Agreement with Bausch Health Companies Inc., a corporation organized under the laws of British Columbia, Canada ("**BH**"), and its wholly owned subsidiary Bausch Health Ireland Limited, a private limited company organized under the laws of Ireland (the "**BH APA**"), the agreements, schedules and exhibits thereto, and bid procedures related to it presented to the DIP Administrative Agent prior to the Petition Date;<br><br>2. the sale order shall provide for the indefeasible repayment in full in cash of the DIP Facility upon consummation of the sale; and<br><br>3. the sale shall be consummated not later than April 9, 2019. |
| Acceptable Plan: | As used herein, the term "**Acceptable Plan**" means a plan of reorganization or liquidation for each of the Chapter 11 Cases that:<br><br>1. Is confirmed on or prior to March 15, 2019; <u>provided</u>, that the closing of the BH APA (or the asset purchase agreement of a higher bidder pursuant to an auction), has occurred on or before April 9, 2019.<br><br>2. Either: (a) Pays the Remaining Prepetition Secured Claim (estimated to be $37.1 million) indefeasibly in full in cash on the effective date of such Acceptable Plan; **OR**<br><br>(b) Offers to the class of unsecured creditors, if they vote to accept such Acceptable Plan, the amounts set forth below, and satisfies the Remaining Prepetition Secured Claim by the applicable amounts below:<br><br>(i) If there is a "shortfall" (i.e. the amount of remaining sale proceeds held for distribution is less than $37.1 million per the Budget) of $0.00 to $5 million, then the Prepetition Secured Parties shall receive $20 million in cash to satisfy the Remaining Prepetition Claim and $12 million in cash shall be made available for distributions to general unsecured creditors;<br><br>(ii) If there is no shortfall but the amount of remaining sale proceeds exceeds $37.1 million then the excess proceeds up to $5 million shall be shared 75% to the Prepetition Secured Lenders and 25% to the general unsecured creditors, such that the Prepetition Secured Parties would receive a total up to $24 million in cash to satisfy in full the Remaining Prepetition Secured Claim and the general unsecured creditors up to $13 million in cash; and<br><br>(iii) If there is no shortfall but the amount of remaining sale proceeds exceeds $42.1 million, then such excess proceeds shall be shared 50/50 as between the Prepetition Secured Lenders and the general unsecured |

10

EXECUTION

| | |
|---|---|
| | creditors until, as applicable, the Prepetition Secured Parties have received $37.1 million cash to satisfy the Remaining Prepetition Secured Claim and the general unsecured creditors have received payment in the full amount of their allowed claims.<br><br>(For the avoidance of doubt, a chart illustrating each waterfall scenario is attached as <u>Exhibit C</u>.)<br><br>3.    Assigns to the Debtors the Avoidance Actions (and/or proceeds thereof) given to the Prepetition Secured Lenders as adequate protection.<br><br>4.    Contains, to the maximum extent permissible by law, releases and other exculpatory provisions for the DIP Secured Parties, Prepetition Secured Parties and each of their respective affiliates in form and substance satisfactory to the DIP Administrative Agent and the Prepetition Administrative Agent in their sole and absolute discretion.<br><br>5.    Becomes effective on or before April 10, 2019.<br><br>6.    Is otherwise in form and substance reasonably satisfactory to the DIP Administrative Agent with respect to any provision that may adversely affect the DIP Secured Parties and/or the Prepetition Secured Parties. |
| Credit Bidding: | Each of the Financing Orders and the DIP Loan Documents shall provide that, in connection with an Acceptable 363 Sale or an Acceptable Plan that provides for the sale of the DIP Collateral, the DIP Administrative Agent and the Prepetition Administrative Agent shall have the right to credit bid up to and including the full amount of the DIP Obligations <u>plus</u> the full amount of the Remaining Prepetition Secured Claim for the DIP Collateral. Any such credit bid may provide for the assignment of the right to purchase the acquired assets to a newly formed acquisition vehicle. Notwithstanding the foregoing, the DIP Administrative Agent and the Prepetition Administrative Agent shall not be entitled to exercise such right to credit bid unless and until the BH APA is terminated or modified in a manner adverse in any material respect to the DIP Secured Parties. |
| Marshalling and Waiver of 506(c) Claims 552(b) Rights: | (i) Each of the Financing Orders shall provide, effective upon the entry of the Final Order, that in no event shall the DIP Administrative Agent, the DIP Lenders, the Prepetition Administrative Agent, or the Prepetition Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral (as defined below), (ii) the First Interim Order shall approve the waiver of all 506(c) claims on account of amounts covered by the Carve-Out, and (iii) the Final Order shall |

11

EXECUTION

| | |
|---|---|
| | approve the waiver of all 506(c) claims and similar rights under 552(b). |
| **Automatic Stay:** | Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Financing Orders, as the case may be, upon the Maturity Date (whether by acceleration or otherwise), the DIP Secured Parties shall be entitled to immediate payment of all obligations under the DIP Facility and to enforce the remedies provided for under the DIP Loan Documents or under applicable law, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court, but subject to the following conditions (the "*Waiting Period Procedures*"):<br><br>1. The DIP Secured Parties shall notify the DIP Loan Parties that the Maturity Date has occurred (such notice, a "*Maturity Date Notice*" and the date of any such notice, the "*Maturity Date Notice Date*"). A copy of any Maturity Date Notice shall be provided by email to the Debtors' counsel.<br><br>2. A waiting period shall commence upon delivery of the Maturity Date Notice and shall expire four (4) business days after the Maturity Date Notice Date (the "*Waiting Period*"). During the Waiting Period, the Debtors shall be entitled to seek an emergency hearing before the Bankruptcy Court for the sole purpose of contesting the occurrence of a Maturity Date (including, for the avoidance of doubt, contesting the occurrence of any breach, default, or Event of Default alleged to underlie the occurrence of the Maturity Date.<br><br>3. During the Waiting Period, the Debtors may continue to use the DIP Collateral, including the Cash Collateral.<br><br>None of the DIP Secured Parties or the Prepetition Secured Parties shall object to any motion filed by the Debtors during the Waiting Period seeking such expedited hearing nor seek to reduce such Waiting Period. |
| **Conditions Precedent:** | The several obligations of the DIP Lenders to make the DIP Loans shall be conditioned on the satisfaction or waiver of the following:<br><br>1. with respect to the First Advance of the New Money Dip Loans and the "Roll Up":<br><br>    a. the filing by the Debtors of an Acceptable Plan and disclosure statement in the Bankruptcy Court not later than December 21, 2018;<br>    b. definitive DIP Loan Documents in form and substance acceptable to the DIP Administrative Agent in its sole and absolute discretion, shall have been executed and delivered by the parties thereto on or prior to December 18, 2018; |

