LATHAM & WATKINS LLP
Richard A. Levy, Esq. (admitted *pro hac vice*)
Matthew L. Warren, Esq. (admitted *pro hac vice*)
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
Telephone:     (312) 876-7700
Facsimile:     (312) 993-9767
Email:         richard.levy@lw.com
               matthew.warren@lw.com

– and –

Jeffrey Mispagel, Esq.
885 Third Avenue
New York, NY 10022
Tel:       (212) 906-1200
Fax:       (212) 751-4864
Email:     jeffrey.mispagel@lw.com

*Proposed Counsel for the Official
Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| SYNERGY PHARMACEUTICALS INC., *et al.*,[1] | Case No. 18-14010 (JLG) |
| Debtors. | (Jointly Administered) |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
THE DEBTORS' MOTION FOR AN ORDER AUTHORIZING THE DEBTORS TO
OBTAIN POSTPETITION FINANCING AND REQUESTING RELATED RELIEF**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: Synergy Pharmaceuticals Inc. (5269); Synergy Advanced Pharmaceuticals, Inc. (4596). The address of the Debtors' corporate headquarters is 420 Lexington Avenue, Suite 2012, New York, New York 10170.

The Official Committee of Unsecured Creditors (the "**Committee**") of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") by and through their undersigned proposed counsel, respectfully submits this objection (the "**Objection**") to the *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief* [Docket No. 15] (the "**DIP Motion**")[2]. In support of this Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1. Less than 36 hours after filing the proposed Second Interim Order and the DIP Credit Agreement – and less than 24 hours after formation of the Committee – the Debtors will ask this Court to enter the Second Interim Order and approve the DIP Credit Agreement. This relief should not be granted. The Debtors have not shown that they have an immediate need for cash, let alone that their cash situation is so dire as to justify this Court's approval, on minimal notice, of DIP Loan Documents that provide the DIP Lenders with control over the outcome of these cases – and in fact the documents filed by the Debtors appear to show the opposite. As such, the appropriate result is that the DIP Motion be continued until the hearing scheduled for January 4, 2019 – at which point the Debtors' budget reflects significant remaining liquidity.

2. Approval of the DIP Facility is inextricably tied to the Proposed Roll Up (as defined below) and bound to the "Acceptable Plan, which, together, will dictate the outcome of these cases. Counsel for the Debtors posturized at the first day hearing that the quick approval of the DIP

---

[2] Capitalized terms used, but not otherwise defined, in this Objection shall have the meaning set forth in the DIP Motion.

2

Facility is necessary because "the eleven and a half million dollars by the end of next week, unfortunately, that, for us, is a sacred cow,"[3] however, the only information the Debtors have presented to back up these bald assertions from Debtors' counsel are two declarations filed after the objection deadline and only thirty-six hours in advance of the hearing on the Second Interim Order plus a budget showing that such funds will not even be used until after January 4, 2019.[4] This is not a sufficient showing to grant this relief.

3. However, in the event the Court determines that it is appropriate to go forward on the Second Interim DIP Order, given the lack of opportunity for the Committee and other stakeholders to review the relief requested, let alone to assess whether such relief is appropriate, any relief granted in connection with the hearing to be held on December 21, 2018 should be expressly limited to relief that is immediately necessary to preserve the value of the Debtors' businesses and should be fully subject to review at the Final Hearing on January 15, 2019. The Court should not allow the Debtors to cede control of these cases so quickly in exchange for an interim loan of $8 million that the Debtors' DIP Budget reflects is not needed until January 4, 2019, at the earliest.

*The Debtors do not have an immediate need for financing.*

4. At the first day hearing in these cases, despite presenting no evidence whatsoever, the Debtors' counsel asserted that the Debtors were in desperate need of cash, going so far as to say that receiving $11.5 million before December 21, 2018 was a "sacred cow" for the Debtors. Before that hearing had concluded, the Debtors had reduced that amount to $8 million, though the

---

[3] First Day Hearing Tr. (Dec. 13, 2018) pg. 40:18.

