LATHAM & WATKINS LLP
Richard A. Levy, Esq. (admitted *pro hac vice*)
Matthew L. Warren, Esq. (admitted *pro hac vice*)
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
Telephone:    (312) 876-7700
Facsimile:    (312) 993-9767
Email:        richard.levy@lw.com
              matthew.warren@lw.com

– and –

Christopher Harris, Esq.
Blake T. Denton, Esq.
Jeffrey Mispagel, Esq.
885 Third Avenue
New York, NY 10022
Tel:          (212) 906-1200
Fax:          (212) 751-4864
Email:        christopher.harris@lw.com
              blake.denton@lw.com
              jeffrey.mispagel@lw.com

*Proposed Counsel for the Official*
*Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| SYNERGY PHARMACEUTICALS INC., *et al.*,[1] | Case No. 18-14010 (JLG) |
| Debtors. | (Jointly Administered) |
| | Hearing Date: January 4, 2019 |

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: Synergy Pharmaceuticals Inc. (5269); Synergy Advanced Pharmaceuticals, Inc. (4596). The address of the Debtors' corporate headquarters is 420 Lexington Avenue, Suite 2012, New York, New York 10170.

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTORS' MOTION FOR (I) AN ORDER (A) APPROVING THE BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) ESTABLISHING THE NOTICE PROCEDURES AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (C) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (D) SCHEDULE A SALE HEARING, AND (E) GRANTING RELATED RELIEF AND (II) AN ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO, AND (C) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "**Committee**") of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") by and through their undersigned proposed counsel, respectfully submits this objection (the "**Objection**") to the *Debtors' Motion for (I) an Order (A) Approving the Bidding Procedures for the Sale of Substantially all of the Debtors' Assets, (B) Establishing the Notice Procedures and Approving the Form and Manner of Notice Thereof, (C) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Schedule a Sale Hearing, and (E) Granting Related Relief and (II) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of all Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief* [Docket No. 17] (the "**Bid Procedures Motion**")[2].  In support of this Objection, the Committee respectfully states as follows:

---

[2]  Capitalized terms used, but not otherwise defined, in this Objection shall have the meaning set forth in the Bid Procedures Motion.  All references to "Exhibit [X]" herein refer to the exhibits to the Declaration of Blake T. Denton, dated December 31, 2018, filed contemporaneously herewith.

## PRELIMINARY STATEMENT

1.    While the Stalking Horse Agreement establishes a base price for the Debtors' assets

– ███████████████████████████████████████████████████████████

██████████████ – it does so at unacceptable costs and damage to the Debtors' estates and

particularly the recoveries of the Debtors' unsecured creditors.[3]  In short, the Debtors and Stalking

Horse Bidder have agreed to (i) a purchase price that conveniently just barely clears the purported

amount of the secured debt, (ii) a sale structure that greatly inhibits competitive bidding and all

but forecloses any realistic prospect for this purchase price to be market tested, and (iii) a

distribution scheme dictating how the sale proceeds will be applied and which specific creditors

will be treated to priority status.  Even worse, this Court is provided no supervision over this

structure nor will it be subject to the requisite standards set forth in the Bankruptcy Code – such

as those governing a plan of reorganization.  Rather, the Debtors, DIP Lenders and Stalking Horse

Bidder have simply agreed on all of these terms and only come to this Court seeking a quick

approval in order to protect the Stalking Horse Bidder and the Debtors' management and board of

directors from future scrutiny.[4]  This structure is one absolutely inconsistent with the Bankruptcy

Code and if permitted would establish a precedent that would undoubtedly become the playbook

---

[3]    The Committee served discovery requests on the Debtors and the Stalking Horse Bidder the day after formation of the Committee, following conclusion of the Second Interim DIP Hearing.  The Debtors and the Stalking Horse Bidder commenced production on a rolling basis on December 27, 2018 and to date have produced approximately 4300 documents representing over 66,000 pages, some only sixteen hours prior to the objection deadline.  While the Committee has endeavored to review as many documents as possible in the past four days, such review is ongoing.  Moreover, as a consequence of the quick speed of these cases this Objection is filed prior to the taking of depositions, which are scheduled for January 2-3, 2019.  As such, the Committee reserves all rights to supplement this Objection with additional arguments and/or evidence prior to or at the Bidding Procedures hearing.

[4]    While an issue for another day, notably the "Acceptable Plan" filed by the Debtors [Docket No. 111], contemplates releasing all current and former directors and officers of the Debtors.  Even based solely on the facts discovered in connection with this Objection, such a release is patently inappropriate as the Committee believes significant causes of action against both current and former directors and officers exist and will need to be pursued at the appropriate time.

for numerous future pre-baked deals seeking to lock-in a specific buyer, specific price and specific distribution of proceeds to benefit secured creditors and management while obtaining a protective stamp of approval from a federal court.

