**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| In re | **Chapter 11 Case No.** |
| | **18-14010 (JLG)** |
| **SYNERGY PHARMACEUTICALS, INC.., et al.,** | |
| | **Jointly Administered** |
| **Debtors.** | **Objection Deadline: February 21, 2019** |
| | **Hearing Date: March 1, 2019** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

### OBJECTION OF THE U. S. SECURITIES AND EXCHANGE COMMISSION TO THE AMENDED DISCLOSURE STATEMENT FOR THE AMENDED JOINT PLAN OF REORGANIZATION OF SYNERGY PHARMACEUTICALS, INC. AND ITS DEBTOR AFFILIATE

The U.S. Securities and Exchange Commission (the "SEC"), a statutory party in these cases[1] and the federal agency responsible for regulating and enforcing compliance with the federal securities laws, objects to the Amended Disclosure Statement for the Amended Joint Plan of Reorganization of Synergy Pharmaceuticals, Inc. and Its Debtor Affiliate ("Disclosure Statement"), filed January 24, 2019.  The SEC objects to the Disclosure Statement on the ground that it describes a plan and ballots that provide for impermissible nonconsensual releases that purport to bind public shareholders, noteholders, and securities class action claimants, and that also provide for a discharge of liquidating debtors in contravention of Section 1141(d)(3) of the Bankruptcy Code.[2]

---

[1] As a statutory party in corporate reorganization proceedings, the SEC "may raise and may appear and be heard on any issue".  11 U.S.C. §1109(a).

[2] Because of the potential waste of time and resources, the SEC believes it is appropriate to raise these objections to the Plan at the disclosure stage of the case.  A court may disapprove a disclosure statement if the plan, on its face, does not meet the confirmation standards of Chapter 11.  *See In re 266 Washington Assocs.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992); *In re Main Street AC, Inc.*, 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999).

## INTRODUCTION

As a general matter, nondebtor third party releases contravene Section 524(e) of the Bankruptcy Code, which provides that only debts of the debtor are affected by the Chapter 11 discharge provisions. Such releases have special significance for public investors because they enable nondebtors to benefit from a debtor's bankruptcy by obtaining their own releases with respect to past misconduct, including violations of the federal securities laws or breaches of fiduciary duty under state law. This concern is implicated here where the Debtors are seeking to bar public shareholders, noteholders, and securities class action claimants, from asserting claims against the released parties.[3]

In the Second Circuit, nonconsensual releases are only permitted in "rare cases" where the injunction is important to the debtor's reorganization. This is not a "rare case." Otherwise, third party releases of non-debtors may be allowed if they are "consensual." Courts in this district have stated that inaction cannot be considered consent. While the Debtors may claim that the third party releases here are consensual, the SEC's view is that silence, in the form of a requirement to affirmatively "opt out" of the releases, cannot constitute "consent" to third party releases. Further, there is no carve-out for the government from the third party release provisions.

The releases should be deleted from the Plan, or, alternatively, the Plan should be amended to state that the releases will not bind impaired shareholders, unsecured

---

[3] Synergy Pharmaceuticals is a publicly traded company whose shares trade on the NASDAQ. It has outstanding senior convertible notes and is a defendant in several securities fraud class actions. (Disc. St. at pp. 14, 16-17, 22-24) The securities class actions allege that Synergy made false and misleading statements concerning the Prepetition Term Loan and the side effect profile of Synergy's approved drug, TRULANCE.

2

creditors and securities class action claimants, except those who elect to opt in to the releases. In addition, the third party releases should be amended to include a carve-out for the government that is acceptable to the SEC.[4]

The exculpation clause also constitutes an impermissible non-debtor release and discharge because it limits the liability of the released parties for conduct prior to the Chapter 11 case, and hence falls squarely within the scope of Section 524(e). This provision should be revised to be limited only to acts directly connected or related to formulation of the Plan and Disclosure Statement.

Finally, the Plan provides a discharge to a liquidating debtor in contravention of Section 1141(d)(3). This provision should be deleted from the Plan.

## BACKGROUND

### A.    Corporate Background

Synergy is a biopharmaceuticals company focused on the commercialization of novel gastrointestinal therapies. The Company has one commercial product, plecanatide, marketed under the name TRULANCE, which is intended for the treatment of chronic bowel disorders. The Company also has one development-stage compound, Dolcanatide, which is being investigated for the treatment of colon cancer. (Disc. St. at pp. 10-12)

---

[4] The Debtors' counsel advised the staff orally that the Debtors would modify the Plan and Disclosure Statement to make clear that neither public shareholders nor the SEC will be bound by the third party releases. The SEC nonetheless is including the argument concerning the impact of the third party releases on public shareholders and the SEC until such time as an amended Plan and Disclosure Statement are filed incorporating those modifications.

