UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x

*In re:*                     :     Case No. 18-14010 (JLG)

                                        :     Chapter 11

Synergy Pharmaceuticals Inc., *et al.,*[1]    :

                                        :     (Jointly Administered)

                         *Debtors*    :

------------------------------------------------------- x

## MEMORANDUM DECISION AND ORDER DENYING APPLICATION OF COLE SCHOTZ P.C., AS FORMER COUNSEL FOR THE AD HOC COMMITTEE OF EQUITY HOLDERS, FOR ALLOWANCE OF AN ADMINISTRATIVE EXPENSE CLAIM PURSUANT TO 11 U.S.C §§ 503(b)(3)(D) AND 503(b)(4) FOR COUNSEL'S SERVICES INCURRED IN MAKING A SUBSTANTIAL CONTRIBUTION IN THESE CASES AND REQUEST FOR A WAIVER OF CERTAIN REQUIREMENTS OF LOCAL BANKRUPTCY RULE 2016-1

<u>**A P P E A R A N C E S**</u>**:**

COLE SCHOTZ P.C.
*Former Attorneys for Ad Hoc Committee of Equity Holders*
Court Plaza North
25 Main Street
Hackensack, New Jersey 07601
<u>By:</u>    Ryan T. Jareck, Esq.


TOGUT, SEGAL & SEGAL LLP
*Attorneys for Plan Administrator*
One Penn Plaza
New York, New York 10119
<u>By:</u>    Neil Berger, Esq.
        Amy Michelle Oden, Esq.


VENABLE LLP
*Attorneys for CRG Servicing LLC*
Rockefeller Center
1270 Avenue of the Americas, 24th Floor
New York, New York 10020
<u>By:</u>    Jeffrey S. Sabin, Esq.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: Synergy Pharmaceuticals Inc. (5269); Synergy Advanced Pharmaceuticals, Inc. (4596). The address of the Debtors' corporate headquarters is 420 Lexington Avenue, Suite 2012, New York, New York 10170.

MORRIS JAMES LLP
*Attorneys for John Noble as Synergy Litigation Trustee*
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
<u>By:</u>    Jeffrey R. Waxman, Esq.


LATHAM & WATKINS, LLP
*Attorneys for Official Committee of Unsecured Creditors*
330 North Wabash Avenue
Suite 2800
Chicago, Illinois 60611
<u>By:</u>    Richard A. Levy, Esq.


UNITED STATES TRUSTEE, REGION 2
*Office of the United States Trustee*
U.S. Federal Office Building
201 Varick Street, Suite 1006
New York, NY 10014
<u>By:</u>    Greg M. Zipes, Esq.

**HON. JAMES L. GARRITY, JR.**
**U.S. BANKRUPTCY JUDGE**

On December 12, 2018 (the "Petition Date"), Synergy Pharmaceuticals, Inc. ("Synergy

Pharmaceuticals") and Synergy Advanced Pharmaceuticals, Inc. ("Synergy Advanced," and

collectively with Synergy Pharmaceuticals, the "Company") filed voluntary petitions for relief

under chapter 11 of the Bankruptcy Code in this Court.[2]   By order dated April 25, 2019, the

Debtors confirmed their Modified Fourth Amended Joint Plan of Reorganization (the "Modified

Fourth Amended Plan").[3]   Cole Schotz, P.C. (the "Firm") is a law firm that acted as counsel to

an ad hoc group of shareholders (the "Ad Hoc Shareholders Group") in these jointly

administered chapter 11 cases for approximately one month after the Petition Date.  Its role

ended on January 29, 2019 when the Office of the United States Trustee (the "U.S. Trustee")

appointed an Official Committee of Equity Holders (the "Equity Committee") herein.[4]

The Equity Committee did not retain the Firm to serve as its counsel.  The Firm has filed

an application pursuant to sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code seeking

payment of professional fees and expenses aggregating $112,216.30 (the "Fee Claim"), that it

says it incurred on behalf of the Ad Hoc Shareholders Group, and based on the group's

substantial contribution to the Debtors' chapter 11 cases (the "Application").[5]  The claim is

---

[2]    *In re Synergy Pharmaceuticals Inc., et al.*, 18-14010-jlg [ECF No. 1]; *In re Synergy Advanced Pharmaceuticals, Inc.*, 18-14011-jlg [ECF No. 1]. All further references to "[ECF No. ___]" are references to documents filed in these Chapter 11 cases jointly administered under Case No. 18-14010.

[3]    Modified Fourth Amended Joint Plan of Reorganization of Synergy Pharmaceuticals Inc. and its Debtor Affiliate [ECF No. 712]; Findings of Fact, Conclusions of Law and Order Confirming Modified Fourth Amended Joint Plan of Reorganization of Synergy Pharmaceuticals Inc. and its Debtor Affiliate [ECF No. 713] ("Plan Confirmation Order").

[4]    Notice of Appointment of Official Committee of Equity Security Holders [ECF No. 279].

[5]    Application of Cole Schotz, P.C., as Former Counsel for the Ad Hoc Committee of Equity Holders, for Allowance of an Administrative  Expenses Claim Pursuant to 11 U.S.C. §§ 503(b)(3)(D) and 503(b)(4) for Counsel's Services Incurred in Making a Substantial Contribution in These Cases And Request For a Waiver of Certain Requirements of Local Bankruptcy Rule 2016-1 [ECF No. 740].

1

exclusive of the $32,990 retainer paid by members of the Ad Hoc Shareholders Group to the

Firm. Portage Point Partners, LLC is the Plan Administrator appointed under the Modified

Fourth Amended Plan (the "Plan Administrator").[6] It objects to the Application (the

"Objection").[7] CRG Servicing LLC ("CRG Servicing"), as agent for, and on behalf of, the

Prepetition Term Lenders (defined below), and John W. Noble, the Litigation Trustee under the

Modified Fourth Amended Plan (the "Litigation Trustee"), join in the Objection.[8] The Court

conducted an evidentiary hearing on the Application (the "Hearing").

For the reasons set forth herein, the Court sustains the Objection and denies the

Application.

## Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and

(b)(1) and the Amended Standing Order of Referral of Cases to Bankruptcy Judges of the United

States District Court for the Southern District of New York, dated January 31, 2012 (Preska,

C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## Facts

As of the Petition Date, the Debtors' business was principally based on the marketing and

sale of Trulance, an FDA approved drug used to treat adults with chronic idiopathic constipation

---

[6]    Plan Confirmation Order ¶ 18.

[7]    Plan Administrator's Objection to Application of Cole Schotz P.C., as Former Counsel for the Ad Hoc Committee of Equity Holders, for Allowance of an Administrative Expenses Claim Pursuant to 11 U.S.C. §§ 503(b)(3)(D) and 503(b)(4) [ECF No. 811].

[8]    Joinder of CRG Servicing LLC and Affiliated Lenders to Plan Administrator's Objection to Application of Cole Schotz P.C., as Former Counsel for the Ad Hoc Committee of Equity Holder, for Allowance of an Administrative Expense claim pursuant to 11 U.S.C. §§503(b)(3)(D) and 503(b)(4) [ECF No. 812]; Joinder of John W. Noble, Litigation Trustee, in Opposition to the Application of Cole Schotz P.C., as Former Counsel for the Ad Hoc Committee of Equity Holder, for Allowance of an Administrative Expense claim pursuant to 11 U.S.C. §§503(b)(3)(D) and 503(b)(4) [ECF No. 813].

and irritable bowel syndrome with constipation. Gemignani Declaration ¶¶ 9-15.[9]  The Company

also was developing another drug/compound – Dolcanatide – for treating patients with ulcerative

colitis and opioid-induced constipation. *Id*. ¶ 16.  Post-petition, the Debtors remained in

possession and control of their business and assets as debtors and debtors-in-possession pursuant

to sections 1107(a) and 1108 of the Bankruptcy Code.   On December 19, 2019, the Firm

appeared in these cases on behalf of the Ad Hoc Shareholders Group, which purported to

represent approximately 310 shareholders owning approximately 18 million shares of the

Company.[10]  On December 20, 2018, the U.S. Trustee appointed an Official Committee of

Unsecured Creditors (the "Creditors Committee").[11]

The Prepetition Secured Term Loan

As of the Petition Date, Synergy Pharmaceuticals was party to a senior secured term loan

(the "Prepetition Term Loan") under that certain Term Loan Agreement (as amended, restated,

modified, or supplemented from time to time, the "Prepetition Term Loan Agreement"),  with

CRG Servicing, as administrative agent and collateral agent and the lenders named therein (the

"Prepetition Term Lenders"). Gemignani Declaration ¶ 20.  Synergy Pharmaceuticals was

indebted to the Prepetition Term Lenders under the Prepetition Term Loan Agreement in the sum

of approximately $110 million of outstanding principal and accrued but unpaid interest including

PIK interest (the "Prepetition Secured Obligations").  *Id.* ¶¶ 19, 26.  Synergy Advanced

guaranteed Synergy Pharmaceutical's obligations under the loan, and those obligations were

---

[9]    Declaration of Gary G. Gemignani in Support of Chapter 11 Petitions and First-Day Papers [ECF No. 16].

[10]    Notice of Appearance and Request for Service of Papers on Behalf of the Ad Hoc Shareholders Group [ECF No. 78].

[11]    Notice of Appointment of Official Committee of Unsecured Creditors [ECF No. 92].

secured by liens on and security interests in (i) substantially all of the Debtors' tangible and

intangible assets and (ii) certain capital stock owned by the Debtors. *Id.* ¶ 20.

The loan was subject to a prepayment premium (the "Prepayment Premium") upon the

occurrence of certain events, including the Debtors filing these chapter 11 cases and the

prepayment of the Prepetition Term Loan. *Id.* ¶ 25. As of the Petition Date, the premium

equaled 32.5% of the aggregate outstanding principal amount of the of Prepetition Term Loan

being repaid. *Id.* The loan also provided for a back-end facility fee equal to two percent (2.0%)

of (a) in the case of a partial optional or mandatory prepayment, the aggregate principal amount

of Prepetition Term Loans prepaid or (b) in the case of any other payment for any other reason,

the aggregate principal amount of the maximum amount of Prepetition Term Loans advanced or

deemed advanced (the **"Back-End Facility Fee"**). The agreement provided that those fees were

payable upon any prepayment or repayment of the Prepetition Term Loan (including at

maturity). *Id.* ¶¶ 25-26. Upon filing its chapter 11 petitions, the Debtors triggered the

Prepayment Premium in the sum of approximately $35 million. At that time, the Back-End

Facility Fee was fixed at approximately $2.2 million. *Id.* ¶ 26.

The Debtors' Financial Struggles

In 2018, the Company began experiencing financial distress, due to market headwinds

and lower than expected sales of Trulance. As a result, the Company was in violation of several

financial covenants in the Prepetition Term Loan and risked defaulting under the terms of the

loan. *See* Gemignani Declaration ¶¶ 30-36. In response, the Debtors: (i) negotiated waivers

under the loan agreement that culminated in the execution of a forbearance agreement; (ii)

pursued alternative financing arrangements; and (iii) simultaneously, engaged in a marketing and

sale process of their business. *Id.* ¶¶ 36-40.

Prepetition - The Debtors Execute a Stalking-
Horse Agreement With Bausch Health Companies

In furtherance of the sale process, and among other things, the Debtors spoke with

Bausch Health Companies ("Bausch") regarding potential commercial partnerships or an

acquisition of the business. *Id.* ¶ 43. Those discussions concluded in an agreement among the

Debtors and Bausch (the "Stalking-Horse Agreement") that called for the sale of substantially all

of the Debtors' assets and the assumption and assignment of certain contracts material to the

operation of the business, for a total purchase price of $185 million, less certain costs and

adjustments, as well as up to $15 million for severance obligations to eligible employees. *Id.* ¶¶

46, 110. The agreement also contemplated, among other things, that the Debtors would conduct

an asset sale pursuant to section 363 of the Bankruptcy Code (the "Sale"), subject to higher and

better offers, and that Bausch would serve as the stalking-horse bidder at the Sale (the "Stalking-

Horse Bidder"). *Id*. ¶ 46. On or about December 12, 2018, the Debtors and Bausch executed the

Stalking-Horse Agreement. *Id*.

The Prepetition Term Lenders Underwrite the DIP Loan

On the Petition Date, the Debtors sought authorization to enter into a DIP financing

agreement (the "DIP Financing Agreement") with the Prepetition Term Lenders (in such

capacity, the "DIP Lenders") which provided for, among other things, the Debtors' use of the

DIP Lenders' cash collateral and the funding of senior secured, super-priority DIP financing in

an aggregate principal amount of $155,000,000 (the "DIP Loan"). *See* DIP Financing Motion ¶

1(a)-(q).[12] The loan was comprised of approximately $110,000,000 to be used to "roll up" a

---

[12]   Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II)
Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative
Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final
Hearing, and (VII) Granting Related Relief  [ECF No. 15].

portion of the Prepetition Secured Obligations (the "Roll-Up DIP Loans"), and $45,000,000 of "new money" loans, to be advanced subject to the terms and conditions of the DIP Loan documents. *Id*. ¶ 1(a). In the proposed DIP Financing Agreement, the Debtors stipulated to the allowance of the Prepayment Premium and Back-End Facility Fee in the aggregate amount of $37.1 million, as valid and enforceable prepetition secured claims.  DIP Financing Motion ¶¶ 1(i), 58. However, those fees were not covered by the Roll-Up DIP Loans.  Rather, the Debtors and DIP Lenders contemplated that those fees would be paid and discharged under the Debtors' reorganization plan.