21787334-v11

EXECUTION



|  | c. the entry by the Bankruptcy Court of the Second Interim Order in form and substance acceptable to the DIP Administrative Agent in its sole and absolute discretion; and |
|  | d. the Debtors shall have been at all times in compliance with the Budget (subject to the Permitted Variances). |
|  | 2. with respect to the Second Advance of the New Money DIP Loans, the entry of the Final Order in form and substance acceptable to the DIP Administrative Agent in its sole and absolute discretion; |
|  | 3. with respect to the BH APA, the Bid Procedures Motion, the Sale Motion and the respective orders of the Bankruptcy Court related thereto shall not have been modified or amended in a manner adverse in any material respects to the rights and interests of the DIP Secured Parties without the prior written consent of the DIP Administrative Agent in its sole and absolute discretion; and |
|  | 4. other than the Designated Defaults or a Liquidity Covenant Default (as such terms are defined in the Limited Forbearance Agreement dated November 19, 2018, among the Debtors and the Prepetition Secured Parties, as amended by Amendment to Limited Forbearance Agreement dated December 5, 2018) and the event of default under the Prepetition Credit Agreement resulting from the Debtors filing for bankruptcy (and any default or other event of default arising therefrom or related thereto), no Default or Event of Default shall have occurred. |
| **Representations and Warranties:** | The representations and warranties of the DIP Loan Parties under the DIP Loan Documents shall be substantially similar to those set forth in the Prepetition Credit Agreement, subject to the Documentation Principles, and include the following, in each case subject to certain exceptions, qualifications, and carve outs to be set forth in the DIP Loan Documents and substantially consistent with the Documentation Principles: |
|  | a. The Debtor is duly organized, validly existing, in good standing and qualified to do business in the state of its organization. |
|  | b. As of the Petition Date, the approximate aggregate outstanding amount of the Prepetition Obligations is [$147,100,000], which amount is the sum of: (i) principal in the amount of $107,551,191.90, plus (ii) accrued and unpaid interest in the amount of $2,322,806.99 (including interest at |

21787334-v11

| | |
|---|---|
| | the Prepetition Default Rate in the amount of $250,952.8), _plus_ (iii) Prepayment Premium in the amount of $34,954,137.37, _plus_ (iv) Back-End Facility Fee in the amount of $2,151,023.84, _plus_ (v) unreimbursed costs, fees and expenses in accordance with the Prepetition Loan Documents.<br><br>c.  The stipulations of the Debtors in each of the Financing Orders are true, accurate and correct.<br><br>d.  The Debtor has full power and authority to operate and conduct its business, to execute, deliver and perform this Binding Term Sheet and associated documents and to incur obligations under this Binding Term Sheet, the DIP Loan Documents and the Financing Orders.<br><br>e.  Neither the DIP Obligations nor the Prepetition Obligations shall be subject to setoff or recoupment or any such rights under Bankruptcy Code section 553 or otherwise with respect to any claim the Debtor may have against the DIP Lender arising on or before the Petition Date.<br><br>f.  All material contracts and agreements with critical Vendors (the "_Vendor Contracts_") and key customers (the "_Customer Contracts_") shall remain in full force and effect and no defaults or termination events exist or have been asserted with respect to any such contracts, other than a default resulting from the commencement of the Chapter 11 Cases, or the insolvency or financial condition of the DIP Loan Parties; _provided_, that no such default shall result in a termination of the (i) BH APA or (ii) any material Vendor Contracts or Customer Contracts. |
| **Affirmative Covenants:** | The affirmative covenants of the DIP Loan Parties under the DIP Loan Documents shall be limited to the following, in each case subject to certain exceptions, qualifications, and carve outs to be set forth in the DIP Loan Documents and substantially consistent with the Documentation Principles:<br><br>a.  use the advances made under the DIP Facility and/or the Cash Collateral only for the purposes set forth herein and identified in the Budget, except as would not cause the Borrower's cash disbursements on an aggregate basis for operating expenses to vary from the Budget by more than the applicable Operating Variance,  and shall not use such funds to commence any action against the DIP Administrative Agent, the DIP Lenders or their respective affiliates, employees, directors, officers or principals; |

14

|  |  |
|---|---|
|  | b. permit the DIP Secured Parties and their representatives and designees to visit and inspect the properties, books and records of the Debtor upon reasonable notice at the Debtor's expense; |
|  | c. subject to the Budget, pay all taxes, assessments, contributions and other governmental charges imposed upon any Debtor or any of its properties or assets as they become due and payable, to the extent payment and/or enforcement thereof is not stayed as a result of the Chapter 11 Cases; |
|  | d. maintain in good working order all material properties used in the Borrower's business, as and to the extent in good working order as of the Petition Date; |
|  | e. maintain insurance with respect to the business and property of the Debtors against loss of the kind and in the amounts maintained by the Debtors as of the Petition Date; |
|  | f. comply in all material respects with the requirements of all applicable laws; |
|  | g. cause its financial professionals to provide the DIP Secured Parties and the Prepetition Secured Parties with detailed weekly status reports regarding the post-petition marketing efforts and provide any information regarding the Acceptable Sale that the DIP Lenders/Prepetition Lenders may request; |
|  | h. comply in all material respects with the schedule of Case Milestones (as defined below); |
|  | i. promptly upon request execute and deliver such documents and do such other acts as the DIP Secured Parties may reasonably request in connection with the DIP Facility, and in accordance with the DIP Loan Documents (including but not limited to execution of any additional security documents that may be required); and |
|  | j. comply with all obligations of the Debtors under the DIP Loan Documents and the Financing Orders. |
| **Negative Covenants:** | The negative covenants of the DIP Loan Parties under the DIP Loan Documents shall be limited to the following, in each case subject to certain exceptions, qualifications, and carve outs to be set forth in the DIP Loan Documents and substantially consistent with the Documentation Principles: |
|  | a. incur any indebtedness (other than the borrowings under the DIP Facility and obligations permitted to be incurred under |