[4] In fact, within the course of the first day hearing, the "sacred cow" that the Debtors allegedly required the following week dropped from $11.5 million to $8 million. First Day Hearing Tr. (Dec. 13, 2018) pg. 84:23-85:6.

budget attached to the First Interim Order did not suggest that the Debtors needed even that amount in the first nine days of these cases. The Debtors have since tweaked the budget to reflect a lower cash balance in the early weeks of these cases, yet neither the Budget nor the declarations submitted by the Debtors' financial advisor and investment banker demonstrate a need for *any* funding by December 21, 2018. To state the obvious, there has been no discovery, no document production and no depositions to investigate the veracity of the Debtors' assertions.

5. The Debtors' are requesting relief that, if granted, will permanently alter the course of these cases by binding the Debtors to sale milestones (regardless of the outcome of the hearing on the bidding procedures on January 4, 2019) and an "Acceptable Plan" construct designed to force a settlement upon the unsecured creditors. That the Debtors are requesting such relief on an expedited schedule with minimal notice simply because they have asserted that the relief is urgent is particularly concerning when viewed in the overall context of these cases, in which the Debtors are working with the Prepetition Secured Parties and the Stalking Horse Bidder to push through, on an expedited schedule over the course of the holiday season, a proposed sale that would pay the Prepetition Secured Parties more than they are entitled, would pay $15 million to the Debtors' lame duck management,[5] and would allow the Stalking Horse Bidder to acquire the Debtors at a lower price than it was apparently willing to pay just two months prior to the Petition Date. While the Debtors' Bid Procedures Motion is not currently set for hearing in connection with the DIP

---

[5] While it is troubling enough that the Debtors seek to divert $15 million of sale proceeds to the Debtors' employees, including management, rather than to the Debtors' creditors, it is perhaps even more troubling that the Debtors assert that if the Court does not approve of this scheme that they will go forward with it anyway (by setting up an escrow account to keep $15 million of the proposed purchase price from ever reaching the Debtors' estates) and that ultimately if this scheme fails then the Stalking Horse Bidder will be entitled to retain the funds. That this scheme to enrich themselves at the expense of creditors is styled as a "severance plan" does not make it any more palatable, particularly given that the alleged "severance plan" was adopted a mere three days prior to the Petition Date (a fact conveniently not disclosed in the Bid Procedures Motion).

4

Motion, the relief sought in those two motions, when viewed together, illuminates the motivations of the key parties in these cases:

- The Stalking Horse Bidder, understandably, seeks to acquire the Debtors at the lowest price possible;

- The Prepetition Secured Parties seek to force a settlement on their inapplicable Prepayment Premium and eliminate the possibility of their prepetition debt being crammed up under a plan of reorganization that would maximize value for the Debtors' estates; and

- The Debtors are motivated by the $15 million in "severance" that their employees, including management, will receive if (and possibly only if) the Stalking Horse Bidder purchases the Debtors.

6.  Through approval of the DIP Credit Documents, the Debtors are seeking to shield the sale process from competitive bidding by setting a shortened timeline – with a bid solicitation period of only four weeks – that would cause a default under the DIP Facility if not complied with. Not only is there no justification for such a rushed sale process – indeed it may be significantly value destructive – but there is no justification for this Court to lock in such a timeline for that process prior to the hearing on the Bid Procedures Motion.

*<u>The proposed terms of the DIP Facility are not warranted.</u>*

7.  The DIP Facility proposes the roll up of $110 million of the Debtors' prepetition debt ($16 million upon entry of the Second Interim Order and the remaining upon entry of the Final Order), despite the fact these cases appear to be run solely for the purpose of liquidating – as quickly as possible and without sufficient opportunity to market-test – the Debtors' assets and distributing all value to the DIP Lenders and Prepetition Lenders. If approved, the DIP Facility

5

would (i) be secured by previously unencumbered assets with potentially significant value, including avoidance actions[6] and the proceeds of foreign license agreements, (ii) approve a $35 million Prepayment Premium, that is not, and cannot, be due, and that would subsume unsecured creditor value, and (iii) mandate an "Acceptable Plan" that forces a settlement with respect to the validity of the Prepayment Premium while eliminating any possibility of a financing raise and plan of reorganization.