2.    As this Court is already aware, the Debtors – at the insistence of the Stalking Horse Bidder and the DIP Agent – seek to establish Bidding Procedures that (a) establish a lightning-fast sale process that will limit the ability of other interested parties to participate and maximize value and (b) preclude any ability for the creditors of the Debtors to propose alternatives to the sale process. On top of the foregoing, the Debtors seek to reward the Stalking Horse Bidder – an entity that ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████ – with lucrative bid protections. As a kicker, ████████████ ██████████████████ the Stalking Horse Agreement dictates the distribution of sale proceeds by assuring payment of $15 million to certain employees of the Debtors (regardless of whether such employees have priority claims or even have allowed claims[6]) pursuant to ████████████ ██████████ prepetition employee plan that was amended only three days before the Petition Date



[6]    The Stalking Horse Agreement provides that "in the event that the Sellers are not authorized to pay severance to employees at the Closing pursuant to the Sale Order, the Purchaser shall instead deposit the Severance Consideration into an escrow account for the benefit of the employees entitled thereto, to be paid to such employees upon the earlier of (X) the Sellers' emergence from bankruptcy or (Y) Bankruptcy Court approval, with any remaining unused funds being remitted to the Purchaser following payment of all severance obligations."

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████.

3.      Incredibly, and as will be demonstrated at the Bidding Procedures hearing, prior to

their acceptance of the Stalking Horse Bid that zeroed out unsecured creditors, ██████████████

███████████████████████████████████████████████████

████████████████████████████, let alone one based on a truncated timeline. ████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████.[7]  When these efforts were unsuccessful, ████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████, the Debtors decided – for some unexplained reason – that they should file

bankruptcy and sell their assets under Section 363 of the Bankruptcy Code.  But before doing so,

the Debtors locked in the Stalking Horse Agreement that dictated (i) payments to employees and

management regardless of whether such employees are hired by the Stalking Horse Bidder (in fact

---

[7]      The Debtors' sole commercial product, TRULANCE, received FDA approval less than two years prior to the Petition Date, and was approved for a second use less than a year prior to the Petition Date.  First-Day Declaration, ¶ 12.  The Debtors entered into potentially lucrative licensing agreements for this product in Canada, mainland China, Hong Kong and Macau even more recently.  First-Day Declaration, ¶¶ 13, 14. Given the recency of these key events, it is curious that the Debtors provide so little specificity regarding recent marketing efforts.  While boasting that Centerview "contacted over 30 pharmaceutical companies and financial buyers" starting in 2015, all the Debtors can say about the 2018 Strategic Review Process that began in May 2018 is that Centerview contacted "several additional potential buyers" and "various potential interested parties."  Bid Procedures Motion, ¶¶ 11-14; First-Day Declaration, ¶¶ 40-43.

the payments are only to be made if they are <u>not</u> hired by the Stalking Horse Bidder), (ii) a purchase

price at ████████████████████████████████████████████████████████████

████████████████████████████████████████████████ and (iii) a sale timeline

assuring that the bargain basement price is subject to limited, if any, challenge. ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████ The Debtors and their management have

a fiduciary duty to all stakeholders to maximize value – not to simply ensure that the assets are

delivered to the Stalking Horse Bidder at a price sufficient to pay off their secured lenders. Given

████████████████████████████████████████████████████████████████

████████████████████████ and the numerous bid-chilling components of the Bidding

Procedures demanded by the Stalking Horse Bidder, such as exposing bidders to the loss of their

Good Faith Deposit, it is challenging to see how the Debtors could prefer the Stalking Horse Bid

over a naked auction.

4.    The Committee objects to the Court's wholesale approval of the proposed Bidding

Procedures and Stalking Horse Agreement because, taken together, they would foster a sale

process that runs afoul of the Bankruptcy Code's primary goal of maximizing value for a debtor's

estate and all of its creditors and instead locks in a transaction without any realistic opportunity for

competitive bidding, and pre-determines the distribution of proceeds from such transaction,

primarily for the benefit of three parties:  the Prepetition Lenders, the Stalking Horse Bidder and

the Debtors' management.  Instead, this Court should enter a Bidding Procedures Order which:

- Incorporates a sale timeline that permits a formal marketing process to be completed – which the Debtors have never undertaken.  The Committee believes that extending the proposed process by four weeks will permit the Debtors' investment banker to run such process, with the Committee's investment banker

advising, and as the Committee will demonstrate at the Bidding Procedures hearing, if necessary, the Debtors' available liquidity will support such timeline.[8]

- Makes absolutely clear that the $15 million of "Severance Consideration" is in no way, shape or form approved by the Bidding Procedures Order. Moreover, the Stalking Horse Agreement should not be approved absent provision that the Stalking Horse will have no termination right if the Severance Consideration is ultimately not approved by this Court and the Stalking Horse will pay the full $200 million purported purchase price to the Debtors regardless of approval of the Severance Consideration.

- Approves the Break-Up Fee and Expense Reimbursement, if at all, at a more typical market level – ███████████████████████████████████████ ████████████████████████████████████████████████ – and provides, as virtually all bidding procedures orders do, that the Break-Up Fee and Expense Reimbursement should only be paid upon consummation of an alternative sale. As structured, the Break-Up Fee and Expense Reimbursement are to be paid, incredibly, from the Good Faith Deposit of the winning bidder, even if the winning bidder properly exercises its termination rights. Such a structure will undoubtedly deter parties from bidding – as it is likely intended to do.

- Expressly permits the Debtors to consider pursuing a plan of reorganization until the time of the Sale Hearing (which, after all, is just a functional equivalent of a competing bid) and, in the event such a path is pursued, the Stalking Horse Bidder's claims should be limited to the Break-Up Fee and Expense Reimbursement.

- Permits bidders to submit lot bids, in particular permitting separate bids for TRULANCE and Dolcanatide.