3

At the time of the bankruptcy filing, Synergy had approximately $110 million outstanding under a senior secured term loan and $19 million outstanding in notes. It also had 248,037,301 shares of common stock outstanding that trade on the NASDAQ Stock Market LLC. As part of its debtor-in-possession financing ("DIP Loan"), Synergy borrowed approximately $20 million in new money and rolled up approximately $52 million of the senior secured term loan into a post-bankruptcy DIP Loan. (Disc. St. at pp. 14-16 & 30 )

**B.  The Plan**

The Plan provides for the sale of all of Synergy's assets to a stalking horse bidder for $185 million in cash plus $15 million to cover severance payments, subject to higher and better offers. (Dkt. # 17 at pp. 5-6) Distributions on account of the remaining term loan, unsecured creditor claims, and securities class action claims, are dependent on the amount of cash available after payment of the DIP Loan and priority, professional and administrative claims (the "Excess Sale Proceeds"). (Plan at 7; Disc. St. at pp. 43-44) If unsecured creditors (including the noteholders) reject the Plan, then they will only receive a distribution if the term loan is paid in full, which distribution will be payable from the Excess Sale Proceeds and the proceeds of avoidance actions, if any. (Disc. St. at pp. 43-44) If the unsecured creditor class votes to accept the Plan, then it will receive a distribution to be contributed by the term lender which will vary depending upon the amount of Excess Sale Proceeds and additional cash if the term loan is paid in full. (*Id.*)

The Plan also provides that securities class action claimants will receive their pro rata share of the proceeds of Synergy's Directors and Officers liability insurance policies and any Excess Sale Proceeds remaining after the payment in full of general unsecured

4

creditors. Finally, the Plan cancels Synergy's equity interests and provides a minimal and contingent distribution to equity holders. (Disc. St. at pp. 44-45)

### C.   The Third Party Release Provisions in the Plan

The Plan defines "Releasing Parties" in Section 1.112 as "(a) the Released Parties; (b) all Holders of Claims that vote to accept the Plan; (c) all Holders of Claims entitled to vote on the Plan who abstain from voting on the Plan and do not elect on their ballot to opt-out of the Third Party Release . . . *provided, however*, that Entities identified in this subsection (f) shall not be considered "Releasing Parties" where their respective Holder has checked the box on the ballot and returned the ballot in accordance with the Disclosure Statement Order to opt out of the Third Party Release contained in Section 9.05 of the Plan."[5]

---

[5] The third party release contained in Section 9.05 of the Plan provides as follows:

"As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended after the Effective Date, each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged each Released Party from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Liquidating Debtors, or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring and sale efforts, the Chapter 11 Cases, the Acceptable Sale, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, preparation, dissemination and filing of the Plan (including, for the avoidance of doubt, the Plan Supplement), the Disclosure

Here, unsecured creditors including noteholders (Class 4) and Section 510(b)

securities class action creditors (Class 5) are impaired and entitled to vote on the Plan.

Pursuant to Section 1.112 of the Plan, if they vote to accept the Plan, or abstain from

voting and fail to opt out, then they are bound by the third party release. Although it

would appear at first glance that public shareholders, who are deemed to reject the Plan,

would not be bound by the third party releases, they are in fact swept into the definition

of Releasing Parties by the inclusion of the defined term "Released Parties" within

subsection (a) of the definition of "Releasing Parties" with no apparent opportunity to opt

out.

## **OBJECTION**

### A. **The Disclosure Statement Lacks Adequate Information to Support the Requested Third Party Releases Under Section 1125(b) of the Bankruptcy Code.**

Section 1125(b) of the Code provides in relevant part that "[a]n acceptance or

rejection of a plan may not be solicited . . . from a holder of a claim or interest with

---

Statement, the DIP Credit Agreement, the Asset Purchase Agreement, the Sale Order, or related agreements, instruments, or other documents, the pursuit of the Acceptable Sale, the pursuit of consummation of the Acceptable Sale, the pursuit of Confirmation of the Plan, the pursuit of consummation of the Plan, the administration and implementation of the Plan, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, provided that, nothing in this Section 9.05 shall be construed to release the Released Parties from gross negligence, willful misconduct, or fraud as determined by a Final Order. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligation or liability of any Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan."

respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder. . . a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information." 11 U.S.C. 1125(b).  Adequate information is defined as "information of a kind, and in sufficient detail . . . that would enable a hypothetical investor typical of holders of claims or interests . . . of the relevant class to make an informed judgment about the plan . . . ." 11 U.S.C. 1125(a)(1).  As described below, under applicable case law, Synergy needs to establish that the third party releases are either consensual or, if they are not consensual, that rare and exceptional circumstances exist to justify their imposition.  In that case, Synergy would also need to show that the released parties provided consideration.  Here, the information in the Disclosure Statement fails to satisfy these requirements.

### B.  The Third Party Releases in the Plan Cannot be Approved as Nonconsensual Releases Because They Contravene Section 524(e) of the Bankruptcy Code and Applicable Law.

Section 524(e) of the Bankruptcy Code addresses the scope of the bankruptcy discharge and states, in relevant part, that a discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt. 11 U.S.C. 524(e).  Like the Debtors here, however, debtors and other plan proponents on occasion seek to use the bankruptcy laws improperly by including provisions in reorganization plans that purport to grant a broad release from liability to nondebtors involved with the company, such as officers, directors, advisors, or indenture trustees.

The release of nondebtors has special significance for holders of equity and debt securities.  These releases and related injunctive provisions allow nondebtors to benefit from a debtor's bankruptcy by obtaining their own releases with respect to past activity.

7

Investors and other creditors could be blocked by such provisions from bringing suits against these nondebtor parties under the federal securities laws or for breach of fiduciary duty under state law.  In the Second Circuit, nonconsensual nondebtor third party releases have been allowed only in "rare cases" when "the injunction plays an important role in the debtor's reorganization."  *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 141(2d Cir. 2005) (*citing In re Drexel Burnham Lambert Group, Inc*. 960 F.2d 285, 293 (2d. Cir. 1992)).  Such cases include situations where "'(i) the estate received substantial consideration,' (ii) 'the enjoined claims were 'channeled' to a settlement fund rather than extinguished,' (iii) 'the enjoined claims would directly impact the debtors' reorganization 'by way of indemnity or contribution,'' or (iv) 'the plan otherwise provided for the full payment of enjoined claims.'" *Oneida, Ltd.*, 351 B.R. 79, 94 (Bankr. S.D.N.Y. 2006), *citing Metromedia,* 416 F.3d at 142.

Here, the Debtors have not shown that this is the "rare case."  There is no stated consideration for the releases, and Synergy is liquidating and not reorganizing.  Although the percentage recovery for unsecured creditors is not known, at most it will only be a fraction of the claims outstanding and there may be no distribution at all, depending on the availability of Excess Sale Proceeds.  Moreover, because Synergy is liquidating, Synergy cannot show that the claims, if not released, would have a direct impact on its reorganization.  Based on the facts here, the provisions should not be approved as nonconsensual releases.

**B.    The Releases Cannot be Approved as Consensual Releases Because Creditors and Shareholders would be Bound by the Releases without their Affirmative Consent.**

Releases in favor of nondebtors in Chapter 11 cases have been allowed if the affected parties have individually consented to them, and case law addresses how valid consent can be established. *See, e.g., Oneida,* 351 B.R. at 94 ("'[n]ondebtor releases may also be tolerated if the affected creditors consent'") (*quoting In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005)). In *In re SunEdison*, 576 B.R. 453, 461 (Bankr. S.D.N.Y. 2017), the court recently held that creditor silence did not signify consent. The Court went on to state that the "meager recoveries (here, less than 3% for unsecured creditors) may explain their inaction without regard to the Release." *Id.* In holding that the nonvoting creditors did not consent, the Court stated that "[c]harging all inactive creditors with full knowledge of the scope and implications of the proposed third party releases, and implying a 'consent' to the third party releases based on the creditors' inaction, is simply not realistic or fair, and would stretch the meaning of 'consent' beyond the breaking point." *Id.* (*quoting In re Chassix Holdings*, 533 B.R. 64, 80-81 (Bankr. S.D.N.Y. 2015) (finding that creditors who "opted in" to a release clearly consented, while creditors who had taken no action at all did not)). *See also In re Washington Mutual*, *Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011) ("Failing to return a ballot is not a sufficient manifestation of consent to a third party release").