Interim Hearing – DIP Financing Motion

On December 13, 2018, the Court conducted an interim hearing on the DIP Financing Motion.  Two affiliated funds holding approximately $10 million of the Debtors' unsecured senior Convertible Notes (together, the "Highbridge Funds") objected to the motion.  *See* Highbridge Funds DIP Financing Objection.[13]  Without limitation, in addition to challenging the validity and enforceability of the Prepayment Premium and Back-End Facility Fee, the Highbridge Funds objected to certain terms and conditions in the DIP Financing Agreement, including: (i) case milestones; (ii) the approval of the $110 million roll-up; (iii) conditioning the $45 million in new money on the Debtors' stipulation to the Prepayment Premium and Back-End Facility Fee; (iv) granting the DIP Lenders a lien on unencumbered assets; and (v) the requirement that Debtors file an acceptable reorganization plan on or before December 21, 2018**.** *Id*. ¶ 1.  Following the hearing, and with the consent of all parties, the Court authorized the

---

[13]    Preliminary Objections of 1992 MSF International Ltd. and 1992 Tactical Credit Master Fund, L.P. to the Debtors' Motion for an Order Authorizing the Debtors to obtain Postpetition Financing and Reservation of Rights [ECF No. 48].

Debtors, on an interim basis only, to utilize cash collateral.  *See* First Interim DIP Order.[14]

However, in that order, the Court approved the Debtors' stipulation to the allowance and

enforceability of the Prepayment Premium and Back-End Facility Fee, subject to the rights of

parties in interest, including "any committee," to object to all or any part of the Prepetition

Secured Obligations, on or before the date that was 60 days after entry of a final order approving

the DIP Financing Agreement.  *See id.* ¶ 3.1.

The Debtors File a Motion Seeking
Approval of the Stalking-Horse Agreement

On the Petition Date, the Debtors also filed a motion seeking the entry of an order

approving, among other things: (i) the Debtors' proposed auction and bid procedures for

soliciting other bids for the sale of the Debtors' assets, and (ii) the Debtors' entry into the

Stalking-Horse Agreement which included a break-up fee and expense reimbursement to Bausch.

*See* Sale Procedures Motion.[15]  The Stalking-Horse Agreement contemplated the sale of

substantially all of the Debtors' assets and the assumption and assignment of certain contracts

material to the operation of the business, for a total purchase price of $185 million, less certain

costs and adjustments, as well as up to $15 million for severance obligations to eligible

employees.  *See id*. ¶ 10.

---

[14]    First Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief  [ECF No. 50].

[15]    *See* Debtor's Motion for (I) An Order (A) Approving the Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Establishing the Notice Procedures and Approving the Form and Manner of Notice Thereof, (C) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Scheduling a Sale Hearing, and (E) Granting Related Relief and (II) An Order (A) Approving the Sale of the Debtors' Assets Free and Clear of all Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief [ECF No. 17].

The Debtors File Their Joint Plan

On December 21, 2018, in accordance with the case milestones under the DIP Financing

Agreement, the Debtors filed their joint plan of reorganization (the "Plan") and related disclosure

statement.[16] Without limitation, the Plan contemplated that the DIP Loan would be paid in full in

cash on the date the sale transaction closed.  As relevant, the Plan included the following classes

of claims and interests:

> Class 3 – the Term Loan Claims (i.e. the Prepayment Premium and Back-End
> Facility Fee aggregating approximately $37.1 million);
>
> Class 4 – General Unsecured Claims; and
>
> Class 8 – Interests in Synergy Pharmaceuticals.

The proposed treatment of the holders of Allowed Class 3 and Class 4 Claims (the "GUCs") was

a function of (i) the amount of Excess Sale Proceeds on hand on the Effective Date of the Plan,

and (ii) whether the Class 4 GUCs voted to accept the Plan.[17]  For these purposes, the "Excess

Sale Proceeds" consisted of the Cash on hand on the Plan's effective date (including the cash

paid under the Asset Purchase Agreement) net of amounts used to pay the DIP Loan in full, in

cash, and the amounts used to fund the claim reserves under the Plan.  To summarize, under the

Plan:

Class 3

> CRG Servicing, as agent for, and on behalf of the Prepetition Term Lenders, was
> to be paid the first $32.1 million of Excess Proceeds on account of the Term Loan
> Claims.

---

[16]  *See* Joint Plan of Reorganization of Synergy Pharmaceuticals Inc. and its Debtor Affiliate [ECF No. 111];
Disclosure Statement for the Joint Plan of Reorganization of Synergy Pharmaceuticals Inc. and its Debtor Affiliate
[ECF No. 112].

[17]   All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Modified
Fourth Amended Plan.

Class 4

>If Class 4 voted to accept the Plan –

>>The holders of Allowed Class 4 Claims would share the next $12 million in Excess Proceeds;

>>Thereafter, holders of Allowed Class 3 and Class 4 Claims  would share any additional Excess Cash pursuant to a formula, until those claims were paid in full.

>If Class 4 voted to reject the Plan, the holders of Allowed Class 4 Claims would receive a recovery on account of their claims only if Excess Sale Proceeds were sufficient to pay the Term Loan Claims in full.

Class 8

>The Class 8 Interests in Synergy Pharmaceutical would be "cancelled, released, and extinguished" and the holders of Allowed Class 8 Interest would recover, pro rata, from sale proceeds only after Class 4 GUCs were paid in full.

**The Creditors Committee Objects to the DIP**
**Financing Motion and Sale Procedures Motion**

The Creditors Committee objected to the DIP Financing Motion and the Sale Procedures Motion.[18]  Without limitation, in addition to challenging the validity and enforceability of the Prepayment Premium and Back-End Facility Fee, the committee objected to certain terms and conditions in the DIP Financing Agreement, including milestones tied to the Sale Procedures Motion.  It also objected to the terms and conditions of the proposed asset sale.  Thereafter, the Ad Hoc Shareholders Group joined in the Highbridge Funds DIP Financing Objection, including

---

[18]    Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion for an Order Authorizing the Debtors to Obtain Prepetition Financing and Request Related Relief [ECF No. 102]; Objection of the Official Committee of Unsecured Creditors to the Debtors Motion for (I) An Order (A) Approving the Bidding Procedures for the Sale of Substantially All of the Debtors Assets, (B) Establishing the Notice Procedures and Approving the Form and Manner of Notice Thereof, (C) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Scheduling a Sale Hearing, and (E) Granting Related Relief and (II) An Order (A) Approving the Sale of the Debtors' Assets Free and Clear of all Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief [ECF No. 140].

the challenge to the enforceability of the Prepayment Premium and Back-End Facility Fee,

lodged its own objection to the DIP Financing Motion, and joined in the Creditors Committee's

objection to the Sale Procedures Motion.[19]  The parties entered into settlement discussions and,

in doing so, adjourned the hearings on the DIP Financing Motion and Sale Procedures Motion.

The U.S. Trustee Forms an Equity Committee

On January 29, 2019, the U.S. Trustee appointed the Equity Committee.[20]  At that point,

the Firm's work in these cases ceased. Thereafter, the Equity Committee lodged its own

objection to the Sale Procedures Motion and the DIP Financing Motion, including the challenge

to the enforceability of the Prepayment Premium and Back-End Facility Fee.[21]

The Global Settlement

The Debtors, the DIP Lenders and the Creditors Committee reached a "global settlement"

(the "Global Settlement") of these disputed issues.  In substance, the settlement contemplated

four things:

> (1) Allowing the Prepayment Premium and Back-End Facility Fee as secured claims in full at approximately $37.1 million in the aggregate;
>
> (2) Removing the Plan's previous construct for the treatment of Class 3 and Class 4 claimants, and instead, providing for the Excess Sale Proceeds to be shared 50/50 among the Term Lenders and GUCs until either (i) the claims of Class 4 claimants were paid in full (with post-petition interest) or (ii) the Term Lenders recovered $36 million (plus certain interest);

---

[19]    Preliminary Objection of the Ad Hoc Committee of Equity Holders to Debtors' DIP Financing Motion and Joinder to Objection Filed by Affiliates of Highbridge Capital [ECF No. 80]; Objection of Ad Hoc Committee of Equity Holders to Debtors' DIP Financing Motion [ECF No. 206]; Ad Hoc Committee of Equity Holders' Objection to the Debtors' Bidding Procedures and Joinder to the Official Committee of Unsecured Creditors' Objection Thereto [ECF No. 137].

[20]    Notice of Appointment of Official Committee of Equity Security Holders [ECF No. 279].

[21]    Objection to the Official Committee of Equity Security Holders to the Debtors' Motion for an Order Authorizing the Debtors to Obtain Postpetition Financing [ECF No. 349]; Objection of the Official Committee of Equity Security Holders to the Proposed Sale of Substantially all of the Debtors' Assets [ECF No. 374].

(3) Releasing the DIP Lenders' liens on avoidance actions and other retained causes of action under the DIP Loan Agreement; and contributing those actions to a litigation trust (the "Litigation Trust") funded for the benefit of the holders of Class 4 claims, and, if those claims were paid in full, for the equity holders; and

(4) Providing that, if the Class 4 claimants recover in full and the Term Lenders recover $36 million (plus certain interest), the equity holders would share remaining Excess Sale Proceeds until the Term Lenders recover the remaining $1.1 million of the Prepayment Premium and Back-End Facility Fee Claim plus certain interest.

Debtors' Settlement Motion ¶ 18.[22]  At the February 21, 2019 hearing on the Debtors' Settlement

Motion, Debtors' counsel estimated that the Class 4 claims totaled approximately $38 million,

and that there would be approximately $27 million in Excess Sale Proceeds.  *See* Feb. 21, 2019

Hr'g. Tr. at 60:5-12 [ECF No. 452].[23]

The Equity Committee Opposes the Global Settlement

The Equity Committee opposed the Debtors' Settlement Motion on the grounds that:

(i) the Prepetition Term Lenders could not enforce the Prepayment Premium and thus, there was

no basis for allowing that claim; and (ii) under the third interim DIP Financing Order, the Equity

Committee had the right to challenge the allowance of the Prepetition Secured Obligations,

---

[22]    *See* Debtors' Motion for Entry of Order Approving Settlement of Objections to Prepetition Secured Obligations and Prepetition Liens [ECF No. 312].

[23]    Based on those estimates, the Global Settlement effectively guaranteed that the GUCs would recover at least $13.5 million on account of their claims. It also preserved upside for both the GUCs and interest holders by ensuring a 50/50 split of Excess Sale Proceeds between the GUCs and the Term Lenders, as well as the transfer of potentially valuable causes of action to the Litigation Trust which would be run for the benefit of junior constituencies.  *See* Feb. 21, 2019 Hr'g. Tr. at 70:2-11 [ECF No. 452].

The Debtors revised the definition of "Excess Sale Proceeds" to mean:

> All of the Cash held by the Debtors' Estates on each Distribution Date, including the Cash Consideration (as defined in the Asset Purchase Agreement) under the Asset Purchase Agreement, less the amounts used to pay the DIP Claims and Other Secured Claims, if any, in full, in cash, and the amounts used to fund the Professional Claims Reserve, the Administrative and Priority Claims Reserve, the Disputed Claims Reserve, and the Wind-Down Reserve; *provided* that Excess Sale Proceeds shall exclude any and all (a) proceeds of Avoidance Actions and (b) proceeds of Causes of Action of the Debtors, in each case, that are vested in the Litigation Trust on the Effective Date.

Modified Fourth Amended Plan ¶ 1.74.

including the Prepayment Premium, and its challenge period had not expired. *See* Equity

Committee Objection to Settlement.[24]  Ultimately, the Equity Committee objected to the

allowance of the Prepayment Premium.[25]  Following a hearing on the Debtors' Settlement

Motion, the Court approved the Global Settlement and overruled the Equity Committee

objection. *See* Global Settlement Order.[26]  Thereafter, the Court approved the DIP Motion on a

final basis.[27] The Debtors amended the Plan to incorporate the terms of the Global Settlement.[28]

The Equity Committee appealed both the Final DIP Order and the Global Settlement

Order to the District Court (collectively, the "Appeals").[29]  CRG Servicing asserted that in filing

the Appeals, the Equity Committee violated the terms of the Court-approved Plan Settlement

Stipulation among the Debtors, the Creditors Committee, the Equity Committee, and CRG

Servicing.[30]  In response to the filing of the Appeals, CRG Servicing moved to enforce the

---

[24]    Objection of the Official Committee of Equity Security Holders of Synergy Pharmaceuticals to the Debtors' Motion for Entry of Order Approving Settlement of Objections to Prepetition Secured Obligations and Prepetition Liens [ECF No. 351].