EXECUTION

the Budget, any other indebtedness permitted to be incurred by the DIP Lenders and the Bankruptcy Court, and any unsecured obligations incurred in the ordinary course of business by the Debtors and permitted to be incurred by the Budget);

b.  incur any liens other than liens permitted in writing by the DIP Administrative Agent in its sole and absolute discretion;

c.  make any investments in any person or make any loan to any person (other than as permitted in writing by the DIP Administrative Agent in its sole and absolute discretion);

d.  engage in any business other than the business engaged in by the Debtors on the Petition Date;

e.  sell any assets outside the ordinary course of business (i) except with the written consent of the DIP Administrative Agent in its sole and absolute discretion, or (ii) unless such sale results in the indefeasible payment in full in cash of the DIP Obligations;

f.  acquire assets, merge, consolidate or dissolve without the consent of the DIP Administrative Agent in its sole and absolute discretion;

g.  terminate or agree to any modification to any organizational documents of any Debtor except with the written consent of the DIP Administrative Agent in its sole and absolute discretion;

h.  engage in any transactions with insiders without the written consent of DIP Administrative Agent in its sole and absolute discretion, except as set forth in the Budget;

i.  use proceeds of the Carve Out, DIP Collateral or Prepetition Collateral except as set forth herein, including, but not limited to, investigate or challenge the validity, perfection, priority, extent, or enforceability of Prepetition Liens; provided, that not more than $75,000 of the proceeds of the Carve Out, DIP Collateral or Prepetition Collateral may be set aside for use by any statutory committees appointed in the Chapter 11 Cases for purposes of investigating such validity, perfection, priority, extent or enforceability of Prepetition Liens

|  |  |
|---|---|
|  | j. amend the any of the Financing Orders or the Budget without the DIP Lenders' consent; |
|  | k. agree to entry of any order precluding or modifying the DIP Lenders' and Prepetition Lenders' rights to "credit bid" up to the full amount of the outstanding DIP Loans plus the Remaining Prepetition Secured Claim for the Debtor's assets; or |
|  | l. other than the Carve Out, consent to the granting of adequate protection payments or liens, super-priority administrative expense claims or liens having priority senior or *pari passu* with those granted to the DIP Lenders or Prepetition Lenders, except as permitted by the DIP Loan Documents. |
| Case Milestones: | The milestone schedule with which the Debtors shall comply, for the purpose of ensuring the timely pursuit and consummation of an Acceptable 363 Sale on or before April 9, 2019 or the consummation of an Acceptable Plan on or before April 10, 2019, shall be as set forth on Exhibit D hereto. |
| Events of Default: | The Events of Default under the DIP Loan Documents shall be substantially similar to those set forth in the Prepetition Credit Agreement, subject to the Documentation Principles, and include the following, in each case subject to certain exceptions, qualifications, cure periods, and carve-outs to be set forth in the DIP Loan Documents and substantially consistent with the Documentation Principles: |
|  | a. The failure by the Debtors to perform or comply with any term, condition, covenant or obligation (including a payment obligation) contained in the DIP Loan Documents or any of the Financing Orders. |
|  | b. The cessation of the DIP Facility to be in full force and effect or the DIP Facility being declared by the Bankruptcy Court to be null and void or the validity or enforceability of the DIP Facility being contested by any Debtor or any Debtor denying in writing that it has any further liability or obligation under the DIP Facility or the DIP Lenders ceasing to have the benefit of the liens granted by the Financing Orders. |
|  | c. The entry of any order of the Bankruptcy Court granting to any third party a claim or lien *pari passu* with or senior to that granted to the DIP Lenders hereunder. |
|  | d. Until the DIP Obligations are repaid in full, the Debtors shall make any payment of principal or interest or otherwise on |

EXECUTION

account of any indebtedness for borrowed money or payables other than the DIP Obligations under the DIP Facility or other than in accordance with the Budget approved by the DIP Administrative Agent in its sole and absolute discretion.

e. The Debtor fails to make any interest payments due under the any of the Financing Orders within three (3) business days of when due.

f. Failure of the Debtor to meet any of the applicable Case Milestones (other than as the result of any action or omission of the DIP Secured Parties).

g. Failure of the Debtors to maintain cash disbursements and collections within the Permitted Variance under the Budget.

h. The entry of an order converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or the Debtors filing a motion or not opposing a motion seeking such relief.

i. The entry of an order dismissing the Chapter 11 Cases, or the Debtors filing a motion or not opposing a motion seeking such relief without the consent of the DIP Lenders.

j. The entry of an order in the Chapter 11 Cases appointing any examiner having expanded powers or a trustee to operate all or any part of the Borrower's business.

k. The entry of an order in the Chapter 11 Cases granting relief from the automatic stay so as to allow a third party or third parties to proceed against any material (in the DIP Administrative Agent's sole discretion) property, including the collateral pledged pursuant to the DIP Facility and the Prepetition Liens, of the Debtor or to commence or continue any prepetition litigation against the Debtors involving potential liability not covered by insurance, in excess of $1,000,000 in the aggregate.

l. The entry of an order in the Chapter 11 Cases charging any of the DIP Collateral or Prepetition Collateral under Section 506(c) of the Bankruptcy Code against the DIP Secured Parties or Prepetition Secured Parties or the commencement of other actions by any DIP Loan Party or affiliate thereof that challenges the rights and remedies of any of the DIP Secured Parties under the DIP Facility or Prepetition Secured Parties under the Prepetition Credit Agreement in any of the Chapter 11 Cases or in a manner inconsistent with the DIP Loan Documents.