8.    Indeed, given that the proposed stalking horse bid at best barely covers the proposed DIP Loan and the prepetition claims asserted by the DIP Lenders with no meaningful residual proceeds for unsecured creditors, it is patently clear that the DIP Lenders are providing the DIP Loan solely to liquidate their collateral for their own benefit, and they certainly do not need a roll up of any portion of their prepetition loans to be incented to consent to the use of cash collateral or to provide a DIP facility. The real purpose of the Proposed Roll Up is to prevent the Debtors or the unsecured creditors from pursuing a potentially value maximizing standalone cram-up plan of reorganization. This is despite the fact that the Stalking Horse Bid supported by the DIP Lenders, and which the DIP Facility is designed to quickly and expeditiously implement with minimal review, would pay in full the DIP Facility and the asserted remaining Prepetition Secured Obligations. In such a context, there is no justification for a lien on unencumbered assets that may present the only recovery to unsecured creditors.

---

[6]    The Debtors' and DIP Lenders' intentions with respect to avoidance actions are not entirely clear based on the Committee's limited review of the DIP Credit Documents. It appears, however, that avoidance actions are a component of "Interim Period Excluded Collateral," yet would be assigned to the DIP Lenders under an "Acceptable Plan." The Court should not approve the "Acceptable Plan" concept on such an expedited basis and without sufficient opportunity for parties to evaluate the terms thereof.

9. The Debtors also request this Court approve superpriority liens encumbering essentially all assets[7] (including potentially significant unencumbered assets) other than Interim Period Excluded Collateral that includes Avoidance Actions and certain other assets (which may be sought at the Final Hearing) and it appears that Superpriority Claims attach to these same assets, resulting in the very real possibility of unsecured creditors receiving less in these chapter 11 cases than they would have received in a chapter 7 liquidation. While to the Committee's knowledge no party has undertaken a collateral review, even the Debtors readily identify significant unencumbered assets such as proceeds from exclusive licensing agreements in Canada and China, Hong Kong and Macau for the Debtors' only commercial product.[8]

## BACKGROUND

**A.    The Debtors' Chapter 11 Cases**

10. On December 12, 2018 (the "**Petition Date**"), the Debtors commenced the above-captioned cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code, as amended (the "**Bankruptcy Code**"). The Debtors are continuing in possession of their property and are operating their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108

---

[7] Pursuant to Section 3.02 of the DIP Security Agreement, "Excluded Assets" include: (a) [reserved], (b) [reserved], (c) [reserved], (d) any "intent-to-use" application for registration of a Trademark filed pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. § 1051, prior to the filing of a "Statement of Use" pursuant to Section 1(d) of the Lanham Act or an "Amendment to Allege Use" pursuant to Section 1(c) of the Lanham Act with respect thereto, solely to the extent, if any, that, and solely during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of any registration that issues from such intent-to-use application under applicable federal law; (e) equity interests in joint ventures or any non-wholly-owned Subsidiaries, if and only if, and solely to the extent that, the grant of a security interest therein shall constitute or result in a breach, termination or default or invalidity under the organizational documents of such joint venture or non-wholly-owned Subsidiary (other than to the extent that any such term would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the NYUCC of any relevant jurisdiction or any other applicable law or principles of equity); (f) any leasehold interest in real property, (g) any Motor Vehicles; (h) any Excluded Accounts; or (i) the Borrower's directors and officers insurance policy or any proceeds thereof.

[8] First-Day Declaration, n. 4.

7

of the Bankruptcy Code. On December 20, 2018, the Office of the United States Trustee appointed the Committee. No trustee or examiner has been appointed in the Chapter 11 Cases.

**B.     The Debtors' Prepetition Capital Structure**

11.    As more fully described in the First-Day Declaration, the Debtors' prepetition capital structure consists of approximately $18.6 million of outstanding unsecured Notes (as defined below), and approximately $110 million purported to be outstanding under the Prepetition Term Loan Agreement. First-Day Declaration, ¶ 19. Overall, the Debtors list $179 million in total liabilities. First-Day Declaration, ¶ 168.