---

[8] This is not a case where the Debtors are losing hundreds of thousands or millions of dollars each passing day. To the contrary, the DIP facility provides for only $8 million in funding between December 21, 2018 and January 15, 2019 and only $45 million for the totality of these cases, the majority of which the Debtors forecast will be untouched at the end of their current 13-week budget. Second Interim Order to Authorize Post-Petition Financing [Docket No. 113], at 2. Consequently, it is artificial and disingenuous for the Debtors to suggest that the process cannot be slowed to consider whether the Debtors' marketing process or bidding procedures may be enhanced.

## BACKGROUND

**A.**  **The Debtors' Chapter 11 Cases**

5.      On December 12, 2018 (the "**Petition Date**"), the Debtors commenced the above-captioned cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code, as amended (the "**Bankruptcy Code**").  The Debtors are continuing in possession of their property and are operating their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On December 20, 2018, the Office of the United States Trustee appointed the Committee.  No trustee or examiner has been appointed in the Chapter 11 Cases.

**B.**  **The Debtors' Strategic Review Process**

6.      In 2015, the Debtors engaged Centerview Partners LLC ("**Centerview**") to explore options and alternatives to enhance shareholder value and to conduct buyer outreach.  Over the course of three years, Centerview purportedly reached out to thirty "pharmaceutical companies and financial buyers".  Bid Procedures Motion, ¶¶ 12, 13.  According to the Debtors, during the last three quarters of 2018, the Debtors' "extensive" outreach continued and Centerview reached out to buyers who had previously expressed interest, as well a few "additional" buyers, although it is unclear from the Debtors' pleadings how many of the thirty parties were contacted prior to 2018.  *Id.*  Any post-2017 marketing is particularly important because, as noted above, TRULANCE was not FDA approved until 2017, making any marketing of the Debtors prior to that time stale and not an appropriate measure of current interest and value in the Debtors' assets.

████ ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

8



On October 25, 2018, the Debtors issued a press release and filed a Form 8-K summarizing their strategic review process.  The Debtors announced that they had received multiple offers to acquire the company, but that "the offers received to acquire Synergy have been significantly below the Company's current market value, and it has been unable to consummate any partnership opportunities."  EX-99.1, Form 8-K dated October 25, 2018 (Exhibit 11).

10.    At the time, the Debtors' closing share price on October 25, 2018 was $1.40 per share, giving the Debtors a market equity value of approximately $347 million, and implying, after taking into account debt under the Prepetition Credit Agreement and other unsecured debt, an enterprise value of greater than $450 million.  Following this press release, the Debtors' stock opened trading on October 26 at $0.40 per share (over 70% lower than the closing price the day before), and closed at $0.43 per share, representing a loss of approximately $241 million in market equity value in less than 24 hours.



15.     Since executing the Stalking Horse Agreement on December 12, 2018, the Debtors have been subject to an onerous no-shop provision that precludes Centerview and the Debtors from engaging with any other bidders. ██████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██

16.     Yet, despite the foregoing, the Debtors now propose a lightning fast sale process with only approximately 5 weeks of marketing following approval of their bidding procedures, which the Debtors seek approximately fifteen business days after the Petition Date.   The Bid Procedures Motion proposes the following abbreviated timeline for the Debtors' sale process:

| *Event* | *Date* | *Number of Marketing Days* |
|---|---|---|
| **Petition Date** | December 12, 2018 | N/A |
| **Bid Procedures Hearing** | January 4, 2019 | 0 |
| **Bid Deadline** | February 9, 2019 at 4:00 p.m. (EST) | 36 |
| **Auction** | February 12, 2019 at 10:00 a.m. (EST) | 39 |
| **Sale Hearing** | February 15, 2019 | N/A |

**OBJECTION**

I. **The Bidding Procedures and the Stalking Horse Agreement Chill Potential Interest in the Debtors' Assets and Should Not be Approved Without Modification**

17.    As currently proposed, the Bidding Procedures and the Stalking Horse Agreement do not provide the best means to maximize the value of the Debtors' estates.  The purpose of bidding procedures is to facilitate the fair sale of a debtor's assets through a process that will maximize the value of such assets for the benefit of the debtor's creditors.  *See Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate.").  The Committee objects to the Bid Procedures Motion because, as currently structured, the deadlines outlined therein thwart any meaningful exposure to the Debtors' assets to higher and better offers. In addition, the off-market nature of the Bid Protections in the Stalking Horse Agreement, which the Debtors seek to lock in at the Bidding Procedures hearing, will serve to chill bidding, especially when considered in conjunction with the lightning-pace of the sale timeline ███████████ ████████████████, and should not be approved absent modification.

   a. *Compressed Sale Milestones and Lack of an Appropriate Marketing Process Will Stifle Alternate Proposals*

18.    In connection with the Bid Procedures Motion, the Debtors and the Purchaser impose aggressive Sale Milestones resulting in a severely condensed sale process – commencing only after the Debtors are no longer subject to the expansive "no shop" prohibitions set forth in the Stalking Horse Agreement.[11]  The proposed timing in the Bidding Procedures is insufficient to

---

[11]    Even after the expiration of the "no shop", under the proposed Bidding Procedures the Debtors would not be allowed to evaluate and/or conduct an alternative transaction contemporaneously with the sale process, as discussed further below.

afford third parties a fair opportunity to participate in the sale process and, as currently formulated, the proposed Bidding Procedures contemplate (i) a bid deadline on February 9, 2019, approximately 36 days after this Court's prospective entry of the Bidding Procedures Order, (ii) an auction on February 12, 2019, three days after the bid deadline, and (iii) a hearing to consider approval of any sale to the successful bidder prior to February 15, 2019.  Bidding Procedures at 2-3.