The determination of whether an action constitutes consent to a release is governed by contract principles. *In re SunEdison, lnc.*, 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding whether a creditor consents to a third party release."), *citing, In re Washington Mutual, Inc.*, 442

9

B.R. 314 at 352 (Bankr. D. Del. 2011).  In the SEC's view, the third party releases here

are not consensual because the Plan contains no mechanism for creditors and

shareholders to affirmatively consent separately to the releases.

Under New York law, "[a]n offeror has no power to transform an offeree's silence

into acceptance when the offeree does not intend to accept the offer."  *Karlin v. Avis*, 457

F.2d 57, 62 (2d. Cir. 1972).  New York courts have recognized three exceptions to this

rule:

> Assent by silence will arise where (1) it is supported by the parties' ongoing
> course of conduct…(2) the offeree accepts the benefits of the offer despite a
> reasonable opportunity to reject them, and understands that the offeror expects
> compensation…or (3) the offeror has given the offeree reason to understand that
> silence will constitute acceptance and the offeree in remaining silent intends to
> accept the offer.  Under the last exception, silence operates as assent because the
> silence is misleading, and the exception does not apply absent some element of
> deception or dishonesty.

*SunEdison* 576 B.R. at 459 (internal citations omitted)*, citing Weiss v. Macy's Retail*

*Holdings Inc.,* 265 F. Supp. 3d 358, 363-4 (S.D.N.Y. 2017).

New York law is consistent with the Restatement of Contracts, which makes clear

that silence cannot be deemed consent under the facts of this case.  Under the

Restatement, silence can be deemed to be acceptance only:

> (1)
> (a) Where an offeree takes the benefit of offered services with reasonable
> opportunity to reject them and reason to know that they were offered with the
> expectation of compensation.
> (b) Where the offeror has stated or given the offeree reason to understand that
> assent may be manifested by silence or inaction, and the offeree in remaining
> silent and inactive intends to accept the offer.
> (c) Where because of previous dealings or otherwise, it is reasonable that the
> offeree should notify the offeror if he does not intend to accept.
> (2) An offeree who does any act inconsistent with the offeror's ownership of
> offered property is bound in accordance with the offered terms unless they are
> manifestly unreasonable.  But if the act is wrongful as against the offeror it is an
> acceptance only if ratified by him.

Restatement 2d of Contracts, § 69.

None of the circumstances giving rise to a duty to speak are present here. Synergy is not offering the creditors or shareholders any benefit whose acceptance can be imputed through silence. Rather, Synergy is threatening to deprive unsecured creditors of a right if they fail to affirmatively object, and to deprive shareholders of a right with no apparent opportunity to object. Moreover, even creditors who vote in favor of the Plan cannot be deemed to have consented to the releases because they have no opportunity to accept the Plan and still opt out of the releases.

While debtors in this district have argued that a variety of different mechanisms, including opt-out provisions, are sufficient to demonstrate consent,[6] in the SEC's view, applicable contract law requires that releases be considered consensual only if the affected parties provide affirmative consent in the form of an opt in to the release, regardless of how they vote on the plan or are deemed to have voted on the plan.

Failure to require an opt in to the releases here could lead to an absurd result. Under the Plan, it is conceivable that an unsecured creditor will vote to accept the Plan and be bound by the release, but will nonetheless receive no consideration in the event

---

[6] *See In re Sabine Oil & Gas Corp., 555 B.R.180, 194* (Bankr. S.D.N.Y. 2016) (Plan provided for a consensual "third party release by holders of claims or interests who did not elect on their ballot to opt out of such release" and for nonconsensual releases in favor of certain lenders that made a substantial contribution); *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 271 (Bankr. S.D.N.Y. 2014) (court permitted the releases with respect to any affected party that consented or was deemed to have consented pursuant to the Plan ballot, which included "those parties who voted in favor of the Plan and those who voted to reject the Plan but failed to opt out from granting the release provisions"); *Adelphia Comm'ns Corp.*, 368 B.R. 140, 268 (Bankr. S.D.N.Y. 2007) (holding that consensual third party releases may be acceptable, and noting that consent can be established where the release is appropriately disclosed and there is a vote in favor of the plan.).

the class rejects the Plan and there are insufficient Excess Sale Proceeds to make a distribution to the class. In that case, the creditor who voted to accept the Plan and who is bound by the release will be worse off than the creditor who rejected the Plan and is not bound by the release. This is a nonsensical result that can only be rectified if all unsecured creditors are required to opt in to the releases

### C.    The Exculpation Provision in the Plan Also Constitutes an Impermissible Non-Debtor Release and Discharge.

Section 9.06 of Synergy's Plan purports to exculpate various parties from prepetition acts "taken or omitted to be taken in connection with, or related to, formulating, negotiating, or preparing the Plan, the Disclosure Statement, the Asset Purchase Agreement or the DIP Credit Agreement."