[25]    Objection of the Official Committee of Equity Security Holders of Synergy Pharmaceuticals to the Claim of CRG Servicing LLC and Certain Affiliate Lenders [ECF No. 412].

[26]    Order Approving Settlement of Objections to Prepetition Secured Obligations and Prepetition Liens [ECF No. 450], as modified by Errata Order [ECF No. 512].

[27]   Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief  [ECF No. 454] ("Final DIP Order").

[28]    Second Amended Joint Plan of Reorganization of Synergy Pharmaceuticals Inc. and its Debtor Affiliate [ECF No. 474].

[29]    Notice of Appeal [ECF No. 537] (Global Settlement Order Appeal); Notice of Appeal [ECF No. 538] (DIP Order Appeal).

[30]    Stipulation and Order Resolving Objections to (I) Debtors' Motion for Entry of Order Approving Appointment and Compensation of Independent Director *Nunc Pro Tunc* to February 13, 2019 and (II) Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Attorneys for Synergy Pharmaceuticals Inc. Effective *Nunc Pro Tunc* to February 13, 2019 [ECF No. 553].

settlement and hold the Equity Committee and its counsel in contempt of Court. *See* CRG

Motion to Enforce Settlement.[31]  On the strength of settlement discussion among the Debtors,

Creditors Committee, Equity Committee, Houlihan Lokey Capital, Inc. ("Houlihan") and CRG

Servicing, the parties resolved the disputes underlying the Appeals and the CRG Motion to

Enforce Settlement and objections to the retention of Houlihan, as financial advisor to the Equity

Committee. *See* Plan Settlement Agreement.[32]

The Plan Settlement Agreement

Without limitation, the agreement called for the Equity Committee to withdraw the

Appeals and support the Plan and for CRG Servicing to withdraw the Motion to Enforce

Settlement. It also provided that:

> (1) After recovering $12 million from Excess Sale Proceeds, CRG Servicing would transfer $1.375 million to a fund maintained by the Plan Administrator;

> (2) The $1.375 million would first be used to: (a) pay Equity Committee's special counsel's approved fees; and (b) escrow $50,000 with the trustee of the Litigation Trust (the "Litigation Trustee") to be used solely for the benefit of the Equity Committee's designees overseeing any proposed settlement of claims proposed by the Litigation Trustee;

> (3) The Administrative and Priority Claims Reserve would include $1.25 million set aside for CRG Servicing's expenses in responding to certain discovery; and

> (4) Equity Committee's counsel's and financial advisor's fees would be capped at $2.5 million in the aggregate.

*See* Plan Settlement Motion ¶ 20.

---

[31]    Motion of CRG Servicing LLC for an Order, Pursuant to 11 U.S.C. § 105(a), (I) Enforcing Plan Settlement, (II) Holding the Official Equity Committee and the Law Firm of Stevens & Lee, P.C. in Contempt of Court And (III) Imposing Sanctions [ECF No. 557].

[32]    Debtors' Motion for Entry of an Order (I) Approving Settlement Among the Debtors, CRG Servicing LLC, the Creditors' Committee, the Equity Committee, and Houlihan Lokey Capital, Inc. and (II) Finding that Proposed Modifications to the Proposed Plan do not Require Further Solicitation [ECF No. 609].

The Court Approves the Plan Settlement
Agreement and Confirms the Fourth Amended Plan

The Court approved the Plan Settlement Agreement,[33] the Debtors further amended the Plan to reflect the terms of the agreement, and the Court confirmed the Modified Fourth Amended Plan.[34]  Under this final version of the Plan, as with every other iteration of the Plan, the Class 8 interests were impaired, and the holders of Allowed Interests were deemed to have rejected the Plan.  *See* Modified Fourth Amended Plan §3.02(h)(iii).  The Interests were "cancelled, released, and extinguished" and the holders of Allowed Interests  shared, pro rata, cash in the Litigation Trust remaining after payments on account of Class 3, 4 and 5 claimants. *Id.* § 3.02(ii).  The Plan accounts for the Plan Settlement Agreement, including CRG Servicing's transfer of the $1.375 million in settlement of its disputes with the Equity Committee, to the CRG-ESH Settlement Fund for the benefit of holders of Allowed Class 8 Interests, and the mechanics for distributing funds to the holders of Allowed Class 8 Interests.

The Firm's Engagement
By the Ad Hoc Shareholders Group

The Ad Hoc Shareholders Group retained the Firm pursuant to an engagement letter dated December 18, 2018 (the "Initial Engagement Letter").[35]  That agreement limited the scope of the Firm's representation to the following services (the "Original Scope of Services"):

> (a) the preparation of a letter to the U.S. Trustee seeking the appointment of an official equity committee, and

> (b) the preparation of a limited objection (the "First DIP Objection") to the DIP Financing Motion.

---

[33]    Order (I) Approving Settlement Among the Debtors, CRG Servicing LLC, The Creditors' Committee, the Equity Committee, and Houlihan Lokey Capital, Inc. and (II) Finding that Proposed Modifications to the Proposed Plan do not Require Further Solicitation [ECF No. 651].

[34]    Plan Confirmation Order.

[35]    *See* Objection, Ex. A.

14

Initial Engagement Letter at 1.  The letter also provides that the First DIP Objection would

"adopt and incorporate a lot of the arguments made by the unsecured noteholders."[36] The parties

agreed that the Original Scope of Services could "only be extended pursuant to a supplemental

written agreement." *Id*. The Initial Engagement Letter states that the Firm's bills will be paid in

regular intervals from the retainer account and that the Firm "reserve[s] the right" to request "an

additional retainer or replenishment of the retainer should circumstances warrant."  *Id.* at 2.[37]

On January 8, 2019, the Firm executed a supplemental engagement letter (the

"Supplemental Engagement Letter,"[38] and together with the Initial Engagement Letter, the

"Engagement Letters").   The Supplemental Engagement Letter was executed by Ryan T. Jareck

of Cole Schotz P.C. and Jose Solorio, in his capacity as the "Authorized Representative of the

Ad Hoc Committee of Equity Holders of Synergy Pharmaceuticals, Inc.," and addressed a

number of matters.  First, the Firm clarified that the Ad Hoc Shareholders Group is the Firm's

---

[36]    As relevant, the Initial Engagement Letter states, as follows:

> The scope of our representation shall be limited to the following: the preparation of a letter to the
> Office of the United States Trustee outlining the need for an official equity committee and
> advocating to the Office of the United States Trustee for the appointment as well as a limited
> objection to the proposed DIP financing (that would adopt and incorporate a lot of the arguments
> made by the unsecured noteholders). This engagement does not include the preparation of a
> motion before the bankruptcy court seeking the appointment of an official equity committee by the
> Court or litigation, including discovery or other motion practice.

Initial Engagement Letter at 1.

[37]    In part, the Initial Engagement Letter states, as follows:

> A retainer is required of clients prior to undertaking representation. The retainer requested in this
> matter is $25,000.00. The amount of the retainer is not a "flat fee" for this representation.  The
> actual fees may be higher or lower depending upon the issues presented and other factors. The
> bills will be paid in regular intervals from the retainer account as fees are earned and expenses
> accrue. We reserve the right, in our discretion, to request an additional retainer or replenishment of
> the retainer should circumstances warrant.

*Id*. at 2.

[38]    *See* Objection, Ex. B.

client, and not any individual group member.  Supplemental Engagement Letter at 1.[39]  Second,

it described the scope of the services it had provided to the group to date and the fees that it had

incurred in doing so.  The Firm represented that it had "completed all of the work described in

the Initial Engagement Letter, and substantially more."[40]  The Firm also advised that the

"additional work [done by the Firm] has taken our fees well beyond the initial retainer of

$25,000 (as evidenced in part by the recent invoice that we sent to the [Ad Hoc Shareholders

Group]," and acknowledged that "[w]e have discussed the prospect of the [Ad Hoc Shareholders

Group] replenishing our retainer, and understand that it may not be feasible."  Nonetheless, the

Firm volunteered that "[w]hile we would appreciate replenishment in any amount possible, we

would like to continue assisting the Committee's efforts as outlined in this letter, even absent

replenishment." *Id.* at 2.  In a footnote, the Firm advised that "[i]t may be possible for the [Ad

Hoc Shareholders Group] and [the Firm] to make an application to be reimbursed for the fees

and expenses incurred in the effort to have an official committee appointed as a 'substantial

---

[39]    In part, in the Supplemental Engagement Letter, the Firm stated:

> First, we are confirming that our client is the Ad Hoc [Shareholders Group], not any individual
> member and certainly not any equity holders who are not even members of the Ad Hoc
> [Shareholders Group].  As counsel to the [Ad Hoc Shareholders Group], we owe certain duties to
> the [Ad Hoc Shareholders Group], including a duty to avoid conflicts of interest, a duty of
> confidentiality, and a duty to provide competent representation, among others. Those duties,
> however, do not extend to any individual member or any shareholder that is not a member of the
> [Ad Hoc Shareholders Group].

Supplemental Engagement Letter at 1.

[40]    More specifically, as to the latter, the Firm advised that,

> In particular, among other things, and in consultation with the [Ad Hoc Shareholders Group], we
> solicited and obtained a competing proposal for debtor-in-possession financing, and prepared for
> and attended two hearings, one on interim approval of debtor-in-possession financing, and one on
> the debtors' motion for approval of proposed bidding procedures. We also filed an objection to
> both the proposed interim financing as well as the bidding procedures.

*Id*. at 1-2.

contribution' under the Bankruptcy Code at a later date. We can discuss this option at a later date

when appropriate." *Id.* at 2, n.1.

Finally, the letter called for an expansion of the Firm's Original Scope of Services to

include the following services:

> 1. Filing a short objection to the entry of a final order approving the debtor-in-possession financing from CRG Servicing, the prepetition lender, adopting whatever arguments the Creditors' Committee will make (and whatever settlement of their objection that the Creditors' Committee may agree to), and appearing at the hearing on the matter;

> 2. To the extent the Creditors' Committee opposes the KEIP [Key Employee Incentive Plan] Motion, filing a short objection to the entry of an order approving the KEIP Motion, adopting whatever arguments the Creditors' Committee will make (and whatever settlement of their objection that the Creditors' Committee may agree to), and appearing at the hearing on the matter; and

> 3. Continuing to interface with the Office of the United States Trustee concerning the appointment of an official equity committee, including, but not limited to, attending any scheduled formation meeting.

*Id.* at 2.

<u>The Application and Opposition to the Application</u>

The Fee Claim represents unpaid fees and expenses incurred by the Firm under the

Engagement Letters.  It is net of retainer payments totaling $32,990 to the Firm by the Ad Hoc

Shareholders Group (the "Retainer).  In support of the Application, the Firm submitted copies of

the invoices it sent to the Ad Hoc Shareholders Group.  In substance, the Plan Administrator

objects to the Application on the grounds that the Firm is not authorized under section 503 to

obtain payment of the Fee Claim and, assuming, *arguendo*, that it is authorized to do so, the

Application fails on the merits.  Objection ¶¶ 1-3.  The Firm filed a reply to the Objection and in

support of the Application ("Reply"),[41] including the declaration of Christopher Moriarty, a

member of the Ad Hoc Shareholders Group (the "Moriarty Declaration").[42]  Briefly, the Firm

contends that is authorized to file the Application, and that it is entitled to recover its fees and

expenses pursuant to sections 503(b)(3) and (4) because the Ad Hoc Shareholders Group

performed valuable services to the estate while it remained active in these cases.

The Court considers those matters below.

## Discussion

Section 503 of the Bankruptcy Code concerns the payment of claims out of a debtor's

estate.  *Olsen v. Robinson Brog Leinwand Greene Genovese & Gluck P.C. (In re Olsen)*, 334

B.R. 104, 107 (S.D.N.Y. 2005).  As relevant, that section states, as follows:

> (a) An entity may timely file a request for payment of an administrative expense,
> or may tardily file such request if permitted by the court for cause.
>
> (b) After notice and a hearing, there shall be allowed administrative expenses,
> other than claims allowed under section 502(f) of this title, including—
>
>     \*        \*        \*        \*
>
> (3) the actual, necessary expenses, other than compensation and reimbursement
> specified in paragraph (4) of this subsection, incurred by--
>
>     \*        \*        \*        \*
>
> (D) a creditor, an indenture trustee, an equity security holder, or a
> committee representing creditors or equity security holders other than a
> committee appointed under section 1102 of this title, in making a
> substantial contribution in a case under chapter 9 or 11 of this title;
>
>     \*        \*        \*        \*

---

[41]    Reply in Support of Ad Hoc Committee of Equity Holders' Application for Allowance of an Administrative
Expenses Claim Pursuant to 11 U.S.C. §§ 503(b)(3)(D) and 503(b)(4) for Making a Substantial Contribution in these
Chapter 11 Cases [ECF No. 825].