18

21787334-v11

m.  Without the prior written consent of the Agent and other than in respect of the DIP Facility and the Carve-Out, the bringing of any motion or taking of any action seeking entry of an order, or the entry of an order by the Bankruptcy Court, in any of the Chapter 11 Cases (i) granting superpriority administrative expense status to any claim *pari passu* with or senior to the claims of the DIP Secured Parties or the Prepetition Secured Parties, (ii) permitting the Debtors to obtain financing under Section 364 of the Bankruptcy Code, (iii) permitting the Debtors to grant security interests or liens under Section 364 of the Bankruptcy Code, (iv) permitting the Debtors to use cash collateral under Section 364 of the Bankruptcy Code, or (v) authorizing the Debtors to take other actions adverse to any DIP Credit Party or any Prepetition Credit Party or their rights and remedies under the DIP Loan Documents, the Prepetition Credit Agreement or their interest in Prepetition Collateral or the DIP Collateral under Section 364 of the Bankruptcy Code.

n.  The entry of any order terminating any Debtor's exclusive right to file a plan of reorganization or the expiration of any Debtor's exclusive right to file a plan of reorganization.

o.  There shall arise any superpriority claim in the Chapter 11 Case which is *pari passu* with or senior to the priority of the claims of the DIP Secured Parties, except with respect to the Carve-Out and as set forth in the DIP Loan Documents.

p.  The entry of any order in the Chapter 11 Cases which provides adequate protection, or the granting by any DIP Loan Party of similar relief in favor of any one or more of any DIP Loan Party's prepetition creditors, contrary to the terms and conditions of any of the Financing Orders or the DIP Loan Documents.

q.  The DIP Loan Parties or any of their subsidiaries or affiliates, or any person claiming by or through any of the foregoing, shall obtain court authorization to commence, or shall commence, join in, assist, acquiesce to, or otherwise participate as an adverse party in any suit or other proceeding against any DIP Credit Party or any Prepetition Credit Party regarding the DIP Facility or the Prepetition Secured Parties regarding the Prepetition Credit Agreement.

r.  A plan of reorganization shall be filed by the Debtors, or be confirmed in any of the Chapter 11 Cases that is not an Acceptable Plan, or any order shall be entered which dismisses any of the Chapter 11 Cases and which order (i) does not provide for termination of the unused commitments under the DIP Facility and payment in full in cash of the DIP Loan Parties' obligations under the DIP Facility, (ii) does not

EXECUTION

provide, to the extent permitted by applicable law, for release and exculpatory provisions relating to the DIP Secured Parties and the Prepetition Secured Parties that are satisfactory to the DIP Administrative Agent and the Prepetition Administrative Agent in their sole and absolute discretion and (iii) is not otherwise reasonably satisfactory to the DIP Administrative Agent and the Prepetition Administrative Agent in their sole and absolute discretion, or any of the DIP Loan Parties or any of their subsidiaries or affiliates, shall file, propose, support, or fail to contest in good faith the filing or confirmation of such a plan or the entry of such an order.

s.   Any judgment or order as to liability not covered by insurance, or debt for the payment of money, in excess of $1,000,000 shall be rendered against the Debtors (individually or in the aggregate), and the enforcement thereof shall not have been stayed.

t.   The Bankruptcy Court shall enter an order authorizing the sale of all or substantially all of the assets of the Debtors unless (i) such order contemplates indefeasible repayment in full in cash of the DIP Facility upon consummation of the sale or (ii) consummated as part of an Acceptable Plan.

u.   The entry of an order in the Chapter 11 Cases avoiding or permitting recovery of any portion of the payments made on account of the obligations under the DIP Facility, the DIP Loan Documents, the Prepetition Credit Agreement or any related documents or the taking of any action by any DIP Loan Party to challenge, support or encourage a challenge of any such payments.

v.   The Final Order and the terms thereof shall cease to create a valid and perfected security interest and lien on the DIP Collateral.

w.   The Final Order does not include a waiver, in form and substance satisfactory to the Agent in its sole and absolute discretion, of (i) the right to surcharge the Prepetition Collateral and/or the DIP Collateral under Section 506(c) of the Bankruptcy Code; (ii) any ability to limit the extension under Section 552(b) of the Bankruptcy Code of the liens of the Prepetition Administrative Agent on the Prepetition Collateral to any proceeds, products, offspring, or profits of the Prepetition Collateral acquired by any DIP Loan Party after the Petition Date and (iii) the doctrine of marshalling.

x.   The filing or support of any pleading by any DIP Loan Party (or any affiliate thereof) seeking, or otherwise consenting to, any relief the granting of which could reasonably be expected to result in the occurrence of an Event of Default.

20

y.  Any non-monetary, judgment or order with respect to a post-petition event shall be rendered against any Debtor which does or would reasonably be expected to (i) cause a material adverse change in the financial condition, business, prospects, operations or assets of the Debtors as a whole or (ii) have a material adverse effect on the rights and remedies of the DIP Lenders, and, in each case, there shall be a period of ten (10) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect.

z.  Any of the Financing Orders being amended or modified without the consent of the DIP Lenders.

aa. Any Vendor Contract or Customer Contract is terminated or modified without the prior written consent of the DIP Administrative Agent in its sole and absolute discretion, and such modification or termination does or would reasonably be expected to (i) cause a material adverse change in the financial condition, business, prospects, operations or assets of the Debtors as a whole, (ii) have a material adverse effect on the rights and remedies of the DIP Secured Parties, or (iii) result in a termination of the BH APA.

bb. The commencement of any investigation by, or issuance of any recall order by, the U.S. Food and Drug Administration, and such FDA investigation or recall order does or would reasonably be expected to (i) cause a material adverse change in the financial condition, business, prospects, operations or assets of the Debtors as a whole, (ii) have a material adverse effect on the rights and remedies of the DIP Secured Parties, or (iii) result in a termination of the BH APA.