12.    On November 3, 2014, the Debtors issued $200 million in aggregate principal amount of 7.50% Senior Convertible Notes due 2019 (the "**Notes**") pursuant to that certain Indenture dated as of November 3, 2014, by and between Synergy Pharmaceuticals Inc., as issuer, and Wells Fargo Bank, National Association, a national banking association, as trustee. First-Day Declaration, ¶ 27. As of the Petition Date, there is approximately $18.6 million in principal amount of Notes outstanding.

13.    Just fifteen months ago, the Debtors entered into the Prepetition Term Loan Agreement dated as of September 1, 2017, with CRG as administrative agent and collateral agent for the Lenders. First-Day Declaration, ¶ 20. As of the Petition Date, the Debtors assert that there is approximately $110 million in principal outstanding under the Prepetition Term Loan Agreement.

14.    As noted in the *Preliminary Objection of 1992 MSF International Ltd. and 1992 Tactical Credit Master Fund, L.P. to the Debtors' Motion for an Order Authorizing the Debtors to Obtain Postpetition Financing and Reservation of Rights* [Docket No. 48], after entering into the Prepetition Term Loan Agreement in September 2017, the Debtors were in default under the terms of the Prepetition Term Loan Agreement by February 2018. Prior to the Petition Date, the

Prepetition Term Loan Agreement was amended six times (four of which also contained waivers of defaults) despite having been outstanding for only fourteen months, and defaults were waived one additional time outside of an amendment.

C.   **The Debtors' Prepetition Capital Structure**

15.   By the DIP Motion, the Debtor seeks relief, *inter alia*, (i) authorizing the Debtors to obtain the DIP Facility and execute the DIP Credit Agreement, (ii) authorizing a roll-up of a portion of the prepetition secured obligations, representing approximately $110 million (the "**Proposed Roll Up**"), (iii) granting the DIP Lenders a security interest in and liens on the DIP Collateral, (iv) granting allowed superpriority administrative expense claims and first priority priming liens to the DIP Lenders, and (v) authorizing the Debtors to use Cash Collateral. This court held an interim hearing on the DIP Motion and entered the First Interim Order on December 13, 2018. As noted herein, the Debtors filed their DIP Credit Agreement and other DIP Loan Documents at 11:20 p.m. Eastern Time on December 19, 2018, less than thirty-six hours prior to the hearing on entry of the Second Interim Order.

**OBJECTION**

I.   **The DIP Budget Does Not Support The Urgency Alleged by the Debtors and Prepetition Lenders**

16.   The Debtors have filed a Budget that shows that the Debtors could maintain a cash balance in excess of $8 million through the week ending January 4, 2019. This expectation is further confirmed by the *Declaration of Sean Gumbs In Support of the Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* ("**Gumbs Declaration**"),

9

which notes that "without the initial funding of $8.0 million that is currently forecast, the Debtors estimate an ending cash balance of approximately $7.6 million for the week ending January 11, 2019 (the week prior to the proposed final DIP hearing)." Gumbs Declaration, ¶ 8. Mystifyingly, the Gumbs Declaration acknowledges this reality in an attempt "[t]o illustrate the risk in delaying the Debtors' access to interim financing." *Id.* In reality, however, the Debtors' projected cash flows demonstrate that there would be no harm to the Debtors' estates if the Second Interim Hearing were adjourned until January 4, 2019 or later.

17. The Debtors' financial advisor and investment banker assert that the Debtors have "an immediate and critical need of approximately $8 million during the period December 21, 2018, through January 15, 2019." Gumbs Declaration, ¶ 7; *see also* Greene Declaration, ¶ 9. Even if that statement is true, it does not follow that the Debtors need $8 million **on** December 21, 2018 and there is no further explanation for this number.