19.    These requested deadlines provide an unreasonably abbreviated schedule for any sale and the Stalking Horse Bidder staunchly refuses to adjust them, despite complaining that it cannot comply with discovery requests tailored to its own sale timeline – noting the Committee "purported to demand compliance less than three business days [after service of its Subpoena] by December 28, 2018 at 5 p.m."[12]  The Stalking Horse Bidder's objection leaves out the fact that the objection deadline to the Bid Procedures Motion was set for December 28, 2018 at 4:00 p.m. EST (and only later extended to December 31 at 2:00 p.m. EST for the Committee) – four business days after the formation of the Committee and nine business days after the commencement of these cases.

20.    Equally important, any "emergency" to which the Debtors and the Stalking Horse Bidder point in support of their proposed expedited schedule, assuming there is one, is self-created. This is a case in which the Debtors purportedly solicited thirty (30) potential purchasers over the course of three years ███████████████████████████████████████████████ ██████████████████████, and, incredibly, it apparently was the Debtors themselves who decided to effectuate a sale through these chapter 11 cases.  Bid Procedures Motion, ¶¶ 11, 12.

---

[12]    *Bausch Health Companies Inc. and Bausch Health Ireland Limited's Objections and Responses to the Official Committee of Unsecured Creditors' Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Bankruptcy Case*, at 2 (Exhibit 23).

This is nothing other than a ploy that locks in severance payments to management, and a full recovery to the senior lenders, to the detriment of all others and to protect the Debtors' officers and directors from legal attack because of their incredibly flawed process and their prepetition decisions which will undoubtedly be subject to future litigation (unless the proposed releases in the "Acceptable Plan" survive), all while the Stalking Horse Bidder gets to purchase the Debtors' assets amidst a chilled bidding process resulting from the artificially expeditious sale timeline.

21.     The Debtors' counsel attempted to justify the rushed timeline for the hearing on the Bid Procedures Motion by asserting that having an order approving the Bidding Procedures entered on January 4, 2019 would allow the Debtors' bankers to solicit potential investors or purchasers at an industry conference taking place the following week:

> As for January 4th, Your Honor, for the bidding procedures order to be entered, Your Honor, that's where our stalking horse comes in.  And our stalking horse is insisting on having January 4th.
>
> It's important to know that January 4th is also helpful for us.  The reason for that is there is the most important conference for the investment banking world and for investors in healthcare.  That happens the weekend after that January 4th.  So something like 5th, 6th, 7th, 9th, there is what is commonly known in the industry as this JPM conference.   Your Honor, I'm not invited, but our bankers are invited. And we want our bankers to be armed with the ability to go talk to investors while they're at that JPM conference.  They cannot talk to investors before the bid procedures order is entered because we've got a no-shot [*sic*] from when we signed until we get our bid procedures order entered.

First Day Hearing Tr. (Dec. 13, 2018), 30:24-31:14 (Exhibit 24).

22.     The Committee agrees that, in the abstract, the conference would present a valuable opportunity for marketing the Debtors assets despite the fact that Centerview is attending in an informal capacity and not on a formal invitation, but the Debtors' efforts at the conference will be hampered given the extremely tight no-shop the Debtors are subject to under the Stalking Horse Agreement – which only permits the Debtors to start any marketing efforts whatsoever once, and solely in accordance with, the entry of the Bidding Procedures.  So, now, the Debtors cannot even

tell prospective bidders that they want to set up meetings with them at the conference to discuss Synergy. The more likely result is that the conference will further delay interested participants from having the time to promptly begin negotiating NDAs and diligencing Synergy, which further compresses the already quick timeline under the Debtors' contemplated schedule.

23.     Given these restrictions, the deadlines set forth in the Bidding Procedures are even shorter than they appear on their face, as potential bidders who would like access to Diligence Material need to sign a confidentiality agreement and provide evidence of the bidder's ability to finance the sale (including its unaudited financial statements, a pro forma capital structure and other information as determined by the Debtors) – despite having no access to the Debtors whatsoever until January 5, 2019 at the earliest, and likely not until January 10, 2019 or later, after the JPM conference concludes. This will likely take a few days for any potential bidder to collect, and thus potential bidders – to the extent they are even among the parties who receive the Sale Notice – will likely have less than thirty days to diligence the transaction and submit a bid. Indeed, any interested party who previously had relevant diligence information was required to destroy it pursuant to Section 5.10 of the Stalking Horse Agreement and thus would be required to begin the diligence process anew.[13]

24.     Any interested bidder tempted to reach out to the Debtors was undoubtedly further deterred by the additional requirements in Section 5.10 requiring the Debtors to report to the Stalking Horse Bidder "any inquiry, indication of interest, proposal or offer from a third party with respect to an Alternative Transaction received by the Sellers or any of their Affiliates or its or their

---

[13]     Section 5.10 of the Stalking Horse Agreement provides, in part: "The Sellers shall immediately instruct any Person in possession of confidential information about the Sellers that was furnished by or on behalf of the Sellers in connection with any actual or potential Alternative Transaction to return or destroy all such information or documents or material incorporating such information in accordance with the confidentiality or similar agreement governing treatment of such confidential information."

employees or Representatives after the date hereof until the Bankruptcy Court shall have entered

the Bidding Procedures Order, and the Sellers shall communicate to BH and the Purchaser the

material terms of, including the identity of the Person or Persons making, any such inquiry,

indication of interest, proposal or offer." ████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████

25.     Further, there is no evidence that the Debtors are in desperate need of funding which

would require such a quick sale process.  As discussed in the Committee's objection to the DIP

Motion, the Debtors' budget shows sufficient funds to operate through an extended sale process.