However, exculpation clauses should be limited only to conduct that took place during the bankruptcy case. *See In re Washington Mutual*, *Inc.,* 442 B.R. at 350 *citing In re PWS Holding Corp., 228 F.3d 224, 246 (3d Cir. 2000)* (exculpations are limited to actions in the bankruptcy case); *Upstream Energy Servs. v. Enron Corp.*, 326 B.R. 497, 504 (affirming exculpation clause that exculpated "only negligent conduct and only such conduct occurring after the filing of Enron's bankruptcy petition and relating to creation of the Plan.") (S.D.N.Y. 2005). The exculpation clause therefore constitutes an impermissible non-debtor release and discharge since it limits the liability of the released parties for conduct prior to the Chapter 11 case, and hence falls squarely within the scope of Section 524(e). If the Court is inclined to approve the exculpation clause, it should be narrowly tailored and limited only to acts directly connected or related to formulation of the Plan and Disclosure Statement.

###### D.   Synergy is not Entitled to a Discharge Because it is Liquidating all of its Assets and is not Continuing in Business.

As discussed above, the Plan contemplates the sale of all of Synergy's assets.

Section 1141(d)(3) of the Bankruptcy Code provides that the confirmation of a plan does

not discharge a debtor if: (i) the plan provides for the liquidation of all or substantially all

of the property of the estate; (ii) the debtor does not engage in business after

consummation of the plan; and (iii) the debtor would be denied a discharge under section

727(a) of the Bankruptcy Code if the case were a Chapter 7 liquidation case.[7]  11 U.S.C.

§1141(d)(3).  The policy of providing a debtor a fresh start after its emergence from Chapter

11 as a going concern is inapplicable to a debtor that sells substantially all of its assets

before or during the Chapter 11 case and terminates its operations.  There is no need for a

fresh start where there is no business to reorganize but merely the need for an orderly

liquidation and distribution of any remaining assets to creditors and interest holders.

The purpose of Section 1141(d)(3) is to discourage the use of the bankruptcy

discharge to traffic in corporate shells.  *In re Fairchild Aircraft Corp.*, 128 B.R. 976, 982

(Bankr. W.D. Tex. 1991).  While the Plan does not indicate that Synergy intends to

market a public shell, the possibility remains so long as Synergy is granted a discharge.

And if Synergy is granted a discharge here, it could constitute unfavorable precedent in

future cases where a public company intentionally seeks to use Chapter 11 improperly.

---

[7] Section 727(a) provides that the court shall grant the debtor a discharge unless, among
other things, "the debtor is not an individual[.]"  11 U.S.C. 727(a)(1)

13

Here, the Plan provides for a discharge of Synergy in contravention of Section 1141(d)(3) of the Bankruptcy Code.[8]

## **CONCLUSION**

The Court should strike the third party releases from the Plan or, alternatively, the Plan should be amended to state the third party releases will not bind impaired shareholders, unsecured creditors, and securities class action claimants, except those who elect to opt in to the releases, and the releases should be amended to include a carve-out for governmental claims.  The exculpation provision should be revised to be limited only to acts directly connected or related to formulation of the Plan and Disclosure Statement. Finally, the Debtors' discharge should be deleted from the Plan.

WHEREFORE, for the reasons stated above, the SEC respectfully requests that the Court enter an order denying approval of the Disclosure Statement.

Dated:  New York, New York
        February 21, 2019

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION


By: /s/ Neal Jacobson
Neal Jacobson
Trial Counsel
New York Regional Office
Brookfield Place, 200 Vesey St., Suite 400
New York, New York 10281
Phone: (212) 336-1100
Fax: (212) 336-1324

---

[8] If the ultimate bidder seeks to engage in a reverse merger (and not an asset purchase) and to continue Synergy's corporate existence and public company status, then the Disclosure Statement should be amended to include detailed disclosure regarding the proposed merger partner as the Disclosure Statement will be the only source of information for holders and potential purchasers of the merged entity's stock.

Jacobsonn@sec.gov

Of Counsel: Alistaire Bambach
Morgan Bradylyons