[42]    Declaration of Christopher Moriarty in Support of Ad Hoc Committee of Equity Holders' Application for
Allowance of an Administrative Expense Claim Pursuant to 11 U.S.C. §§ 503(b)(3)(D) and 503(b)(4) for Making a
Substantial Contribution in These Cases [ECF No. 825-1].

(4) reasonable compensation for professional services rendered by an attorney or
an accountant of an entity whose expense is allowable under subparagraph (A),
(B), (C), (D), or (E) of paragraph (3) of this subsection, based on the time, the
nature, the extent, and the value of such services, and the cost of comparable
services other than in a case under this title, and reimbursement for actual,
necessary expenses incurred by such attorney or accountant[.]

11 U.S.C. § 503(a), (b)(3)(D), (b)(4).

<u>Whether the Firm was Authorized to File the Application</u>

The Plan Administrator contends that the Firm is not authorized to file the Application

for two reasons.  First, it asserts that the Firm lacks standing to seek payment of an

administrative expense under section 503(a) because it is not among the entities identified in

section 503(b)(3)(D) as being eligible to do so.  Objection ¶ 26.  The Plan Administrator argues

that, in this instance,  the Ad Hoc Shareholders Group, not the Firm, must first file an application

under sections 503 for the allowance and payment of the Fee Claim.  *Id.*  The Firm disputes that

contention.

Courts in this circuit read the plain language of the statute to bar a professional retained

by an ad hoc committee from filing its own application for the payment of an administrative

expense under section 503(a) of the Bankruptcy Code.  For example, in *Olsen v. Robinson Brog*

*Leinwand Greene Genovese & Gluck P.C. (In re Olsen)*, 334 B.R. 104 (S.D.N.Y. 2005), the

district court (Lynch, J) reversed an order of the bankruptcy court awarding a law firm fees under

section 503(b)(4) pursuant to an application filed by the law firm under section 503(a), in the

client's name, but without the client's authorization.  In doing so, Judge Lynch observed that

"[t]he most natural reading of [sections 503(a), (b)(3)(D) and (b)(4)] is that the 'entity' who may

file a request for payment under subsection (a) for attorneys' fees under subsection (b)(4) is the

same 'entity' whose expense is allowable under subsection (b)(3)(D), i.e., the creditor."  *Id*. at

19

106 (citation omitted).  "On this reading, the creditor, and not the creditor's attorney, may apply

for the payment of fees from the estate." *Id.   See also In re Am. Preferred Prescription, Inc.*,

194 B.R. 721 (Bankr. E.D.N.Y. 1996) (denying law firm standing to bring a fee application

under section 503(b)(4) independent of its former client).[43]

Although the Application is styled as the "Application of Cole Schotz P.C, As Former

Counsel for the Ad Hoc Committee of Equity Holders," the Firm maintains that the Plan

Administrator's objection "seeks to elevate form over substance[.]" *See* Reply ¶ 2.  It correctly

contends that in both *In re Olsen* and *In re Am. Preferred Prescription, Inc.,* the courts

recognized that where an attorney files a fee request on behalf of its client, it may be appropriate

to proceed directly to the merits of the application, without requiring the client to file its own

application.  *See In re Olsen*, 334 B.R. at 106 (the district court noted that under certain

circumstances, it may be appropriate for a court to consider a fee application filed by counsel

under section 503(a), to have been filed "on behalf of his or her creditor client so that the court

may proceed directly to its merits without multiplying proceedings by standing on formalities.")

(quoting *In re Oxford Homes, Inc.,* 204 B.R. 264, 267–68 (Bankr.D.Me.1997)); *In re Am.*

---

[43]    In that case, the bankruptcy court held that

> By the plain language of the statute, section 503(b)(4) requires a finding of substantial
> contribution by a creditor under section 503(b)(3)(D) as a pre-requisite to an award of counsel fees
> under section 503(b)(4). In this case, the [creditor/client] never applied to this Court for
> reimbursement of its expenses in making a substantial contribution to the case; has been out of the
> case for over one year; and, this Court has never been asked to determine whether [the
> creditor/client's] expense, as a former creditor, should be compensated for making a substantial
> contribution to this estate. . . .   In this Court's reading of section 503(b)(4) in order for [the law
> firm] to be reimbursed under that section, [the law firm's] client, the former creditor . . . must be
> an entity whose expense is allowable under section 503(b)(3)(D). The [the law firm], as
> [creditor/client's] former counsel, cannot simply apply for legal fees and reimbursement of legal-
> related expenses independent of a determination that [creditor/client's] own expenses are
> allowable. The creditor must either, first or together with the attorney, apply to the court for
> reimbursement of expenses allowable under section 503(b)(3)(D) for making a substantial
> contribution to the case.

*In re Am. Preferred Prescription, Inc.*, 194 B.R. 721, 724 (Bankr. E.D.N.Y. 1996).

*Preferred Prescription, Inc.*, 194 B.R. at 724 ("[t]he creditor should at least support the counsel requesting the fees which were incurred on behalf of the creditor and which result in a benefit to the estate, aside from, and in addition to those services which benefit the creditor.")  The Firm contends that is the case here, because the predicate for the substantial contribution claim is the Ad Hoc Shareholders Group's accomplishments in these Chapter 11 cases, and the group authorized the Firm to file the Application on its behalf.  Reply ¶¶ 2-4.

The Firm correctly notes that the Application focuses on the actions that the Ad Hoc Shareholders Group took in the case prior to the appointment of the Equity Committee.[44]  The Firm also has submitted evidence that supports its contention that the Ad Hoc Shareholders Group authorized the Firm to file the Application.  In his declaration, Christopher Moriarty identifies himself as a person who "was a shareholder of Synergy Pharmaceuticals Inc. and owned 17,000 shares as of the December 12, 2018 commencement of these Chapter 11 cases." Moriarty Declaration ¶ 2.  He says that he was "a member of the Ad Hoc [Shareholders Group]. . . ." *Id*.  In support of the Application, he asserts that

> [t]he Application was submitted as a joint application by and among the Ad Hoc [Shareholders Group] and [the Firm]. The Ad Hoc [Shareholders Group] joins in

---

[44]    As relevant, the Application provides, as follows:

Application, Preliminary Statement, ¶ 1 ("The Ad Hoc [Shareholders Group] achieved an extraordinary result in these cases …."); *id.*, ¶ 3 ("The Ad Hoc [Shareholders Group]  conducted itself in a commercially reasonable matter …."); *id.*, ¶ 4 ("A review of the Ad Hoc [Shareholders Group] activities ….").

Application, Factual Background, ¶ 5 ("Among other things, the Ad Hoc [Shareholders Group] performed the following activities.…").

Application, Relief Requested and Basis Therefor, ¶ 10 ("Here, the Ad Hoc [Shareholders Group] took immediate action in these cases, including filing an objection to the Debtors' proposed DIP financing.…"); *id.*, ¶ 16 ("The Ad Hoc [Shareholders Group]  provided a tangible benefit to the Debtors' estates."); *id.*, ¶ 17 ("The Ad Hoc [Shareholders Group] actions did not duplicate the efforts of others in these cases."); *id.*, ¶ 18 ("In addition, the Ad Hoc [Shareholders Group] introduced JMB Capital to the Debtors concerning an alternative DIP financing proposal.").

Reply ¶ 2.

and fully supports the Application and the reimbursement of [the Firm's] fees and expenses [of the Fee Claim].

*Id.* ¶ 5.[45]   That statement notwithstanding, Mr. Moriarty's testimony at the Hearing was clear that the issue of whether to authorize the Firm to file the Application was not put to a formal vote of the group.[46]   However, he testified that although there was no such formal vote, the Ad Hoc Shareholders Group considered the matter on an informal basis, and no member of the group objected to the filing of the Application.[47]   He also testified that in the normal course of the

---

[45]   Mr. Moriarty also notes that:

> The members of the Ad Hoc [Shareholders Group] would do anything to support [the Firm] and show it the same good faith that [the Firm] showed the Ad Hoc [Shareholders Group].  It is truly unfortunate that [the Firm] has to respond to the objection by [the Plan Administrator], and perform additional work just to be reimbursed for its fees and expenses. [The Firm] should be rewarded for stepping up and protecting shareholders' interests.

Moriarty Declaration ¶ 12.

[46]   At the Hearing, Mr. Moriarty testified, as follows:

> Q. If you could turn to paragraph 5 of your declaration, sir.
>
> A. Specifically, the second sentence of paragraph 5, and I'm going to read this for you, "[t]he ad hoc committee joins in and fully supports the application", do you see that sentence?
>
> A. Yes.
>
> Q. Was there actually a vote by the ad hoc committee that you attended?
>
> A. A vote?
>
> Q. Yes, sir.
>
> A. Not that I'm aware of. . . .

June 26, 2019 Hr'g. Tr. at 30:7-16 [ECF No. 841].

[47]   Mr. Moriarty testified, as follows:

> A. Not that I'm aware of. I think that it was -- if I recall, it was put out to the people in the group that if there was any objections that people should be heard. I believe that's how it was submitted.

*Id.* at 30:16-19.

22

group's operations, he and Mr. Solorio were authorized to act on behalf of the group and, in that

capacity, he and Mr. Solorio approved the filing of the Application and the Reply. [48]

    On this record, the Court finds that the Ad Hoc Shareholders Group supports the Firm's

filing of the Application and the merits of the Application.  Under these circumstances, the Court

will consider the Firm to have filed the Application on behalf of the Ad Hoc Shareholders

Group.  *See In re Olsen*, 334 B.R. at 106;  *In re Am. Preferred Prescription, Inc.,* 194 B.R. at

724.  *See also In re Glickman, Berkowitz, Levinson & Weiner, P.C.*, 196 B.R. 291, 295 n.3

(Bankr.E.D.Pa.1996) (finding that applicant law firm had standing to file section 503 motion

---

[48]    Mr. Moriarty testified, as follows:

> Q. [Counsel] asked you whether or not there was a formal vote to approve the filing of the application. Do you recall that?
>
> A. Yes.
>
> Q. Okay. Who did [the Firm] normally deal with in connection with decisions to take certain positions in these cases?
>
> A. Primarily, a gentleman by the name of Jose.
>
> Q. Mr. Solorio?
>
> A. Mr. Solorio, yes.
>
> Q. And yourself as well, correct?
>
> A. Yes.
>
> Q. Okay. Do you recall being presented with a draft of the application which would have been prior to its May 1st filing and ask whether or not you had any comments or any objections to it being filed?
>
> A. Yes.
>
> Q. And am I correct that you approved -- and Mr. Solorio approved its filing?
> A. Yes, we did.
>
> Q. And the same could be said for the reply; is that also correct?
>
> A. Yes.

*Id*. at 32:2-24.

despite the Court's concern that the law firm, not the creditor/client filed the motion, but stating

that "to the extent [the law firm] is acting on [the creditor's] behalf, the Court has determined

that consideration of the substantive issues underlying their request is appropriate.")

The only funds that the Ad Hoc Shareholders Group has paid to the Firm to date, are

those used to fund the Retainer.  The Fee Claim consists of fees and expenses incurred beyond

the Retainer – it does not include any portion of the Retainer.  The Plan Administrator argues

that the Engagement Letters do not obligate the Ad Hoc Shareholders Group to pay fees that

exceed the Retainer or are otherwise beyond the Scope of Services.  Objection ¶ 46.  It says that,

as a consequence, the Ad Hoc Shareholders Group cannot assert a claim under section 503(b)(3)

for the reimbursement of the Firm's fees and expenses beyond the Retainer, and accordingly, the

Firm cannot assert the Fee Claim under section 503(b)(4).  *Id.*  The Plan Administrator asserts

that this is the second ground for finding that the Firm lacks standing to seek payment of the Fee

Claim under section 503.  *Id.*  The Firm disputes those contentions.  *See* Reply ¶¶17-21.

The Engagement Letters evidence the legal relationship between the Firm and the Ad

Hoc Shareholders Group.  *See Knopf v. Meister, Seelig & Fein, LLP*, No. 15CV5090(DLC),

2017 WL 1449511, at *6 (S.D.N.Y. Apr. 21, 2017), *aff'd*, 721 F. App'x 96 (2d Cir. 2018)

(analyzing terms of an engagement agreement under contract law in New York); *Jacobson v.

Sassower,* 66 N.Y.2d 991, 993, 489 N.E.2d 1283 (1985)(interpreting terms of a retainer

agreement under New York contract law).  The Initial Engagement Letter states that the Firm's

bills will be "paid in regular intervals from the Retainer" and that the Firm "reserve[s] the right"

to request an "additional retainer or replenishment." Initial Engagement Agreement at 2.  In the

Supplemental Engagement Letter, the Firm clarified that the Firm's client was the Ad Hoc

Shareholders Group.  Thus, no individual member of the group is liable to the Firm for the fees

24

and expenses incurred by the Firm under the agreement.  Supplemental Engagement Letter at 1.