cc. The commencement of any investigation of any Debtor by any federal or state agency or other governmental or judicial entity, and such investigation does or would reasonably be expected to (i) cause a material adverse change in the financial condition, business, prospects, operations or assets of the Debtors as a whole, (ii) have a material adverse effect on the rights and remedies of the DIP Secured Parties, or (iii) result in a termination of the BH APA.

dd. The issuance by the Internal Revenue Service or any state tax authority of one or more deficiency notices exceeding, in the aggregate, $1,000,000 at any time.

ee. The closing of an Acceptable 363 Sale shall not have occurred on or prior to March 31, 2019, and the Budget shall not have been modified by the DIP Loan Parties (with the consent of

EXECUTION

| | |
|---|---|
| | the DIP Administrative Agent in its sole an absolute discretion) to reflect and forecast the DIP Loan Parties' Cash Receipts, Cash Operating Disbursements and Cash Bankruptcy Disbursements for the period commencing on April 1, 2019 through and including April 10, 2019 (subject to Permitted Variances). |
| **Remedies:** | Notwithstanding the provisions of Section 362 of the Bankruptcy Code, but subject to the Waiting Period Procedures and any other applicable provisions of the Financing Orders, as the case may be, if any Event of Default occurs and is continuing, the DIP Secured Parties may take any or all of the following actions:<br><br>a.  declare by a Maturity Date Notice the commitment of the DIP Lenders to make Loans and consent to use of Cash Collateral to be terminated, whereupon such commitment and consent shall be terminated;<br><br>b.  declare a Maturity Date Notice  the unpaid amount of the DIP Obligations and the Prepetition Obligations, all interest accrued and unpaid thereon, and all other amounts owing or payable under the DIP Loan Documents, the Prepetition Loan Documents, this Binding Term Sheet and the Financing Orders;<br><br>c.   to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Debtor; or<br><br>d.  take any other action or exercise any other right or remedy (including, without limitation, with respect to the liens in favor of the DIP Administrative Agent and the DIP Lenders) permitted under the Dip Loan Documents, or by applicable law. |
| **Expenses and Indemnification:** | The DIP Administrative Agent and the DIP Lenders (and their affiliates and respective officers, directors, employees, advisors and agents) (each such person, an "*Indemnitee*") will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the gross negligence or willful misconduct of the relevant indemnified person. Such indemnity shall not be available (i) to the extent arising from a material breach of any obligation of such Indemnitee under the DIP Loan Documents or (ii) to the extent arising out of any loss, claim, damage, liability or expense that does not involve an act or omission of the DIP Loan Parties and that is brought by an Indemnitee against another Indemnitee (other than claims against an Indemnitee in its |

22

EXECUTION

| | capacity or in fulfilling its role as DIP Administrative Agent or any similar role under the DIP Loan Documents). |
|---|---|
| **Governing Law:** | New York. |

*{Signatures follow.}*

23

EXECUTION

**IN WITNESS WHEREOF**, the parties hereto have caused this Binding Term Sheet to be executed as of the date first set forth above.

**DIP LOAN PARTIES:**

**SYNERGY PHARMACEUTICALS INC.**, as Borrower

By: _____

Name:   Gary G. Gemignani

Title:   EVP, Chief Financial Officer

**SYNERGY ADVANCED PHARMACEUTICALS, INC.**, as Guarantor

By: _____

Name:   Gary G. Gemignani

Title:   EVP, Chief Financial Officer

24

EXECUTION

**CRG SERVICING LLC,** as DIP Administrative Agent

By _____
   Nathan Hukill
   President


**DIP LENDER**S:

**CRG PARTNERS III L.P.**
   By CRG PARTNERS III GP L.P., its General Partner
     By CRG PARTNERS III GP LLC, its General Partner

     By _____
       Nathan Hukill
       Authorized Signatory


**CRG PARTNERS III (CAYMAN) UNLEV AIV I L.P.**
   By CRG PARTNERS III (CAYMAN) GP L.P., its General Partner
     By CRG PARTNERS III GP LLC, its General Partner

     By _____
       Nathan Hukill
       Authorized Signatory

     Witness: _____
     Name: Nicole Nesson


**CRG PARTNERS III–PARALLEL FUND "A" L.P.**
   By CRG PARTNERS III–PARALLEL FUND "A" GP L.P., its General Partner
     By CRG PARTNERS III GP LLC, its General Partner

     By _____
       Nathan Hukill
       Authorized Signatory


**CRG PARTNERS III–PARALLEL FUND "B" L.P.**
   By CRG PARTNERS III–PARALLEL FUND "B" GP L.P., its General Partner
     By CRG PARTNERS III GP LLC, its General Partner

     By _____
       Nathan Hukill
       Authorized Signatory

21787334-v11

EXECUTION

**CRG PARTNERS III (CAYMAN) LEV AIV I L.P.**
    By CRG PARTNERS III (CAYMAN) GP L.P., its General Partner
    By CRG PARTNERS III GP LLC, its General Partner

By _____
    Nathan Hukill
    Authorized Signatory

Witness: _____
Name: Nicole Nesson

**CRG ISSUER 2017-1**
    By CRG SERVICING LLC, acting by power of attorney

By _____
    Nathan Hukill
    Authorized Signatory

26

EXECUTION

## EXHIBIT A: DIP LENDERS AND COMMITMENTS

| Lender | $ Amount | Proportionate Share |
|---|---|---|
| CRG Partners III L.P. | 7,618,864 | 4.919% |
| CRG Partners III (Cayman) Unlev AIV I L.P. | 7,743,700 | 5.000% |
| CRG Partners III – Parallel Fund "A" L.P. | 12,497,080 | 8.069% |
| CRG Partners III – Parallel Fund "B" L.P. | 18,000,000 | 11.622% |
| CRG Partners III (Cayman) Lev AIV I L.P. | 13,500,000 | 8.717% |
| CRG Issuer 2017-1 | 95,514,355 | 61.672% |
| Total | 154,873,999 | 100.000% |