## II. The Proposed "Roll Up" of the Prepetition Debt is Inappropriate

18. The Debtors' Proposed Roll Up would reduce on a dollar-for-dollar basis a portion of the Prepetition Secured Obligations, thereby allowing the DIP Lenders to convert prepetition debt into a postpetition claim that enjoys superpriority administrative expense status and that is secured with estate assets (such as proceeds from foreign licenses) that are not currently encumbered, improperly circumventing the Bankruptcy Code's priorities and distribution framework. At first glance, the Proposed Roll Up appears patently inappropriate and an attempt by the Prepetition Secured Parties to gouge the Debtors' estate by further elevating certain of their claims to a senior secured status and utilize the remaining unencumbered assets of the Debtors to fund a sale process solely for the benefit of the Prepetition Secured Parties and preclude potentially viable alternative paths that would result in the reorganization of the Debtors. It certainly is not necessary to motivate the DIP Lender to make a loan that is designed to quickly effectuate a

Stalking Horse Bid that will be, coincidentally, just enough to pay off the DIP facility and remaining Prepetition Secured Obligations, including the handsome returns thereon.[9]

19. Notably, the DIP Lenders and the Prepetition Lenders are one and the same – both loans are made by a *single* lender. The Proposed Roll Up was not necessary to avoid "free riding" in the Prepetition Lender group – rather it appears, as noted above, that the purpose of the Proposed Roll Up is solely to avoid the potential for pursuing a plan of reorganization or other plan that is not within the tight confines of the "Acceptable Plan".

20. Where a lender extends credit with an "ulterior purpose," as the DIP Lenders are doing here by seeking to fill collateral holes in a run around of the Bankruptcy Code, charging excessive fees and grabbing control of these chapter 11 cases, such extension is not in good faith. *See In re Colad Grp., Inc.,* 324 B.R. 208, 225 (Bankr. W.D.N.Y. 2005) (finding that debtor failed to carry affirmative burden to establish good faith of the proposed financing transaction; the presence of offensive terms and conditions in the financing agreement created uncertainty as to lender's intent and rendered inappropriate a finding of good faith); *see also In re EDC Holding Co.*, 676 F.2d 945, 949 (7th Cir. 1982). "Such machinations would be commercially unreasonable outside bankruptcy. [DIP Lenders] may not use the bankruptcy process to obtain respectability for otherwise suspect efforts to influence [the case]." *In re: Aerogroup International, Inc.*, 2017 WL 9885009 (Bankr. D. Del.).

21. Finally, the Proposed Roll Up would impede the lien investigation rights of the Committee. Although the DIP Motion provides a period for a lien investigation, the reality is that

---

[9] As the prepetition fee letter remains undisclosed, the Committee does not even know the full extent of such fees. Of course, the sheer extent of such fees is but one of the reasons that it is critically important the challenge rights of the Committee be more clearly preserved than currently proposed in the Second Interim Order.

muddled language in Section 5.1 of the Second Interim Order means the window will be effectively closed for the portion of the prepetition obligations rolled up into the Prepetition Term Loan less than twenty-four hours after the appointment of the Committee – detracting potentially substantial value from unsecured creditors before these cases have even gotten off the ground. Instead, the Committee's challenge rights should be expanded to expressly include (i) any matter covered by any of the Debtor's stipulations in the First Interim Order or the Second Interim Order and (ii) the releases provided for in Section 5.4 of the Second Interim Order in favor of the DIP Lenders and the Prepetition Lenders.

### III. The Debtors' DIP Facility Purports to Grant the Prepetition Secured Parties with Liens on Unencumbered, and Valuable, Assets

22. The DIP Collateral, as currently proposed, includes substantially all unencumbered assets of the Debtors, which assets would otherwise be available for unsecured creditor recoveries in these chapter 11 cases. These assets include, among other things, avoidance actions (which shall be assigned to the DIP Loan Parties as part of the Debtors' "Acceptable Plan"), proceeds of foreign licenses and perhaps the Debtors' interest in any director and officer liability insurance and the proceeds thereof.[10] Moreover, the DIP / Prepetition Lenders seek to have these unencumbered assets secure the entire Proposed Roll Up, not just a diminution claim relating to the prepetition collateral. The Committee objects to the DIP Lenders being granted any liens or superpriority claims on avoidance actions or any other unencumbered assets except to secure new postpetition money or an adequate protection claim for diminution in value of the prepetition collateral caused by the sale or the use of such collateral.