A liquidity crisis that would require an expedited sale does not exist here.  Given the situation, the

Committee submits the Sale Milestones must be extended for an additional four-week period to

allow for reasonable diligence, formulation of competing offers and to responsibly test the

marketplace for the Debtors' assets.  This is particularly necessary given ████████████████

████████████████████████████████████████████████████████████████████████.

26.     These sale milestones are much more aggressive than those of comparable

bankruptcy cases.  Here, the Sale Milestones establish an unreasonably short period under the

circumstances because: (i) ████████████████████████████████████████████████████████

████████████████████████████,[14] (ii) the assets are essentially a drug portfolio that is not

shrinking in value over a few weeks, and (iii) the Debtors have sufficient liquidity to fund an

extended marketing and sale process.  Moreover, comparable bankruptcy cases approving such

---

[14]     As noted above, the Debtors' description of the prepetition marketing process covers a three-year period and
does not indicate the extent to which marketing was undertaken in the months prior to the Petition Date.  *See*
First-Day Declaration, ¶¶ 40-42; Bid Procedures Motion, ¶¶ 11-14.

aggressive milestones between the Bidding Procedures hearing and the Auction did not also have

a strict no-shop that essentially negated the use of the entire period prior to the Bidding Procedures

hearing.   The consequence of such compressed timing is that only a bidder with a working

knowledge of the relevant information regarding the Debtors and their businesses will have

adequate time to formulate a reasoned bid for the assets.   Interested third parties must be afforded

adequate time to conduct proper and fulsome due diligence, formulate bids and procure any

necessary financing to participate in the sale process.

### b. The Bid Protections are Excessive

27.     When triggered, the Debtors are seeking authority to pay $8.95 million in Bid

Protections to the Stalking Horse Bidder, comprised as follows: (i) a $7 million Break-Up Fee and

(ii) up to $1.95 million in expense reimbursements.   Accordingly, the Stalking Horse Bidder would

be entitled to fees aggregating 4.475% of the $200 million Purchase Price (and 4.84% of the $185

million that is proposed to be received by the Debtors' estates).   These excessive fees are

unnecessary and will discourage bidding.

28.     Deal protections are governed by Section 503(b) of the Bankruptcy Code, which

provides for administrative expense status for "the actual, necessary costs and expenses of

preserving the estate."  11 U.S.C. 503(b).   ████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████████

████████████████      The Debtors weakly assert in the Bid Procedures Motion that "[b]ut for the Bid

---

■  ██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████████

Protections, the Debtors do not believe the Stalking Horse Bidder would have entered into the

Stalking Horse Agreement."  Bid Procedures Motion, ¶ 43.  The facts show otherwise.  The

Debtors cannot now claim the Bid Protections are necessary to induce the Stalking Horse Bidder

to bid when the Stalking Horse Bidder is now █████████████████████████████████

29.    Even if this Court finds the Bid Protections are a necessary inducement to create a

stalking horse bid, the Bid Protections are out-sized relative to the transaction value.  To be

approved, deal protections should encourage, not discourage bidding.  *See Integrated Resources*,

147 B.R. 650 (S.D.N.Y. 1992) (holding that "[i]f the break-up fee encourages bidding it will be

approved, if it stifles bidding, it will not be approved."); *see also In re 995 Fifth Ave. Assocs.*, 96

B.R. 24, 28 (Bankr. S.D.N.Y. 1989)) (break-up fees should be "reasonable in relation to the

bidder's efforts and to the magnitude of the transaction").  As such, courts have reduced or

disallowed fees when (i) the requested reimbursement of expenses did not represent the actual

costs incurred by the stalking horse, and/or (ii) they included excessive break-up fees in light of

the proposed transaction.  *See In re Reliant Energy Channelview LP*, 594 F.3d 200, 208 (3d Cir.

2010) (affirming bankruptcy court rejection of bid chilling break-up fee representing

approximately 3% of the purchase price).  Cases generally do not allow fees that exceed 3% of the

proposed purchase price.  *See* Anne M. Anderson, *Acquisitions in Bankruptcy: 363 Sales Versus

Plan Sales and the Existence of Fire Sales*, 22 Am. Bankr. Inst. L. Rev. 1, 6 (2014) (noting break-

up fees "average 2.3% of the stalking horse price"); *see also* Joseph Samet, *Use of Break-Up and*

---

■

*Topping Fees in Corporate and Bankruptcy Asset Sales*, 918 PLI/Comm 3351, 363 (2009).  Here,

the proposed Bid Protections aggregating a startling 4.475% (or 4.84% depending on how the $15

million earmarked for management is addressed); not only is this a waste of estate assets, but the

Bid Protections also create an excessively high threshold for an initial competing bid (especially

given ███████████████████████ and extremely limited time to formulate a bid

post-petition) and will accordingly suppress the competitive bidding process.  The proposed Bid

Protections are excessive, chill bidding, and must be modified.