At the Hearing, Mr. Moriarty confirmed that he understood that at no time were the group

members liable to the Firm for payment of the Fee Claim.[49]  The Ad Hoc Shareholders Group is

a juridical entity that does not have, and never had, assets to pay any portion of the Retainer or

Fee Claim.  In the Supplemental Engagement Letter the Firm agreed to provide additional

services to the Ad Hoc Shareholders Group notwithstanding that, at that time, the Firm's work

had "taken [its] fees well beyond the initial retainer of $25,000[,]" and that it would provide

additional services "even absent replenishment [of the Retainer]."  *Id.* at 2.  By the plain terms of

---

[49]    Mr. Moriarty's testimony at the Hearing included that following:

> Q. Do you recall in that engagement letter whether or not you assumed any personal liability for the
> fees and expenses that [the Firm] is seeking from the Court today?
>
> A. No.
>
> Q. Do you recall the committee assuming any responsibility for payment for the [the Firm's] fees
> and expenses that are set to --
>
> A. No.
>
> Q. Are you aware of any other member of the [Ad Hoc Shareholders Group] assuming any personal
> liability or responsibility for the fees and expenses sought by [the Firm]?
>
> A. No.

*Id.* at 22:21-23:7.  Mr. Moriarty also testified, as follows:

> Q. Okay. Turning back to your declaration, would you please direct your attention to paragraph 5
> of the declaration? The second sentence: "[t]he [A]d [H]oc [Shareholders Group]  joins in and fully
> supports the application and the reimbursement of [the Firm's] fees and expenses." [Who is] being
> reimbursed?
>
> A. [The Firm], it appears.
>
> Q. Well, reimbursed generally means I'm out of pocket, I want to be reimbursed. Who is out of
> pocket here?
>
> A. [The Firm].

*Id.* at 23:18-24:1.

the agreement, the Firm's sole recourse for payment of its fees and expenses is from the Retainer.

According to the Firm, if it elected to do so, it could "pursue amounts above what it received" against Mr. Solorio, in his individual capacity because Mr. Solorio signed the Engagement Letters and Mr. Solorio is financially responsible for payment of the fees incurred under those agreements.[50]  The Firm states that counsel had conversations with Mr. Solorio about the payment of the Fee Claim; after the Firm left the case it sent Mr. Solorio copies of the invoices; Mr. Solorio is aware that the Firm filed the Application; and "nowhere in those [Engagement Letters] does it say that Mr. Solorio is not individually responsible for the fees."[51] The Firm claims Mr. Solorio may be held personally liable for legal fees and expenses incurred above the Retainer.  The Firm further states that it could not say whether it would actually pursue Mr. Solorio for the legal fees, but maintained that  that the Engagement Letters do not absolve Mr. Solorio from personal responsibility for the fees.[52]  However, the Supplemental Engagement Letter clearly shows that Mr. Solorio executed the letter in his capacity as the authorized representative of the Ad Hoc Shareholders Group.  Moreover, the Supplemental Engagement Letter is clear that the Ad Hoc Shareholders Group is the Firm's client, and not any member of the group.  It does not make an exception for Mr. Solorio.  Thus, whatever arrangements the

---

[50]    At the Hearing, Mr. Jareck of Cole Schotz P.C explained, as follows:

> So to the extent we wanted to pursue an individual, we could pursue Mr. Solorio. That's our position. Whether we're actually going to pursue an individual retail shareholder for amounts that exceeded what we received by way of the retainer, I can't tell you we would do that, but we believe that the document is clear that Mr. Solorio signed it, and Mr. Solorio's financially responsible.

*Id.* at 49:16-22.

[51]    *Id*. at 49:16- 50:14.

[52]    *Id*.

Firm has made or will make with Mr. Solorio for payment of the fees, are of no moment, because

the Engagement Letters clearly show that Mr. Solorio executed the agreements in his capacity as

the authorized representative of the Ad Hoc Shareholders Group, and individual members of the

group are not liable for the Firms fees and expenses.  Thus, there would be no grounds for Mr.

Solorio to seek reimbursement of the fees and expenses under section 503(b)(3).

The Firm argues that even if the members of the Ad Hoc Shareholders Group are not

responsible for the payment of the Fee Claim, it is nonetheless entitled to payment of that fee

pursuant to section 503(b)(4).  Reply ¶ 19.  As support, it relies on *In re Western Asbestos Co.*,

318 B.R. 527 (Bankr. N.D. Cal. 2004).  In that case, the issue before the bankruptcy court was

"whether an attorney may obtain an administrative claim for fees and expenses [under section

503 of the Bankruptcy Code] for its creditor client's substantial contribution to a chapter 11 case

when its creditor client has no obligation to pay those fees and expenses." *Id*. at 528.  The court

held that under those circumstances, "an attorney may obtain an administrative claim [under

section 503(b)(4)][.]" *Id.*  There, three debtors in the administratively consolidated cases were at

one time distributors and installers of building materials containing asbestos.  All three entities

and their insurance companies were actual and/or potential defendants in lawsuits filed by

individuals exposed to asbestos who had either developed a disease as a result of their exposure

or feared that they would do so in the future (the "asbestos claimants").  *Id.*  The Stutzman Firm

served as co-counsel to a group of asbestos claimants pursuant to an arrangement whereby its

fees and expenses were paid by its co-counsel ("Baron & Budd").  After the debtors confirmed

their plan of reorganization, Baron & Budd filed an application (the "503(b) Application") for

payment of the Stutzman Firm's attorney fees and expenses under section 503(b)(3)(D) of the

Bankruptcy Code. *Id.* at 529. The Futures Representative objected to the application.

27

During the hearing on the 503(b) Application, the attorneys disclosed that Baron & Budd compensated the Stutzman Firm for its services and did not claim the right to seek reimbursement for those payments from its asbestos claimant clients. *Id.* The bankruptcy court found that Baron & Budd had no right to an administrative claim for the Stutzman Firm's attorneys' fees and expenses pursuant to section 503(b)(3)(D) because the asbestos claimants, not Baron & Budd, were creditors of the debtors, the asbestos claimants did not incur any obligation to pay the Stutzman Firm's fees, and attorneys' fees and expenses are expressly excluded from section 503(b)(3). *Id*. at 530.   However, the court found that Baron & Budd could assert that claim under section 503(b)(4).   In construing the relationship between sections 503(b)(3)(D) and 503(b)(4), the court found that a "natural reading" of the statute is that section 503(b)(3)(D) "permits an administrative claim for expenses other than attorneys' fees and expenses that are actually incurred by a creditor who made a substantial contribution[,]" while section 503(b)(4) "permits an administrative claim for attorneys' fees and expenses of an attorney who represents a creditor who made a substantial contribution regardless of whether the fees and expenses were incurred by the creditor." *Id.*   In reaching that conclusion, the bankruptcy court rejected certain "dicta" in *In re Sedona Institute,* 220 B.R. 74 (9th Cir. BAP 1998).   As described by the *Western Asbestos* court, in that case, in reversing and remanding an order of the bankruptcy court denying a law firm's administrative expense claim for making a substantial contribution, the bankruptcy appellate panel directed the trial court to (i) consider whether the creditor had made a substantial contribution, and (ii) whether the creditor had any obligation to pay the attorneys' fees and expenses. *Id.* at 531.   In doing so, the appellate panel stated that

> A primary objective of § 503(b)(3)(D) is to encourage creditor participation....The policy is achieved by offering to reimburse those creditors who make substantial contributions. If the creditor is not liable for the fees in the first place, then the purpose of the statute is not served by the estate assuming the obligation.

*Id.* (quoting *Sedona Institute*, 220 B.R. at 81) (citations omitted).   The *Western Asbestos* court

disagreed that policy reasons militate against allowing an administrative expense claim in those

circumstances.  It stated that:

> Creditors generally participate in chapter 11 cases through attorneys. If the
> creditor makes a substantial contribution to a chapter 11 case, why should it make
> a difference from a policy standpoint whether the creditor is obligated to pay the
> attorneys' fees and expenses? The requirement that the attorney represent a
> creditor who made a substantial contribution protects the estate from the assertion
> of a claim by an attorney with no connection to the case.

*Id.*

The Firm asserts that the "the sound policy and reasoning of *Western Asbestos* and its

rejection of the *dicta* in *Sedona Institute* should guide this Court."  Reply ¶ 21 (footnote

omitted).  However, in making that argument the Firm fails to account for Judge Lynch's

rejection, in *In re Olsen*, of the *Western Asbestos* court's construction of section 503(b)(4).  In

*Olsen*, the law firm cited *Western Asbestos* as support for its contention that it could seek fees

under section 503 even though no payment obligation had been incurred by its creditor client.

334 B.R. at 107.  Judge Lynch found no merit in the argument:

> An implication of *Western Asbestos's* holding is that, at least under certain
> circumstances, an attorney is entitled to payment under section 503 *in his own
> right.* The Court rejects this analysis. First, for the reasons discussed above (and
> ignored by the *Western Asbestos* court), only a creditor, or an attorney acting on
> behalf of a creditor, may apply for and receive attorneys' fees under section 503.
> Where the creditor has incurred no obligation to pay his attorney, that attorney
> cannot be said to be seeking fees from the estate "on the creditor's behalf."
> Second, section 503(b)(3) expressly states that it covers "the actual, necessary
> expenses, other than *compensation and reimbursement specified in paragraph (4)
> of this subsection, incurred by,*" § 503(b)(3) (emphasis added), *"a creditor* ... in
> making a substantial contribution in a case under chapter 9 or 11 of this title," §
> 503(b)(3)(D) (emphasis added). In this Court's view, the statute contemplates that
> the fees covered by subsection (b)(4), like those costs covered by subsection
> (b)(3), will have been "incurred by" a creditor.

*Id.*

29

The Court finds Judge Lynch's analysis of the interplay of sections 503(b)(3) and (b)(4) more persuasive than that of the *Western Asbestos* court. The Firm lacks standing under section 503 to file the Application on behalf of the Ad Hoc Shareholders Group because the members of the group have no obligation to pay the fees that comprise the Fee Claim. For that reason, the Court denies the Application.

However, even assuming, *arguendo*, that the Firm has standing to assert the Fee Claim under section 503 of the Bankruptcy Code, the claim nonetheless fails because the Firm has not met its burden of demonstrating that the Ad Hoc Shareholders Group made a "substantial contribution" to these chapter 11 cases.

Whether the Firm Has Demonstrated That the Ad Hoc
Shareholders Group Made a Substantial Contribution in These Cases

Fees and expenses are only recoverable by an attorney under section 503(b)(4) of the Bankruptcy Code when incurred as enumerated under section 503(b)(3), for example, in making a "substantial contribution" to a chapter 9 or 11 case. The statute does not define the term "substantial contribution." The substantial contribution inquiry is a factual one that is taken in the context of the policy goals of the Bankruptcy Code. *See In re Bayou Grp., LLC*, 431 B.R. 549, 560 (Bankr. S.D.N.Y. 2010). *See also In re Consolidated Bancshares, Inc.,* 785 F.2d 1249, 1253 (5th Cir.1986) ("The inquiry regarding a substantial contribution is one of fact."). Substantial contributions awards are "designed to promote meaningful participation in the reorganization process, but at the same time, discourage mushrooming administrative expenses." *In re Granite Partners*, 213 B.R. 440, 445 (Bankr. S.D.N.Y. 1997). *See also In re Sedona Institute*, 220 B.R. 74, 79 (9th Cir. BAP 1998) (describing the substantial contribution provisions as "an accommodation between the twin objectives of encouraging 'meaningful creditor participation in the reorganization process,' and 'keeping fees and administrative expenses at a

minimum so as to preserve as much of the estate as possible for the creditors.'") (quoting *Lebron v. Mechem Fin. Inc.*, 27 F.3d 937, 944 (3d Cir. 1994)).  The competing policies of promoting meaningful creditor participation in the reorganization process and keeping administrative expenses to a minimum "gives rise to the well settled rule that these statutory provisions are to be narrowly construed . . . and that any recovery is subject to strict scrutiny by the court . . . ." *In re U.S. Lines, Inc.*, 103 B.R. 427, 429 (Bankr. S.D.N.Y. 1989) (internal citations omitted).

"Inherent in the term 'substantial' is the concept that the benefit received by the estate must be more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests." *In re Dana Corp.,* 390 B.R. 100, 108 (Bankr. S.D.N.Y. 2008) (*citing Lebron v. Mechem Financial Inc.*, 27 F.3d 937, 944 (3d Cir.1994)).  Rather, compensation under section 503 is reserved for those rare and extraordinary circumstances when the creditor's involvement truly enhances the administration of the estate. *In re Am. Preferred Prescription, Inc.,* 194 B.R. 721, 727 (Bankr. E.D.N.Y. 1996) (citing *In re Best Products Co., Inc.,* 173 B.R. at 865).  To qualify for administrative priority status under section 503, the contribution must be (i) substantial, (ii) directly benefit the estate – and not merely a class of creditors or interest holders – and (iii) not duplicative of services performed by others.  *See Trade Creditor Grp. v. L.J. Hooker Corp., Inc. (In re Hooker Invs., Inc.)*, 188 B.R. 117, 120–21 (S.D.N.Y. 1995) (stating that relevant factors in determining whether an applicant has made a substantial contribution include "whether the services in question were provided to benefit all parties in the case; whether the services conferred a direct, significant and demonstrably positive benefit upon the estate; and whether the services were duplicative of services performed by others"), *aff'd*, 104 F.3d 349 (2d Cir. 1996)). *See also In re KiOR, Inc.,* 567 B.R. 451, 459 (D. Del. 2017) (stating that "[e]xtensive and active participation alone does not qualify [as a

substantial contribution]. . . services that are duplicative of other estate professionals are insufficient[,] . . ); *In re Bethlehem Steel Corp.*, No. 02-2854 (MBM), 2003 WL 21738964, at *6 (Bankr. S.D.N.Y. July 28, 2003) (noting that a "substantial contribution" is "one that substantially and directly benefits the estate.").