21787334-v11

EXECUTION

EXHIBIT B: BUDGET

*Prepared at the Direction of Counsel*
*Privileged and Confidential*
*DRAFT - Subject to Material Change*
*For Professional Eyes ONLY*

($ in Thousands)

| | Fiscal Year: | 2018 | 2018 | 2018 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2018-2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Week Ended: | 12/14/18 | 12/21/18 | 12/28/18 | 01/04/19 | 01/11/19 | 01/18/19 | 01/25/19 | 02/01/19 | 02/08/19 | 02/15/19 | 02/22/19 | 03/01/19 | 03/08/19 | 03/08/19 |
| | Actual / Forecast: | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| | Post-Petition Week: | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | Total |
| **13-Week Cash Flow Budget** | | | | | | | | | | | | | | | |
| **Operating Receipts** | | | | | | | | | | | | | | | |
| Sales Receipts | $ | 1,039 | $ 1,712 | $ 1,806 | $ 1,891 | $ 1,766 | $ 1,766 | $ 1,766 | $ 1,766 | $ 1,766 | $ 1,766 | $ 1,766 | $ 1,766 | $ - | $ 20,579 |
| Other Receipts | | - | - | - | 40 | - | - | - | 40 | - | - | - | 40 | - | 120 |
| **Total Operating Receipts** | $ | 1,039 | $ 1,712 | $ 1,806 | $ 1,931 | $ 1,766 | $ 1,766 | $ 1,766 | $ 1,806 | $ 1,766 | $ 1,766 | $ 1,766 | $ 1,806 | $ - | $ 20,699 |
| **Operating Disbursements** | | | | | | | | | | | | | | | |
| Payroll | | - | - | (1,823) | - | (1,823) | - | - | (1,823) | - | (3,545) | - | (1,823) | - | (10,837) |
| Sales & Marketing | | - | (101) | - | (713) | (4) | (4) | (4) | (887) | (4) | (139) | (4) | (887) | - | (2,749) |
| GTN (Rebate / TC) | | - | (89) | (386) | (1,920) | (372) | - | (150) | (970) | (476) | (1,333) | (150) | (8,163) | - | (14,009) |
| Inventory | | - | (15) | (3,716) | (103) | (157) | (1) | (1) | (4,353) | (1) | (1) | (1) | (43) | - | (8,390) |
| R&D / Regulatory | | - | - | (342) | (666) | - | - | (405) | (425) | (95) | - | - | (385) | - | (2,318) |
| G&A | | - | - | - | (201) | (15) | (15) | (15) | (201) | (15) | (125) | (15) | (481) | - | (1,083) |
| Other Disbursements | | - | (733) | (131) | - | (700) | (72) | (733) | (131) | (700) | (447) | (733) | (131) | (500) | (5,010) |
| **Total Operating Disbursements** | $ | - | $ (939) | $ (6,397) | $ (3,603) | $ (3,070) | $ (92) | $ (1,308) | $ (8,790) | $ (1,291) | $ (5,589) | $ (903) | $ (11,912) | $ (500) | $ (44,395) |
| **Operating Cash Flow** | $ | 1,039 | $ 773 | $ (4,591) | $ (1,672) | $ (1,304) | $ 1,674 | $ 458 | $ (6,983) | $ 475 | $ (3,823) | $ 863 | $ (10,106) | $ (500) | $ (23,696) |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | | |
| Interest | | - | - | (258) | (279) | - | - | - | (2,095) | - | - | - | (1,837) | - | (4,469) |
| **Total Non-Operating Disbursements** | $ | - | $ - | $ (258) | $ (279) | $ - | $ - | $ - | $ (2,095) | $ - | $ - | $ - | $ (1,837) | $ - | $ (4,469) |
| **Bankruptcy Related Disbursements** | | | | | | | | | | | | | | | |
| DIP Financing Fees | | - | (900) | - | - | - | - | - | - | - | - | - | (1,350) | - | (2,250) |
| Professional Fees | | - | (200) | - | - | - | (650) | - | (395) | - | (4,153) | - | (1,490) | - | (6,889) |
| Utility Deposit | | (30) | - | - | - | - | - | - | - | - | - | - | - | - | (30) |
| **Total Bankruptcy Related Disbursements** | $ | (30) | $ (1,100) | $ - | $ - | $ - | $ (650) | $ - | $ (395) | $ - | $ (4,153) | $ - | $ (2,840) | $ - | $ (9,169) |
| **Net Cash Flow before Financing** | $ | 1,009 | $ (327) | $ (4,849) | $ (1,950) | $ (1,304) | $ 1,024 | $ 458 | $ (9,474) | $ 475 | $ (7,976) | $ 863 | $ (14,784) | $ (500) | $ (37,334) |
| **Cash Balance** | | | | | | | | | | | | | | | |
| Beginning Cash Balance | | 14,328 | 15,336 | 26,509 | 21,660 | 53,210 | 51,906 | 52,930 | 53,389 | 43,915 | 44,390 | 36,414 | 37,277 | 52,171 | 14,328 |
| Net Cash Flow before Financing | | 1,009 | (327) | (4,849) | (1,950) | (1,304) | 1,024 | 458 | (9,474) | 475 | (7,976) | 863 | (14,784) | (500) | (37,334) |
| DIP Proceeds (New Money) | | - | 11,500 | - | 33,500 | - | - | - | - | - | - | - | - | - | 45,000 |
| DIP Paydown | | - | - | - | - | - | - | - | - | - | - | - | (155,323) | - | (155,323) |
| 363 Sale Proceeds | | - | - | - | - | - | - | - | - | - | - | - | 185,000 | - | 185,000 |
| **Ending Cash Balance** | $ | 15,336 | $ 26,509 | $ 21,660 | $ 53,210 | $ 51,906 | $ 52,930 | $ 53,389 | $ 43,915 | $ 44,390 | $ 36,414 | $ 37,277 | $ 52,171 | $ 51,671 | $ 51,671 |