---

[10] The Debtors include interest in directors and officers insurance policies and proceeds thereof as collateral that is Interim Period Excluded Collateral under the Second Interim Order, but these policies also appear as "Excluded Assets" in Section 3.02(i) of the DIP Security Agreement. At minimum, clarification is necessary on how these policies are intended to be treated.

12

23. With respect to the proposed liens and claims on avoidance actions, such relief is fundamentally at odds with the unique purposes served by avoidance actions. Avoidance actions are distinct creatures of bankruptcy law designed to benefit, and ensure equality of distribution among, general unsecured creditors. *See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 244 (3d Cir. 2000), rev'd on other grounds (identifying underlying intent of avoidance powers to recover valuable assets for estate's benefit); *In re Tribune Co.*, 464 B.R. 126, 171 (Bankr. D. Del. 2011) (noting "that case law permits all unsecured creditors to benefit from avoidance action recoveries"). The Debtors have not provided any justification for the extraordinary assignment to the DIP Loan Parties of avoidance actions, or for the potential payment of superpriority claims with the proceeds of such actions.

24. The proceeds of the Debtors' foreign licenses, which the Debtors themselves divulge are unencumbered, also constitute significant potential value for the estates, and by encumbering such assets, dissolving perhaps the only value available to unsecured creditors' recovery, the DIP Lenders seek to circumvent the purpose of the Bankruptcy Code by improperly filling their own collateral holes. To illustrate the potential upside value in the Debtors' foreign licenses, on December 17, 2018, Cipher Pharmaceuticals Inc. ("**Cipher**") announced that its new drug submission for plecanatide for irritable bowel syndrome with constipation was accepted by Health Canada.[11] Cipher acquired the Canadian rights to develop, market, distribute and sell plecanatide from the Debtors in February 2018.

---

[11] *See* Cipher Pharmaceuticals Announces PLECANATIDE Accepted for Review by Health Canada, https://finance.yahoo.com/news/cipher-pharmaceuticals-announces-plecanatide-accepted-120000280.html?fbclid=IwAR2bYGNqyHFaZ3sHhPwxQcFPK3blYSl8DYyYrYJfGSJUNTZc_dG-x9tdKYA.

25. At a minimum, the DIP Lenders should first be required to marshal their existing collateral before resorting to such unencumbered assets or the proceeds thereof.[12]  Otherwise, by seeking to resort first to the previously unencumbered assets, the DIP / Prepetition Lenders could deprive unsecured creditors of the recovery they would have otherwise enjoyed had the DIP Loans not been approved, while the DIP Lenders come out no different.  Thus marshaling must be required in this context if the Court determines it is proper to permit the Prepetition Secured Parties to fill holes in their collateral package through providing the relatively minimal loan pursuant to the Second Interim Order.

## IV.    The Proposed Second Interim Order Seeks Additional Inappropriate Relief.

26. While the Committee, and all other stakeholders, have had insufficient opportunity to fully review the relief requested in the Second Interim Order – a fact which by itself should give the Court pause in granting the relief sought therein – based on its review to date, the Committee finds numerous provisions of the Second Interim Order to be inappropriate at this juncture, if ever:

- Section H(iv):  Changes to the Budget should be in the DIP Lenders' "reasonable" discretion – not their sole discretion – given much of the DIP appears to just be a "safety net" for the Debtors.  The DIP Loan Agent should also have reasonable consent rights.

- Section H(iv):  This section should be clarified that the cap on payment of professional fees should not affect the allowability of those fees as they are allowed administrative claims so long as they are approved by the Court.

- Any reporting, including the delivery of notices, required to be provided under the DIP Loan Documents to the DIP Loan Agent should also be provided to the Committee.

---

[12] As drafted, if the Prepetition Administrative Agent does not obtain a waiver of the doctrine of marshalling, that constitutes an Event of Default under the DIP Credit Agreement.  DIP Credit Agreement, section 11.01(ll).