30.    To the extent this Court does approve the Break-Up Fee at this junction, the

structure of any Break-Up Fee should be adjusted.  Under the current Stalking Horse Agreement,

the Break-Up Fee is payable three days after any material breach of a representation, warranty or

covenant (even if the Stalking Horse Bidder is the Successful Bidder) or if the Stalking Horse

Bidder is not the Successful Bidder, regardless of whether an Alternative Transaction is

consummated.  Not only is the Break-Up Fee payable almost immediately upon termination (and

prior to the consummation of any Alternative Transaction), the Bidding Procedures build in that

"a portion of the Good Faith Deposit of a Successful Bidder (other than the Stalking Horse Bidder)

equal to the Bid Protections due to the Stalking Horse Bidder under the Stalking Horse Agreement

shall be used to pay the Stalking Horse Bidder in accordance with the terms of the Stalking Horse

Agreement and the Bidding Procedures Order."  Bidding Procedures at 14.  Thus, any Qualified

Bidder has to agree up front that if it is the Successful Bidder then a portion of its deposit will be

payable to the Stalking Horse Bidder in the form of the Break-Up Fee, and if for some reason the

Successful Bidder does not consummate its transaction, its only recourse for that portion of the

"deposit" is an administrative expense claim against the Debtors.  This will undoubtedly have a

serious bid-deterring effect given the risks it shifts to any bidder interested in participating in the Auction and cannot be tolerated.

31.     The Committee respectfully submits that the Break-Up Fee should be payable upon the various termination events set forth in the Stalking Horse Agreement <u>only if</u> an Alternative Transaction is consummated within nine months following such termination and the Break-Up Fee is payable solely from proceeds of such Alternative Transaction, but that the Break-Up Fee and Expense Reimbursement should be afforded administrative priority status and the consent of the DIP Lender to payment from the DIP Collateral as protection – which of course is the typical result in nearly every Section 363 sale.  In addition, the Break-Up Fee should not be payable from the Good Faith Deposits of any Qualified Bidders, or payable at all if the Stalking Horse Bidder is the Successful Bidder and elects not to close the transaction due to a breach of a representation or warranty.[17]  This way, the plethora of termination rights of the Stalking Horse Bidder do not serve to chill bidding or destroy estate value – and create an unnecessary liquidity crisis – if the Debtors cannot otherwise consummate a transaction.

## II.   <u>Approval of $15 Million of the Purchase Price to Pay Severance is Inappropriate and Subverts the Bankruptcy Code</u>

32.     The Debtors would like the Court to believe that the proposed Severance Consideration merely amends pre-existing severance obligations, that such obligations are in the ordinary course of business and do not require this Court's approval, and that the postpetition termination payments would be afforded administrative priority status.[18]  Needless to say at this

---

[17]     To say the least, the Stalking Horse Agreement has a variety of "outs."

[18]     It is the Debtors who are responsible for proving entitlement to an administrative expense.  *In re Drexel Burnham Lambert Grp. Inc.*, 134 B.R. 482, 489 (Bankr. S.D.N.Y. 1991) (noting the claimant bears the burden of proof).  The Debtors, thus far, have failed to provide information adequate to determine how each

juncture, the Committee disputes all of these assertions. 

33.    Regardless, these are all issues that would be properly heard as part of a motion requesting approval of a key employee retention or incentive plan and considered by this Court after a full review and consideration of the employee programs – or in the context of a hearing to determine whether such severance claims that were created on the eve of the bankruptcy filing and which can still be eliminated are truly entitled to administrative priority status under the Bankruptcy Code.   Instead of taking this more typical path, the Debtors and the Stalking Horse Bidder seek to use the Stalking Horse Agreement to dictate the distribution of the sale proceeds, self-selecting which claims against the Debtors will be paid regardless of assumption of liability by the Stalking Horse Bidder.   Indeed, the Debtors note they seek to pay the Severance Consideration even if this Court does not approve the payments.   As this Court is aware, an asset purchase agreement is not the place to dictate distribution of proceeds, treatment of claims,

---

employee will be compensated.  This failure hamstrings any effort to analyze the legitimacy and purpose of these arrangements, much less whether these payments can be afforded administrative priority.

Even if the severance payments may be afforded administrative priority status, classification of severance payments as an administrative expense rests on the belief that the severance is provided to alleviate the economic hardship of a terminated employee.  *See Bradwell v. GAF Corp.*, 954 F.2d 798, 801 (2d Cir. 1992).  However, the length of the severance periods provided for by the Debtors, up to twelve months, far exceeds what is needed to prevent employee hardship.  In comparison, in the cases relied upon by the Debtors, the severance pay ranged from two (2) to four (4) weeks.  *See Straus-Duparquet, Inc. v. Local Union No. 3 Int'l Bhd. of Elec. Workers, A F of L, CIO*, 386 F.2d 649, 650 (2d Cir. 1967); *see also In re W. T. Grant Co.*, 620 F.2d 319 (2d Cir. 1980).

determination of claim priority and other aspects of the Debtors' case. The proper place for that is in a chapter 11 plan.