Services that warrant a substantial contribution award "generally take the form of constructive contributions in key reorganizational aspects, when *but for* the role of the creditor, the movement towards final reorganization would have been substantially diminished." *In re AMR Corp.*, No. 11-15463 (SHL), 2014 WL 3855320, at *2 (Bankr. S.D.N.Y. Aug. 5, 2014) (citing *U.S. Lines, Inc.,* 103 B.R. at 430 and *In re D.W.G.K. Rest., Inc.,* 84 B.R. 684, 690 (Bankr.S.D.Cal.1988)). *See also In re KiOR, Inc.,* 567 B.R. at 459 ("A substantial contribution is one that confers a benefit to the entire estate and fosters the reorganization process.") An applicant will satisfy the substantial contribution test when it has provided "actual and demonstrable benefit to the debtor's estate, its creditors, and to the extent relevant, the debtor's shareholders." *U.S. Lines,* 103 B.R. at 429. *See also In re Best Prods. Co., Inc.*, 173 B.R. 862, 866 (Bankr. S.D.N.Y. 1994) ("The integrity of § 503(b) can only be maintained by strictly limiting compensation to extraordinary creditor actions which lead directly to tangible benefits to the creditors, debtor or estate."); A claimant cannot establish a substantial contribution "merely by [it's] extensive participation in the case or . . . based on services that duplicated those of professionals already compensated by the estate[.]" *In re Bayou Grp., LLC*, 431 B.R. at 561. Thus, it is settled that "[c]reditors face an especially difficult burden in passing the 'substantial contribution' test since they are presumed to act primarily in their own interests." *In re Dana Corp.*, 390 B.R. at 108 (citations omitted). In the same vein, the substantial contribution

provisions should not be relied on "to reward . . . unofficial committees who merely furthered their own or their constituent's interests."  *In re Bayou Grp., LLC*, 431 B.R. at 562.

"The burden of proof as to the substantial benefit rendered to the estate is on the applicant, and the entitlement to an award must be established by a preponderance of the evidence." *In re Ocean Blue Leashold Property LLC,* 414 B.R. 798, 809 (Bankr. S.D. Fla. 2009) (citing *In re Buttes Gas & Oil Co*., 112 B.R. 191, 193 (Bankr. S.D. Tex. 1989)).  Courts apply the substantial contribution test after the fact and, as such, must consider whether the applicant has provided actual benefits to the case. *In re Granite Partners*, 213 B.R. 440, 447 (Bankr. S.D.N.Y. 1997). "Accordingly, the applicant must show a 'causal connection' between the service and the contribution." *Id*. (citing *Matter of DP Partners Ltd. P'ship*, 106 F.3d 667, 673 (5th Cir. 1997)). "The party's compensation is not dependent on a contractual entitlement to reimbursement, but rather on whether a substantial contribution was made." *In re Gen. Homes Corp. FGMC, Inc.,* 143 B.R. 99, 103 (Bankr. S.D. Tex. 1992) (citing *In re Revere Copper & Brass,* 60 B.R. 892 (Bankr.S.D.N.Y.1986)). "While the language of section 503(b)(4) does not specifically limit the professional services to those incurred in the activity for which the entity qualified for treatment under section 503(b)(3), courts have had no trouble implying such a requirement." *See* 4 COLLIER ON BANKRUPTCY ¶ 503.11 (Alan Resnick & Henry J. Sommers eds., 16th ed. 2020) (citation omitted).

The Firm says that the Ad Hoc Shareholders Group should be rewarded because in the approximately 30 days that it operated, it "conducted itself in a commercially reasonable matter and stayed far clear from the all-too common 'obstructionist' behavior this Court observes from other committees."  Application ¶ 3.  It maintains that  that the group "was surgical in its approach and made good faith efforts to reach consensus where appropriate," and that even when

it was not able to reach consensus with the Debtors, the group "took a measured approach and

advocated the position it thought best maximized value and provided an actual and demonstrable

benefit to the Debtors' estates for the benefit of all stakeholders." *Id.*  The Firm maintains that

the Ad Hoc Shareholders Group "facilitated, as opposed to impeded, progress, at a reasonable

cost to the Debtors' estates, making the value contributed even more appropriate." *Id.* ¶ 4. The

Court finds that the Firm overstates the significance of the role that the Ad Hoc Shareholders

Group played in these cases.  Below, the Court reviews the actions the that the Ad Hoc

Shareholders Group took prior to the appointment of the Equity Committee.  In broad strokes,

the Firm contends that the Ad Hoc Shareholders Group contributed to the success of these cases

through the actions it took  at the outset of these cases in connection with the DIP Financing

Motion, the Sale Procedures Motion, and matters relating to the establishment of the KEIP, as

well as the work the Firm did in persuading the U.S. Trustee to appoint the Equity Committee.

The Court reviews those matters below.

The DIP Financing Motion

       Introduction of JMB Capital

Sometime after the Debtors filed the DIP Financing Motion the Ad Hoc Shareholders

Group introduced JMB Capital Partners Master Fund, L.P. ("JMB Capital") to the Debtors as a

potential alternative source of DIP financing.  JMB Capital signed a non-binding indication of

interest, but, after completing its diligence, did not pursue the transaction. *See* Application ¶ 5.

Nonetheless, the Firm says that the group's introduction of JMB Capital to the Debtors supports

the claim for substantial contribution because that introduction encouraged competing bids

among DIP Lenders.  *Id.* The Court disagrees.  There is no evidence in the record demonstrating

that the shareholder's introduction of  JMB Capital to the Debtors had any impact on the DIP

Loan approval process. It does not support the Application. *See In re KiOR, Inc.*, 567 B.R. 451,

459 (D. Del. 2017) (stating "activities that primarily further the movant's self-interest do not

suffice. . . and expected or routine activities in a chapter 11 case—such as encouraging

negotiation among parties, commenting and participating in successful plan negotiations, and

reviewing documents—generally do not constitute a substantial contribution. . . ."); *In re*

*Granite Partners,* 213 B.R. 440, 447 (Bankr. S.D.N.Y. 1997) (explaining an applicant must show

a causal connection between services and benefit) *Cf. Marcus Montgomery Wolfson & Burten,*

*P.C. v. AM Int'l (In re AM Int'l)*, 203 B.R. 898, 905 (D. Del. 1996) (finding substantial

contribution where that the actions of the applicant brought value to the estate that was clearly

not available in the prepackaged plan).

Joinder to Highbridge Funds DIP Financing Objection

On December 19, 2018, the Firm filed a joinder to the Highbridge Funds DIP Financing

Objection.[53] In objecting to discrete provisions of the proposed financing,[54] the group merely

> join[ed] in the objection (the "Highbridge Objection") to the DIP Financing
> Motion filed by affiliates of Highbridge Capital Management, LLC
> ("Highbridge"). The [Ad Hoc Shareholders Group] joins in the Highbridge
> Objection, concurs with those arguments and hereby incorporates those arguments
> and assertions herein by reference.

Ad Hoc Shareholders Group Joinder To Highbridge Funds DIP Financing Objection ¶ 6. In the

objection, the Firm adopted the arguments of Highbridge Funds in its entirety, asserted that the

Debtors' assets were significantly undervalued, and noted that the members of the Ad Hoc

---

[53]    Preliminary Objection of the Ad Hoc Committee of Equity Holders to Debtors' DIP Financing Motion  and Joinder to Objection filed by Affiliates of  Highbridge Capital [ECF No. 80] ("Ad Hoc Shareholders Group Joinder To Highbridge Funds DIP Financing Objection").

[54]    Those provisions included: (i) miscellaneous case milestones in a rushed timeline; (ii) approval of the Roll-Up DIP Loan of $110 million; (iii) Debtors' stipulation to the allowance of the Prepayment Premium; (iv) granting of a DIP lien on unencumbered assets as well as avoidance actions (upon entry of a final order); and (v) the requirement that the Debtors file an "Acceptable Plan" on or before December 21, 2018. *Id.* ¶3.

Shareholders Group were seeking the appointment of an official committee of equity holders. ¶¶

1- 2.  The Firm says that due to the Ad Hoc Shareholders Group's efforts, among others, the

Court denied approval of the hurried case timeline and milestones such as the requirement to file

an "Acceptable Plan" on or before December 21, 2018.  However, there is no evidence in the

record demonstrating that the objection had any impact on the Court's resolution of the motion.

The record reflects that it was Highbridge Funds that first raised this issue of hurried case

timelines and milestones in their objection. The Ad Hoc Shareholders Group Joinder To

Highbridge Funds DIP Financing Objection did not raise any novel arguments or cite any case

law; it adopted the Highbridge Funds DIP Financing Objection in its entirety.[55]  The case law is

clear. "A direct benefit also cannot be established merely by a movant's extensive participation

in the case or be based on services that duplicated those of professionals already compensated by

the estate, such as counsel for the debtor or an official committee." *In re KiOR, Inc.*, 567 B.R.

451, 459 (D. Del. 2017) (citing *Worldwide Direct*, 334 B.R. 112, 134 (Bankr. D. Del. 2005)

stating that "services that are duplicative of other estate professionals are insufficient")). *See In*

*re Bayou Grp., LLC*, 431 B.R. 549, 561 (S.D.N.Y. 2010) holding same; *see In re Calumet Realty*

*Co.*, 34 B.R. 922, 926 (Bankr. E.D. Pa. 1983) (denying application for substantial contribution

because there was a lack of credible connection between the actions of the applicant and the

reorganization process); *see also In re Granite Partners, L.P.*, 213 B.R. 440, 447 (Bankr.

S.D.N.Y. 1997) (holding that an applicant must demonstrate a credible connection between his

effort and the reorganization process). The Firm fails to show any causal connection between its

---

[55]    In doing so, the Firm adhered to the agreed scope of its retention under the Initial Engagement Letter. *See*
Initial Engagement Letter, p. 1 ("The scope of our representation shall be limited to the following: . . . a limited
objection to the proposed DIP financing (that would adopt and incorporate a lot of the arguments made by the
unsecured noteholders.")

joinder to the Highbridge Funds DIP Financing Objection and this court's ruling regarding the

case milestones.

Ad Hoc Shareholders Group DIP Objection

On January 14, 2019, the Firm filed another objection to the DIP Financing Motion.[56]  In

it, the group noted that it was "not opposed in principle to the Debtors' request for DIP financing

and the use of cash collateral to fund a value-maximizing sale transaction or restructuring."  Ad

Hoc Shareholders Group DIP Objection ¶1.  It "commend[ed] the parties for agreeing to a third

interim DIP order (the "Third Interim Order") that defer[ed] the inappropriate case control and

milestones that constrain the Debtors' fiduciary duty to consider alternatives to the 'Acceptable

Plan,' among other objectionable relief, to a final hearing on February 21, 2019." *Id.*

Nonetheless, it requested that (i) a provision to the proposed Third Interim Order be added to

provide any official equity committee sixty (60) days from appointment to investigate and assert

a challenge to the Prepetition Term Loan claims; (ii) the Debtors provide past and future

variance reports concerning the DIP budget to the group; and (iii) the proposed order be clarified

to confirm that if there is a successful challenge to the lenders' claims, there is no obligation to

reimburse the lender for fees incurred in the challenge litigation. *Id.* ¶ 3.  The Debtors revised the

proposed order to provide any committee or party in interest sixty days to challenge the validity

or amount of any of the Prepetition Secured Obligations and the validity or enforceability of the

Prepetition Liens and security interests in the prepetition collateral.[57]  The Ad Hoc Shareholders

---

[56]   Objection of Ad Hoc Committee of Equity Holders to Debtors' DIP Financing Motion [ECF No. 206] (the "Ad Hoc Shareholders Group DIP Objection").

[57]   Third Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief  [ECF No. 250] ¶ 5.1.1.

Group also received clarification on the fee issue and variances such that they became "comfortable" and did not press their objection.  *See* Application ¶¶5, 17.