## EXHIBIT C: ACCEPTABLE PLAN ILLUSTRATION

**Synergy Pharmaceuticals**
**Illustrative Sharing Waterfall**

*Confidential Preliminary Working Draft*
*Work Product Prepared at the Direction of Counsel For Discussion Purposes Only*

| | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Distributable Cash After Wind-Down** | | 30,100 | 32,100 | 34,100 | 37,100 | 39,600 | 42,100 | 44,600 | 47,100 | 49,600 | 52,100 | 54,600 | 57,100 | 59,600 | 62,100 | 64,600 | 67,100 | 69,600 | 72,100 |
| (Shortfall) / Excess | | (7,000) | (5,000) | (3,000) | - | 2,500 | 5,000 | 7,500 | 10,000 | 12,500 | 15,000 | 17,500 | 20,000 | 22,500 | 25,000 | 27,500 | 30,000 | 32,500 | 35,000 |
| **Initial Sharing** | | | | | | | | | | | | | | | | | | | |
| Proceeds to Secured Lender | | 30,100 | 20,100 | 20,100 | 20,100 | 20,100 | 20,100 | 20,100 | 20,100 | 20,100 | 20,100 | 20,100 | 20,100 | 20,100 | 20,100 | 20,100 | 20,100 | 20,100 | 20,100 |
| Proceeds to Unsecureds | | - | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 |
| Range 1 (Shortfall <5M) | 100% | N/A | - | 2,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Range 2 (Excess up to 5M) | 75% | N/A | - | | | 1,875 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 |
| Range 3 (Excess Above 5M) | 50% | N/A | - | | | - | - | 1,250 | 2,500 | 3,750 | 5,000 | 6,250 | 7,500 | 8,750 | 10,000 | 11,250 | 12,500 | 13,750 | 15,000 |
| Total Sharing Proceeds to Secured Lender | | | - | 2,000 | 5,000 | 6,875 | 8,750 | 10,000 | 11,250 | 12,500 | 13,750 | 15,000 | 16,250 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 |
| **Total Proceeds from Distributable Cash After Wind-Down** | | | | | | | | | | | | | | | | | | | |
| Secured Lender | | 30,100 | 20,100 | 22,100 | 25,100 | 26,975 | 28,850 | 30,100 | 31,350 | 32,600 | 33,850 | 35,100 | 36,350 | 37,100 | 37,100 | 37,100 | 37,100 | 37,100 | 37,100 |
| Unsecureds | | | 12,000 | 12,000 | 12,000 | 12,625 | 13,250 | 14,500 | 15,750 | 17,000 | 18,250 | 19,500 | 20,750 | 22,500 | 25,000 | 27,500 | 30,000 | 32,500 | 35,000 |
| *Secured Claim Deficiency* | | | | | | | | | | | | | | | | | | | |
| Recovery % | 37,100 | 81% | 54% | 60% | 68% | 73% | 78% | 81% | 85% | 88% | 91% | 95% | 98% | 100% | 100% | 100% | 100% | 100% | 100% |
| *Unsecured Claims* | | | | | | | | | | | | | | | | | | | |
| Recovery % | 38,603 | 0% | 31% | 31% | 31% | 33% | 34% | 38% | 41% | 44% | 47% | 51% | 54% | 58% | 65% | 71% | 78% | 84% | 91% |

EXECUTION

## EXHIBIT D: CASE MILESTONE SCHEDULE

**Budget**

1. On or before the Petition Date, the DIP Administrative Agent shall have approved, based on then current information, the Budget.

2. On or before December 18, 2018, the DIP Administrative Agent shall have reaffirmed its approval, based on then then current information, of the Budget, or the DIP Loan Parties shall have adopted a revised budget acceptable to the DIP Administrative Agent in its sole and absolute discretion.

**DIP Facility**

1. Not later than the Petition Date, the Debtors shall file with the Bankruptcy Court a motion seeking approval of the DIP Facility, this Binding Term Sheet, the DIP Loans, and all fees, expenses, indemnification, and other obligations contemplated thereunder.

2. Not later than 3 days following the Petition Date, the Bankruptcy Court shall have entered the First Interim Order.

3. Not later than December 18, 2018, finalize DIP Credit Agreement.

4. Not later than December 21, 2018, the Bankruptcy Court shall have entered the Second Interim Order.

5. Not later than January 15, 2019, the Bankruptcy Court shall have entered the Final Order.

**Acceptable 363 Sale**

1. Not later than December 12, 2019, the Debtors shall file with the Bankruptcy Court Sale Motion and Bid Procedures Motion, in each case acceptable to the DIP Administrative Agent in its sole and absolute discretion.

2. Not later than January 4, 2019, a Bid Procedures Hearing shall be held in the Bankruptcy Court.

3. The deadline for bidding shall be a date not later than February 9, 2019.

4. The date specified for an auction, if necessary, shall be a date not later than February 12, 2019.

5. Not later than February 15, 2019, a Sale Hearing shall be held in the Bankruptcy Court.

6. The closing of the Acceptable 363 Sale shall occur on or before April 9, 2019.

**Acceptable Plan**

1. Not later than January 4, 2019, the Debtors shall file their Schedules and Statement of Financial Affairs.

21787334-v11

2.  The bar date for filing proofs of claim shall be a date not later than February 11, 2019.

3.  Not later than December 21, 2019, the Debtors shall file with the Bankruptcy Court an Acceptable Plan and a disclosure statement with respect thereto.

4.  Not later than February 18, 2019, the Bankruptcy Court shall enter an order approving a disclosure statement with respect to an Acceptable Plan.