- Section 1.4.1: The Debtors' authorization to enter into and comply with the terms of the DIP Loan Documents should be qualified by "except as otherwise provided in this Second Interim Order".

- Section 1.4.3: Any amendments to the DIP Loan Documents under this section should require prior Committee consent.

- Section 1.4.4: This section approves the Upfront Fee and the Exit Fee despite the fact that those fees are not payable until the Final DIP Advance Date and the Maturity Date, respectively. The approval of such fees should occur solely in the context of the Final Order.

- Section 1.6: The delivery of payments and transfers of Estate property to the DIP Loan Agent should be subject to Section 5.1.

- Section 1.6: The last sentence provides for the payment of the Remaining Prepetition Secured Claim, but no application of payments should be allowed to the Remaining Prepetition Secured Claim until any objection to that claim is resolved.

- Section 1.8.1: The payment of fees and expenses provided for in this section should be subject to the procedures for payment in Section 1.8.2.

- Section 2.1.6: The DIP Liens and the DIP Superpriority Claims should be subject to a carve-out for "Excluded Assets" as defined in the DIP Security Agreement and the Interim Period Excluded Collateral.

- Section 2.2.1: The carve-out for DIP Superpriority Claims should exclude the "Excluded Assets" as defined in the DIP Security Agreement.

- Section 3.3: Section 507(b) Priority Claims should be subject to exceptions for "Excluded Assets" as defined in the DIP Security Agreement and the Interim Period Excluded Collateral.

- Section 3.5: To the extent the DIP Secured Parties lose any challenge to the Prepetition Obligations, Prepetition Liens or Remaining Prepetition Secured Claim, then such fees and expenses in connection therewith should not be reimbursed and should be disgorged to the extent paid – particularly with respect to the Prepayment Premium which will clearly require a challenge.

- Section 4.3.2: Any hearing on relief from the automatic stay should permit the Court to consider all relevant circumstances and should not waive any rights under Section 105 of the Bankruptcy Code.

- Section 5.1:

    o The 60-day deadline for the challenge period should be satisfied by the Committee or any other party in interest seeking standing to file such a

complaint, not for actually getting standing and filing the complaint, <u>provided that</u> such motion to seek standing attaches a copy of the proposed complaint.

- o This section should expressly allow the court the ability to unwind the Roll Up in the instance that a challenge is successful rather than simply provide that nothing in the Second Interim Order would prevent such a result. Section 5.2 should be deleted in its entirety as there is no basis for requiring a showing of undue advantage to the DIP Loan Agent or the DIP Lenders in their prepetition capacities in connection with such challenge.

- Section 5.4: The last sentence needs to make clear the Carve-Out is still in effect until <u>both</u> the DIP Obligations and allowed Remaining Prepetition Secured Claims have been paid, not just the DIP Obligations.

## **RESERVATION OF RIGHTS**

27. The Committee reserves the right to supplement and amend this Objection and introduce evidence at any hearing on approval of the DIP Motion, or such other hearings as may be scheduled in these cases from time to time, including, without limitation, with regards to the Bid Procedures Motion. Further, the Committee reserves the right to respond, further object, join in, or amend any objection herein with respect to any argument or objection made by any person relating to the DIP Motion or the other relief requested in these cases.

**CONCLUSION**

WHEREFORE, the Committee respectfully request that this Court grant the relief requested in this Objection and such other relief as the Court deems just and proper.

Dated: December 21, 2018
New York, New York

*/s/ Matthew L. Warren*

Richard A. Levy, Esq. (admitted *pro hac vice*)
Matthew L. Warren, Esq. (admitted *pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
Email:  richard.levy@lw.com
  matthew.warren@lw.com

Jeffrey Mispagel, Esq.
LATHAM & WATKINS LLP
885 Third Avenue
New York, NY 10022
Tel:  (212) 906-1200
Fax:  (212) 751-4864
Email:  jeffrey.mispagel@lw.com

*Proposed Counsel for the Official
Committee of Unsecured Creditors*