34.    Consistent with the Debtors' approach throughout these cases, the only explanation for why the "Severance Consideration" is sought to be addressed through the Bid Procedures Motion was provided by the Debtors' proposed counsel, who asserted that approval of the "Severance Consideration" is included in the Bid Procedures Motion because the Debtors would not be ready to ask for approval of the "Severance Consideration" if the sale does not happen.[20]

35.    Any order entered by this Court should make clear that the construct of the Severance Consideration is not being approved at this time and, to the extent the Court approves any Break-Up Fee (despite being unnecessary[21] and in excess of typical market rates, as set forth above), should the Stalking Horse Bidder terminate the Stalking Horse Agreement on account of this Court's refusal to approve the Severance Consideration and machinations set forth in Section 1.6(a)(ii) of the Stalking Horse Agreement then the Stalking Horse Bidder shall not be entitled to any Bid Protections.

36.    In addition, the Bidding Procedures must be clarified as to how the Debtors intend to value bids with respect to the $15 million that will go solely to management and not the Debtors' estates – would a bid that did not include such payoff but otherwise exceeded the Stalking Horse

---

[20]    "MR. MEISLER: Your Honor, on that point, Mr. Higgins is right; we did tie it to the sale motion, we put it in the sale motion, and here's why. We wanted to disclose the severance plan in the employee motion because we think it's a fitting place to put the severance program. And there are insiders in that severance program; to be specific the CEO and CFO are in that severance program. The reason why we put it in the sale motion is the authority that I want is I want to pay -- I want to tie the authority to pay severance through the sale because if the sale doesn't happen -- if I don't get your approval on the sale, I'm not ready to ask for approval on the severance." First Day Hearing Tr. (Dec. 13, 2018), 72:22-73:8 (Exhibit 24).

[21]    The Stalking Horse Bidder is provided with substantial operating covenant protections in other provisions of the Stalking Horse Agreement, including, but not limited to, walk rights in Section 3.6(b) if the Stalking Horse Bidder does not believe the assets are sufficient to conduct the business in the same manner "as it is conducted on the date hereof" and Section 5.1 (Conduct of Business Pending Closing) which provides twenty-eight sub-clauses governing the Debtors' actions prior to closing.

Bidder's Purchase Price be higher or would the failure to include the payout to management mean the bid is insufficient?

37.     To address this ambiguity, the Bidding Procedures should be amended so that the $15 million of the Severance Consideration is excluded from the Debtors' calculations when determining whether a Qualified Bid (including the Starting Bid or any subsequent Overbids) presents consideration equal or superior to what is provided for in the Stalking Horse Agreement. In other words, for purposes of the Bidding Procedures the Purchase Price should be valued at $185 million instead of the $200 million Purchase Price that includes the Severance Consideration. Otherwise, the Debtors are chilling bidding by requiring that any Qualified Bid or Overbid provide total consideration in excess of $200 million – despite the fact that the Debtors' estates are only receiving $185 million as currently contemplated in the Stalking Horse Agreement (with the Severance Consideration going to management or being refunded to the Stalking Horse Bidder).

38.     Alternatively, the Stalking Horse Bidder could avoid the foregoing result and simplify the matter by simply agreeing that it will pay the estate $200 million, and it will be up to the Debtors, subject to compliance with the Bankruptcy Code and the opportunity for other parties in interest to weigh in, to seek this Court's approval regarding distribution of such proceeds. Again, this would of course be consistent with a typical 363 sale approach where the buyer pays the purchase price and this Court, following notice and hearing, approves distributions to creditors.

39.     The Stalking Horse Bidder cannot have it both ways.  Either its bid is $185 million, and Qualified Bids and Overbids are determined based on that amount (and the appropriateness of the Break-Up Fee is evaluated based on that amount); or its bid is $200 million, regardless of whether the Court allows $15 million of the Purchase Price to be set aside for the Debtors' "severance" program.  The Stalking Horse cannot be permitted to reduce the Purchase Price (or

walk away from the sale) if the "severance" payments are not approved, yet pretend in the meantime that its bid is $200 million.

### III.    The Committee Should be Consulted Throughout the Sale Process

40.    Given the importance of responsible oversight over the Debtors' sale process, as highlighted above, the Committee has issues with the consultation rights provided to the Consultation Parties in the as-filed Bidding Procedures.  The Committee and the Debtors are working to resolve these issues and the Committee anticipates reaching an acceptable compromise prior to the hearing; however, the Committee reserves all of its rights to supplement this objection at the hearing in the instance that an acceptable settlement regarding consultation rights is not reached.

### IV.    There Are Other Problematic Provisions in the Proposed Bidding Procedures and the Stalking Horse Agreement

41.    Based on its review to date of the information provided by the Debtors, there is additional relief requested in the Bidding Procedures and the Stalking Horse Agreement that are inappropriate at this time or should otherwise be modified.  The problems with the Stalking Horse Agreement are both relevant to this Court's consideration of the Bid Procedures Motion and further support this Objection.

42.    Most importantly, it is imperative that the Debtors be allowed to seek an alternative plan of reorganization while their 363 sale process is ongoing, and thus a fiduciary out should be built into the Bidding Procedures.  The dual paths would ensure the value of the estates are being maximized without jeopardizing the work the Debtors have already done to secure the Stalking Horse Agreement.  This Court has previously recognized the importance of such a fiduciary out, especially when there is a "no-shop" in place and ███████████████████████████ as

is the case here.[22] 

43.     The other problematic provisions of the Bidding Procedures and Stalking Horse

Agreement relate to, *inter alia*, the following (with respect to which the Committee reserves its

rights), without limitation:

- The Bidding Procedures provide that the Debtors shall deliver, no later than twenty-four (24) hours following the Bid Deadline, written copies of any such Bid to counsel for the Stalking Horse Bidder.  There is no reason the Stalking Horse Bidder should be entitled to special treatment and receive all bids submitted when no other bidder is privy to such information.  Either all the bidders should get all the bids – which would be unusual to say the least – or only the lead bid should be distributed, as is typical.