The Firm argues that its objection to the DIP Financing Motion substantially contributed to the success of these cases because the objection resulted in: (i) an extension of time for the official equity committee (if appointed) to assert a challenge against the DIP Secured Parties; (ii) a clarification concerning the DIP Secured Parties' entitlement to fees and expenses paid from the estate in an unsuccessful litigation; and because the Firm became comfortable that the revised variances set forth in the Third Interim DIP Order and budget were appropriate and not likely to lead to a DIP Loan termination event. *Id*. ¶ 5.  These results do not give rise to a finding of "substantial contribution" to the estate. Taking the arguments in reverse, first, "language incorporated to quell an objector's concerns does not necessarily signify the merit or importance of the objection; it often means the opposite." *See In re Granite Partners*, 213 B.R. at 449. Second, attempts by the Ad Hoc Shareholders Group to clarify arguments contribute nothing to the estate, and cannot possibly be construed to have conferred a contribution and certainly not a "substantial contribution" to the estates. *Id*. at 449 (stating that "attempt[s] to clarify the effect of the plan on the Primavera litigation was also motivated by self-interest and contributed nothing.") Finally, the extension of time for an official equity committee to lodge an objection to the DIP secured parties conferred a benefit on the estate. If nothing else, it preserved rights. However, the Firm is unable to show, and the record does not evidence, that it was the Ad Hoc Shareholders Group objection that was the direct cause of this concession. In fact, this issue was first raised by the Highbridge Funds in its reservation of rights when it stated "[m]ore importantly, any such relief that this Court may grant at the December 21 interim hearing should be truly interim in nature so that the official committee of unsecured creditors, once formed, and

its professionals, once appointed, can have a reasonable opportunity to review and challenge, as

appropriate, the terms and conditions of the proposed DIP financing – including those egregious

case control provisions. . . ."[58]  The Highbridge Funds' concern was preserving the right to object

for the Creditors Committee while the Firm's concern was preserving the right to object when

and if an official equity committee was appointed. The negotiated Third Interim DIP Order

simply preserves the right for "any Committee or other party in interest with the requisite

standing" to object within a specified time period.[59]  Again the Firm cannot show, and the record

does not support, that the Ad Hoc Shareholders Group's objections to the DIP Financing Motion,

in and of themselves, altered the character or terms of the DIP Loan or the DIP Financing

Motion, and would therefore give rise to a finding of substantial contribution conferred on these

cases. *See  In re Alert Holdings, Inc.,* 157 B.R. 753, 757 (Bankr. S.D.N.Y. 1993) (stating that

"extensive participation in a case, without more, is insufficient to compel compensation"); *In re*

*Bethlehem Steel Corp.,* No. 02 CIV. 2854 (MBM), 2003 WL 21738964, at *6 (S.D.N.Y. July 28,

2003) (stating that the integrity of § 503(b) can only be maintained by strictly limiting

compensation to extraordinary creditor actions which lead directly to tangible benefits to the

creditors, debtor or estate.).

The Sale Procedures Motion

The Creditors Committee bore the laboring oar in contesting the proposed bidding

procedures contained in the Debtors Sale Procedures Motion.  In its objection to the Sale

Procedures Motion, the committee challenged, among other things, the timing of the sale, the

---

[58]    Reservation of Rights of 1992 MSF International Ltd. and 1992 Tactical Credit Master Fund, L.P. to the Second
Interim Order Authorizing the Debtors to Obtain Postpetition Financing and Granting Related Relief  [ECF No. 79]
¶ 1.

[59]    Third Interim Order ¶ 5.1.1.

Break-Up Fee and Expense Reimbursement provisions, the "no-shop" provisions in the sale

agreement, the Debtors' attempt to include $15 million in "severance consideration" as part of

the purchase price, and the lack of consultation rights for official committee(s).[60]  In its

objection, the Ad Hoc Shareholders Group echoed the Creditors Committee's concerns about

what it contended was an artificially truncated sale timeline.[61]  In doing so, it "join[ed] the

[Creditors] Committee in its objections to the Bidding Procedures . . . and adopt[ed] any

objections to the Bidding Procedures raised in the UCC Objection which are not specifically

raised herein."  *See* Ad Hoc Shareholders Group Objection to Debtors' Bidding Procedures ¶ 16.

The parties eventually resolved the bidding procedures objections, by, among other things, an

agreement by the Debtors to (i) extend the sale timeline by two weeks, (ii) modify the mechanics

of the payment of the breakup fee and the source of funds for payment of the breakup fee, and

(iii) clarify the treatment of  the severance consideration offered under the Stalking-Horse

Agreement.  *See* Jan. 4, 2019 Hr'g Tr. 14:23-17:5 [ECF No. 220] (describing settlement).  There

was no auction, as the Debtors sold the assets to the Stalking-Horse Bidder. There was no

substantial change that resulted from the objections filed by the Firm.  *See In re Dana Corp.*, 390

B.R. 100, 108 (Bankr. S.D.N.Y. 2008) ("[A]n applicant satisfies the substantial contribution test

when it has provided actual and demonstrable benefit to the debtor's estate, its creditors, and to

---

[60]    Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion for (I) An Order (A) Approving the Bidding Procedures for the Sale of Substantially all of the Debtors' Assets, (B) Establishing the Notice Procedures and Approving the Form and Manner of Notice Thereof, (C) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Schedule [*sic*] a Sale Hearing, and (E) Granting Related Relief and (II) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief  [ECF No. 140] ("UCC Sale Motion Objection").

[61]    Ad Hoc Committee of Equity Holders' Objection to the Debtors' Bidding Procedures and Joinder to the Official Committee of Unsecured Creditors' Objection Thereto [ECF No. 137] ("Ad Hoc Shareholders Group Objection to Debtors' Bidding Procedures") at  ¶¶ 7-12, 14.

the extent relevant, the debtor's shareholders.") (quoting *In re U.S. Lines, Inc.,* 103 B.R. 427,

429 (Bankr. S.D.N.Y. 1989)).

The Key Employee Incentive Plan

After the Creditors Committee agreed with the Debtors to an amended the key employee

incentive plan **("KEIP"),** and on the heels of the U.S. Trustee's objection to the KEIP,[62] the Ad

Hoc Shareholders Group filed an objection to the KEIP on the grounds that it did not comply

with section 503(c) of the Bankruptcy Code and was not designed to achieve value-maximizing

objectives. *See* Ad Hoc Shareholders Group KEIP Objection.[63]  In support of the objection, the

group asserted that the KEIP did not comply with section 503(c) of the Bankruptcy Code, and

was not designed to achieve value-maximizing objectives, but rather, was a disguised retention

plan with a threshold target that was easy to meet.  The Equity Committee was appointed prior to

the return date of the KEIP motion, and the group withdrew its objection to the motion.[64]  The

Court overruled all other objections to the KEIP and approved it as filed.[65]  The filing of the Ad

Hoc Shareholders Group KEIP Objection provided no benefit to the estate and does not support

the Application.

The Appointment of the Equity Committee

From the outset of these cases, the Ad Hoc Shareholders Group contended that the equity

holders were "in the money."  For example in joining the Highbridge Funds DIP Financing

---

[62]    Objection of the United Stated Trustee to Debtors' Motion for Entry of An Order Approving the Implementation of the Debtors' Key Employee Incentive Plan [ECF No. 195].

[63]    Objection of the Ad Hoc Committee of Equity Holders to Debtors' Motion for Approval of a Key Employee Incentive Plan [ECF No. 207].

[64]    Notice of Withdrawal of Objection of the Ad Hoc Committee of Equity Holders to Debtors' Motion for Approval of a Key Employee Incentive Plan [ECF No. 281].

[65]    *See* Order Approving the Implementation of the Debtors' Key Employee Incentive Plan [ECF No. 291].

Objection, the Ad Hoc Shareholders Group noted that "[a]s recently as early October 2018, the

market value of the Synergy Pharmaceuticals shares was over $400 million[,]" and, as such "the

value of the Debtors' assets and business should be more than enough to pay all creditors in full

and provide a meaningful distribution to equity holders if these Chapter 11 proceedings are

conducted in a proper way."[66]  Likewise, in support of its objection to the Debtors' KEIP

Motion,[67] the group argued that the then current stalking horse bid of $200 million for the

Debtors' assets "significantly undervalues the Debtors," because  "based on information and

belief, as recently as two months [prior to the Petition Date], the Debtors' market capitalization

was approximately $347 million."[68]  Asserting that there was value in the Debtors' equity that

could be realized through the chapter 11 process, the Firm urged the U.S. Trustee to accord the

---

[66]    Ad Hoc Shareholders Group Joinder To Highbridge Funds DIP Financing Objection  ¶¶ 1, 1 n.4.

[67]    *See* Notice of Debtors' Motion for Entry of an Order Approving the Implementation of the Debtors' Key Employee Incentive Plan [ECF No. 144] ("KEIP Motion").

[68]    *See* Ad Hoc Shareholders Group KEIP Objection ¶ 6.  The shareholders elaborated on that point, as follows:

> Since June 9, 2017, the Debtors' only commercialized product, TRULANCE, has incurred weekly sales growth on average of 2.43%.  If this trend continues, sales will surpass $150 million in 2019. Based on information and belief, and when looking at other comparable pharmaceutical company sale transactions, it is reasonable to expect that the fair market value of a company like the Debtors, just looking at its one commercialized product, TRULANCE, should yield a sale price 5-10 times annual revenues. Obtaining a sale price that is significantly less than the value of the Debtors' assets does not appear to be a challenging or difficult metric to achieve.

*Id.* As support for those contentions, the shareholders noted, as follows:

> By way of example, on January 8, 2017, Merrimack Pharmaceuticals sold its single drug Onivyde to French pharmaceuticals company Ipsen for $575 million, at a time when the drug had only $50 million in annual sales. Another drug company, Sucampo, had annual sales of $230 million for a drug Amitiza, which treats conditions similar to that treated by TRULANCE, and it was sold to Malinckrodt in December 2017 for $1.2 billion, which is 5 times annual sales. At the time of that transaction, there were less than 4 years left on the patent. TRULANCE's patent, however, expires in 2032. With this kind of market information, which includes just a few examples, it is reasonable to expect Synergy to have a value, before even considering Synergy's other drug in the pipeline not yet FDA approved, to have a value of 5-10 times peak sales.

*Id.* at 4, n.3.

shareholders official committee status and representation in these cases by professionals

compensated by the estate.  The Firm says that it prepared and submitted a substantive letter to

the U.S. Trustee seeking the formation of an official committee of equity holders.[69] The Firm

asserts that the letter included:

> (i) comprehensive legal analyses supporting the need for the Equity Committee to adequately represent all equity holders; and

> (ii) an extensive analysis of the Debtors' pleadings and other publicly available information to establish a reasonable likelihood based on the facts known at the time that, if the process was run appropriately, there would be a meaningful return to equity holders.

Application ¶ 5.  The Firm contends that the Ad Hoc Shareholders Group was extraordinarily

successful in lobbying the U.S. Trustee to appoint the Equity Committee because as a direct

result of the Firm's efforts, it convinced the U.S. Trustee that

> (i) absent vigorous representation of the rights of equity holders, based on the facts known at the time, there existed a significant risk that the value of the Debtors' estates would not be maximized and that the Debtors' insiders would manage these cases exclusively for their benefit, and

> (ii) there was good reason to believe at that time that the value of the Debtors' assets and business should be more than enough to pay all creditors in full and provide a meaningful distribution to equity holders if these Chapter 11 proceedings were conducted in a proper way.

*Id.* ¶1.  The Firm says that in obtaining the appointment of the Equity Committee by the U.S.

Trustee on January 29, 2019, during the worst governmental shutdown in the country's history,

the Ad Hoc Shareholders Group "achieved an extraordinary result in these cases."  *Id.*

The Firm also asserts that although no value in the Debtors' assets materialized in the months

following the formation of the Equity Committee, and the Debtors closed the asset sale with

Bausch on the terms set forth in the Stalking-Horse Agreement filed on the Petition Date, and

---

[69]    The letter was not filed in the record nor introduced into evidence.

Class 8 Interest Holders received no distribution under the Plan on account of the intrinsic value

of the Synergy Pharmaceuticals shares, the formation of the Equity Committee, in and of itself,

conferred a direct and important benefit in these cases. *Id.* ¶ 2. They say that is so because

through its professionals, the Equity Committee gave the equity holders a voice that the  Court

considered during the case. *Id.* They also lay claim to the success of the Equity Committee's

professionals in arriving at the Plan Settlement Agreement.  They do so by pointing to the fact

that the Equity Committee "obtained significant benefits [for interest holders] including

exculpation rights, governance rights related to the litigation trust, membership on the plan

oversight committee, consent rights to the election of a litigation trustee and plan administrator

and the sharing *pro rata* of up to $1,375,000 on account of holders of Class 8 allowed interests

under the plan." *Id.*

The Firm has not demonstrated that its efforts on behalf of the Ad Hoc Shareholders

Group had any impact on the U.S. Trustee's decision to appoint the Equity Committee.  The

Court is aware of  efforts by individual shareholders to lobby the Court and U.S. Trustee to

appoint an official equity committee. There is no evidence in the record that links the Firm's

letter and other overtures to the U.S. Trustee to the  appointment of the Equity Committee.