5.  Not later than March 15, 2019, the Bankruptcy Court shall enter an order confirming an Acceptable Plan.

6.  Not later than April 10, 2019, such Acceptable Plan shall become effective.

EXECUTION

## EXHIBIT B: BUDGET

21787334-v11

*Prepared at the Direction of Counsel*
*Privileged and Confidential*
*DRAFT - Subject to Material Change*
*For Professional Eyes ONLY*

($ in Thousands)

| | Fiscal Year: | 2018 | 2018 | 2018 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2018-2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Week Ended: | 12/14/18 | 12/21/18 | 12/28/18 | 01/04/19 | 01/11/19 | 01/18/19 | 01/25/19 | 02/01/19 | 02/08/19 | 02/15/19 | 02/22/19 | 03/01/19 | 03/08/19 | 03/08/19 |
| | Actual / Forecast: | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| | Post-Petition Week: | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | Total |
| **13-Week Cash Flow Budget** | | | | | | | | | | | | | | | |
| **Operating Receipts** | | | | | | | | | | | | | | | |
| Sales Receipts | $ | 1,039 | $ 1,712 | $ 1,806 | $ 1,891 | $ 1,766 | $ 1,766 | $ 1,766 | $ 1,766 | $ 1,766 | $ 1,766 | $ 1,766 | $ 1,766 | $ - | $ 20,579 |
| Other Receipts | | - | - | - | 40 | - | - | - | 40 | - | - | - | 40 | - | 120 |
| **Total Operating Receipts** | $ | 1,039 | $ 1,712 | $ 1,806 | $ 1,931 | $ 1,766 | $ 1,766 | $ 1,766 | $ 1,806 | $ 1,766 | $ 1,766 | $ 1,766 | $ 1,806 | $ - | $ 20,699 |
| | | | | | | | | | | | | | | | |
| **Operating Disbursements** | | | | | | | | | | | | | | | |
| Payroll | | - | - | (1,823) | - | (1,823) | - | - | (1,823) | - | (3,545) | - | (1,823) | - | (10,837) |
| Sales & Marketing | | - | (101) | - | (713) | (4) | (4) | (4) | (887) | (4) | (139) | (4) | (887) | - | (2,749) |
| GTN (Relay/ TC) | | - | (89) | (386) | (1,920) | (372) | - | (150) | (970) | (476) | (1,333) | (150) | (8,163) | - | (14,009) |
| Inventory | | - | (15) | (3,716) | (103) | (157) | (1) | (1) | (4,353) | (1) | (1) | (1) | (43) | - | (8,390) |
| R&D / Regulatory | | - | - | (342) | (666) | - | - | (405) | (425) | (95) | - | - | (385) | - | (2,318) |
| G&A | | - | - | - | (201) | (15) | (15) | (15) | (201) | (15) | (125) | (15) | (481) | - | (1,083) |
| Other Disbursements | | - | (733) | (131) | - | (700) | (72) | (733) | (131) | (700) | (447) | (733) | (131) | (500) | (5,010) |
| **Total Operating Disbursements** | $ | - | $ (939) | $ (6,397) | $ (3,603) | $ (3,070) | $ (92) | $ (1,308) | $ (8,790) | $ (1,291) | $ (5,589) | $ (903) | $ (11,912) | $ (500) | $ (44,395) |
| | | | | | | | | | | | | | | | |
| **Operating Cash Flow** | $ | 1,039 | $ 773 | $ (4,591) | $ (1,672) | $ (1,304) | $ 1,674 | $ 458 | $ (6,983) | $ 475 | $ (3,823) | $ 863 | $ (10,106) | $ (500) | $ (23,696) |
| | | | | | | | | | | | | | | | |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | | |
| Interest | | - | - | (258) | (279) | - | - | - | (2,095) | - | - | - | (1,837) | - | (4,469) |
| **Total Non-Operating Disbursements** | $ | - | $ - | $ (258) | $ (279) | $ - | $ - | $ - | $ (2,095) | $ - | $ - | $ - | $ (1,837) | $ - | $ (4,469) |
| | | | | | | | | | | | | | | | |
| **Bankruptcy Related Disbursements** | | | | | | | | | | | | | | | |
| DIP Financing Fees | | - | (900) | - | - | - | - | - | - | - | - | - | (1,350) | - | (2,250) |
| Professional Fees | | - | (200) | - | - | - | (650) | - | (395) | - | (4,153) | - | (1,490) | - | (6,889) |
| Utility Deposit | | (30) | - | - | - | - | - | - | - | - | - | - | - | - | (30) |
| **Total Bankruptcy Related Disbursements** | $ | (30) | $ (1,100) | $ - | $ - | $ - | $ (650) | $ - | $ (395) | $ - | $ (4,153) | $ - | $ (2,840) | $ - | $ (9,169) |
| | | | | | | | | | | | | | | | |
| **Net Cash Flow before Financing** | $ | 1,009 | $ (327) | $ (4,849) | $ (1,950) | $ (1,304) | $ 1,024 | $ 458 | $ (9,474) | $ 475 | $ (7,976) | $ 863 | $ (14,784) | $ (500) | $ (37,334) |
| | | | | | | | | | | | | | | | |
| **Cash Balance** | | | | | | | | | | | | | | | |
| Beginning Cash Balance | | 14,328 | 15,336 | 26,509 | 21,660 | 53,210 | 51,906 | 52,930 | 53,389 | 43,915 | 44,390 | 36,414 | 37,277 | 52,171 | 14,328 |
| Net Cash Flow before Financing | | 1,009 | (327) | (4,849) | (1,950) | (1,304) | 1,024 | 458 | (9,474) | 475 | (7,976) | 863 | (14,784) | (500) | (37,334) |
| DIP Proceeds (New Money) | | - | 11,500 | - | 33,500 | - | - | - | - | - | - | - | - | - | 45,000 |
| DIP Paydown | | - | - | - | - | - | - | - | - | - | - | - | (155,323) | - | (155,323) |
| 363 Sale Proceeds | | - | - | - | - | - | - | - | - | - | - | - | 185,000 | - | 185,000 |
| **Ending Cash Balance** | $ | 15,336 | $ 26,509 | $ 21,660 | $ 53,210 | $ 51,906 | $ 52,930 | $ 53,389 | $ 43,915 | $ 44,390 | $ 36,414 | $ 37,277 | $ 52,171 | $ 51,671 | $ 51,671 |