- The "Same or Better Terms" provision provides extensive leeway to the Debtors to reject Bids that they do not consider qualified, without oversight or consultation. This provision should be modified to require consultation with the Consultation Parties and to require that terms of Bids be evaluated in their totality.

---

[22]     "THE COURT:  The reason I scheduled a hearing is, when I read the agreement, which wasn't originally given to me, it had a no-shop no-talk provision, it didn't have a fiduciary out, and there's no evidence that the debtor ever marketed the asset. So how can I approve it?"  Transcript of Hearing at 5:10-14, *In re SunEdison, Inc.*, No. 16-10992 (SMB) (Bankr. S.D.N.Y. Nov. 14, 2017) (Exhibit 29).

- The "Time Frame for Closing" currently contains no parameters for discretionary extensions.

- If a Potential Bidder's Bid is deemed deficient, the Potential Bidder should be permitted to remedy any deficiencies prior to the Auction.  The Bidding Procedures currently require such deficiencies to be remedied prior to the Bid Deadline, despite the Debtors not being required to determine whether a Bid is a Qualified Bid until *after* the Bid Deadline.  If a deficient Bid is capable of being remedied, the Debtors' estates will benefit from allowing the Potential Bidder sufficient opportunity to remedy deficiencies.

- The DIP Agent, on behalf of the DIP Lenders and the Prepetition Term Lenders, is currently allowed to become a Qualified Bidder "at its sole discretion."  As with any other Potential Bidder, whether the DIP Agent is a Qualified Bidder should be determined in consultation with the Consultation Parties.

- There is no clear carve-out to the Prepetition Term Lenders' credit bid rights for the prepayment portion of their claims (which is invalid under the clear language of the applicable documents and applicable law) or their claim for an exit fee (for which no documentation has been provided).  The Prepetition Term Lenders should only be permitted to credit bid to the extent of the <u>allowed</u> portion of their claims.

- The Stalking Horse Bidder is not currently required to serve as the Backup Bidder.  Because all other Potential Bidders are required to serve as a Backup Bidder, the Stalking Horse Bidder should be required to serve as Backup Bidder in order to create a level playing field.

- The Bidding Procedures require the Backup Bidder to keep its bid open for as little as thirty (30) days after entry of the Sale Order, an excessively short timeframe that provides little wiggle room for unanticipated closing delays.  The Backup Bid should be kept open for sixty (60) days after entry of the Sale Order or until the closing of the transaction with the Successful Bidder.

- Partial bids are prohibited, even if the total consideration from such partial bids exceeds the Purchase Price under the Stalking Horse Agreement.  The Bidding Procedures should be designed to maximize the value received by the Debtors estates and thus partial bids should be permitted if the combined consideration exceeds the Purchase Price under the Stalking Horse Agreement.

- The Overbid Amount should be reduced to $1,000,000 to foster competitive bidding.

- The Good Faith Deposit should be based on the cash consideration portion of the Purchase Price, and should not be used to pay the Bid Protections.

- The Bidding Procedures should provide that the implementation of the Sale is subject to entry of the Sale Order.

- Section 1.1(m) of the Stalking Horse Agreement should clarify that if litigation against the Stalking Horse Bidder is commenced by an official committee or trust on which a Designated Party serves then it does not trigger the right of the Stalking Horse Bidder to pursue such Designated Party on account of Avoidance Actions.

- "Excluded Assets" in the Stalking Horse Agreement should be revised to include the proceeds of D&O insurance policies.

- The Debtors should be obligated to execute any confidentiality or non-disclosure agreement with any party that previously executed such agreement on substantially identical terms to ensure there is no delay in such parties access to diligence information following the end of the no-shop period.

## RESERVATION OF RIGHTS

44.     The Committee reserves the right to supplement and amend this Objection and introduce evidence at any hearing on approval of the Bid Procedures Motion, or such other hearings as may be scheduled in these cases from time to time, including, without limitation, with regards to the Bid Procedures Motion or the Debtors' proposed sale or after receipt of responses to discovery requests or the Debtors' depositions.  Further, the Committee reserves the right to respond, further object, join in, or amend any objection herein with respect to any argument or objection made by any person relating to the Bid Procedures Motion or the other relief requested in these cases.

## <u>CONCLUSION</u>

WHEREFORE, the Committee respectfully request that this Court grant the relief

requested in this Objection and such other relief as the Court deems just and proper.

Dated:  December 31, 2018
        New York, New York

*/s/ Matthew L. Warren*

Richard A. Levy, Esq. (admitted *pro hac vice*)
Matthew L. Warren, Esq. (admitted *pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
Telephone:   (312) 876-7700
Facsimile:    (312) 993-9767
Email:        richard.levy@lw.com
              matthew.warren@lw.com

Christopher Harris, Esq.
Blake T. Denton, Esq.
Jeffrey Mispagel, Esq.
LATHAM & WATKINS LLP
885 Third Avenue
New York, NY 10022
Tel:          (212) 906-1200
Fax:          (212) 751-4864
Email:        christopher.harris@lw.com
              blake.denton@lw.com
              jeffrey.mispagel@lw.com

*Proposed Counsel for the Official*
*Committee of Unsecured Creditors*