However, assuming *arguendo* that it was the Firm's efforts that directly led to the U.S. Trustee

appointing the Equity Committee, that alone is not sufficient to establish "substantial

contribution" to the estates.  In arguing to the contrary, the Firm misplaces its reliance on *Marcus

Montgomery Wolfson & Burten, P.C. v. AM Int'l (In re AM Int'l)*, 203 B.R. 898 (D. Del. 1996)

("*AM Int'l*") and *In re Energy Partners, Ltd.*, 422 B.R. 68 (Bankr. S.D. Tex. 2009) ("*Energy

Partners*") as support for that contention.  The Court reviews those cases below.

In *AM Int'l*, the debtor filed a prepackaged bankruptcy case based upon a proposed

reorganization plan calling for the distribution of 97% of the reorganized debtor's stock to

noteholders, leaving 3% of the stock for the debtor's preferred (2%) and common (1%) equity

holders.  203 B.R. at 901.  A small group of common and preferred equity holders contended that

the plan "grossly undervalued the going concern and liquidation value" of the debtor and

petitioned the U.S. Trustee for the appointment of an official equity committee.  *Id.*  After the

U.S. Trustee denied the request, the equity holders formed an ad hoc committee of equity holders

(the "AMI Shareholders Group"), retained counsel and a financial advisor, and petitioned the

court to appoint an official equity committee. *Id.* at 901-02.  The bankruptcy court granted the

motion after finding that there was "a considerable question as to whether AMI was in fact

insolvent."  *Id.* at 902.  Thereafter, the official equity committee (the "AMI Equity Committee"),

with assistance from counsel to the AMI Shareholders Group, negotiated a settlement that was

incorporated into a consensual plan of reorganization (the "AMI Plan") which allowed for

holders of preferred equity interests to exercise approximately 1,000,000 warrants for a price of

$18 a share within three years of the effective date of the plan.  *Id.*  The AMI Shareholders

Group applied for reimbursement of counsel's fees and expenses under sections 503(b)(3)(D)

and (b)(4) of the Bankruptcy Code, arguing that the AMI Equity Committee added a significant

amount of necessary information to AMI's disclosure statement, and created additional value for

equity shareholders and the estate as a whole through the development of the warrant structure

under the Plan. *Id.*  The bankruptcy court denied the application. *See id.*  In doing so, among

other things, it concluded the warrant structure under the plan added "no tangible, additional

value for equity shareholders and the estate as a whole." *Id.*  On appeal, the district court

reversed.  *See id.* at 905.  First, it noted that the day after the bankruptcy court denied the

application, the warrants traded at approximately $1.40 and the present value of the warrants was estimated at $1.5 million. *Id*. at 902. Accordingly, the district court found that the AMI Shareholders Group, and ultimately through the AMI Equity Committee, worked "to create a warrant structure which . . . . permitted the Creditors Committee to recoup all of their claims before shareholders could begin to attempt to get any value from [the company]." *Id*. at 904. The district court reasoned that the warrant structure provided the company with a "potential source of equity after all the warrants had been exercised" and that the warrants "could increase investor interest." *Id.* at 904-05. The court held that in this sense, the AMI Shareholder Group, and their work in creating the warrant structure, "contributed substantially" to the case by providing value to the estate "that was clearly not available in the prepackaged plan." *Id.* at 905. The district court also recognized that in *In re Columbia Gas Transmissions Corp.,* No. 91–804 (Bankr.D.Del. July 13, 1993), the court granted a section 503(b) application on the grounds that "obtaining appointment of an equity committee made a substantial contribution to the estate." *Id.* The district court found that the case deserved "some deference," its reasoning was sound, and concluded that "[l]ike counsel in *Columbia Gas*," the AMI Shareholder Group "contributed substantially to the estate not only by the creation and appointment of an equity committee, but also by virtue of the results they achieved as detailed previously." *Id*.

The AMI Shareholders Group argued that the plan filed with the debtor's bankruptcy petition grossly undervalued the reorganized debtor's going concern value, assumed a leadership role in the bankruptcy case before and after the appointment of the AMI Equity Committee, and was instrumental in developing the warrant structure under the AMI Plan that permitted equity holders to capture the value in the debtor's stock that the group argued existed. The facts of the case at hand are distinguishable. Here, the Firm lobbied the U.S. Trustee to appoint the Equity

Committee by contending that the Debtors' insiders were managing the cases for their benefit

and that there was good reason to believe the Company's going concern value exceeded its

liabilities.  *See* Application ¶ 1.  Even if that argument persuaded the U.S. Trustee to appoint the

Equity Committee, the treatment of the Class 8 Interests under the Modified Fourth Amended

Plan did not vary from the Plan filed shortly after the Petition Date because the stock was

valueless.  Moreover, the Ad Hoc Shareholders Group played no role in the case after the U.S.

Trustee appointed the Equity Committee and, as such, was not involved in formulating either the

Global Settlement or the Plan Settlement Agreement.   The latter is the agreement giving rise to

the establishment and funding of the CRG-ESH Settlement Fund, which is the sole source of

value in this case for the holders of Allowed Interests.  *AM Int'l* does not support the proposition

that to provide a substantial contribution under section 503, an ad hoc committee simply needs to

open the door for the appointment of an official committee; rather, it demonstrates that an ad hoc

committee's work also must be instrumental in and directly lead to a net benefit to the estate.

The Firm has made no such showing in the Application.

In *Energy Partners*, the debtor filed its chapter 11 case with the major objectives of

rehabilitating and enhancing its oil and gas operations, and, as reorganized, listing its stock on

the New York Stock Exchange.  422 B.R. at 77.  As filed, the debtor's reorganization plan called

for equity interest to be cancelled, because the debtor's valuation showed that its liabilities

exceeded assets.  *See id*. at 72.  An equity security holder ("Birch Run") contested that valuation

and retained counsel who filed an objection to the plan's disclosure statement.  *Id*. at 73.  In

support of the objection, counsel argued that the debtor's valuation was inaccurate and that a

proper valuation demonstrated that the value of the debtor's assets exceeded its liabilities by

approximately $212 million.  *Id.* at 73-74.  Moreover, Birch Run's counsel ("Fulbright") was in

47

frequent contact with the U.S. Trustee regarding its objection and the prospects for appointing an official equity committee. *Id.* at 74. Fulbright also communicated with other attorneys about soliciting other equity holders to form an official committee. *Id.* At the disclosure statement hearing, the bankruptcy court sustained Birch Run's objection and required the debtor to amend the disclosure statement to include a discussion about the Birch Run valuation. *Id.* Thereafter, the debtor filed an amended disclosure statement which included the Birch Run valuation, but with the caveat that it "vehemently disagreed" with the valuation. *Id.* at 74-75. Later, the debtor filed an amended plan but did not change the proposed treatment of equity security holders. *Id.* at 75. Thereafter, the U.S. Trustee appointed an official committee of equity holders. The committee retained Andrews Kurth LLC ("A&K") as its counsel, and Fulbright ceased providing services to Birch Run in the case. *Id.* On behalf of the official equity committee, A&K "provided extensive services" and was "heavily involved in the plan confirmation process." *Id.* Those services included legal and factual research on confirmation issues, preparation of an objection to confirmation, and work concerning proper valuation methods regarding the value of the debtor. *Id.* Ultimately, as a result of negotiations that the debtor's counsel conducted with A&K, among other attorneys, the debtor filed a further amended plan which provided shareholders with 5% of the common stock in the reorganized debtor. *Id.* at 76. The court confirmed the plan. Thereafter, the stock of the reorganized debtor was listed on the New York Stock Exchange. *Id.* at 77. Thus, the debtor realized its objectives in filing the case. *Id.* Thereafter, Birch Run, as a member of the equity committee, filed an application pursuant to sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code for payment of $61,480.40 which represented the legal fees and expenses Fulbright invoiced to Birch Run and for which Birch Run

was liable. *Id.* at 71-72. The debtor objected to the application on the grounds that Birch Run

did not provide a substantial contribution to the case as required by section 503(b)(3)(D).

The bankruptcy court overruled the objection and granted the motion. *Id*. at 92-93. In

doing so, it applied the seven-factor test discussed in *In re Mirant*, 354 B.R. 113, 132-35 (Bankr.

N.D. Tex. 2006). *Id*. at 80. Central to the court's analysis were its findings that "[a]s a direct

result," of actions taken by Fulbright on behalf of Birch Run, the momentum to form the official

equity committee "substantially increased," which in turn led to A&K's retention, which

provided representation of all equity holders and culminated in the negotiation of a consensual

plan of reorganization. *Id.* The court reasoned that doing so avoided, "an extremely expensive

fight over the value of the [d]ebtor's assets and over the confirmability of the plan." *Id.* at 81.

The court rejected the debtor's argument that Birch Run did not provide any benefit to the estate

because the official equity committee "never formally adopted the Birch Run valuation." *Id.* at

n.10. The court found that the estate benefitted from the Birch Run equity valuation because it

provided leverage in plan negotiations which led to the filing of the further amended plan. *Id*.

The court discussed the significance of the Birch Run valuation, as follows:

> The formation of the Equity Committee forced the [d]ebtor to negotiate with the
> Committee knowing that if negotiations failed, the Equity Committee would
> oppose confirmation of the plan and would have at its disposal for introduction
> into evidence the Birch Run valuation showing that contrary to the valuation
> relied upon by the [d]ebtor, the assets of the estate exceeded its liabilities; and that
> therefore any plan cancelling the interests of the equity holders would be unfair
> and inequitable under 11 U.S.C. § 1129(b). The fact that the Equity Committee
> never formally adopted the Birch Run valuation—and it is by no means clear to
> this Court what "formal adoption" means—would not have prohibited the
> Committee from introducing this particular valuation into evidence at any
> cramdown confirmation hearing. Counsel for the [d]ebtor and the other
> constituent groups assuredly knew of and appreciated this possibility as they
> negotiated with the Equity Committee.

*Id.* Thus, in *Energy Partners* Birch Run, an equity holder, took a leadership role by providing evidence, through its counsel, that the debtor had more value than was reflected in the debtor's plan, as filed.  That work spurred the appointment of an official equity committee which, through counsel, and with the threat of a valuation battle predicated on Birch Run's valuation analysis, was then able to quickly negotiate a plan that provided value to equity.  The *Energy Partners* court did not predicate the substantial contribution award on Birch Run's success in facilitating the formation of the equity committee.  Rather it was on the assistance Birch Run provided in demonstrating that there was value in the debtor's stock that had to be accounted for under the debtor's plan.  *See id.* at 87.  Here, the Ad Hoc Shareholders Group did not perform analyses that demonstrated that there was value in the stock.  Contrary to the position that the Firm advocated in lobbying the U.S. Trustee to appoint the Equity Committee, the Synergy Pharmaceuticals shareholders were never "in the money," and the Firm's contentions to the contrary provided no leverage or support to the Equity Committee in opposing the treatment of the Class 8 Interest holders under the Plan.  The Equity Committee obtained a recovery for the holders of Allowed Interests from the Prepetition Term Lenders, not the Debtors, and did so through litigation with those lenders on matters raised by the Equity Committee without input from the Ad Hoc Shareholders Group.   The Debtors incorporated the Plan Settlement Agreement into the Modified Fourth Amended Plan, without altering the treatment they accorded Allowed Interests in every draft of the Plan.  The interests were "cancelled, released, and extinguished" and the holders of Allowed Interests  shared, pro rata, cash in the Litigation Trust remaining after payments on account of Class 3, 4 and 5 claimants.  Modified Fourth Amended Plan § 3.02(h)(ii).  As such, the Class 8 Interests were impaired, and the holders of Allowed Interests

were deemed to have rejected the Plan. *See id*. § 3.02(h)(iii). *Energy Partners* does not support the Application.

"A substantial contribution award is made only for extraordinary creditor actions, on those rare occasions when the creditor's involvement truly fosters and enhances the administration of the estate." *In re United Merchants & Mfrs., Inc.,* No. 97 Civ. 5437(DC), 1999 WL 4929, at *2 (S.D.N.Y. Jan. 5, 1999, *aff'd,* 198 F.3d 235 (2d Cir.1999) )(internal quotation marks omitted). *See also In re Bethlehem Steel Corp.,* No. 02 CIV. 2854 (MBM), 2003 WL 21738964, at *6 (S.D.N.Y. July 28, 2003) (stating that "[t]he integrity of § 503(b) can only be maintained by strictly limiting compensation to extraordinary creditor actions which lead directly to tangible benefits to the creditors, debtor or estate.") Assuming, *arguendo,* that the Firm has standing to file the Application, and based on the foregoing, it is clear that the Ad Hoc Shareholders Group has failed to meet its burden of demonstrating that the actions it took in these cases merit a substantial contribution award.

<u>Conclusion</u>

Based on the foregoing, and for all the reasons set forth herein, the Court denies the Application.

IT IS SO ORDERED.

Dated:  New York, New York
        November 5, 2020

/s/ *James L. Garrity, Jr.*
Hon. James L. Garrity, Jr.
U.S. Bankruptcy Judge